# Exhibit A
# Part 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| UBS AG, LONDON BRANCH, | : | : |
| | : | |
| Plaintiff, | : | Index No. _____ |
| | : | |
| - against - | : | **SUMMONS** |
| | : | |
| GREKA INTEGRATED, INC., | : | Plaintiff designates New York County as |
| | : | the place of trial pursuant to CPLR |
| Defendant. | : | §§ 503(a) and 509 |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TO:  GREKA INTEGRATED, INC.
     630 Fifth Avenue, Suite 2410
     New York, NY 10111

     You are hereby summoned and required to serve on Plaintiff's undersigned attorneys

your answering papers on this Motion for Summary Judgment in Lieu of Complaint Pursuant to

CPLR § 3213 within the time provided in the Notice of Motion annexed hereto.  In case of your

failure to answer or appear, summary judgment will be taken against you by default for the relief

demanded in the Notice of Motion.

Dated: October 21, 2019          Respectfully submitted,
       New York, New York

                                 O'MELVENY & MYERS LLP


                                 By: _____
                                     Daniel L. Cantor
                                     Ethan M. Scapellati
                                     7 Times Square
                                     New York, New York  10036
                                     Phone: (212) 326 2000

                                     *Attorneys for Plaintiff UBS AG, London*
                                     *Branch*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UBS AG, LONDON BRANCH,

                        Plaintiff,

              - against -

GREKA INTEGRATED, INC.,

                      Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Index No. ____
Mot. Seq. ____

**NOTICE OF MOTION FOR SUMMARY JUDGMENT IN LIEU OF COMPLAINT PURSUANT TO CPLR § 3213**

      PLEASE TAKE NOTICE that upon the Summons dated October 21, 2019, the annexed Affidavit of William W. Chandler, the exhibits attached thereto, and the accompanying Memorandum of Law, Plaintiff UBS AG, London Branch will move this Court at the Motion Submission Part, Room 130, at the Courthouse located at 60 Centre Street, New York, on November 26, 2019 at 9:30 a.m., or as soon thereafter as counsel can be heard, for an order, pursuant to CPLR § 3213: (i) granting Plaintiff summary judgment in lieu of complaint against Defendant Greka Integrated, Inc. on the First Lien Greka Integrated Guaranty Agreement and the Second Lien Greka Integrated Guaranty Agreement; (ii) awarding to Plaintiff judgment against Defendant in the amount of $100,000,000, the amount due to Plaintiff under the First Lien Greka Integrated Guaranty Agreement and the Second Lien Greka Integrated Guaranty Agreement, plus interest, costs, and fees thereon; (iii) awarding to Plaintiff all of its costs, charges and expenses, including attorneys' fees and disbursements, incurred in enforcing the First Lien Greka Integrated Guaranty Agreement and the Second Lien Greka Integrated Guaranty Agreement; and (iv) granting such other and further relief as is just and proper.

      PLEASE TAKE FURTHER NOTICE that, pursuant to CPLR § 3213, answering papers, if any, are required to be served upon the undersigned so as to be received at least ten (10) days

prior to the return date of this motion.


Dated: October 21, 2019                    Respectfully submitted,

      New York, New York

                                O'MELVENY & MYERS LLP


By: _____
     Daniel L. Cantor
     Ethan M. Scapellati
     7 Times Square
     New York, New York 10036
     Phone: (212) 326 2000

     *Attorneys for Plaintiff UBS AG, London Branch*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UBS AG, LONDON BRANCH,                            .          :
                                                             :
                            Plaintiff,            :   Index No. _____
                                                 :   Mot. Seq. ___
            - against -                          :
                                                 :
GREKA INTEGRATED, INC.,                           .
                                                 :
                            Defendant.           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT IN LIEU OF COMPLAINT UNDER CPLR § 3213**



O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
212-326-2000

*Attorneys for Plaintiff UBS AG, London
Branch*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

JURISDICTION AND VENUE ................................................................. 2

FACTUAL BACKGROUND ..................................................................... 3

    A.    UBS and the Borrowers Enter Into the Credit Agreements. ................................. 3

    B.    GIT Agrees to Unconditionally and Absolutely Repay the Loans Plus Interest, Fees, and Costs. ................................................................... 4

    C.    The Borrowers' Payment Obligations Under The Credit Agreements Are Due And Payable. ................................................................... 5

ARGUMENT ..................................................................................... 8

CONCLUSION ................................................................................. 11

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple Bank for Sav. v. Mehta*,
   609 N.Y.S.2d 221 (1st Dep't 1994) ......................................................... 9

*Banco Popular N. Am. v. Victory Taxi Mgmt.*,
   1 N.Y.3d 381 (2004) ......................................................... 8

*Bank of Am., N.A. v. Solow*,
   59 A.D.3d 304 (1st Dep't 2009) ......................................................... 8

*Bank of Am., N.A. v. Tatham*,
   305 A.D.2d 183 (1st Dep't 2003) ......................................................... 9

*Chase Manhattan Bank, N.A. v. Marcovitz*,
   392 N.Y.S.2d 435 (1st Dep't 1977) ......................................................... 10

*Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A., "Rabobank Int'l," N.Y. Branch v. Navarro*,
   25 N.Y.3d 485 (2015) ......................................................... 8, 10, 11

*In re HVI Cat Canyon, Inc.*,
   No. 9:19-bk-11573-MB (Bankr. C.D. Cal.) ......................................................... 7

*Lawson v. Patrick Henry Hotel*,
   2006 WL 4682183 (Sup. Ct., N.Y. Cty. July 13, 2006) ......................................................... 9

*Littleton Constr. Ltd. v. Huber Constr., Inc.*,
   27 N.Y.3d 1081 (2016) ......................................................... 10

*Plaza 400 Owners Corp. v. Resnicoff*,
   640 N.Y.S.2d 984 (N.Y. Civ. Ct. 1996) ......................................................... 9

*Poah One Acquisition Holdings V Ltd. v. Armenta*,
   96 A.D.3d 560 (1st Dep't 2012) ......................................................... 8

*Schwartz v. Turner Holdings, Inc.*,
   527 N.Y.S.2d 229 (1st Dep't 1988) ......................................................... 9

**Statutes**

CPLR § 3213 ......................................................... 8, 9, 10

CPLR § 503(a) ......................................................... 2

CPLR § 509 ......................................................... 2

ii

## TABLE OF AUTHORITIES

**Page(s)**

**Other Authorities**

*Volumetric production payment (VPP)*, INVESTOPEDIA (Oct. 21, 2019),
https://www.investopedia.com/terms/v/volumetric-production-payment.asp. ........................ 3

Plaintiff UBS AG, London Branch ("UBS" or "Lender") respectfully submits this memorandum of law in support of its motion for summary judgment in lieu of complaint under CPLR § 3213 to enforce the May 20, 2016 First Lien Greka Integrated Guaranty Agreement and May 20, 2016 Second Lien Greka Integrated Guaranty Agreement (together, the "Guaranties") against Defendant Greka Integrated, Inc. ("GIT" or "Guarantor").

### PRELIMINARY STATEMENT

UBS sues to enforce the Guaranties, under which GIT absolutely and unconditionally guaranteed the repayment of two $50 million notes ($100 million in total) issued to UBS by GIT's affiliates HVI Cat Canyon, Inc. ("HVICC") and Rincon Island Limited Partnership ("Rincon," and together with HVICC, "Borrowers") under a May 20, 2016 First Lien Credit Agreement and May 20, 2016 Second Lien Credit Agreement (together, the "Credit Agreements").[1]

There can be no legitimate dispute that the full amount of the Borrowers' debt under the Credit Agreements (plus interest, fees and costs) is currently due and payable. As detailed below, there have been numerous undisputed defaults by the Borrowers, including bankruptcy filings by both HVICC and Rincon, which have resulted in acceleration of the amounts due under the Credit Agreements.

There also can be no legitimate dispute that GIT has a current obligation under the Guaranties to repay to UBS the amounts owed by the Borrowers. The Guaranties' clear and unambiguous terms provide "that if a Borrower . . . shall fail to pay in full when due (whether at

---

[1] The Guaranties and the Credit Agreements are annexed as Exhibits 1–4 of the October 21, 2019 Affirmation of William W. Chandler ("Chandler Aff."). The First Lien Credit Agreement and First Lien Guaranty Agreement are essentially identical to the Second Lien Credit Agreement and the Second Lien Guaranty Agreement, respectively. Accordingly, unless otherwise noted, citations to the Guaranties or to the Credit Agreements refer to provisions in both the first and second lien versions of the respective agreements.

1

stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, the Guarantor will *promptly* pay the same in cash, without any demand or notice whatsoever."[2]  Moreover, GIT's obligations under the Guaranty Agreements are "***absolute, irrevocable and unconditional*** . . . irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense."[3]

Finally, there can be no legitimate dispute that, despite being well aware of its affiliates' defaults and the acceleration of the amounts due under the Credit Agreements, GIT has not satisfied its obligations under the Guaranties.

Accordingly, UBS respectfully requests that the Court enter judgment in UBS's favor against GIT for $100 million, the total amount borrowed under the Credit Agreements, plus all interest, fees, and costs due under the Credit Agreements.

### JURISDICTION AND VENUE

Jurisdiction and venue are proper in this Court because GIT expressly agreed in the Guaranties to (i) "irrevocably and unconditionally submit[] to the jurisdiction of" this Court, and (ii) "irrevocably and unconditionally waive[] . . . any objection to the laying of venue" in this Court for "any suit, action or proceeding arising out of or relating to" the Guaranties.[4]  *See also* CPLR §§ 503(a), 509.

---

[2]  Chandler Aff., Ex. 1 § 2.01 (emphasis added).

[3]  *Id.* § 2.02 (emphasis added).

[4]  *Id.* §§ 6.09(b), (c).

2

## FACTUAL BACKGROUND[5]

**A.**    **UBS and the Borrowers Enter Into the Credit Agreements.**

The relationship between UBS and the Borrowers dates back more than 12 years to February 2007, when UBS and the Borrowers (or their predecessors) entered into the Volumetric Production Payment Documents relating to the Borrowers' oil and gas interests in California.[6] A volumetric production payment ("VPP") is "a type of structured investment that involves the owner of an oil or gas interest selling or borrowing money against a specific volume of production associated with that" interest.[7] In May 2016, following years of financial and other problems that prevented the Borrowers from meeting their VPP obligations, the parties agreed to terminate the Volumetric Production Payment Documents and replace them with the Credit Agreements.[8]

Under the Credit Agreements, VPP and Borrowers' VPP related obligations were converted to two $50 million notes, for a total of $100 million (each, a "Loan"; together, the "Loans").[9] The Credit Agreements, of course, require the Borrowers to repay the Loans with interest, and also require the payment of certain fees and costs.[10] The Credit Agreements include

---

[5]    Capitalized terms used but not defined herein shall have the meanings given them in the Credit Agreements and the Guaranties.

[6]    Chandler Aff., Ex. 3 § 1.01(a).

[7]    *Volumetric production payment (VPP)*, INVESTOPEDIA (Oct. 21, 2019), https://www.investopedia.com/terms/v/volumetric-production-payment.asp.

[8]    Chandler Aff., Ex. 5; *id.* ¶ 2.

[9]    UBS executed the Credit Agreements as Administrative Agent and Collateral Agent, but it was also the sole Lender under those agreements. *Id.*, Ex. 6. In bringing this action, UBS is acting in both its capacity as a Lender, and as Administrative Agent and Collateral Agent.

[10]    *Id.*, Ex. 3 §§ 2.04(a), 2.05, 2.06, 2.09. The First Credit Agreement bears an annual interest rate measured by the "Adjusted LIBOR Rate," which is further defined in the First Lien Credit Agreement Section 1.01(a). The Second Credit Agreement bears an annual interest rate of 6.00%. *Id.*, Ex. 4 § 1.01(a). Further, the Credit Agreements provide for a 2.00% default rate in addition to the annual interest rates. *Id.* § 2.06(b).

3

Case 1:19-cv-10786-LLS-KNF Document 5-1 Filed 11/21/19 Page 12 of 92

an extensive list of potential Events of Default.[11]  Not surprisingly, the Events of Default include

the failure to make principal and interest payments when due.[12]  It is also an Event of Default for

a Borrower to commence a voluntary bankruptcy proceeding.[13]  The Credit Agreements provide

that, upon the occurrence of an Event of Default, UBS has the right, among other things, to

accelerate the Borrowers' obligations and declare any principal, interest, fees or costs due and

payable, "without presentment, demand, protest or any other notice of any kind."[14]  Moreover, in

the event of a Borrower's bankruptcy filing, the Borrowers' Loan obligations "shall

automatically become due and payable"—*i.e.*, without any declaration and "without presentment,

demand, protest or any other notice of any kind."[15]

> The Credit Agreements also provide that UBS is entitled to recover all "out-of-pocket

expenses"—"including the fees, charges and disbursements of any counsel"—it incurs "in

connection with the enforcement or protection of its rights" under the Credit Agreements.[16]

**B.    GIT Agrees to Unconditionally and Absolutely Repay the Loans Plus Interest, Fees, and Costs.**

> On the same day that the Borrowers executed the Credit Agreements, GIT entered into

the Guaranties.  The Guaranties, which are governed by New York law, unambiguously provide

that (i) GIT guarantees to UBS "the prompt payment in full when due (whether at stated

maturity, by acceleration or otherwise) of the principal of and interest on . . . the Loans made by

[UBS] to . . . Borrowers," and (ii) GIT agrees "that if a Borrower . . . shall fail to pay in full

---

[11]   *Id.* § 7.01.

[12]   *Id.* §§ 7.01(a), (b).

[13]   *Id.* § 7.01(h).

[14]   *Id.* § 7.01.

[15]   *Id.*

[16]   *Id.* § 9.03(a).

4

when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed

Obligations, [GIT] will promptly pay the same in cash, without any demand or notice

whatsoever."[17]

      The Guaranties further state that GIT's obligations are "absolute, irrevocable and

unconditional irrespective of the value, genuineness, validity, regularity or enforceability of the

Guaranteed Obligations of Borrowers and other Loan Parties under the Credit Agreement . . .

[and] irrespective of any other circumstance whatsoever that might otherwise constitute a legal

or equitable discharge or defense of a surety or a Guarantor (except for payment in full)."[18]  GIT

also agreed to waive "diligence, presentment, demand of payment, protest, and all notices

whatsoever" as defenses to their obligations to guarantee payment of Borrowers' obligations

under the Credit Agreements.[19]

      In addition, GIT expressly acknowledged that each of the Guaranties "constitutes an

instrument for the payment of money, and [GIT] consents and agrees that [UBS], at its sole

option, in the event of a dispute by [GIT] in the payment of any moneys due hereunder, shall

have the right to bring a motion-action under New York CPLR Section 3213."[20]

## C. The Borrowers' Payment Obligations Under The Credit Agreements Are Due And Payable.

      Since the Credit Agreements' execution, there have been numerous Events of Default by

the Borrowers.

      On August 19, 2016, UBS sent HVICC a letter notifying it that two Events of Default had

occurred, including Rincon's filing, on August 8, 2016, of a voluntary bankruptcy petition in the

---

[17]  *Id.*, Ex. 1 § 2.01; *see also id.* § 6.12 (further explaining absolute and unconditional nature of the Guaranties).

[18]  *Id.* § 2.02.

[19]  *Id.*

[20]  *Id.* § 2.06.

5

United States Bankruptcy Court for the Northern District of Texas, Case No. 16-33174-hdh11.[21]
The letter further notified HVICC that as a result of those defaults, "the principal of the Loans,
together with accrued interest thereon and any unpaid accrued Fees and all other Obligations of
the Borrowers accrued thereunder . . . have automatically become due and payable, without
presentment, demand, protest or any other notice of any kind."[22]

On November 4, 2016, UBS sent a letter to HVICC and GIT, referencing the August 19,
2016 letter and notifying them of five additional defaults under Sections 7.01(d) and 7.01(e) of
the Credit Agreements.[23]

On May 26, 2017, UBS sent a letter to both HVICC and GIT enclosing, as Exhibit A, a
list of 19 Defaults and Events of Default under the Credit Agreements.[24] Based on these Events
of Default, UBS declared that "the full amount of the first and second lien loans have been
accelerated and are currently due and payable."[25]

UBS sent additional letters to HVICC and GIT on December 15, 2017, January 11, 2018,
February 9, 2018, March 13, 2018, August 9, 2018, October 16, 2018, November 19, 2018,
December 11, 2018, January 17, 2019, February7, 2019, March 8, 2019, May 9, 2019, June 10,
2019, and July 10, 2019.[26] In each of these letters, UBS identified additional Events of
Default—including HVICC's failure to make certain specified payments of principal, interest,
fees and costs—and notified HVICC that as a result of those defaults (and the previously
identified defaults), "the principal of the Loans, together with accrued interest thereon, interest

---

[21]  *Id.*, Ex. 8.

[22]  *Id.*

[23]  *Id.*, Ex. 9.

[24]  *Id.*, Ex. 10.

[25]  *Id.*

[26]  *Id.*, Ex. 11 (containing other letters).

accruing at the Default Rate thereon, any unpaid accrued Fees and all other Obligations of the Borrowers accrued thereunder . . . automatically became due and payable."[27]

On July 25, 2019, HVICC filed a voluntary bankruptcy petition in the United States Bankruptcy Court for the Southern District of New York, Case No. 19-12417.[28] As with Rincon's bankruptcy filing two years earlier, HVICC's bankruptcy is an Event of Default under Section 7.01(h) of the Credit Agreements and is an independently sufficient reason for the Loans being "automatically due and payable."[29]

Subsequent to HVICC's bankruptcy filing, on August 9, 2019 and September 12, 2019, UBS sent HVICC and GIT two additional letters identifying new and additional Events of Default.[30] The letters also include a calculation of the then-current amounts of interest, fees and costs due to UBS under the Credit Agreements.[31]

Since the Closing Date, the Borrowers have not made any required payments of principal, interest, fees or costs under the Credit Agreements (other than certain interest payments and fees on the First Lien Loan prior to September 2018 and Administrative Agency Fees due on the First Lien Loan in 2017).[32] Moreover, in its bankruptcy, HVICC has acknowledged that "the current outstanding amount due to UBS is approximately $114,000,000"—although UBS contended that the then-outstanding amount was at least $128 million.[33]

---

[27] *Id.*

[28] HVICC's bankruptcy has since been transferred to the Central District of California. *See In re HVI Cat Canyon, Inc.*, No. 9:19-bk-11573-MB (Bankr. C.D. Cal.).

[29] Chandler Aff., Ex. 3 § 7.01(h).

[30] *Id.*, Ex. 12; *id.*, Ex. 13.

[31] *Id.*, Ex. 12; *id.*, Ex. 13.

[32] *Id.* ¶ 18.

[33] *Id.*, Ex. 14.

7

GIT is well aware of the Borrowers' payment failures and various other defaults, having been an addressee on all but one of UBS's default letters to the Borrowers. But despite its absolute and unconditional guaranty of the Borrowers' payment obligations, GIT has not, to date, made any payments on Borrowers' behalf to UBS.[34]

## ARGUMENT

CPLR § 3213 "provides a speedy and effective means for resolving presumptively meritorious claims." *Banco Popular N. Am. v. Victory Taxi Mgmt.*, 1 N.Y.3d 381, 383 (2004). Although CPLR § 3213 is most often employed in connection with promissory notes, it is well established that the procedure applies to absolute and unconditional guaranties like those at issue here. *See, e.g., Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A., "Rabobank Int'l," N.Y. Branch v. Navarro*, 25 N.Y.3d 485, 492 (2015) ("*Navarro*") ("[U]nconditional guaranty is an instrument for the payment of "money only" within the meaning of CPLR 3213."); *Poah One Acquisition Holdings V Ltd. v. Armenta*, 96 A.D.3d 560, 560 (1st Dep't 2012) ("Plaintiff appropriately moved based on the absolute and unconditional guaranty."); *Bank of Am., N.A. v. Solow*, 59 A.D.3d 304, 304–05 (1st Dep't 2009) (recourse to CPLR § 3213 deemed appropriate where the "guaranty was absolute and unconditional"). Moreover, GIT has expressly acknowledged—*in the Guaranties themselves*—that they are "instruments for the payment of money," and that UBS can enforce them through an action under CPLR § 3213.

The prima facie case for summary judgment under CPLR § 3213 on a guaranty is simple and straightforward—movant need only "prove the existence of the guaranty, the underlying debt and the guarantor's failure to perform under the guaranty." *Navarro*, 25 N.Y.3d at 492 (citations and internal quotation marks omitted); *see also Armenta*, 96 A.D.3d at 560 (plaintiff

---

[34]    *Id.* ¶ 19.

"demonstrated its entitlement to summary judgment as against [guarantor] by submitting the guaranty executed by him and an affidavit of nonpayment"); *Bank of Am., N.A. v. Tatham*, 305 A.D.2d 183, 183 (1st Dep't 2003) ("[M]otion for summary judgment was properly granted upon proof of the loan documents, including the guaranty agreement, and failure to pay in accordance therewith.").

UBS easily meets that standard here. UBS's motion papers include copies of the Credit Agreements and the Guaranties, along with evidence that the Borrowers' debt is currently due and payable—including the incontrovertible fact that both HVICC and Rincon have voluntarily sought bankruptcy protection—and that neither the Borrowers nor GIT have paid that debt.[35] And while the total amount due to UBS above and beyond the $100 million principal (*i.e.*, the interest, fees and other costs the Borrowers agreed to pay under the Credit Agreement) will depend upon the date of judgment and require some routine calculation, that does not defeat a motion under CPLR § 3213.[36] *See Plaza 400 Owners Corp. v. Resnicoff*, 640 N.Y.S.2d 984, 989 (N.Y. Civ. Ct. 1996) ("If a guarantee, by its own terms, unconditionally obligates the guarantor only to pay money, it is an instrument for the payment of money only. The need for calculation or hearing does not disqualify it from CPLR 3213 eligibility.") (internal citation omitted); *see also Apple Bank for Sav. v. Mehta*, 609 N.Y.S.2d 221, 222 (1st Dep't 1994) (citing *Schwartz v. Turner Holdings, Inc.*, 527 N.Y.S.2d 229, 230 (1st Dep't 1988)) (affirming trial court's granting of plaintiff's CPLR § 3213 motion where court ordered clerk of court to "compute[]" "interest as prayed for allowable by law"); *Lawson v. Patrick Henry Hotel*, 2006 WL 4682183 (Sup. Ct.,

---

[35]  *See supra* at pp. 5–7 (listing the letters of default sent to parties).

[36]  As noted above, UBS's September 12, 2019 letter to HVICC and GIT includes a then-current calculation of those amounts. *See* Chandler Aff., Ex. 13.

N.Y. Cty. July 13, 2006) (stating that courts routinely grant CPLR § 3213 motions and "permit the use of outside benchmarks, such as the LIBOR rate" to calculate interest).[37]

Because UBS has established its prima facie case, "the burden shifts to the defendant to establish, by admissible evidence, the existence of a triable issue with respect to a bona fide defense." *Navarro*, 25 N.Y.3d at 492 (citations and internal quotation marks omitted). But GIT cannot establish a bona fide defense because, as is typical of absolute and unconditional guaranties, any such defense is barred by the Guaranties' plain language. Under the Guaranties, GIT expressly agreed, among other things:

- that its obligation to UBS is "absolute, irrevocable and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of" Borrowers' obligations under the Credit Agreements;

- that its obligation to UBS is "absolute, irrevocable and unconditional . . . irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or a Guarantor (except for payment in full)";

- to waive "diligence, presentment, demand of payment, protest, and all notices whatsoever" as defenses to its guaranty obligations;

- to waive any requirement that UBS "exhaust any right, power or remedy" against the Borrowers or any other person; and

- that the Guaranties are "a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset" that UBS may have with respect to the Borrowers.[38]

It is black-letter New York law that courts enforce clear and unambiguous contractual terms as written. *See Littleton Constr. Ltd. v. Huber Constr., Inc.*, 27 N.Y.3d 1081, 1083 (2016)

---

[37] Further, a movant can recover its costs, expenses, and attorney's fees arising from an action under CPLR § 3213 where the instrument sued upon permits such recovery. *See Chase Manhattan Bank, N.A. v. Marcovitz*, 392 N.Y.S.2d 435, 436 (1st Dep't 1977) (where defendant agreed in guaranty to pay "legal and other costs and expenses," plaintiff could recover such costs and expenses on its CPLR § 3213 motion). As discussed above, UBS is entitled to recover such expenses under Section 9.03(a) of the Credit Agreements.

[38] Chandler Aff., Ex. 1 § 2.02; *see also id.* § 6.12 (noting that GIT's obligations are "absolute and unconditional" irrespective of various conditions).

10

("If a contract is complete, clear and unambiguous, it must be enforced according to its plain meaning."). Where a loan agreement or guaranty uses clear and unambiguous language in defining the guarantor's obligations as absolute and unconditional, irrespective of any defenses or counterclaims, New York courts consistently grant summary judgment to lenders. *See Navarro*, 25 N.Y.3d at 494 (granting summary judgment where, "[b]y its plain terms, in broad, sweeping and unequivocal language, the guaranty forecloses any challenge to the enforceability and validity of the documents which establish defendant's liability for payments arising under the purchase agreement, as well as to any other possible defense to his liability for the obligations of the [borrower] businesses"). Therefore, unless GIT can somehow conjure up a bona fide defense that escapes the broad reach of the provisions it agreed to—and it cannot—UBS is entitled to summary judgment.

## CONCLUSION

UBS has demonstrated that (i) the Borrowers' debts under the Credit Agreements are due and owing, (ii) GIT has absolutely and unconditionally guaranteed the payment of those debts, and (iii) UBS has not been paid. Accordingly, UBS respectfully requests that the Court enter judgment for UBS against GIT in the amount of $100 million, plus interest, fees, costs and expenses, including legal fees incurred in enforcing the agreements, due under the Credit Agreements, and for such other and further relief as the Court deems just and proper.

11

Dated: October 21, 2019
     New York, New York

Respectfully submitted,

O'MELVENY & MYERS LLP


By: _____

    Daniel L. Cantor
    Ethan M. Scapellati
    7 Times Square
    New York, New York 10036
    Phone: (212) 326 2000

*Attorneys for Plaintiff UBS AG, London Branch*

## Rule 17 Word Count Certification

*Word Count*: Under 22 NYCRR § 202.70(g) Rule 17, all memoranda of law are limited to 7,000 words. This memorandum of law is compliant because it contains 3,201 words.

Dated: October 21, 2019
New York, New York

Respectfully submitted,

O'MELVENY & MYERS LLP

By: _____
Daniel L. Cantor
Ethan M. Scapellati
7 Times Square
New York, New York 10036
Phone: (212) 326 2000

*Attorneys for Plaintiff UBS AG, London Branch*

13

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------- X
UBS AG, LONDON BRANCH,                           :    Index No. _____
                                                 :    Mot. Seq. ___
                              Plaintiff,          :
                                                 :
              -against-                           :
                                                 :
GREKA INTEGRATED, INC.,                           :
                                                 :
                              Defendant.          :
                                                 :
-------------------------------------------------------------- :

### AFFIDAVIT OF WILLIAM W. CHANDLER

STATE OF CONNECTICUT )
                     ) ss.:
COUNTY OF FAIRFIELD  )

   William W. Chandler, being duly sworn, deposes and says:

   1.   I am a Managing Director of plaintiff UBS AG, London Branch ("UBS").

I respectfully submit this affidavit in support of UBS's Motion for Summary Judgment in Lieu

of Complaint under CPLR § 3213.  I make this affidavit based on personal knowledge and the

review of certain UBS records, and I could and would testify competently to the facts stated in

this affidavit if called as a witness.

   2.   On February 14, 2007, UBS and HVI Cat Canyon, Inc. ("HVICC") and Rincon

Island Limited Partnership ("Rincon," and together with HVICC, the "Borrowers") entered into

the Volumetric Production Payment Documents in connection with the Borrowers' oil and gas

interests in California.[1]  On May 20, 2016, following years of financial and other problems that prevented the Borrowers from meeting their VPP obligations, the parties agreed to terminate the Volumetric Production Payment Documents and replace them with the First and Second Lien Credit Agreements (together, the "Credit Agreements").

3.    On the same day, May 20, 2016, UBS and Greka Integrated, Inc. ("GIT") entered into and executed the First and Second Greka Integrated Guaranty Agreements (together, the "Guaranties").

4.    Attached as Exhibit 1 is a true and correct copy of the executed First Lien Greka Integrated Guaranty Agreement dated as of May 20, 2016, by and among UBS and GIT.

5.     Attached as Exhibit 2 is a true and correct copy of the executed Second Lien Greka Integrated Guaranty Agreement dated as of May 20, 2016, by and among UBS and GIT.

6.    Attached as Exhibit 3 is a true and correct copy of the executed First Lien Credit Agreement dated as of May 20, 2016, by and among UBS, Borrowers, and GOGH, LLC.

7.    Attached as Exhibit 4 is a true and correct copy of the executed Second Lien Credit Agreement dated as of May 20, 2016, by and among UBS, Borrowers, and GOGH, LLC.

8.    Attached as Exhibit 5 is a true and correct copy of the executed Termination Agreement dated as of May 20, 2016, by and among UBS and Borrowers.

9.    Attached as Exhibit 6 is a true and correct copy of Schedule 1.01(d) to the First Lien Credit Agreement, which demonstrates that UBS was the sole lender under that agreement.

---

[1]    Capitalized terms used but not defined herein shall have the meanings given them in Plaintiff's Memorandum of Law in Support of its Motion for Summary Judgment in Lieu of Complaint under CPLR §3213.

2

10.     Attached as Exhibit 7 is a true and correct copy of Schedule 1.01(d) to the Second Lien Credit Agreement, which demonstrates that UBS was the sole lender under that agreement.

11.     Attached as Exhibit 8 is a true and correct copy of the letter regarding "Notice of Default under the Credit Agreements," dated August 19, 2016, sent by UBS to HVICC.

12.     Attached as Exhibit 9 is a true and correct copy of the letter regarding "Notice of Additional Defaults under the Credit Agreements," dated November 4, 2016, sent by UBS to HVICC and GIT.

13.     Attached as Exhibit 10 is a true and correct copy of the letter regarding "Defaults under the Credit Agreements," dated May 26, 2017, sent by UBS to HVICC and GIT (the "May 26, 2017 Letter").

14.     Attached as Exhibit 11 is a true and correct copy of the letter regarding "Defaults and Reservation of Rights under the Credit Agreements," dated July 10, 2019, sent by UBS to HVICC and GIT.  Appended to the original letter was the May 26, 2017 Letter and fourteen (14) other letters that UBS had previously sent to HVICC and GIT regarding "Defaults and Reservation of Rights under the Credit Agreements."  These fourteen letters (which are included in Exhibit 11) are dated December 15, 2017, January 11, 2018, February 9, 2018, March 13, 2018, August 9, 2018, October 16, 2018, November 19, 2018, December 11, 2018, January 17, 2019, February 7, 2019, March 8, 2019, April 8, 2019, May 9, 2019, and June 10, 2019.

15.     Attached as Exhibit 12 is a true and correct copy of the letter regarding "Defaults and Reservation of Rights under the Credit Agreements," dated August 9, 2019, sent by UBS to HVICC and GIT.

3

Case 1:19-cv-10786-LLS-KNF   Document 5-1   Filed 11/21/19   Page 25 of 92

16.     Attached as Exhibit 13 is a true and correct copy of the letter regarding "Defaults and Reservation of Rights under the Credit Agreements," dated September 12, 2019, sent by UBS to HVICC and GIT.

17.     Attached as Exhibit 14 is a true and correct copy of an August 4, 2019 order issued by the United States Bankruptcy Court for the Southern District of New York in *In re HVI Cat Canyon, Inc.*, Case No. 19-12417, titled "Interim Order Granting Debtor's Motion Pursuant to 11 U.S.C. §§ 105, 361, 362 and 363 Approving Use of Cash Collateral, Providing Adequate Protection and Scheduling Final Hearing Pursuant to Bankruptcy Rule 4001."

18.     Since the Closing Date of the Credit Agreements, the Borrowers have not made any required payments of principal, interest, fees or costs under the Credit Agreements to UBS (other than, certain interest payments due on the First Lien Loan prior to September 2018 and the Administrative Agency Fee due on the First Lien Loan in 2017).

19.     To date, GIT has not made any payments on the Borrowers' behalf to UBS under the Guaranties.

WILLIAM W. CHANDLER

Sworn to before me this
21st day of October, 2019

Notary Public

DIANA M. SANTO
Notary Public, State of Connecticut
My Commission Expires Jan. 31, 2023

4

## Rule 17 Word Count Certification

*Word Count*: Under 22 NYCRR § 202.70(g) Rule 17, all affidavits are limited to 7,000 words.

This affidavit is compliant because it contains 931 words.

Dated: October 21, 2019
New York, New York

Respectfully submitted,

O'MELVENY & MYERS LLP

By: _____
Daniel L. Cantor
Ethan M. Scapellati
7 Times Square
New York, New York 10036
Phone: (212) 326 2000

*Attorneys for Plaintiff UBS AG, London Branch*

5

# EXHIBIT 1

EXECUTION VERSION

## FIRST LIEN GREKA INTEGRATED GUARANTY AGREEMENT

dated as of May 20 , 2016,

among

**GREKA INTEGRATED, INC.**

as Guarantor,

and

**UBS AG, LONDON BRANCH,**

as Administrative Agent and Collateral Agent

TABLE OF CONTENTS

<u>Section</u>                                                                                  <u>Page</u>

ARTICLE I
DEFINITIONS

Section 1.01   Defined Terms...................................................................................1
Section 1.02   Resolution of Drafting Ambiguities....................................................3

ARTICLE II

Section 2.01   The Guarantee....................................................................................3
Section 2.02   Obligations Unconditional..................................................................3
Section 2.03   Reinstatement.....................................................................................5
Section 2.04   Subrogation; Subordination................................................................5
Section 2.05   Remedies............................................................................................5
Section 2.06   Instrument for the Payment of Money.................................................5
Section 2.07   Continuing Guarantee.........................................................................5
Section 2.08   General Limitation on Guarantee Obligations.....................................5
Section 2.09   Additional Waivers and Agreements....................................................6

ARTICLE III
REPRESENTATIONS AND WARRANTIES

Section 3.01   Organization; Powers..........................................................................7
Section 3.02   Authorization; Enforceability..............................................................7
Section 3.03   No Conflicts........................................................................................7
Section 3.04   Financial Statements; Projections; Benefit...........................................8
Section 3.05   Equity Interests and Subsidiaries.........................................................8
Section 3.06   Litigation; Compliance with Laws.......................................................9
Section 3.07   Agreements..........................................................................................9
Section 3.08   Taxes...................................................................................................9
Section 3.09   No Material Misstatements.................................................................10
Section 3.10   Solvency.............................................................................................10
Section 3.11   Security Documents............................................................................10
Section 3.12   Anti-Terrorism and Related Laws.......................................................11

ARTICLE IV
AFFIRMATIVE COVENANTS

Section 4.01   Reporting Covenants..........................................................................12
Section 4.02   Greka Refining Asset Sale..................................................................13

ARTICLE V

NEGATIVE COVENANTS

Section 5.01   Liens...................................................................................................13

-i-

OMM_US:74139845

Section 5.02      Dividends. ......................................................................................13
Section 5.03      Greka Refining Asset Sale. .............................................................13
Section 5.04      Transactions with Affiliates. ..........................................................14

## ARTICLE VI

## MISCELLANEOUS

Section 6.01      Notices..............................................................................................14
Section 6.02      Waivers; Amendment........................................................................16
Section 6.03      Damage Waiver.................................................................................16
Section 6.04      Successors and Assigns......................................................................16
Section 6.05      Survival of Agreement. .....................................................................17
Section 6.06      Counterparts; Integration; Effectiveness..........................................17
Section 6.07      Severability. ......................................................................................17
Section 6.08      Right of Setoff...................................................................................17
Section 6.09      Governing Law; Jurisdiction; Consent to Service of Process. .........18
Section 6.10      Waiver of Jury Trial. .........................................................................19
Section 6.11      Headings............................................................................................19
Section 6.12      Obligations Absolute........................................................................19
Section 6.13      No Advisory or Fiduciary Responsibility. .......................................20

EXHIBITS

Exhibit A                    Greka Refining Officer's Certificate

SCHEDULES

Schedule 3.05(a)         Equity Interests and Subsidiaries
Schedule 3.06            Litigation
Schedule 3.07            Agreements

OMM_US:74139845

## FIRST LIEN GREKA INTEGRATED GUARANTY AGREEMENT

This FIRST LIEN GREKA INTEGRATED GUARANTY AGREEMENT dated as of May 20 , 2016 (as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this "**Agreement**" or this "**Guarantee**") made by GREKA INTEGRATED, INC. (the "**Guarantor**"), as guarantor, in favor of UBS AG, LONDON BRANCH, in its capacities as administrative agent and as collateral agent pursuant to the Credit Agreement (as hereinafter defined), for the benefit of the Secured Parties (as defined in the Credit Agreement) (in its capacity as administrative agent and together with any successors in such capacity, the "**Administrative Agent**" and in its capacity as collateral agent and together with any successors in such capacity, the "**Collateral Agent**").

## R E C I T A L S

A.      The Borrowers, Holdings, the Administrative Agent, the Collateral Agent and the lenders thereunder have, in connection with the execution and delivery of this Agreement, entered into that certain first lien credit agreement, dated as of May 20 , 2016 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"; which term shall also include and refer to any increase in the amount of indebtedness under the Credit Agreement and any refinancing or replacement of the Credit Agreement (whether under a bank facility, securities offering or otherwise) or one or more successor or replacement facilities whether or not with a different group of agents or lenders (whether under a bank facility, securities offering or otherwise) and whether or not with different obligors upon the Administrative Agent's acknowledgment of the termination of the predecessor Credit Agreement).

B.      The Guarantor will receive substantial benefits from the execution, delivery and performance of the obligations under the Credit Agreement and the other Loan Documents and is, therefore, willing to enter into this Agreement.

C.      The Guarantor is willing irrevocably and unconditionally to guaranty the Secured Obligations as and to the extent provided herein.

## AGREEMENT

NOW THEREFORE, based upon the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in order to induce Lenders to enter into the Credit Agreement and to make Loans and other extensions of credit thereunder, the Guarantor hereby agrees as follows:

## ARTICLE I
## DEFINITIONS

**SECTION 1.01      Defined Terms**.

(a)      Terms used but not otherwise defined herein that are defined in the Credit Agreement shall have the meanings given to them in the Credit Agreement.  Sections 1.03 and 1.05 of the

Credit Agreement shall apply herein *mutatis mutandis*.

      (b)      The following terms shall have the following meanings:

"**Administrative Agent**" shall have the meaning assigned to such term in the preamble.

"**Agreement**" shall have the meaning assigned to such term in the preamble.

"**Collateral Agent**" shall have the meaning assigned to such term in the preamble.

"**Credit Agreement**" shall have the meaning assigned to such term in the recitals.

"**Greka Collateral**" shall mean all property pledged or granted as collateral pursuant to the Greka Security Agreement from time to time.

"**Greka Refining**" shall mean Greka Refining Company (formerly known as Santa Maria Refining Company), a California corporation.

"**Greka Refining Asset Sale**" shall mean the conveyance, sale, transfer or other disposition (including by way of merger or consolidation or a dividend or other distribution) of (i) any Equity Interests in Greka Refining or (ii) all or substantially all, or any substantial part, of the assets of Greka Refining, including, without limitation, the sale of the refinery of Greka Refining.

"**Greka Refining Credit Facility**" shall mean the Credit Agreement, dated as of September 10, 2010, to which Greka Refining is a party, as such agreement may be amended, supplemented, restated, modified, refinanced or otherwise replaced from time to time.

"**Guarantee**" shall have the meaning assigned to such term in the preamble.

"**Guaranteed Obligations**" shall have the meaning assigned to such term in <u>Section 2.01</u>.

"**Guarantor**" shall have the meaning assigned to such term in the preamble.

"**Net Proceeds**" shall mean the proceeds received by the Guarantor, Greka Refining or any of their respective Affiliates (including cash proceeds subsequently received in respect of non-cash consideration initially received) in respect of a Greka Refining Asset Sale net, solely in the case of a Greka Refining Asset Sale to a Person that is not the Guarantor or an Affiliate of the Guarantor, of (i) selling expenses paid or payable to an unrelated third party (including reasonable brokers' fees or commissions, legal, accounting and other professional and transactional fees, transfer and similar taxes and the Guarantor's good faith estimate of income taxes actually paid or payable in connection with such Greka Refining Asset Sale); (ii) amounts provided as a reserve, in accordance with GAAP, against (x) any liabilities under any indemnification obligations associated with any Greka Refining Asset Sale to an unrelated third party, or (y) any other liabilities retained by the Guarantor associated with the properties sold in any Greka Refining Asset Sale to an unrelated third party (excluding any liabilities owed to any Affiliates) (*provided* that, to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Proceeds); (iii) the Guarantor's good faith estimate of payments required to be made with respect to unassumed liabilities relating to the properties sold within 90 days of

2

Case 1:19-cv-10786-LLS-KNF Document 5-1 Filed 11/21/19 Page 33 of 92

any Greka Refining Asset Sale (excluding liabilities owed to any Affiliate) (*provided* that, to the extent such cash proceeds are not used to make payments in respect of such unassumed liabilities within 90 days of such Greka Refining Asset Sale, such cash proceeds shall constitute Net Proceeds); and (iv) the principal amount, premium or penalty, if any, interest and other amounts outstanding under the Greka Refining Credit Facility which are secured by a Lien on the properties sold in any Greka Refining Asset Sale and which are repaid with such proceeds (other than any such Indebtedness assumed by any purchaser of such properties).

**SECTION 1.02**     <u>Resolution of Drafting Ambiguities</u>.

      The Guarantor acknowledges and agrees that it was represented by counsel in connection with the execution and delivery of this Agreement and the other Loan Documents to which it is a party, that it and its counsel reviewed and participated in the preparation and negotiation hereof and thereof and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation hereof or thereof.

**ARTICLE II**

**SECTION 2.01**     <u>The Guarantee</u>.

      The Guarantor hereby guarantees to each Secured Party and their respective successors and assigns, the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of the principal of and interest on (including any interest, fees, costs or charges that would accrue but for the provisions of the Title 11 of the United States Code after any bankruptcy or insolvency petition under Title 11 of the United States Code) the Loans made by the Lenders to, and the Notes held by each Lender of, Borrowers, and all other Secured Obligations from time to time owing to the Secured Parties by any other Loan Party under any other Loan Document or by any other Loan Party under any Hedging Agreement or Treasury Services Agreement entered into with a counterparty that is a Secured Party (provided that, in the case of any Hedging Agreement, the Required Lenders shall have consented to such counterparty being a Secured Party with respect to Hedging Agreements), in each case strictly in accordance with the terms thereof (such obligations being herein collectively called the "**Guaranteed Obligations**"). The Guarantor hereby agrees that if a Borrower or another Company shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, the Guarantor will promptly pay the same in cash, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal. The liability of the Guarantor under this Guarantee is a primary, and not secondary, obligation of such Guarantor.

**SECTION 2.02**     <u>Obligations Unconditional</u>.

      The obligations of the Guarantor under <u>Section 2.01</u> shall constitute a guaranty of payment and, to the fullest extent permitted by applicable Requirements of Law, are absolute, irrevocable and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations of Borrowers and other Loan Parties under the Credit Agreement, the Notes, if any, the Guaranty Agreement or any other agreement or instrument referred to herein or therein, or any

OMM_US:74139845

substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or a Guarantor (except for payment in full). Without limiting the generality of the foregoing, it is agreed that, to the fullest extent permitted by applicable Requirements of Law, the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantor hereunder which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

> (i)     at any time or from time to time, without notice to the Guarantor, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

> (ii)     any of the acts mentioned in any of the provisions of this Agreement, the Credit Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein shall be done or omitted;

> (iii)     the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Loan Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

> (iv)     any Lien or security interest granted to any Lender, Agent or other Secured Party as security for any of the Guaranteed Obligations shall fail to be perfected; or

> (v)     the release of the Guarantor or any other guarantor that provides a Guarantee.

The Guarantor hereby expressly waives, to the fullest extent allowed by applicable Requirements of Law, diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that any Secured Party exhaust any right, power or remedy or proceed against either Borrower under this Agreement, the Credit Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein, or against any other person under any other guarantee of, or security for, any of the Guaranteed Obligations. The Guarantor waives, to the fullest extent permitted by applicable Requirements of Law, any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by any Secured Party upon this Guarantee or acceptance of this Guarantee, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all dealings between Borrowers and the Secured Parties shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee. This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by Secured Parties, and the obligations and liabilities of the Guarantor hereunder shall not be conditioned or contingent upon the pursuit by the Secured Parties or any other person at any time of any right or remedy against Borrowers or against any other person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto. This Guarantee shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantor and the successors and assigns thereof, and shall

OMM_US:74139845



inure to the benefit of the Secured Parties, and their respective successors and assigns, notwithstanding that from time to time during the term of this Agreement there may be no Guaranteed Obligations outstanding.

### SECTION 2.03    Reinstatement.

The obligations of the Guarantor under this Guarantee shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of any Loan Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

### SECTION 2.04    Subrogation; Subordination.

The Guarantor hereby agrees that until the indefeasible payment and satisfaction in full in cash of all Guaranteed Obligations it shall waive any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in Section 2.01, whether by subrogation or otherwise, against any of the Borrowers, Holdings or any other guarantor of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations. Any Indebtedness of any Loan Party or Subsidiary owing to the Guarantor shall be subordinated to the Secured Obligations in the manner set forth in the Intercompany Note evidencing such Indebtedness.

### SECTION 2.05    Remedies.

The Guarantor agrees that, as between the Guarantor and the Lenders and Agents, the obligations of Borrowers under the Credit Agreement and the Notes, if any, may be declared to be forthwith due and payable as provided in Section 7.01 of the Credit Agreement (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 7.01 of the Credit Agreement) for purposes of Section 2.01, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against a Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by a Borrower) shall forthwith become due and payable by the Guarantor for purposes of Section 2.01.

### SECTION 2.06    Instrument for the Payment of Money.

The Guarantor hereby acknowledges that the guarantee in this Agreement constitutes an instrument for the payment of money, and consents and agrees that any Lender, Agent or other Secured Party, at its sole option, in the event of a dispute by such Guarantor in the payment of any moneys due hereunder, shall have the right to bring a motion-action under New York CPLR Section 3213.

### SECTION 2.07    Continuing Guarantee.

The guarantee in this Agreement is a continuing guarantee of payment, and shall apply to all Guaranteed Obligations whenever arising.

### SECTION 2.08    General Limitation on Guarantee Obligations.

In any action or proceeding involving any state corporate limited partnership or limited

OMM_US:74139845

liability company law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of the Guarantor under Section 2.01 would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 2.01, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by the Guarantor, any Loan Party or any other person, be automatically limited and reduced to the highest amount that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

### SECTION 2.09    Additional Waivers and Agreements.

Notwithstanding any provisions of this Agreement or the other Loan Documents to the contrary, the Guarantor further irrevocably and unconditionally waives each of the following, to the fullest extent permitted by applicable Requirements of Law:

(i)  any defense based upon invalidity, irregularity or unenforceability of the Guaranteed Obligations as against any Borrower or any other Person, or any discharge or limitation of the liability of any Borrower or any other Person, or any restraint or stay applicable to actions against any Borrower, whether such disability, limitation or restraint or stay is consensual, or by order of a court or other governmental authority, or arising by operation of law or any liquidation, receivership, bankruptcy, or other debtor-relief proceeding (except, in each case, for payment in full);

(ii)  any rights of the Guarantor of subrogation, reimbursement, indemnification, and/or contribution against any Borrower or any other Person (*provided* that subsequent to indefeasible payment and satisfaction in full in cash of all Guaranteed Obligations, the Guarantor may pursue such rights to the extent permitted by Section 2.04 of this Agreement), and any other rights or defenses that are or may become available to such Guarantor or any other Person by reason of Sections 2787-2855, inclusive of the California Civil Code;

(iii) any rights or defenses that may be available by reason of any election of remedies by a Secured Party (including, without limitation, any such election which in any manner impairs, effects, reduces, releases, destroys or extinguishes the Guarantor's subrogation rights, rights to proceed against any Borrower for reimbursement, or any other rights of the Guarantor to proceed against any other Person or security (e.g., an election which destroys the Guarantor's rights of subrogation or reimbursement against any Borrower or any other Person by operation of Section 580d of the California Code of Civil Procedure or otherwise)); and

(iv)  if the Guaranteed Obligations are secured by real property or an estate for years, the Guarantor further waives any rights or defenses such Guarantor may have because the Guaranteed Obligations are secured by real property or an estate for years. These rights or defenses include, but are not limited to, any rights or defenses based upon, directly or indirectly, any of Section 580a, 580b, 580d or 726 of the California Code of Civil Procedure.

The foregoing provisions of this Agreement mean, among other things, that, to the fullest extent permitted by applicable Requirements of Law (a) a Secured Party may collect from the Guarantor without first foreclosing on any real or personal property Collateral pledged by any Borrower or any other guarantor or Person for the Guaranteed Obligations; and (b) if a Secured Party forecloses on a real

OMM_US:74139845



Case 1:19-cv-10786-LLS-KNF  Document 5-1  Filed 11/21/19  Page 37 of 92

property pledged by any Borrower or Person: (1) the amount of the Guaranteed Obligations may be reduced only by the price for which the Collateral sold at the foreclosure sale, even if the Collateral was worth more than the sale price; and (2) the Secured Parties may collect from the Guarantor even if the Secured Parties, by foreclosing on the real property Collateral, have destroyed any right of the Guarantor or Persons to collect from any Borrower or any other guarantor or Person.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

**SECTION 3.01    Organization; Powers.**

The Guarantor (a) is duly organized and validly existing under the laws of the jurisdiction of its organization, (b) has all requisite corporate power and authority to carry on its business as now conducted and to own and lease its property and (c) is qualified and in good standing (to the extent such concept is applicable in the applicable jurisdiction) to do business in every jurisdiction where such qualification is required, except in such jurisdictions where the failure to so qualify or be in good standing, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  There is no existing default under any Organizational Document of the Guarantor or any event which, with the giving of notice or passage of time or both, would constitute a default by any party thereunder.

**SECTION 3.02    Authorization; Enforceability.**

The Transactions to be entered into by the Guarantor are within its powers and have been duly authorized by all necessary action on the part of the Guarantor.  Each of this Agreement and the Greka Security Agreement has been duly executed and delivered by the Guarantor and constitutes, and when executed and delivered by the Guarantor, will constitute, a legal, valid and binding obligation of the Guarantor, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**SECTION 3.03    No Conflicts.**

The transactions contemplated by this Guarantee and the Greka Security Agreement (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except (i) such as have been obtained or made and are in full force and effect and (ii)  consents, approvals, registrations, filings, permits or actions the failure to obtain or perform which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, (b) will not violate the Organizational Documents of the Guarantor, (c) will not violate any Requirement of Law in any material respect, (d) will not violate or result in a default or require any consent or approval under any indenture, agreement or other instrument, in each case with respect to Indebtedness of Greka Integrated or any of its Subsidiaries, binding upon the Guarantor or any of its Subsidiaries or its or their respective properties, or give rise to a right thereunder to require any payment to be made by the Guarantor, (e) will not in any material respect violate or result in a default or require any consent or approval under any agreement or other instrument (other than with respect to Indebtedness of the Guarantor or any of its Subsidiaries) binding upon the Guarantor or any of its Subsidiaries or its or their respective properties, or give rise to a right thereunder to require any payment to be made by the

7



Guarantor, and (f) will not result in the creation or imposition of any Lien on any property of the Guarantor or any of its Subsidiaries, except Liens created by the Loan Documents and Permitted Liens.

### SECTION 3.04    Financial Statements; Projections; Benefit.

(a)    Historical Financial Statements. The Guarantor has heretofore delivered to the Administrative Agent the consolidated balance sheets and related consolidated statements of income, stockholders' equity and cash flows of the Guarantor and its Subsidiaries, (i) as of and for the fiscal years ended December 31, 2012, December 31, 2013 and December 31, 2014, audited by and accompanied by the unqualified opinion of BDO Seidman, independent public accountants (except in the case of the 2014 financial statements of the Borrowers), and (ii) as of and for the six-month period ended June 30, 2015 and for the comparable period of the preceding fiscal year, in each case, certified by the chief financial officer of the Guarantor. Such financial statements have been prepared in accordance with GAAP and present fairly and accurately the financial condition and results of operations and cash flows of the Guarantor and its Subsidiaries as of the dates and for the periods to which they relate.

(b)    No Liabilities. Except as set forth in the financial statements referred to in Section 3.04(a), there are no liabilities of the Guarantor or any of its consolidated subsidiaries of any kind, whether accrued, contingent, absolute, determined, determinable or otherwise, which could, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, and the Guarantor knows of no existing condition, situation or set of circumstances which could reasonably be expected to result in such a liability, other than liabilities under the Loan Documents, the Second Lien Loan Documents and the GLR Facility. Since December 31, 2014, there has been no event, change, circumstance or occurrence that, individually or in the aggregate, has had or could reasonably be expected to result in a Material Adverse Effect.

### SECTION 3.05    Equity Interests and Subsidiaries.

(a)    Equity Interests. Schedule 3.05(a) sets forth the number of each class of Equity Interests of Holdings authorized, and the number outstanding, on the Closing Date and the number of shares covered by all outstanding options, warrants, rights of conversion or purchase and similar rights at the Closing Date. All Equity Interests of Holdings are duly and validly issued and are fully paid and non-assessable, and each of Holdings and Greka Refining is a Wholly Owned Subsidiary of the Guarantor. The Guarantor is the record and beneficial owner of, and has good and marketable title to, the Equity Interests pledged by it under the Greka Security Agreement, free of any and all Liens, rights or claims of other persons, except the security interest created by the Security Documents and the Second Lien Security Documents, and there are no outstanding warrants, options or other rights to purchase, or shareholder, voting trust or similar agreements outstanding with respect to, or property that is convertible into, or that requires the issuance or sale of, any such Equity Interests.

(b)    No Consent of Third Parties Required. No consent of any person including any other general or limited partner, any other member of a limited liability company, any other shareholder or any other trust beneficiary is necessary or reasonably desirable (from the perspective of a secured party) in connection with the creation, perfection or first priority status of the security interest of the Collateral Agent in any Equity Interests pledged to the Collateral Agent for the benefit of the Secured Parties under the Greka Security Agreement or the exercise by the Collateral Agent of the voting or other rights provided for in the Greka Security Agreement or the exercise of remedies in respect thereof.

**SECTION 3.06     Litigation; Compliance with Laws**.

Except as disclosed in Schedule 3.06 hereof, there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority now pending or, to the knowledge of the Guarantor, threatened against or affecting the Guarantor or any business, property or rights of the Guarantor (i) that involve this Guarantee or the Greka Security Agreement or (ii) that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or result in liabilities or other obligations of the Guarantor, in the aggregate, of more than $2.5 million.  None of the Guarantor nor any of its property is in violation of, nor will the continued operation of its property as currently conducted violate, any Requirements of Law (including any zoning or building ordinance, code or approval or any building permits) or any restrictions of record or agreements affecting any of the Guarantor's Real Property or is in default with respect to any Requirement of Law, where such violation or default, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

**SECTION 3.07     Agreements**.

The Guarantor is not a party to any agreement or instrument or subject to any corporate or other constitutional restriction that, individually or in the aggregate, has resulted or could reasonably be expected to result in a Material Adverse Effect.  The Guarantor is not in default in any manner under any provision of any indenture or other agreement or instrument evidencing Indebtedness, or any other agreement or instrument to which it is a party or by which it or any of its property is or may be bound, where such default, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect, and no condition exists which, with the giving of notice or the lapse of time or both, would constitute such a default.  Schedule 3.07 accurately and completely lists all material agreements (other than customary oil and gas leases and other leases of Real Property) to which the Guarantor is a party which are in effect on the date hereof in connection with the operation of the business conducted thereby and, to the extent requested by the Administrative Agent, the Guarantor has delivered to the Administrative Agent complete and correct copies of all such material agreements, including any amendments, supplements or modifications with respect thereto, and all such agreements are in full force and effect.

**SECTION 3.08     Taxes**.

The Guarantor has (a) timely filed or caused to be timely filed all federal Tax Returns and all material state, local and foreign Tax Returns required to have been filed by it and all such Tax Returns are true and correct in all material respects, (b) duly and timely paid, collected or remitted or caused to be duly and timely paid, collected or remitted all Taxes (whether or not shown on any Tax Return) due and payable, collectible or remittable by it and all assessments received by it, except Taxes (i) that are being contested in good faith by appropriate proceedings and for which the Guarantor has set aside on its books adequate reserves in accordance with GAAP or (ii) which could not, individually or in the aggregate, have a Material Adverse Effect  and (c) satisfied all of its withholding Tax obligations except for failures that could not be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect.  The Guarantor and each Subsidiary thereof has made adequate provision in accordance with GAAP for all material Taxes not yet due and payable.  The Guarantor is not aware of any proposed or pending Tax assessments, deficiencies or audits that could be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect.  Except as could not be reasonably expected to, individually or in the

9

aggregate, result in a Material Adverse Effect, the Guarantor has not ever "participated" in a "listed transaction" within the meaning of Treasury Regulation Section 1.6011-4.

SECTION 3.09    No Material Misstatements.

No information, report, financial statement, certificate, exhibit or schedule furnished by or on behalf of the Guarantor to the Administrative Agent or any Lender in connection with the negotiation of any Loan Document or included therein or delivered pursuant thereto, taken as a whole, contained or contains any material misstatement of fact or omitted or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were or are made, not misleading as of the date such information is dated or certified; *provided* that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection, the Guarantor represents only that it acted in good faith and utilized reasonable assumptions in the preparation of such information, report, financial statement, exhibit or schedule.

SECTION 3.10    Solvency.

Immediately after the consummation of the Transactions to occur on the Closing Date and immediately following the making of each Loan and after giving effect to the application of the proceeds of each Loan, (a) the fair value of the properties of the Guarantor (individually and on a consolidated basis with its subsidiaries) will exceed its debts and liabilities, subordinated, contingent or otherwise; (b) the present fair saleable value of the property of the Guarantor (individually and on a consolidated basis with its subsidiaries) will be greater than the amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (c) the Guarantor (individually and on a consolidated basis with its subsidiaries) will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (d) the Guarantor (individually and on a consolidated basis with its subsidiaries) will not have unreasonably small capital with which to conduct its business in which it is engaged as such business is now conducted and is proposed to be conducted following the Closing Date.

SECTION 3.11    Security Documents.

The Greka Security Agreement is effective to create in favor of the Collateral Agent for the benefit of the Secured Parties, legal, valid and enforceable Liens on, and security interests in, the Greka Collateral and, when (i) financing statements and other filings in appropriate form are filed in the offices specified on Schedule 6 to the Perfection Certificate and (ii) upon the taking of possession or control by the Collateral Agent of the Greka Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Collateral Agent to the extent possession or control by the Collateral Agent is required by the Greka Security Agreement), the Liens created by the Greka Security Agreement shall constitute fully perfected Liens on, and security interests in, all right, title and interest of the grantor in the Greka Collateral (other than such Greka Collateral in which a security interest cannot be perfected under the UCC as in effect at the relevant time in the relevant jurisdiction), in each case subject to no Liens other than Liens of the Second Lien Collateral Agent under the Second Lien Loan Documents and Permitted Collateral Liens.

OMM_US:74139845



Case 1:19-cv-10786-LLS-KNF   Document 5-1   Filed 11/21/19   Page 41 of 92

**SECTION 3.12    Anti-Terrorism and Related Laws.**

(a)    The Guarantor has not and, to its knowledge, none of its Affiliates and none of its respective owners, officers, directors, brokers or agents has, (i) violated or is in violation of Sanctions Laws or Anti-Money Laundering Laws or (ii) been convicted of, has been charged with, or is under investigation by, a Governmental Authority for violations of Sanctions Laws, Anti-Money Laundering Laws or any other Requirements of Law.  The Guarantor has instituted and maintained, and will continue to maintain, in effect, policies and procedures designed to promote and achieve compliance with Sanctions Laws and Anti-Money Laundering Laws and with the representations, warranties and covenants contained in this Section 3.12.

(b)    Neither the Guarantor, nor, to its knowledge, any of its Affiliates, owners, officers, directors, brokers or agents, in each case, acting or benefitting in any capacity in connection with the Loans, is (i) a Sanctioned Person, (ii) a shell bank or (iii) subject to special measures because of money laundering concerns under Section 311 of the USA PATRIOT Act and its implementing regulations.

(c)    Neither the Guarantor, nor, to its knowledge, any of its Affiliates, owners, officers, directors, brokers or agents, in each case, acting or benefitting in any capacity in connection with the Loans, (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Sanctioned Person, (ii) deals in, or otherwise engages in any transaction related to, any Sanctioned Person, any property or interests in property of a Sanctioned Person or otherwise blocked pursuant to any Sanctions Law or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any Sanctions Law.

(d)    The Guarantor will not, directly or indirectly, use the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other person, (i) to fund any activities or business of or with any Sanctioned Person, or in any country or territory that, at the time of such funding is, or whose government is, the subject of any Sanctions, (ii) to facilitate any unlawful activity or (iii) in any other manner that would result in a violation of Sanctions by any person (including any person participating in the Loans, whether as lender, underwriter, advisor, investor or otherwise).

(e)    Neither the Guarantor, nor, to its knowledge, any of its Affiliates, owners, officers, directors, brokers or agents, in each case, acting or benefitting in any capacity in connection with the Loans, has taken or will take any action in furtherance of, nor will any proceeds of the Loans be used, directly or indirectly, in furtherance of, an offer, payment, promise to pay, or authorization or approval of the payment or giving of money, property, gifts or anything else of value, directly or indirectly, to any "government official" (including any officer or employee of a government or government-owned or controlled entity or of a public international organization (e.g. the International Monetary Fund or World Bank), or any person acting in an official capacity for or on behalf of any of the foregoing, or any political party or party official or candidate for political office) to influence official action or secure an improper advantage or otherwise in any manner which results in violation of the U.S. Federal Corrupt Practices Act of 1977, as amended, the UK Bribery Act 2010 and the rules and regulations thereunder or any other applicable Requirements of Law relating to anti-corruption or anti-bribery (collectively, "**Anti-Corruption Laws**"); and the Guarantor has conducted its business in compliance with Anti-Corruption

OMM_US:74139845



Case 1:19-cv-10786-LLS-KNF   Document 5-1   Filed 11/21/19   Page 42 of 92

Laws and has instituted and maintained and will continue to maintain policies and procedures designed to promote and achieve compliance with such Anti-Corruption Laws and with the representations, warranties and covenants contained herein.

# ARTICLE IV
# AFFIRMATIVE COVENANTS

The Guarantor covenants and agrees that, so long as any part of the Guaranteed Obligations (other than contingent obligations to the extent no claim giving rise thereto has been asserted) shall remain unpaid, unless the Majority Lenders shall otherwise consent in writing, the Guarantor will:

**SECTION 4.01**     **Reporting Covenants**.

Furnish to the Administrative Agent:

(a)     Annual Reports.  As soon as available and in any event within 120 days (or in the case of the 2015 fiscal year 180 days) after the end of each fiscal year, beginning with the fiscal year ending December 31, 2015, the consolidated balance sheets of the Guarantor and its Subsidiaries as of the end of such fiscal year and related consolidated statements of income, cash flows and stockholders' equity for such fiscal year, in comparative form with such financial statements as of the end of, and for, the preceding fiscal year, and notes thereto, all prepared in accordance with Regulation S-X and accompanied by an opinion of BDO Seidman or other independent public accountants of recognized national standing satisfactory to the Administrative Agent (which opinion shall not be qualified as to scope or contain any going concern or other qualification), stating that such financial statements fairly present, in all material respects, the financial condition, results of operations and cash flows of the Guarantor and its Subsidiaries as of the dates and for the periods specified in accordance with GAAP.

(b)     Quarterly Reports.  As soon as available and in any event within 60 days after the end of each of the first three fiscal quarters of each fiscal year, beginning with the fiscal quarter ending June 30, 2016, the consolidated balance sheets of the Guarantor and its Subsidiaries as of the end of such fiscal quarter and related consolidated statements of income and cash flows for such fiscal quarter and for the then elapsed portion of the fiscal year, in comparative form with the consolidated statements of income and cash flows for the comparable periods in the previous fiscal year, and notes thereto, all prepared in accordance with Regulation S-X under the Securities Act and accompanied by a certificate of a Financial Officer stating that such financial statements fairly present, in all material respects, the financial condition, results of operations and cash flows of the Guarantor and its Subsidiaries as of the date and for the periods specified in accordance with GAAP consistently applied, and on a basis consistent with audited financial statements referred to in clause (a)(i) of this Section 4.01, subject to normal year-end audit adjustments.

(c)     Notice of Greka Refining Asset Sales.  On or prior to the date that is not less than ten (10) Business Days prior to any Greka Refining Asset Sale, provide notice of such Greka Refining Asset Sale together with any agreements entered into in connection therewith to the Administrative Agent.  The Guarantor shall provide copies to the Administrative Agent of all agreements and documents entered into in connection with any Greka Refining Asset Sale.

OMM_US:74139845



(d)     Certification of Net Proceeds.  Concurrent with the consummation of any Greka Refining Asset Sale, a certification that sets forth all Net Proceeds of such Greka Refining Asset Sale, including any amounts referred to in clauses (i) through (iii) of the definition of Greka Refining Asset Sale.

(e)     Officer's Certificate.  Concurrent with the delivery of any annual report pursuant to Section 4.01(a), a certificate of a Financial Officer of the Guarantor, substantially in the form of Exhibit A, attesting to the financial condition of the refinery of Greka Refining.

(f)     Other Information.  Promptly, from time to time, provide such other information regarding the operations, business affairs and financial condition of the Guarantor, or compliance with the terms of this Agreement, as the Administrative Agent or any Lender may reasonably request.

SECTION 4.02     **Greka Refining Asset Sale**.  Not later than five (5) Business Days following receipt of any Net Proceeds from any Greka Refining Asset Sale, pay to the Administrative Agent an aggregate amount equal to 100% of such Net Proceeds, which payment will be applied as a prepayment of the Loans in accordance with Sections 2.10(h) and (i) of the Credit Agreement, it being understood that the obligation of the Guarantor under this Section 4.02 shall be unconditional and shall not be affected by any other Indebtedness or Lien of the Guarantor or any of its Affiliates (other than the Indebtedness and Liens described in clause (iv) of the definition of Net Proceeds to the extent such Greka Refining Asset Sale is to a Person that is not the Guarantor or an Affiliate of the Guarantor).

### ARTICLE V

### NEGATIVE COVENANTS

The Guarantor covenants and agrees that, so long as any part of the Guaranteed Obligations (other than contingent obligations to the extent no claim giving rise thereto has been asserted) shall remain unpaid, unless the Majority Lenders shall otherwise consent in writing, such Guarantor will not:

SECTION 5.01     Liens.

Create, incur, assume or permit to exist any Lien on any of the Greka Collateral other than Liens securing the payment of any Secured Obligations or Secured Obligations (as defined in the Second Lien Credit Agreement).

SECTION 5.02     **Dividends**.

Authorize, declare or pay, directly or indirectly, any Dividends that are comprised of (a) any Net Proceeds of any Greka Refining Asset Sale, (b) any Equity Interests in Greka Refining or (c) all or substantially all, or any substantial part, of the assets of Greka Refining, including, without limitation, the sale of the refinery of Greka Refining.

SECTION 5.03     **Greka Refining Asset Sale**.

Conduct or permit a Greka Refining Asset Sale unless the Net Proceeds thereof are applied in accordance with Section 4.02 hereof.

13



SECTION 5.04    **Transactions with Affiliates**.

Enter into or permit any Greka Refining Asset Sale with any Affiliate.

## ARTICLE VI

## MISCELLANEOUS

SECTION 6.01    **Notices**.

(a)    **Generally**.  Except as provided in paragraph (b) below, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows:

(i)    if to the Guarantor, at:

GREKA INTEGRATED, INC.
630 Fifth Avenue, Suite 2410
New York, NY 10111
Telecopier No.:  (212) 218-4679
With a soft copy via email to: vab@greka.com

With a hard copy to:

GREKA INTEGRATED, INC.
P.O. Box 5489
Santa Maria, CA 93456
Attention:  SVP and General Counsel
Telecopier No.:  (805) 347-1072
With a soft copy via email to: smw@greka.com

(ii)    if to the Administrative Agent or the Collateral Agent, at:

UBS AG, London Branch
100 Liverpool Street
London EC2M 2RH
Attention:  Structured Finance Processing
Fax: 44 20 7568 3978
Telephone: 44 20 7568 5584 / 0502
Email:  Loansagency@ubs.com and ol-bpsdocs-emea@ubs.com (No notices to be emailed to these addresses)

(iii)    if to a Lender, to it at its address (or telecopier number) set forth in its Administrative Questionnaire.

(iv)    if to any other Secured Party, to it at its address on file with the Administrative Agent.

14

OMM_US:74139845



Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when received or, if verified by a dated transmission receipt, when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient). Notices delivered through electronic communications to the extent provided in paragraph (b) below, shall be effective as provided in said paragraph (b). Any party hereto may change its address or telecopier number for notices and other communications hereunder by written notice to the Guarantors and the Administrative Agent.

(b)      Electronic Communications. An Agent or the Guarantor may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it (including pursuant to the provisions of this Section 6.01); *provided* that approval of such procedures may be limited to particular notices or communications.

The Guarantor hereby agrees that it will provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent or other Secured Parties pursuant to this Agreement and any other Loan Document, including all notices, requests, financial statements, financial and other reports, certificates and other information materials (the "**Communications**"), by transmitting them in an electronic medium in a format reasonably acceptable to the Administrative Agent at loansagency@ubs.com, or at such other e-mail address(es) provided to the Guarantor from time to time or in such other form as the Administrative Agent shall require. In addition, the Guarantor agrees to continue to provide the Communications to the Administrative Agent in the manner specified in this Agreement or any other Loan Document or in such other form as the Administrative Agent shall require. Nothing in this Section 6.01 shall prejudice the right of the Agents, any other Secured Party or any Loan Party to give any notice or other communication pursuant to this Agreement or any other Loan Document in any other manner specified in this Agreement or any other Loan Document or as any such Agent shall require.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

To the extent consented to by the Administrative Agent in writing from time to time, the Administrative Agent agrees that receipt of the Communications by the Administrative Agent at its e-mail address(es) set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents.

(c)      Platform. The Guarantor further agrees that any Agent may make the Communications available to the Lenders and other Secured Parties by posting the Communications on SyndTrak or a substantially similar secure electronic transmission system (the "**Platform**"). The Platform

OMM_US:74139845

is provided "as is" and "as available." The Agents do not warrant the accuracy or completeness of the Communications, or the adequacy of the Platform and expressly disclaim liability for errors or omissions in the communications. No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects, is made by any Agent in connection with the Communications or the Platform. In no event shall any Agent or any of its Related Parties have any liability to the Companies, any Lender or any other person for damages of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of any Loan Party's or such Agent's transmission of communications through the Internet, except to the extent the liability of such person is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such person's gross negligence or willful misconduct.

## SECTION 6.02   Waivers; Amendment.

(a)   Generally.  No failure or delay by any Agent or any other Secured Party in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of each Agent and the other Secured Parties hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by the Guarantor therefrom shall in any event be effective unless the same shall be permitted by this Section 6.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether any Agent or any Lender may have had notice or knowledge of such Default at the time.

(b)   Required Consents.  Neither this Agreement nor any provision hereof may be waived, amended, supplemented or modified except, pursuant to an agreement or agreements in writing entered into by the Agents and the Guarantor, with the written consent of the Majority Lenders or, to the extent required by Section 9.02(b) of the Credit Agreement, each Lender.

## SECTION 6.03   Damage Waiver.

To the fullest extent permitted by applicable Requirements of Law, the Guarantor shall not assert, and the Guarantor hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof. No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

## SECTION 6.04   Successors and Assigns.

OMM_US:74139845

The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted by the Credit Agreement, except that the Guarantor may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent, the Collateral Agent and each Lender (and any other attempted assignment or transfer by the Guarantor shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any person (other than the parties hereto and the other Secured Parties and their respective successors and assigns permitted hereby) any legal or equitable right, remedy or claim under or by reason of this Agreement.

### SECTION 6.05    Survival of Agreement.

All covenants, agreements, representations and warranties made by the Guarantor in this Agreement and the other Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Agents, the Collateral Sub-Agent or any Other Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid.

### SECTION 6.06    Counterparts; Integration; Effectiveness.

This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents, and any separate letter agreements with respect to fees payable to the Administrative Agent, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. This Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by telecopier or other electronic transmission (i.e. a "pdf" or "tif" document) shall be effective as delivery of a manually executed counterpart of this Agreement.

### SECTION 6.07    Severability.

Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

### SECTION 6.08    Right of Setoff.

If an Event of Default shall have occurred and be continuing, each Lender and each of

OMM_US:74139845

their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable Requirements of Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Guarantor against any and all of the obligations of the Guarantor now or hereafter existing under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Guarantor may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness. The rights of each Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or their respective Affiliates may have.

**SECTION 6.09**   <u>Governing Law; Jurisdiction; Consent to Service of Process</u>.

(a)   <u>Governing Law</u>.  Except to the extent otherwise expressly provided in a Security Document, this Agreement and the other Loan Documents and the transactions contemplated hereby and thereby, and all disputes between the parties hereto or thereto under or relating to this Agreement or any other Loan Document or the facts or circumstances leading to their respective execution, whether in contract, tort or otherwise, shall be construed in accordance with and governed by the laws (including statutes of limitation) of the State of New York, without regard to conflicts of law principles that would require the application of the laws of another jurisdiction.

(b)   <u>Submission to Jurisdiction</u>.  The Guarantor irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, against the Administrative Agent, any Lender, or any Related Party of the foregoing in any way relating to this Agreement or any other Loan Document or the transactions relating hereto or thereto, in any forum other than the courts of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such courts and agrees that all claims in respect of any such action, litigation or proceeding may be heard and determined in such New York State court or, to the fullest extent permitted by applicable law, in such federal court.  Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement or in any other Loan Document shall limit or prevent the Administrative Agent or any Lender from bringing any action or proceeding relating to this Agreement or any other Loan Document against the Guarantor or any of its Subsidiaries or its or their respective properties in the courts of any jurisdiction in which it may be necessary, desirable or convenient in order to enforce any rights or collect any amounts due under this Agreement or any other Loan Document, and the Administrative Agent and each Lender is hereby authorized to bring any such action or proceeding in any such jurisdiction.

(c)   <u>Venue</u>.  The Guarantor hereby irrevocably and unconditionally waives, to the fullest extent permitted by applicable Requirements of Law, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in <u>Section 6.09(b)</u>.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable Requirements of Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

OMM_US:74139845



(d)      Service of Process.  Each party hereto irrevocably consents to service of process in any action or proceeding arising out of or relating to any Loan Document, in the manner provided for notices (other than telecopier) in Section 6.01.  Nothing in this Agreement or any other Loan Document will affect the right of any party hereto to serve process in any other manner permitted by applicable Requirements of Law.

**SECTION 6.10    Waiver of Jury Trial**.

THE GUARANTOR HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE REQUIREMENTS OF LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**SECTION 6.11    Headings**.

Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

**SECTION 6.12    Obligations Absolute**.

To the fullest extent permitted by applicable Requirements of Law, all obligations of the Guarantor hereunder shall be absolute and unconditional irrespective of:

(a)      any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of any Loan Party;

(b)      any lack of validity or enforceability of any Transaction Document or any other agreement or instrument relating thereto against any Loan Party;

(c)      any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations, or any other amendment or waiver of or any consent to any departure from any Transaction Document or any other agreement or instrument relating thereto;

(d)      any exchange, release or failure to obtain or non-perfection of any other Collateral, or any release of the Guarantor or Loan Party, or any release or amendment or waiver of or consent to any departure from any guarantee, for all or any of the Guaranteed Obligations;

(e)      any exercise or non-exercise, or any waiver of any right, remedy, power or privilege under or in respect hereof or any Transaction Document; or

19



Case 1:19-cv-10786-LLS-KNF   Document 5-1   Filed 11/21/19   Page 50 of 92

(f)        any other circumstances which might otherwise constitute a defense available to, or a discharge of, the Loan Parties.

**SECTION 6.13    No Advisory or Fiduciary Responsibility**.

In connection with all aspects of each transaction contemplated hereby, the Guarantor acknowledges and agrees that:  (a) the credit facilities provided for under the Loan Documents and any related arranging or other services in connection therewith, and the Transactions and other transactions contemplated by the Loan Documents, any Transaction Documents to which any Secured Parties are party and any Hedging Agreements or Treasury Services Agreements with Secured Parties, are each arm's-length commercial transactions among the Companies and their respective Affiliates, on the one hand, and the Agents, the Lenders, the other Secured Parties and their respective Affiliates, on the other hand, and the Guarantor is capable of evaluating and understanding, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by such other Loan Documents, Transaction Documents, Hedging Agreements and Treasury Services Agreements (including any amendment, waiver or other modification hereof or thereof); (b) in connection with the process leading to the Transactions and such other transactions, each Agent, each Lender, each other Secured Party and each of their respective Affiliates is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary for any Loan Party or any of their respective Affiliates, stockholders, creditors or employees or any other person; (c) none of the Agents, any Lender, any other Secured Party or any Affiliate thereof has assumed or will assume an advisory, agency or fiduciary responsibility in favor of any Loan Party or any of their respective Affiliates with respect to any of the Transactions or any other transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any such other Transaction Document, Hedging Agreement or Treasury Services Agreement (irrespective of whether any Agent, any Lender, any other Secured Party or any Affiliate thereof has advised or is currently advising the any Loan Party or their respective Affiliates on other matters) and none of the Agents, any Lender, any other Secured Party or any Affiliate thereof has any obligation to any Loan Party or their respective Affiliates with respect to the Transactions or the other transactions contemplated hereby except those obligations expressly set forth herein and in such other Transaction Documents, Hedging Agreements or Treasury Services Agreements; (d) the Agents, the Lenders, the other Secured Parties and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Guarantor and the other Loan Parties and their respective Affiliates, and none of the Agents, any Lender, any other Secured Party or any Affiliate thereof has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (e) the Agents, the Lenders, the other Secured Parties and the Affiliates thereof have not provided and will not provide any legal, accounting, regulatory, tax, investment or other advice with respect to any of the Transactions or the other transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any such other Transaction Document, Hedging Agreement or Treasury Services Agreement) and the Guarantor has consulted its own legal, accounting, regulatory and tax advisors to the extent they deemed appropriate.  The Guarantor hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against the Agents, the Lenders, the other Secured Parties and their Affiliates with respect to any breach or alleged breach of agency or fiduciary duty.

[Signature Pages Follow]

OMM_US:74139845



IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

GREKA INTEGRATED, INC.

By: _____
Name: Susan M. Whalen
Title: Senior Vice President and General Counsel

UBS AG, LONDON BRANCH, as Administrative
Agent and Collateral Agent

By: _____
Name:
Title:

By: _____
Name:
Title:

(First Lien Greka Integrated Guaranty Agreement)

Case 1:19-cv-10786-LLS-KNF Document 5-1 Filed 11/21/19 Page 52 of 92

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

GREKA INTEGRATED, INC.

By: _____
Name: Susan M. Whalen
Title: Senior Vice President and General Counsel

UBS AG, LONDON BRANCH, as Administrative
Agent and Collateral Agent

By: _____
Name: Samuel Molinaro
Title: Group Managing Director

By: _____
Name: William W. Chandler
Title: Managing Director

[Signature Page to First Lien Greka Integrated Guaranty Agreement]

Schedule 3.05(a)
to
First Lien Greka Integrated Guaranty Agreement

## Equity Interests of Holdings

| Current Legal Entities Owned | Record Owner | Certificate No. | Membership Interest | Percent Pledged |
|---|---|---|---|---|
| GOGH, LLC | Greka Integrated, Inc. | n/a | 100% | 100% |

Schedule 3.06
to
First Lien Greka Integrated Guaranty Agreement

**Litigation**

None.

Schedule 3.07
to
First Lien Greka Integrated Guaranty Agreement

**Agreements**

Loan Documents

Second Lien Loan Documents

Amended and Restated Credit Agreement among Guarantor and GLR dated as of May 20__, 2016 related to the GLR Facility and the Guarantor's associated Guaranty and Collateral Agreement and promissory note.

Guarantee and Collateral Agreement among Guarantor, the other entities party thereto and Guggenheim Corporate Funding, LLC dated as of September 10, 2010 related to the Greka Refining Credit Facility.

**EXHIBIT A**

**OFFICER'S CERTIFICATE**

[See attached.]

**Exhibit A**

[Form of]
<u>OFFICER'S CERTIFICATE</u>

[            ], 20[  ]

Reference is made to (i) that certain First Lien Greka Integrated Guaranty Agreement dated as of May <u>20 </u>, 2016 (the "<u>First Lien Guaranty Agreement</u>"), among Greka Integrated, Inc., as guarantor ("<u>Greka Integrated</u>"), and UBS AG, London Branch, as administrative agent and collateral agent (in such capacities, the "<u>First Lien Agent</u>"), and (ii) that certain Second Lien Greka Integrated Guaranty Agreement dated as of May <u>20 </u>, 2016 (the "<u>Second Lien Guaranty Agreement</u>" and together with the First Lien Guaranty Agreement, the "<u>Guaranty Agreements</u>"), among Greka Integrated and UBS AG, London Branch, as administrative agent and collateral agent (in such capacities, the "<u>Second Lien Agent</u>" and together with the First Lien Agent, the "<u>Agents</u>"). Each capitalized term used but not defined herein has the meaning given to such term in the Guaranty Agreements.

This Officer's Certificate is being furnished pursuant to Section 4.01(e) of the Guaranty Agreements. The undersigned, [            ], does hereby certify that [s/he] is the duly elected, qualified and acting [_____] of Greka Integrated, and does hereby further certify (in [his/her] capacity as [_____] and not in [his/her] individual capacity), in the name of and on behalf of Greka Integrated, to the Agents, that with respect to the fiscal year ended December 31, 20[  ]:

1. Greka Refining had positive net income for such fiscal year:    Yes: _____   No: _____

2. Greka Refining had positive cash flow for such fiscal year:    Yes: _____   No: _____

3. There was no event of default (after giving effect to any grace period) during such fiscal year under any instrument or other agreement, in each case with respect to indebtedness for borrowed money or that is evidenced by a note, bond or other similar instrument of Greka Refining:    Yes: _____   No: _____

4. Greka Refining did not enter into, or increase the amount of its indebtedness for borrowed money (or that is evidenced by a note, bond or other similar instrument) under, any instrument or other agreement in each case with respect to intercompany indebtedness between or among Greka Refining and any of Greka Integrated and its other Affiliates ("<u>Intercompany Indebtedness</u>"), during such fiscal year, other than accrued and unpaid interest or fees:    Yes: _____   No: _____

OMM_US:74552699

Case 1:19-cv-10786-LLS-KNF   Document 5-1   Filed 11/21/19   Page 58 of 92

5.  Greka Refining did not enter into, or increase the amount of its indebtedness for borrowed money (or that is evidenced by a note, bond or other similar instrument) under, any instrument or other agreement, in each case with respect to indebtedness for borrowed money (or that is evidenced by a note, bond or other similar instrument) other than Intercompany Indebtedness, during such fiscal year and other than accrued and unpaid interest or fees:                                    Yes: _____   No: _____

6.  Has a confidentiality agreement, letter of intent, sale agreement, or similar instrument or agreement, with respect to a Greka Refining Asset Sale been executed?                                    Yes: _____   No: _____

[Signature page follows]

Exhibit A

OMM_US:74552699

FILED: NEW YORK COUNTY CLERK 10/21/2019 10:53 PM
NYSCEF DOC. NO. 5
INDEX NO. 656157/2019
RECEIVED NYSCEF: 10/21/2019

IN WITNESS WHEREOF, the undersigned has caused this Officer's Certificate to be duly executed as of the day and year first above written.

GREKA INTEGRATED, INC.

By:_____

Name:

Title:

OMM_US:74552699



# EXHIBIT 2

EXECUTION VERSION

**SECOND LIEN GREKA INTEGRATED GUARANTY AGREEMENT**

**dated as of May  20 , 2016,**

**among**

**GREKA INTEGRATED, INC.**

**as Guarantor,**

**and**

**UBS AG, LONDON BRANCH,**

**as Administrative Agent and Collateral Agent**

# TABLE OF CONTENTS

**Section**                                                                    **Page**

## ARTICLE I
## DEFINITIONS

Section 1.01    Defined Terms...................................................................1
Section 1.02    Resolution of Drafting Ambiguities. ..............................3

## ARTICLE II

Section 2.01    The Guarantee. ..................................................................3
Section 2.02    Obligations Unconditional. ...............................................3
Section 2.03    Reinstatement......................................................................5
Section 2.04    Subrogation; Subordination...............................................5
Section 2.05    Remedies..............................................................................5
Section 2.06    Instrument for the Payment of Money. ...........................5
Section 2.07    Continuing Guarantee. .......................................................5
Section 2.08    General Limitation on Guarantee Obligations. .............5
Section 2.09    Additional Waivers and Agreements. ..............................6

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

Section 3.01    Organization; Powers..........................................................7
Section 3.02    Authorization; Enforceability............................................7
Section 3.03    No Conflicts. .......................................................................7
Section 3.04    Financial Statements; Projections; Benefit.....................8
Section 3.05    Equity Interests and Subsidiaries......................................8
Section 3.06    Litigation; Compliance with Laws....................................9
Section 3.07    Agreements. .........................................................................9
Section 3.08    Taxes.....................................................................................9
Section 3.09    No Material Misstatements. .............................................10
Section 3.10    Solvency.............................................................................10
Section 3.11    Security Documents..........................................................10
Section 3.12    Anti-Terrorism and Related Laws...................................11

## ARTICLE IV
## AFFIRMATIVE COVENANTS

Section 4.01    Reporting Covenants.........................................................12
Section 4.02    Greka Refining Asset Sale ..............................................13

## ARTICLE V
## NEGATIVE COVENANTS

Section 5.01    Liens....................................................................................13

OMM_US:74315685

Section 5.02    Dividends. ........................................................................................... 13
Section 5.03    Greka Refining Asset Sale. .................................................................. 14
Section 5.04    Transactions with Affiliates. ............................................................... 14

## ARTICLE VI

## MISCELLANEOUS

Section 6.01    Notices. .............................................................................................. 14
Section 6.02    Waivers; Amendment. ........................................................................ 16
Section 6.03    Damage Waiver. ................................................................................. 16
Section 6.04    Successors and Assigns. ..................................................................... 16
Section 6.05    Survival of Agreement. ...................................................................... 17
Section 6.06    Counterparts; Integration; Effectiveness. .......................................... 17
Section 6.07    Severability. ....................................................................................... 17
Section 6.08    Right of Setoff. .................................................................................. 17
Section 6.09    Governing Law; Jurisdiction; Consent to Service of Process. ........... 18
Section 6.10    Waiver of Jury Trial. ......................................................................... 19
Section 6.11    Headings. ........................................................................................... 19
Section 6.12    Obligations Absolute. ........................................................................ 19
Section 6.13    No Advisory or Fiduciary Responsibility. .......................................... 20

EXHIBITS

Exhibit A                    Greka Refining Officer's Certificate

SCHEDULES

Schedule 3.05(a)             Equity Interests and Subsidiaries
Schedule 3.06                Litigation
Schedule 3.07                Agreements

OMM_US:74315685

## SECOND LIEN GREKA INTEGRATED GUARANTY AGREEMENT

This SECOND LIEN GREKA INTEGRATED GUARANTY AGREEMENT dated as of May 20, 2016 (as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this "**Agreement**" or this "**Guarantee**") made by GREKA INTEGRATED, INC. (the "**Guarantor**"), as guarantor, in favor of UBS AG, LONDON BRANCH, in its capacities as administrative agent and as collateral agent pursuant to the Credit Agreement (as hereinafter defined), for the benefit of the Secured Parties (as defined in the Credit Agreement) (in its capacity as administrative agent and together with any successors in such capacity, the "**Administrative Agent**" and in its capacity as collateral agent and together with any successors in such capacity, the "**Collateral Agent**").

## R E C I T A L S

A.      The Borrowers, Holdings, the Administrative Agent, the Collateral Agent and the lenders thereunder have, in connection with the execution and delivery of this Agreement, entered into that certain second lien credit agreement, dated as of May 20, 2016 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"; which term shall also include and refer to any increase in the amount of indebtedness under the Credit Agreement and any refinancing or replacement of the Credit Agreement (whether under a bank facility, securities offering or otherwise) or one or more successor or replacement facilities whether or not with a different group of agents or lenders (whether under a bank facility, securities offering or otherwise) and whether or not with different obligors upon the Administrative Agent's acknowledgment of the termination of the predecessor Credit Agreement).

B.      The Guarantor will receive substantial benefits from the execution, delivery and performance of the obligations under the Credit Agreement and the other Loan Documents and is, therefore, willing to enter into this Agreement.

C.      The Guarantor is willing irrevocably and unconditionally to guaranty the Secured Obligations as and to the extent provided herein.

## AGREEMENT

NOW THEREFORE, based upon the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in order to induce Lenders to enter into the Credit Agreement and to make Loans and other extensions of credit thereunder, the Guarantor hereby agrees as follows:

### ARTICLE I
### DEFINITIONS

SECTION 1.01      Defined Terms.

(a)      Terms used but not otherwise defined herein that are defined in the Credit Agreement shall have the meanings given to them in the Credit Agreement. Sections 1.03 and 1.05 of the

Credit Agreement shall apply herein *mutatis mutandis*.

(b)       The following terms shall have the following meanings:

"**Administrative Agent**" shall have the meaning assigned to such term in the preamble.

"**Agreement**" shall have the meaning assigned to such term in the preamble.

"**Collateral Agent**" shall have the meaning assigned to such term in the preamble.

"**Credit Agreement**" shall have the meaning assigned to such term in the recitals.

"**Greka Collateral**" shall mean all property pledged or granted as collateral pursuant to the Greka Security Agreement from time to time.

"**Greka Refining**" shall mean Greka Refining Company (formerly known as Santa Maria Refining Company), a California corporation.

"**Greka Refining Asset Sale**" shall mean the conveyance, sale, transfer or other disposition (including by way of merger or consolidation or a dividend or other distribution) of (i) any Equity Interests in Greka Refining or (ii) all or substantially all, or any substantial part, of the assets of Greka Refining, including, without limitation, the sale of the refinery of Greka Refining.

"**Greka Refining Credit Facility**" shall mean the Credit Agreement, dated as of September 10, 2010, to which Greka Refining is a party, as such agreement may be amended, supplemented, restated, modified, refinanced or otherwise replaced from time to time.

"**Guarantee**" shall have the meaning assigned to such term in the preamble.

"**Guaranteed Obligations**" shall have the meaning assigned to such term in <u>Section 2.01</u>.

"**Guarantor**" shall have the meaning assigned to such term in the preamble.

"**Net Proceeds**" shall mean the proceeds received by the Guarantor, Greka Refining or any of their respective Affiliates (including cash proceeds subsequently received in respect of non-cash consideration initially received) in respect of a Greka Refining Asset Sale net, solely in the case of a Greka Refining Asset Sale to a Person that is not the Guarantor or an Affiliate of the Guarantor, of (i) selling expenses paid or payable to an unrelated third party (including reasonable brokers' fees or commissions, legal, accounting and other professional and transactional fees, transfer and similar taxes and the Guarantor's good faith estimate of income taxes actually paid or payable in connection with such Greka Refining Asset Sale); (ii) amounts provided as a reserve, in accordance with GAAP, against (x) any liabilities under any indemnification obligations associated with any Greka Refining Asset Sale to an unrelated third party, or (y) any other liabilities retained by the Guarantor associated with the properties sold in any Greka Refining Asset Sale to an unrelated third party (excluding any liabilities owed to any Affiliates) (*provided* that, to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Proceeds); (iii) the Guarantor's good faith estimate of payments required to be made with respect to unassumed liabilities relating to the properties sold within 90 days of any Greka Refining Asset Sale (excluding liabilities owed to any Affiliate) (*provided* that, to the extent

2

Case 1:19-cv-10786-LLS-KNF   Document 5-1   Filed 11/21/19   Page 66 of 92

such cash proceeds are not used to make payments in respect of such unassumed liabilities within 90 days of such Greka Refining Asset Sale, such cash proceeds shall constitute Net Proceeds); and (iv) the principal amount, premium or penalty, if any, interest and other amounts outstanding under the Greka Refining Credit Facility which are secured by a Lien on the properties sold in any Greka Refining Asset Sale and which are repaid with such proceeds (other than any such Indebtedness assumed by any purchaser of such properties).

### SECTION 1.02    Resolution of Drafting Ambiguities.

The Guarantor acknowledges and agrees that it was represented by counsel in connection with the execution and delivery of this Agreement and the other Loan Documents to which it is a party, that it and its counsel reviewed and participated in the preparation and negotiation hereof and thereof and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation hereof or thereof.

### ARTICLE II

### SECTION 2.01    The Guarantee.

The Guarantor hereby guarantees to each Secured Party and their respective successors and assigns, the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of the principal of and interest on (including any interest, fees, costs or charges that would accrue but for the provisions of the Title 11 of the United States Code after any bankruptcy or insolvency petition under Title 11 of the United States Code) the Loans made by the Lenders to, and the Notes held by each Lender of, Borrowers, and all Performance Payments, Make-Whole Payments, Final Settlement Amount (including any Remaining Payments) and other Secured Obligations from time to time owing to the Secured Parties by any other Loan Party under any other Loan Document or by any other Loan Party under any Hedging Agreement or Treasury Services Agreement entered into with a counterparty that is a Secured Party (provided that, in the case of any Hedging Agreement, the Required Lenders shall have consented to such counterparty being a Secured Party with respect to Hedging Agreements), in each case strictly in accordance with the terms thereof (such obligations being herein collectively called the "**Guaranteed Obligations**").  The Guarantor hereby agrees that if a Borrower or another Company shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, the Guarantor will promptly pay the same in cash, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.  The liability of the Guarantor under this Guarantee is a primary, and not secondary, obligation of such Guarantor.

### SECTION 2.02    Obligations Unconditional.

The obligations of the Guarantor under Section 2.01 shall constitute a guaranty of payment and, to the fullest extent permitted by applicable Requirements of Law, are absolute, irrevocable and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations of Borrowers and other Loan Parties under the Credit Agreement, the Notes, if any, the Guaranty Agreement or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed

3

Obligations, and, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or a Guarantor (except for payment in full). Without limiting the generality of the foregoing, it is agreed that, to the fullest extent permitted by applicable Requirements of Law, the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantor hereunder which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

      (i)     at any time or from time to time, without notice to the Guarantor, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

      (ii)    any of the acts mentioned in any of the provisions of this Agreement, the Credit Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein shall be done or omitted;

      (iii)   the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Loan Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

      (iv)   any Lien or security interest granted to any Lender, Agent or other Secured Party as security for any of the Guaranteed Obligations shall fail to be perfected; or

      (v)    the release of the Guarantor or any other guarantor that provides a Guarantee.

The Guarantor hereby expressly waives, to the fullest extent allowed by applicable Requirements of Law, diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that any Secured Party exhaust any right, power or remedy or proceed against either Borrower under this Agreement, the Credit Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein, or against any other person under any other guarantee of, or security for, any of the Guaranteed Obligations. The Guarantor waives, to the fullest extent permitted by applicable Requirements of Law, any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by any Secured Party upon this Guarantee or acceptance of this Guarantee, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all dealings between Borrowers and the Secured Parties shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee. This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by Secured Parties, and the obligations and liabilities of the Guarantor hereunder shall not be conditioned or contingent upon the pursuit by the Secured Parties or any other person at any time of any right or remedy against Borrowers or against any other person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto. This Guarantee shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantor and the successors and assigns thereof, and shall inure to the benefit of the Secured Parties, and their respective successors and assigns, notwithstanding that from time to time during the term of this Agreement there may be no Guaranteed Obligations

4

OMM_US:74315685



outstanding.

### SECTION 2.03      Reinstatement.

The obligations of the Guarantor under this Guarantee shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of any Loan Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

### SECTION 2.04      Subrogation; Subordination.

The Guarantor hereby agrees that until the indefeasible payment and satisfaction in full in cash of all Guaranteed Obligations it shall waive any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in Section 2.01, whether by subrogation or otherwise, against any of the Borrowers, Holdings or any other guarantor of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations.  Any Indebtedness of any Loan Party or Subsidiary owing to the Guarantor shall be subordinated to the Secured Obligations in the manner set forth in the Intercompany Note evidencing such Indebtedness.

### SECTION 2.05      Remedies.

The Guarantor agrees that, as between the Guarantor and the Lenders and Agents, the obligations of Borrowers under the Credit Agreement and the Notes, if any, may be declared to be forthwith due and payable as provided in Section 7.01 of the Credit Agreement (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 7.01 of the Credit Agreement) for purposes of Section 2.01, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against a Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by a Borrower) shall forthwith become due and payable by the Guarantor for purposes of Section 2.01.

### SECTION 2.06      Instrument for the Payment of Money.

The Guarantor hereby acknowledges that the guarantee in this Agreement constitutes an instrument for the payment of money, and consents and agrees that any Lender, Agent or other Secured Party, at its sole option, in the event of a dispute by such Guarantor in the payment of any moneys due hereunder, shall have the right to bring a motion-action under New York CPLR Section 3213.

### SECTION 2.07      Continuing Guarantee.

The guarantee in this Agreement is a continuing guarantee of payment, and shall apply to all Guaranteed Obligations whenever arising.

### SECTION 2.08      General Limitation on Guarantee Obligations.

In any action or proceeding involving any state corporate limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of the Guarantor under Section 2.01 would otherwise be held or determined to be void, voidable, invalid or unenforceable, or

5

subordinated to the claims of any other creditors, on account of the amount of its liability under Section 2.01, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by the Guarantor, any Loan Party or any other person, be automatically limited and reduced to the highest amount that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

### SECTION 2.09    Additional Waivers and Agreements.

Notwithstanding any provisions of this Agreement or the other Loan Documents to the contrary, the Guarantor further irrevocably and unconditionally waives each of the following, to the fullest extent permitted by applicable Requirements of Law:

(i)  any defense based upon invalidity, irregularity or unenforceability of the Guaranteed Obligations as against any Borrower or any other Person, or any discharge or limitation of the liability of any Borrower or any other Person, or any restraint or stay applicable to actions against any Borrower, whether such disability, limitation or restraint or stay is consensual, or by order of a court or other governmental authority, or arising by operation of law or any liquidation, receivership, bankruptcy, or other debtor-relief proceeding (except, in each case, for payment in full);

(ii)  any rights of the Guarantor of subrogation, reimbursement, indemnification, and/or contribution against any Borrower or any other Person (*provided* that subsequent to indefeasible payment and satisfaction in full in cash of all Guaranteed Obligations, the Guarantor may pursue such rights to the extent permitted by Section 2.04 of this Agreement), and any other rights or defenses that are or may become available to such Guarantor or any other Person by reason of Sections 2787-2855, inclusive of the California Civil Code;

(iii) any rights or defenses that may be available by reason of any election of remedies by a Secured Party (including, without limitation, any such election which in any manner impairs, effects, reduces, releases, destroys or extinguishes the Guarantor's subrogation rights, rights to proceed against any Borrower for reimbursement, or any other rights of the Guarantor to proceed against any other Person or security (e.g., an election which destroys the Guarantor's rights of subrogation or reimbursement against any Borrower or any other Person by operation of Section 580d of the California Code of Civil Procedure or otherwise)); and

(iv)  if the Guaranteed Obligations are secured by real property or an estate for years, the Guarantor further waives any rights or defenses such Guarantor may have because the Guaranteed Obligations are secured by real property or an estate for years. These rights or defenses include, but are not limited to, any rights or defenses based upon, directly or indirectly, any of Section 580a, 580b, 580d or 726 of the California Code of Civil Procedure.

The foregoing provisions of this Agreement mean, among other things, that, to the fullest extent permitted by applicable Requirements of Law (a) a Secured Party may collect from the Guarantor without first foreclosing on any real or personal property Collateral pledged by any Borrower or any other guarantor or Person for the Guaranteed Obligations; and (b) if a Secured Party forecloses on a real property pledged by any Borrower or Person: (1) the amount of the Guaranteed Obligations may be reduced only by the price for which the Collateral sold at the foreclosure sale, even if the Collateral was worth more than the sale price; and (2) the Secured Parties may collect from the Guarantor even if the Secured Parties, by foreclosing on the real property Collateral, have destroyed any right of the Guarantor

6

Case 1:19-cv-10786-LLS-KNF Document 5-1 Filed 11/21/19 Page 70 of 92

or Persons to collect from any Borrower or any other guarantor or Person.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

### SECTION 3.01 <u>Organization; Powers</u>.

The Guarantor (a) is duly organized and validly existing under the laws of the jurisdiction of its organization, (b) has all requisite corporate power and authority to carry on its business as now conducted and to own and lease its property and (c) is qualified and in good standing (to the extent such concept is applicable in the applicable jurisdiction) to do business in every jurisdiction where such qualification is required, except in such jurisdictions where the failure to so qualify or be in good standing, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. There is no existing default under any Organizational Document of the Guarantor or any event which, with the giving of notice or passage of time or both, would constitute a default by any party thereunder.

### SECTION 3.02 <u>Authorization; Enforceability</u>.

The Transactions to be entered into by the Guarantor are within its powers and have been duly authorized by all necessary action on the part of the Guarantor. Each of this Agreement and the Greka Security Agreement has been duly executed and delivered by the Guarantor and constitutes, and when executed and delivered by the Guarantor, will constitute, a legal, valid and binding obligation of the Guarantor, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

### SECTION 3.03 <u>No Conflicts</u>.

The transactions contemplated by this Guarantee and the Greka Security Agreement (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except (i) such as have been obtained or made and are in full force and effect and (ii) consents, approvals, registrations, filings, permits or actions the failure to obtain or perform which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, (b) will not violate the Organizational Documents of the Guarantor, (c) will not violate any Requirement of Law in any material respect, (d) will not violate or result in a default or require any consent or approval under any indenture, agreement or other instrument, in each case with respect to Indebtedness of Greka Integrated or any of its Subsidiaries, binding upon the Guarantor or any of its Subsidiaries or its or their respective properties, or give rise to a right thereunder to require any payment to be made by the Guarantor, (e) will not in any material respect violate or result in a default or require any consent or approval under any agreement or other instrument (other than with respect to Indebtedness of the Guarantor or any of its Subsidiaries) binding upon the Guarantor or any of its Subsidiaries or its or their respective properties, or give rise to a right thereunder to require any payment to be made by the Guarantor, and (f) will not result in the creation or imposition of any Lien on any property of the Guarantor or any of its Subsidiaries, except Liens created by the Loan Documents and Permitted Liens.

OMM_US:74315685



**SECTION 3.04    Financial Statements; Projections; Benefit.**

(a)    Historical Financial Statements.  The Guarantor has heretofore delivered to the Administrative Agent the consolidated balance sheets and related consolidated statements of income, stockholders' equity and cash flows of the Guarantor and its Subsidiaries, (i) as of and for the fiscal years ended December 31, 2012, December 31, 2013 and December 31, 2014, audited by and accompanied by the unqualified opinion of BDO Seidman, independent public accountants (except in the case of the 2014 financial statements of the Borrowers), and (ii) as of and for the six-month period ended June 30, 2015 and for the comparable period of the preceding fiscal year, in each case, certified by the chief financial officer of the Guarantor.  Such financial statements have been prepared in accordance with GAAP and present fairly and accurately the financial condition and results of operations and cash flows of the Guarantor and its Subsidiaries as of the dates and for the periods to which they relate.

(b)    No Liabilities.  Except as set forth in the financial statements referred to in Section 3.04(a), there are no liabilities of the Guarantor or any of its consolidated subsidiaries of any kind, whether accrued, contingent, absolute, determined, determinable or otherwise, which could, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, and the Guarantor knows of no existing condition, situation or set of circumstances which could reasonably be expected to result in such a liability, other than liabilities under the Loan Documents, the First Lien Loan Documents and the GLR Facility.  Since December 31, 2014, there has been no event, change, circumstance or occurrence that, individually or in the aggregate, has had or could reasonably be expected to result in a Material Adverse Effect.

**SECTION 3.05    Equity Interests and Subsidiaries.**

(a)    Equity Interests.  Schedule 3.05(a) sets forth the number of each class of Equity Interests of Holdings authorized, and the number outstanding, on the Closing Date and the number of shares covered by all outstanding options, warrants, rights of conversion or purchase and similar rights at the Closing Date.  All Equity Interests of Holdings are duly and validly issued and are fully paid and non-assessable, and each of Holdings and Greka Refining is a Wholly Owned Subsidiary of the Guarantor. The Guarantor is the record and beneficial owner of, and has good and marketable title to, the Equity Interests pledged by it under the Greka Security Agreement, free of any and all Liens, rights or claims of other persons, except the security interest created by the Security Documents and the First Lien Security Documents, and there are no outstanding warrants, options or other rights to purchase, or shareholder, voting trust or similar agreements outstanding with respect to, or property that is convertible into, or that requires the issuance or sale of, any such Equity Interests.

(b)    No Consent of Third Parties Required.  No consent of any person including any other general or limited partner, any other member of a limited liability company, any other shareholder or any other trust beneficiary is necessary or reasonably desirable (from the perspective of a secured party) in connection with the creation, perfection or second priority status of the security interest of the Collateral Agent (second only to the Liens of the First Lien Collateral Agent under the First Lien Security Documents) in any Equity Interests pledged to the Collateral Agent for the benefit of the Secured Parties under the Greka Security Agreement or the exercise by the Collateral Agent of the voting or other rights provided for in the Greka Security Agreement or the exercise of remedies in respect thereof.

8

**SECTION 3.06    Litigation; Compliance with Laws**.

Except as disclosed in Schedule 3.06 hereof, there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority now pending or, to the knowledge of the Guarantor, threatened against or affecting the Guarantor or any business, property or rights of the Guarantor (i) that involve this Guarantee or the Greka Security Agreement or (ii) that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or result in liabilities or other obligations of the Guarantor, in the aggregate, of more than $2.5 million.  None of the Guarantor nor any of its property is in violation of, nor will the continued operation of its property as currently conducted violate, any Requirements of Law (including any zoning or building ordinance, code or approval or any building permits) or any restrictions of record or agreements affecting any of the Guarantor's Real Property or is in default with respect to any Requirement of Law, where such violation or default, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

**SECTION 3.07    Agreements**.

The Guarantor is not a party to any agreement or instrument or subject to any corporate or other constitutional restriction that, individually or in the aggregate, has resulted or could reasonably be expected to result in a Material Adverse Effect.  The Guarantor is not in default in any manner under any provision of any indenture or other agreement or instrument evidencing Indebtedness, or any other agreement or instrument to which it is a party or by which it or any of its property is or may be bound, where such default, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect, and no condition exists which, with the giving of notice or the lapse of time or both, would constitute such a default.  Schedule 3.07 accurately and completely lists all material agreements (other than customary oil and gas leases and other leases of Real Property) to which the Guarantor is a party which are in effect on the date hereof in connection with the operation of the business conducted thereby and, to the extent requested by the Administrative Agent, the Guarantor has delivered to the Administrative Agent complete and correct copies of all such material agreements, including any amendments, supplements or modifications with respect thereto, and all such agreements are in full force and effect.

**SECTION 3.08    Taxes**.

The Guarantor has (a) timely filed or caused to be timely filed all federal Tax Returns and all material state, local and foreign Tax Returns required to have been filed by it and all such Tax Returns are true and correct in all material respects, (b) duly and timely paid, collected or remitted or caused to be duly and timely paid, collected or remitted all Taxes (whether or not shown on any Tax Return) due and payable, collectible or remittable by it and all assessments received by it, except Taxes (i) that are being contested in good faith by appropriate proceedings and for which the Guarantor has set aside on its books adequate reserves in accordance with GAAP or (ii) which could not, individually or in the aggregate, have a Material Adverse Effect  and (c) satisfied all of its withholding Tax obligations except for failures that could not be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect. The Guarantor and each Subsidiary thereof has made adequate provision in accordance with GAAP for all material Taxes not yet due and payable.  The Guarantor is not aware of any proposed or pending Tax assessments, deficiencies or audits that could be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect.  Except as could not be reasonably expected to, individually or in the

9

aggregate, result in a Material Adverse Effect, the Guarantor has not ever "participated" in a "listed transaction" within the meaning of Treasury Regulation Section 1.6011-4.

**SECTION 3.09**   **No Material Misstatements**.

No information, report, financial statement, certificate, exhibit or schedule furnished by or on behalf of the Guarantor to the Administrative Agent or any Lender in connection with the negotiation of any Loan Document or included therein or delivered pursuant thereto, taken as a whole, contained or contains any material misstatement of fact or omitted or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were or are made, not misleading as of the date such information is dated or certified; *provided* that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection, the Guarantor represents only that it acted in good faith and utilized reasonable assumptions in the preparation of such information, report, financial statement, exhibit or schedule.

**SECTION 3.10**   **Solvency**.

Immediately after the consummation of the Transactions to occur on the Closing Date and immediately following the making of each Loan and after giving effect to the application of the proceeds of each Loan, (a) the fair value of the properties of the Guarantor (individually and on a consolidated basis with its subsidiaries) will exceed its debts and liabilities, subordinated, contingent or otherwise; (b) the present fair saleable value of the property of the Guarantor (individually and on a consolidated basis with its subsidiaries) will be greater than the amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (c) the Guarantor (individually and on a consolidated basis with its subsidiaries) will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (d) the Guarantor (individually and on a consolidated basis with its subsidiaries) will not have unreasonably small capital with which to conduct its business in which it is engaged as such business is now conducted and is proposed to be conducted following the Closing Date.

**SECTION 3.11**   **Security Documents**.

The Greka Security Agreement is effective to create in favor of the Collateral Agent for the benefit of the Secured Parties, legal, valid and enforceable Liens on, and security interests in, the Greka Collateral and, when (i) financing statements and other filings in appropriate form are filed in the offices specified on <u>Schedule 6</u> to the Perfection Certificate and (ii) upon the taking of possession or control by the Collateral Agent of the Greka Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Collateral Agent to the extent possession or control by the Collateral Agent is required by the Greka Security Agreement), the Liens created by the Greka Security Agreement shall constitute fully perfected Liens on, and security interests in, all right, title and interest of the grantor in the Greka Collateral (other than such Greka Collateral in which a security interest cannot be perfected under the UCC as in effect at the relevant time in the relevant jurisdiction), in each case subject to no Liens other than Liens of the First Lien Collateral Agent under the First Lien Loan Documents and Permitted Collateral Liens.

OMM_US:74315685



### SECTION 3.12    Anti-Terrorism and Related Laws.

(a)    The Guarantor has not and, to its knowledge, none of its Affiliates and none of its respective owners, officers, directors, brokers or agents has, (i) violated or is in violation of Sanctions Laws or Anti-Money Laundering Laws or (ii) been convicted of, has been charged with, or is under investigation by, a Governmental Authority for violations of Sanctions Laws, Anti-Money Laundering Laws or any other Requirements of Law.  The Guarantor has instituted and maintained, and will continue to maintain, in effect, policies and procedures designed to promote and achieve compliance with Sanctions Laws and Anti-Money Laundering Laws and with the representations, warranties and covenants contained in this Section 3.12.

(b)    Neither the Guarantor, nor, to its knowledge, any of its Affiliates, owners, officers, directors, brokers or agents, in each case, acting or benefitting in any capacity in connection with the Loans, is (i) a Sanctioned Person, (ii) a shell bank or (iii) subject to special measures because of money laundering concerns under Section 311 of the USA PATRIOT Act and its implementing regulations.

(c)    Neither the Guarantor, nor, to its knowledge, any of its Affiliates, owners, officers, directors, brokers or agents, in each case, acting or benefitting in any capacity in connection with the Loans, (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Sanctioned Person, (ii) deals in, or otherwise engages in any transaction related to, any Sanctioned Person, any property or interests in property of a Sanctioned Person or otherwise blocked pursuant to any Sanctions Law or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any Sanctions Law.

(d)    The Guarantor will not, directly or indirectly, use the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner other person, (i) to fund any activities or business of or with any Sanctioned Person, or in any country or territory that, at the time of such funding is, or whose government is, the subject of any Sanctions, (ii) to facilitate any unlawful activity or (iii) in any other manner that would result in a violation of Sanctions by any person (including any person participating in the Loans, whether as lender, underwriter, advisor, investor or otherwise).

(e)    Neither the Guarantor, nor, to its knowledge, any of its Affiliates, owners, officers, directors, brokers or agents, in each case, acting or benefitting in any capacity in connection with the Loans, has taken or will take any action in furtherance of, nor will any proceeds of the Loans be used, directly or indirectly, in furtherance of, an offer, payment, promise to pay, or authorization or approval of the payment or giving of money, property, gifts or anything else of value, directly or indirectly, to any "government official" (including any officer or employee of a government or government-owned or controlled entity or of a public international organization (e.g. the International Monetary Fund or World Bank), or any person acting in an official capacity for or on behalf of any of the foregoing, or any political party or party official or candidate for political office) to influence official action or secure an improper advantage or otherwise in any manner which results in violation of the U.S. Federal Corrupt Practices Act of 1977, as amended, the UK Bribery Act 2010 and the rules and regulations thereunder or any other applicable Requirements of Law relating to anti-corruption or anti-bribery (collectively, "**Anti-Corruption Laws**"); and the Guarantor has conducted its business in compliance with Anti-Corruption Laws and has instituted and maintained and will continue to maintain policies and procedures designed to

11



Case 1:19-cv-10786-LLS-KNF   Document 5-1   Filed 11/21/19   Page 75 of 92

promote and achieve compliance with such Anti-Corruption Laws and with the representations, warranties and covenants contained herein.

## ARTICLE IV
## AFFIRMATIVE COVENANTS

The Guarantor covenants and agrees that, so long as any part of the Guaranteed Obligations (other than contingent obligations to the extent no claim giving rise thereto has been asserted) shall remain unpaid, unless the Majority Lenders shall otherwise consent in writing, the Guarantor will:

**SECTION 4.01**     **Reporting Covenants**.

Furnish to the Administrative Agent:

(a)     Annual Reports.  As soon as available and in any event within 120 days (or in the case of the 2015 fiscal year 180 days) after the end of each fiscal year, beginning with the fiscal year ending December 31, 2015, the consolidated balance sheets of the Guarantor and its Subsidiaries as of the end of such fiscal year and related consolidated statements of income, cash flows and stockholders' equity for such fiscal year, in comparative form with such financial statements as of the end of, and for, the preceding fiscal year, and notes thereto, all prepared in accordance with Regulation S-X and accompanied by an opinion of BDO Seidman or other independent public accountants of recognized national standing satisfactory to the Administrative Agent (which opinion shall not be qualified as to scope or contain any going concern or other qualification), stating that such financial statements fairly present, in all material respects, the financial condition, results of operations and cash flows of the Guarantor and its Subsidiaries as of the dates and for the periods specified in accordance with GAAP.

(b)     Quarterly Reports.  As soon as available and in any event within 60 days after the end of each of the first three fiscal quarters of each fiscal year, beginning with the fiscal quarter ending June 30, 2016, the consolidated balance sheets of the Guarantor and its Subsidiaries as of the end of such fiscal quarter and related consolidated statements of income and cash flows for such fiscal quarter and for the then elapsed portion of the fiscal year, in comparative form with the consolidated statements of income and cash flows for the comparable periods in the previous fiscal year, and notes thereto, all prepared in accordance with Regulation S-X under the Securities Act and accompanied by a certificate of a Financial Officer stating that such financial statements fairly present, in all material respects, the financial condition, results of operations and cash flows of the Guarantor and its Subsidiaries as of the date and for the periods specified in accordance with GAAP consistently applied, and on a basis consistent with audited financial statements referred to in clause (a)(i) of this Section 4.01, subject to normal year-end audit adjustments.

(c)     Notice of Greka Refining Asset Sales.  On or prior to the date that is not less than ten (10) Business Days prior to any Greka Refining Asset Sale, provide notice of such Greka Refining Asset Sale together with any agreements entered into in connection therewith to the Administrative Agent.  The Guarantor shall provide copies to the Administrative Agent of all agreements and documents entered into in connection with any Greka Refining Asset Sale.

(d)     Certification of Net Proceeds.  Concurrent with the consummation of any Greka Refining Asset Sale, a certification that sets forth all Net Proceeds of such Greka Refining Asset Sale,

12

OMM_US:74315685

including any amounts referred to in clauses (i) through (iii) of the definition of Greka Refining Asset Sale.

(e)   Officer's Certificate.  Concurrent with the delivery of any annual report pursuant to Section 4.01(a), a certificate of a Financial Officer of the Guarantor, substantially in the form of Exhibit A, attesting to the financial condition of the refinery of Greka Refining; *provided* that the Guarantor shall be deemed to have delivered such certificate for purposes of this Agreement upon delivery of a certificate substantially in the form of Exhibit A to the First Lien Agent (as defined in such certificate).

(f)   Other Information.  Promptly, from time to time, provide such other information regarding the operations, business affairs and financial condition of the Guarantor, or compliance with the terms of this Agreement, as the Administrative Agent or any Lender may reasonably request.

SECTION 4.02   **Greka Refining Asset Sale**.  Subject to Discharge of First Lien Obligations, not later than five (5) Business Days following receipt of any Net Proceeds from any Greka Refining Asset Sale, pay to the Administrative Agent an aggregate amount equal to 100% of such Net Proceeds, which payment will be applied as a prepayment of the Loans in accordance with Sections 2.10(h) and (i) of the Credit Agreement, it being understood that the obligation of the Guarantor under this Section 4.02 shall be unconditional and shall not be affected by any other Indebtedness or Lien of the Guarantor or any of its Affiliates (other than the Indebtedness and Liens described in clause (iv) of the definition of Net Proceeds to the extent such Greka Refining Asset Sale is to a Person that is not the Guarantor or an Affiliate of the Guarantor).

# ARTICLE V

# NEGATIVE COVENANTS

The Guarantor covenants and agrees that, so long as any part of the Guaranteed Obligations (other than contingent obligations to the extent no claim giving rise thereto has been asserted) shall remain unpaid, unless the Majority Lenders shall otherwise consent in writing, such Guarantor will not:

SECTION 5.01   **Liens**.

Create, incur, assume or permit to exist any Lien on any of the Greka Collateral other than Liens securing the payment of any Secured Obligations or Secured Obligations (as defined in the First Lien Credit Agreement).

SECTION 5.02   **Dividends**.

Authorize, declare or pay, directly or indirectly, any Dividends that are comprised of (a) any Net Proceeds of any Greka Refining Asset Sale, (b) any Equity Interests in Greka Refining or (c) all or substantially all, or any substantial part, of the assets of Greka Refining, including, without limitation, the sale of the refinery of Greka Refining.

OMM_US:74315685

**SECTION 5.03    Greka Refining Asset Sale.**

Conduct or permit a Greka Refining Asset Sale unless the Net Proceeds thereof are applied in accordance with Section 4.02 hereof.

**SECTION 5.04    Transactions with Affiliates.**

Enter into or permit any Greka Refining Asset Sale with any Affiliate.

## ARTICLE VI

## MISCELLANEOUS

**SECTION 6.01    Notices.**

(a)    Generally.  Except as provided in paragraph (b) below, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows:

(i)    if to the Guarantor, at:

GREKA INTEGRATED, INC.
630 Fifth Avenue, Suite 2410
New York, NY 10111
Telecopier No.:  (212) 218-4679
With a soft copy via email to: vab@greka.com

With a hard copy to:

GREKA INTEGRATED, INC.
P.O. Box 5489
Santa Maria, CA 93456
Attention:  SVP and General Counsel
Telecopier No.:  (805) 347-1072
With a soft copy via email to: smw@greka.com

(ii)    if to the Administrative Agent or the Collateral Agent, at:

UBS AG, London Branch
100 Liverpool Street
London EC2M 2RH
Attention:  Structured Finance Processing
Fax: 44 20 7568 3978
Telephone: 44 20 7568 5584 / 0502
Email:  Loansagency@ubs.com and ol-bpsdocs-emea@ubs.com (No notices to be emailed to these addresses)

(iii)    if to a Lender, to it at its address (or telecopier number) set forth in its Administrative Questionnaire.

14



(iv)    if to any other Secured Party, to it at its address on file with the Administrative Agent.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when received or, if verified by a dated transmission receipt, when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient).  Notices delivered through electronic communications to the extent provided in paragraph (b) below, shall be effective as provided in said paragraph (b).  Any party hereto may change its address or telecopier number for notices and other communications hereunder by written notice to the Guarantors and the Administrative Agent.

(b)    Electronic Communications.  An Agent or the Guarantor may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it (including pursuant to the provisions of this Section 6.01); *provided* that approval of such procedures may be limited to particular notices or communications.

The Guarantor hereby agrees that it will provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent or other Secured Parties pursuant to this Agreement and any other Loan Document, including all notices, requests, financial statements, financial and other reports, certificates and other information materials (the "**Communications**"), by transmitting them in an electronic medium in a format reasonably acceptable to the Administrative Agent at loansagency@ubs.com, or at such other e-mail address(es) provided to the Guarantor from time to time or in such other form as the Administrative Agent shall require.  In addition, the Guarantor agrees to continue to provide the Communications to the Administrative Agent in the manner specified in this Agreement or any other Loan Document or in such other form as the Administrative Agent shall require.  Nothing in this Section 6.01 shall prejudice the right of the Agents, any other Secured Party or any Loan Party to give any notice or other communication pursuant to this Agreement or any other Loan Document in any other manner specified in this Agreement or any other Loan Document or as any such Agent shall require.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

To the extent consented to by the Administrative Agent in writing from time to time, the Administrative Agent agrees that receipt of the Communications by the Administrative Agent at its e-mail address(es) set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents.

(c)    Platform.  The Guarantor further agrees that any Agent may make the

15

OMM_US:74315685

Communications available to the Lenders and other Secured Parties by posting the Communications on SyndTrak or a substantially similar secure electronic transmission system (the "**Platform**"). The Platform is provided "as is" and "as available." The Agents do not warrant the accuracy or completeness of the Communications, or the adequacy of the Platform and expressly disclaim liability for errors or omissions in the communications. No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects, is made by any Agent in connection with the Communications or the Platform. In no event shall any Agent or any of its Related Parties have any liability to the Companies, any Lender or any other person for damages of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of any Loan Party's or such Agent's transmission of communications through the Internet, except to the extent the liability of such person is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such person's gross negligence or willful misconduct.

### SECTION 6.02   Waivers; Amendment.

(a)      Generally.  No failure or delay by any Agent or any other Secured Party in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of each Agent and the other Secured Parties hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by the Guarantor therefrom shall in any event be effective unless the same shall be permitted by this Section 6.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether any Agent or any Lender may have had notice or knowledge of such Default at the time.

(b)      Required Consents.  Neither this Agreement nor any provision hereof may be waived, amended, supplemented or modified except, pursuant to an agreement or agreements in writing entered into by the Agents and the Guarantor, with the written consent of the Majority Lenders or, to the extent required by Section 9.02(b) of the Credit Agreement, each Lender.

### SECTION 6.03   Damage Waiver.

To the fullest extent permitted by applicable Requirements of Law, the Guarantor shall not assert, and the Guarantor hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof. No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

### SECTION 6.04   Successors and Assigns.

16

The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted by the Credit Agreement, except that the Guarantor may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent, the Collateral Agent and each Lender (and any other attempted assignment or transfer by the Guarantor shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any person (other than the parties hereto and the other Secured Parties and their respective successors and assigns permitted hereby) any legal or equitable right, remedy or claim under or by reason of this Agreement.

### SECTION 6.05    Survival of Agreement.

All covenants, agreements, representations and warranties made by the Guarantor in this Agreement and the other Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Agents, the Collateral Sub-Agent or any Other Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan, Performance Payment, Make-Whole Payment or Final Settlement Amount (including any Remaining Payments), or any fee or any other amount payable under this Agreement is outstanding and unpaid.

### SECTION 6.06    Counterparts; Integration; Effectiveness.

This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents, and any separate letter agreements with respect to fees payable to the Administrative Agent, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. This Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by telecopier or other electronic transmission (i.e. a "pdf" or "tif" document) shall be effective as delivery of a manually executed counterpart of this Agreement.

### SECTION 6.07    Severability.

Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

### SECTION 6.08    Right of Setoff.

If an Event of Default shall have occurred and be continuing, each Lender and each of

17



their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable Requirements of Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Guarantor against any and all of the obligations of the Guarantor now or hereafter existing under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Guarantor may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness. The rights of each Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or their respective Affiliates may have.

**SECTION 6.09   Governing Law; Jurisdiction; Consent to Service of Process**.

(a)   Governing Law.  Except to the extent otherwise expressly provided in a Security Document, this Agreement and the other Loan Documents and the transactions contemplated hereby and thereby, and all disputes between the parties hereto or thereto under or relating to this Agreement or any other Loan Document or the facts or circumstances leading to their respective execution, whether in contract, tort or otherwise, shall be construed in accordance with and governed by the laws (including statutes of limitation) of the State of New York, without regard to conflicts of law principles that would require the application of the laws of another jurisdiction.

(b)   Submission to Jurisdiction.  The Guarantor irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, against the Administrative Agent, any Lender, or any Related Party of the foregoing in any way relating to this Agreement or any other Loan Document or the transactions relating hereto or thereto, in any forum other than the courts of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such courts and agrees that all claims in respect of any such action, litigation or proceeding may be heard and determined in such New York State court or, to the fullest extent permitted by applicable law, in such federal court.  Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement or in any other Loan Document shall limit or prevent the Administrative Agent or any Lender from bringing any action or proceeding relating to this Agreement or any other Loan Document against the Guarantor or any of its Subsidiaries or its or their respective properties in the courts of any jurisdiction in which it may be necessary, desirable or convenient in order to enforce any rights or collect any amounts due under this Agreement or any other Loan Document, and the Administrative Agent and each Lender is hereby authorized to bring any such action or proceeding in any such jurisdiction.

(c)   Venue.  The Guarantor hereby irrevocably and unconditionally waives, to the fullest extent permitted by applicable Requirements of Law, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in Section 6.09(b).  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable Requirements of Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

OMM_US:74315685

(d)  <u>Service of Process</u>. Each party hereto irrevocably consents to service of process in any action or proceeding arising out of or relating to any Loan Document, in the manner provided for notices (other than telecopier) in <u>Section 6.01</u>. Nothing in this Agreement or any other Loan Document will affect the right of any party hereto to serve process in any other manner permitted by applicable Requirements of Law.

**SECTION 6.10    Waiver of Jury Trial.**

THE GUARANTOR HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE REQUIREMENTS OF LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**SECTION 6.11    Headings**.

Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

**SECTION 6.12    Obligations Absolute**.

To the fullest extent permitted by applicable Requirements of Law, all obligations of the Guarantor hereunder shall be absolute and unconditional irrespective of:

(a)  any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of any Loan Party;

(b)  any lack of validity or enforceability of any Transaction Document or any other agreement or instrument relating thereto against any Loan Party;

(c)  any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations, or any other amendment or waiver of or any consent to any departure from any Transaction Document or any other agreement or instrument relating thereto;

(d)  any exchange, release or failure to obtain or non-perfection of any other Collateral, or any release of the Guarantor or Loan Party, or any release or amendment or waiver of or consent to any departure from any guarantee, for all or any of the Guaranteed Obligations;

(e)  any exercise or non-exercise, or any waiver of any right, remedy, power or privilege under or in respect hereof or any Transaction Document; or

19



(f)     any other circumstances which might otherwise constitute a defense available to, or a discharge of, the Loan Parties.

**SECTION 6.13    No Advisory or Fiduciary Responsibility**.

In connection with all aspects of each transaction contemplated hereby, the Guarantor acknowledges and agrees that: (a) the credit facilities provided for under the Loan Documents and any related arranging or other services in connection therewith, and the Transactions and other transactions contemplated by the Loan Documents, any Transaction Documents to which any Secured Parties are party and any Hedging Agreements or Treasury Services Agreements with Secured Parties, are each arm's-length commercial transactions among the Companies and their respective Affiliates, on the one hand, and the Agents, the Lenders, the other Secured Parties and their respective Affiliates, on the other hand, and the Guarantor is capable of evaluating and understanding, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by such other Loan Documents, Transaction Documents, Hedging Agreements and Treasury Services Agreements (including any amendment, waiver or other modification hereof or thereof); (b) in connection with the process leading to the Transactions and such other transactions, each Agent, each Lender, each other Secured Party and each of their respective Affiliates is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary for any Loan Party or any of their respective Affiliates, stockholders, creditors or employees or any other person; (c) none of the Agents, any Lender, any other Secured Party or any Affiliate thereof has assumed or will assume an advisory, agency or fiduciary responsibility in favor of any Loan Party or any of their respective Affiliates with respect to any of the Transactions or any other transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any such other Transaction Document, Hedging Agreement or Treasury Services Agreement (irrespective of whether any Agent, any Lender, any other Secured Party or any Affiliate thereof has advised or is currently advising the any Loan Party or their respective Affiliates on other matters) and none of the Agents, any Lender, any other Secured Party or any Affiliate thereof has any obligation to any Loan Party or their respective Affiliates with respect to the Transactions or the other transactions contemplated hereby except those obligations expressly set forth herein and in such other Transaction Documents, Hedging Agreements or Treasury Services Agreements; (d) the Agents, the Lenders, the other Secured Parties and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Guarantor and the other Loan Parties and their respective Affiliates, and none of the Agents, any Lender, any other Secured Party or any Affiliate thereof has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (e) the Agents, the Lenders, the other Secured Parties and the Affiliates thereof have not provided and will not provide any legal, accounting, regulatory, tax, investment or other advice with respect to any of the Transactions or the other transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any such other Transaction Document, Hedging Agreement or Treasury Services Agreement) and the Guarantor has consulted its own legal, accounting, regulatory and tax advisors to the extent they deemed appropriate. The Guarantor hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against the Agents, the Lenders, the other Secured Parties and their Affiliates with respect to any breach or alleged breach of agency or fiduciary duty.

[Signature Pages Follow]

OMM_US:74315685



IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

GREKA INTEGRATED, INC.

By: _____

Name: Susan M. Whalen
Title: Senior Vice President and General Counsel

UBS AG, LONDON BRANCH, as Administrative Agent and Collateral Agent

By: _____

Name:
Title:

By: _____

Name:
Title:

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

GREKA INTEGRATED, INC.

By: _____

Name: Susan M. Whalen

Title: Senior Vice President and General Counsel

UBS AG, LONDON BRANCH, as Administrative Agent and Collateral Agent

By: _____

Name: Samuel Molinaro

Title: Group Managing Director

By: _____

Name: William W. Chandler

Title: Managing Director

[Signature Page to Second Lien Greka Integrated Guaranty Agreement]

Schedule 3.05(a)
to
Second Lien Greka Integrated Guaranty Agreement

**Equity Interests of Holdings**

| Current Legal Entities Owned | Record Owner | Certificate No. | Membership Interest | Percent Pledged |
|---|---|---|---|---|
| GOGH, LLC | Greka Integrated, Inc. | n/a | 100% | 100% |

Schedule 3.06
to
Second Lien Greka Integrated Guaranty Agreement

**Litigation**

None.

Schedule 3.07
to
Second Lien Greka Integrated Guaranty Agreement

**Agreements**

Loan Documents

First Lien Loan Documents

Amended and Restated Credit Agreement among Guarantor and GLR dated as of May 20, 2016 related to the GLR Facility and the Guarantor's associated Guaranty and Collateral Agreement and promissory note.

Guarantee and Collateral Agreement among Guarantor, the other entities party thereto and Guggenheim Corporate Funding, LLC dated as of September 10, 2010 related to the Greka Refining Credit Facility.

## EXHIBIT A

**OFFICER'S CERTIFICATE**

**Exhibit A**

[Form of]
<u>OFFICER'S CERTIFICATE</u>

[          ], 20[ ]

Reference is made to (i) that certain First Lien Greka Integrated Guaranty Agreement dated as of May _20_, 2016 (the "<u>First Lien Guaranty Agreement</u>"), among Greka Integrated, Inc., as guarantor ("<u>Greka Integrated</u>"), and UBS AG, London Branch, as administrative agent and collateral agent (in such capacities, the "<u>First Lien Agent</u>"), and (ii) that certain Second Lien Greka Integrated Guaranty Agreement dated as of May _20_, 2016 (the "<u>Second Lien Guaranty Agreement</u>" and together with the First Lien Guaranty Agreement, the "<u>Guaranty Agreements</u>"), among Greka Integrated and UBS AG, London Branch, as administrative agent and collateral agent (in such capacities, the "<u>Second Lien Agent</u>" and together with the First Lien Agent, the "<u>Agents</u>"). Each capitalized term used but not defined herein has the meaning given to such term in the Guaranty Agreements.

This Officer's Certificate is being furnished pursuant to Section 4.01(e) of the Guaranty Agreements. The undersigned, [          ], does hereby certify that [s/he] is the duly elected, qualified and acting [_____] of Greka Integrated, and does hereby further certify (in [his/her] capacity as [_____] and not in [his/her] individual capacity), in the name of and on behalf of Greka Integrated, to the Agents, that with respect to the fiscal year ended December 31, 20[ ]:

1.  Greka Refining had positive net income for such fiscal year:  Yes: _____  No: _____

2.  Greka Refining had positive cash flow for such fiscal year:  Yes: _____  No: _____

3.  There was no event of default (after giving effect to any grace period) during such fiscal year under any instrument or other agreement, in each case with respect to indebtedness for borrowed money or that is evidenced by a note, bond or other similar instrument of Greka Refining:  Yes: _____  No: _____

4.  Greka Refining did not enter into, or increase the amount of its indebtedness for borrowed money (or that is evidenced by a note, bond or other similar instrument) under, any instrument or other agreement in each case with respect to intercompany indebtedness between or among Greka Refining and any of Greka Integrated and its other Affiliates ("<u>Intercompany Indebtedness</u>"), during such fiscal year, other than accrued and unpaid interest or fees:  Yes: _____  No: _____

5.  Greka Refining did not enter into, or increase the amount of its indebtedness for borrowed money (or that is evidenced by a note, bond or other similar instrument) under, any instrument or other agreement, in each case with respect to indebtedness for borrowed money (or that is evidenced by a note, bond or other similar instrument) other than Intercompany Indebtedness, during such fiscal year and other than accrued and unpaid interest or fees:                              Yes: _____    No: _____

6.  Has a confidentiality agreement, letter of intent, sale agreement, or similar instrument or agreement, with respect to a Greka Refining Asset Sale been executed?               Yes: _____    No: _____

[Signature page follows]

Exhibit A

Case 1:19-cv-10786-LLS-KNF   Document 5-1   Filed 11/21/19   Page 92 of 92

IN WITNESS WHEREOF, the undersigned has caused this Officer's Certificate to be duly executed as of the day and year first above written.

GREKA INTEGRATED, INC.

By:_____
    Name:
    Title: