# Exhibit A
# Part 2

# EXHIBIT 3

Case 1:19-cv-10786-LLS-KNF   Document 5-2   Filed 11/21/19   Page 3 of 70

EXECUTION VERSION

$50,000,000

**FIRST LIEN CREDIT AGREEMENT**

dated as of May 20, 2016,

among

**HVI CAT CANYON, INC.**

and

**RINCON ISLAND LIMITED PARTNERSHIP,**

as Borrowers,

**GOGH, LLC,**

as Holdings,

**THE LENDERS PARTY HERETO**

and

**UBS AG, LONDON BRANCH,**

Administrative Agent and Collateral Agent

## TABLE OF CONTENTS

**Section**                                                         **Page**

### ARTICLE I

### DEFINITIONS

| Section 1.01 | Defined Terms. | 1 |
| Section 1.02 | [Reserved]. | 35 |
| Section 1.03 | Terms Generally. | 35 |
| Section 1.04 | Accounting Terms; GAAP. | 35 |
| Section 1.05 | Resolution of Drafting Ambiguities. | 36 |

### ARTICLE II

### THE LOANS

| Section 2.01 | Loans on Closing Date. | 36 |
| Section 2.02 | Loans. | 36 |
| Section 2.03 | Closing Procedure. | 36 |
| Section 2.04 | Evidence of Debt; Repayment of Loans. | 37 |
| Section 2.05 | Fees. | 37 |
| Section 2.06 | Interest on Loans. | 37 |
| Section 2.07 | Termination of Commitments. | 38 |
| Section 2.08 | Interest Period. | 38 |
| Section 2.09 | Amortization. | 39 |
| Section 2.10 | Optional and Mandatory Prepayments of Loans. | 39 |
| Section 2.11 | Alternate Rate of Interest. | 41 |
| Section 2.12 | Yield Protection. | 41 |
| Section 2.13 | Breakage Payments. | 43 |
| Section 2.14 | Payments Generally; Pro Rata Treatment; Sharing of Setoffs. | 43 |
| Section 2.15 | Taxes. | 45 |
| Section 2.16 | Mitigation Obligations; Replacement of Lenders. | 48 |
| Section 2.17 | Joint and Several Liability of Borrowers. | 49 |
| Section 2.18 | Defaulting Lenders. | 50 |

### ARTICLE III

### REPRESENTATIONS AND WARRANTIES

| Section 3.01 | Organization; Powers. | 50 |
| Section 3.02 | Authorization; Enforceability. | 51 |
| Section 3.03 | No Conflicts. | 51 |
| Section 3.04 | Financial Statements; Projections. | 51 |
| Section 3.05 | Properties. | 52 |
| Section 3.06 | Maintenance of Oil and Gas Properties. | 53 |
| Section 3.07 | Intellectual Property. | 54 |
| Section 3.08 | Equity Interests and Subsidiaries. | 54 |
| Section 3.09 | Litigation; Compliance with Laws. | 55 |

FILED: NEW YORK COUNTY CLERK 10/21/2019 10:53 PM INDEX NO. 656157/2019
NYSCEF DOC. NO. 7 Case 1:19-cv-10786-LLS-KNF Document 5-2 Filed 11/21/19 Page 5 of 70 RECEIVED NYSCEF: 10/21/2019

Page

| Section 3.10 | Agreements. | 55 |
| Section 3.11 | Federal Reserve Regulations. | 56 |
| Section 3.12 | Investment Company Act. | 56 |
| Section 3.13 | [Reserved]. | 56 |
| Section 3.14 | Taxes. | 56 |
| Section 3.15 | No Material Misstatements. | 56 |
| Section 3.16 | Labor Matters. | 56 |
| Section 3.17 | Solvency. | 57 |
| Section 3.18 | Employee Benefit Plans. | 57 |
| Section 3.19 | Environmental Matters. | 57 |
| Section 3.20 | Insurance. | 59 |
| Section 3.21 | Security Documents. | 59 |
| Section 3.22 | Anti-Terrorism and Related Laws. | 60 |
| Section 3.23 | Gas Imbalances, Prepayments. | 61 |
| Section 3.24 | Marketing of Production. | 61 |
| Section 3.25 | Hedging Agreements. | 61 |

## ARTICLE IV

## CONDITIONS TO CLOSING

| Section 4.01 | Conditions to Closing. | 62 |
| Section 4.02 | Additional Conditions to Closing. | 67 |

## ARTICLE V

## AFFIRMATIVE COVENANTS

| Section 5.01 | Financial Statements, Reports, etc. | 68 |
| Section 5.02 | Litigation and Other Notices. | 72 |
| Section 5.03 | Existence; Businesses and Properties. | 73 |
| Section 5.04 | Insurance. | 74 |
| Section 5.05 | Obligations and Taxes. | 75 |
| Section 5.06 | Employee Benefits. | 75 |
| Section 5.07 | Maintaining Records; Access to Properties and Inspections; Annual Meetings. | 75 |
| Section 5.08 | [Reserved]. | 76 |
| Section 5.09 | Compliance with Environmental Laws; Environmental Reports. | 76 |
| Section 5.10 | [Reserved]. | 77 |
| Section 5.11 | Additional Collateral; Additional Guarantors. | 77 |
| Section 5.12 | Security Interests; Further Assurances. | 78 |
| Section 5.13 | Information Regarding Collateral. | 79 |
| Section 5.14 | Affirmative Covenants with Respect to Leases. | 79 |
| Section 5.15 | Ratings. | 79 |
| Section 5.16 | Reserve Reports. | 79 |
| Section 5.17 | Title Information. | 80 |
| Section 5.18 | Post-Closing Matters. | 81 |

## ARTICLE VI

## NEGATIVE COVENANTS



FILED: NEW YORK COUNTY CLERK 10/21/2019 10:53 PM
NYSCEF DOC. NO. 7
INDEX NO. 656157/2019
RECEIVED NYSCEF: 10/21/2019

Case 1:19-cv-10786-LLS-KNF   Document 5-2   Filed 11/21/19   Page 6 of 70

Page

| | | |
|---|---|---|
| Section 6.01 | Indebtedness. | 81 |
| Section 6.02 | Liens. | 83 |
| Section 6.03 | Sale and Leaseback Transactions. | 85 |
| Section 6.04 | Investment, Loan, Advances and Acquisition. | 85 |
| Section 6.05 | Mergers and Consolidations. | 86 |
| Section 6.06 | Asset Sales. | 87 |
| Section 6.07 | Dividends. | 88 |
| Section 6.08 | Transactions with Affiliates. | 89 |
| Section 6.09 | Financial Covenants. | 90 |
| Section 6.10 | Capital Expenditures and Consolidated G&A Expenses. | 92 |
| Section 6.11 | Prepayments of Other Indebtedness; Modifications of Organizational Documents and Other Documents, etc.; Supply Contracts | 93 |
| Section 6.12 | Limitation on Certain Restrictions on Subsidiaries. | 94 |
| Section 6.13 | Limitation on Issuance of Capital Stock. | 94 |
| Section 6.14 | Limitation on Creation of Subsidiaries. | 95 |
| Section 6.15 | Business; International Operations. | 95 |
| Section 6.16 | Limitation on Accounting Changes. | 95 |
| Section 6.17 | Fiscal Year. | 95 |
| Section 6.18 | No Further Negative Pledge. | 96 |
| Section 6.19 | Compliance with Certain Laws. | 96 |
| Section 6.20 | Gas Imbalances, Take-or-Pay or Other Prepayments. | 96 |
| Section 6.21 | Hedging Agreements. | 97 |
| Section 6.22 | Deposit Accounts, Securities Accounts and Commodity Accounts; Cap Ex Account. | 97 |
| Section 6.23 | Hydrocarbon Sales. | 98 |
| Section 6.24 | Oil and Gas Properties. | 98 |

## ARTICLE VII

## EVENTS OF DEFAULT

| | | |
|---|---|---|
| Section 7.01 | Events of Default. | 99 |
| Section 7.02 | Application of Proceeds. | 101 |

## ARTICLE VIII

## THE ADMINISTRATIVE AGENT AND THE COLLATERAL AGENT

| | | |
|---|---|---|
| Section 8.01 | Appointment and Authority. | 102 |
| Section 8.02 | Rights as a Lender. | 103 |
| Section 8.03 | Exculpatory Provisions. | 103 |
| Section 8.04 | Reliance by Agent. | 104 |
| Section 8.05 | Delegation of Duties. | 105 |
| Section 8.06 | Resignation of Agent. | 105 |
| Section 8.07 | Non-Reliance on Agent and Other Lenders. | 105 |
| Section 8.08 | Withholding Tax. | 106 |
| Section 8.09 | Enforcement. | 106 |
| Section 8.10 | Collateral Matters. | 106 |
| Section 8.11 | Administrative Agent May File Proofs of Claim. | 107 |



FILED: NEW YORK COUNTY CLERK 10/21/2019 10:53 PM          INDEX NO. 656157/2019
NYSCEF DOC. NO. Case 1:19-cv-10786-LLS-KNF  Document 5-2  Filed 11/21/19  Page 7 of 70  RECEIVED NYSCEF: 10/21/2019

Page

# ARTICLE IX

## MISCELLANEOUS

| Section 9.01 | Notices. | 108 |
| Section 9.02 | Waivers; Amendment. | 111 |
| Section 9.03 | Expenses; Indemnity; Damage Waiver. | 114 |
| Section 9.04 | Successors and Assigns. | 115 |
| Section 9.05 | Survival of Agreement. | 118 |
| Section 9.06 | Counterparts; Integration; Effectiveness. | 119 |
| Section 9.07 | Severability. | 119 |
| Section 9.08 | Right of Setoff. | 119 |
| Section 9.09 | Governing Law; Jurisdiction; Consent to Service of Process. | 119 |
| Section 9.10 | Waiver of Jury Trial. | 120 |
| Section 9.11 | Headings. | 121 |
| Section 9.12 | Treatment of Certain Information; Confidentiality. | 121 |
| Section 9.13 | USA PATRIOT Act Notice and Customer Verification. | 121 |
| Section 9.14 | Interest Rate Limitation. | 122 |
| Section 9.15 | [Reserved]. | 122 |
| Section 9.16 | Obligations Absolute, Suretyship Waivers and Other Matters. | 122 |
| Section 9.17 | Joint and Several Liability. | 125 |
| Section 9.18 | No Advisory or Fiduciary Responsibility. | 125 |

## SCHEDULES

| | |
|---|---|
| Schedule 1.01(a) | Subsidiary Guarantors |
| Schedule 1.01(b) | Permitted Holders |
| Schedule 1.01(c) | WTI Price Example Calculation |
| Schedule 1.01(d) | Commitments |
| Schedule 2.05 | Deferred Closing Fees |
| Schedule 3.03 | Governmental Approvals; Compliance with Laws |
| Schedule 3.05(g) | Released Liens and Related Indebtedness |
| Schedule 3.06 | Maintenance of Oil and Gas Properties |
| Schedule 3.07(b) | Intellectual Property Registrations |
| Schedule 3.07(c) | Violations or Proceedings Regarding Intellectual Property |
| Schedule 3.08(a) | Wholly Owned Subsidiaries |
| Schedule 3.08(c) | Organizational Chart |
| Schedule 3.09 | Litigation |
| Schedule 3.10 | Material Agreements |
| Schedule 3.19 | Environmental Matters |
| Schedule 3.20 | Insurance |
| Schedule 3.23 | Gas Imbalances |
| Schedule 3.24 | Marketing of Production |
| Schedule 3.25 | Hedging Agreements |
| Schedule 4.01(n)(vi) | Landlord Access Agreements |
| Schedule 6.01(e) | Existing Indebtedness |
| Schedule 6.02(c) | Existing Liens |
| Schedule 6.04(b) | Existing Investments |

## EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Administrative Questionnaire |
| Exhibit B | Form of Assignment and Assumption |
| Exhibit C | Form of Closing Request |
| Exhibit D | Form of Compliance Certificate |
| Exhibit E | [Reserved] |
| Exhibit F | [Reserved] |
| Exhibit G | Form of Landlord Access Agreement |
| Exhibit H-1 | Form of Guaranty Agreement |
| Exhibit H-2 | Form of Greka Integrated Guaranty Agreement |
| Exhibit I | [Reserved] |
| Exhibit J | Form of Mortgage |
| Exhibit K | Form of Note |
| Exhibit L-1 | Form of Perfection Certificate |
| Exhibit L-2 | Form of Perfection Certificate Supplement |
| Exhibit M-1 | Form of Security Agreement |
| Exhibit M-2 | Form of Greka Integrated Security Agreement |
| Exhibit N | Forms of Opinion of Company Counsel |
| Exhibit O | Form of Solvency Certificate |
| Exhibit P | Form of Intercompany Note |
| Exhibit Q(1) | Form of U.S. Tax Compliance Certificate |
| Exhibit Q(2) | Form of U.S. Tax Compliance Certificate |
| Exhibit Q(3) | Form of U.S. Tax Compliance Certificate |
| Exhibit Q(4) | Form of U.S. Tax Compliance Certificate |

Exhibit R        Form of Intercreditor Agreement
Exhibit S        Form of Lease Operating Statement
Exhibit T        Form of Production Variance Report
Exhibit U        Form of Cash Flow Quarterly Report

## FIRST LIEN CREDIT AGREEMENT

This FIRST LIEN CREDIT AGREEMENT (this "**Agreement**") dated as of May 20, 2016, among HVI CAT CANYON, INC. (f/k/a Greka Oil & Gas, Inc.), a Colorado corporation ("**HVI CC**"), RINCON ISLAND LIMITED PARTNERSHIP, a Texas limited partnership ("**Rincon**" and together with HVI CC, the "**Borrowers**" and each, a "**Borrower**"), GOGH, LLC, a Colorado limited liability company ("**Holdings**"), the Lenders (such term and each other capitalized term used but not defined herein having the meaning given to it in Article I), and UBS AG, LONDON BRANCH, as administrative agent (in such capacity, "**Administrative Agent**") for the Lenders and as collateral agent (in such capacity, "**Collateral Agent**") for the Secured Parties.

### WITNESSETH:

WHEREAS, Borrowers and UBS AG, London Branch have agreed to enter into this Agreement in respect of Loans in an aggregate principal amount of $50,000,000 and the Second Lien Credit Agreement in respect of loans in an aggregate principal amount of $50,000,000 and providing for certain Performance Payments (as defined in the Second Lien Credit Agreement).

WHEREAS, Greka Integrated and Holdings have agreed to guaranty the Loans and other Obligations and the Second Lien Loans and other Obligations under and as defined in the Second Lien Credit Agreement; and the Loan Parties have agreed to grant to the Administrative Agent and the Second Lien Administrative Agent Liens on the Collateral to secure such obligations as further provided in the Loan Documents and Second Lien Loan Documents.

NOW, THEREFORE, the Lenders are willing to extend such credit to Borrowers on the terms and subject to the conditions set forth herein.  Accordingly, the parties hereto agree as follows:

### ARTICLE I

### DEFINITIONS

SECTION 1.01    **Defined Terms**.

As used in this Agreement, the following terms shall have the meanings specified below:

"**2016 Pre-Funding Cash Contributions**" shall mean cash loans in an amount not to exceed $3,000,000 in the aggregate made after February 1, 2016 and prior to the date that is thirty (30) days after the Closing Date, by GLR to any of the Borrowers, which cash loans are fully subordinated to the Obligations and the Obligations (as defined in the Second Lien Credit Agreement) as provided in the GLR Intercreditor Agreement; *provided* that the Administrative Agent shall have received evidence that funds from such cash loans were deposited in an account or accounts of any Borrower in the form of bank statements, cancelled checks or other evidence satisfactory to the Administrative Agent in its sole reasonable discretion.

"**Adjusted LIBOR Rate**" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, (a) an interest rate per annum (rounded upward, if necessary, to the nearest 1/100th of 1%) determined by the Administrative Agent to be equal to the LIBOR Rate for such Eurodollar Borrowing in effect for such Interest Period divided by (b) 1 *minus* the Statutory Reserves (if any) for such Eurodollar Borrowing for such Interest Period; *provided* that the Adjusted LIBOR Rate shall be deemed to be not less than 0.50% per annum.

"**Administrative Agent**" shall have the meaning assigned to such term in the preamble hereto and includes each other person appointed as the successor pursuant to Article VIII.

"**Administrative Agent Fee**" shall have the meaning assigned to such term in Section 2.05.

"**Administrative Questionnaire**" shall mean an Administrative Questionnaire in substantially the form of Exhibit A.

"**Affiliate**" shall mean, when used with respect to a specified person, another person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the person specified; *provided, however*, that, for purposes of Section 6.08, the term "Affiliate" shall also include (i) any person that directly or indirectly owns more than 10% of any class of Equity Interests of the person specified or (ii) any person that is an executive officer or director of the person specified.

"**Agents**" shall mean the Administrative Agent and the Collateral Agent; and "**Agent**" shall mean any of them.

"**Agreement**" shall have the meaning assigned to such term in the preamble hereto.

"**Anti-Corruption Laws**" shall have the meaning assigned to such term in Section 3.22(e).

"**Anti-Money Laundering Laws**" shall mean any Requirements of Law related to money laundering, including the Bank Secrecy Act, 31 U.S.C. §§ 5311 *et seq.*, as amended by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("**USA PATRIOT Act**") of 2001 (Title III of Pub. L. 107-56), and its implementing regulations and the Money Laundering Control Act, 18 U.S.C. §§ 1956 and 1957.

"**Applicable Margin**" shall mean, for any day, with respect to any Eurodollar Loan, 3.50%.

"**Approved Counterparty**" shall mean (a) any Lender or any Affiliate of a Lender and (b) any other person whose long term senior unsecured debt rating is A-/A2 by Standard & Poor's Ratings Group or Moody's Investors Service Inc. (or their equivalent) or higher.

"**Approved Fund**" shall mean any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Approved Petroleum Engineers**" shall mean (a) Netherland, Sewell & Associates, Inc., (b) Ryder Scott Company Petroleum Consultants, L.P. and (c) any other independent petroleum engineers reasonably acceptable to the Administrative Agent.

"**ARIES Database**" shall mean an electronic database which uses the ARIES software format and details all the assets and assumptions in the applicable Reserve Report, in each case reasonably satisfactory to the Administrative Agent.

"**Asset Sale**" shall mean (a) any conveyance, sale, lease, sublease, assignment, transfer or other disposition (including by way of merger or consolidation and including any Sale and Leaseback

Transaction) of any property, excluding sales of Hydrocarbons and dispositions of cash and Cash Equivalents, in each case, in the ordinary course of business, by any Company, (b) any issuance or sale of any Equity Interests of a Subsidiary (other than the Borrowers), in each case, to any person other than (i) a Borrower or (ii) any Subsidiary Guarantor, (c) any issuance or sale of any Equity Interests of Holdings to a person other than Greka Integrated, (d) any issuance or sale of any Equity Interests of HVI CC to a person other than Holdings or (e) any issuance or sale of any Equity Interests of Rincon to a person other than HVI CC or Holdings.

"**Assignment and Assumption**" shall mean an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 9.04(b)), and accepted by the Administrative Agent, in substantially the form of Exhibit B, or any other form approved by the Administrative Agent.

"**Attributable Indebtedness**" shall mean, when used with respect to any Sale and Leaseback Transaction, as at the time of determination, the present value (discounted at a rate equivalent to Borrowers' then-current weighted average cost of funds for borrowed money as at the time of determination, compounded on a semi-annual basis) of the total obligations of the lessee for rental payments during the remaining term of the lease included in any such Sale and Leaseback Transaction.

"**Available Cash Balance**" shall mean the cash balances as of the Closing Date (excluding, for avoidance of doubt, any amounts in the Cap Ex Account) that are not restricted and are immediately available to Borrowers in Borrowers' Deposit Accounts that are subject to Control Agreements and that are not subject to any Liens (other than Liens permitted by Sections 6.02(l)-(m) and bankers' Liens permitted by Section 6.02(j) in favor of the depository bank in its capacity as depository bank).

"**Board**" shall mean the Board of Governors of the Federal Reserve System of the United States.

"**Board of Directors**" shall mean, with respect to any person, (a) in the case of any corporation, the board of directors of such person, (b) in the case of any limited liability company, the board of managers of such person, (c) in the case of any partnership, the Board of Directors of the general partner of such person and (d) in any other case, the functional equivalent of the foregoing.

"**Borrower**" and "**Borrowers**" shall have the meaning assigned to such terms in the preamble hereto.

"**Borrowing**" shall mean Loans made or continued on the same date.

"**Business Day**" shall mean any day other than a Saturday, Sunday or other day on which banks in New York City or London are authorized or required by law to close; *provided, however*, that when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"**Cap Ex Account**" shall mean Deposit Account #4996944391 of HVI CC at Citibank, N.A. established for the purpose of holding proceeds of the Cap Ex Facility.

"**Cap Ex Account – Greka Integrated**" shall mean an account or accounts of Greka Integrated at a bank of its choice that holds the proceeds of the Cap Ex Facility.



FILED: NEW YORK COUNTY CLERK 10/21/2019 10:53 PM
NYSCEF DOC. NO. Case 1:19-cv-10786-LLS-KNF Document 5-2 Filed 11/21/19 Page 13 of 70

INDEX NO. 656157/2019
RECEIVED NYSCEF: 10/21/2019

"**Cap Ex Control Agreement**" shall mean a control agreement in form and substance satisfactory to the Collateral Agent entered into with respect to the Cap Ex Account by the Collateral Agent, HVI CC and Citibank, N.A.

"**Cap Ex Facility**" shall mean the capital expenditure facility (which includes the 2016 Pre-Funding Cash Contributions) for $7,500,000 established under the GLR Facility; *provided* that up to $3,000,000 of the proceeds of the Cap Ex Facility may be used by the Borrowers to fund working capital or operating losses of the Borrowers, which may be funded through 2016 Pre-Funding Cash Contributions.

"**Cap Ex Loan**" shall have the meaning assigned to such term in Section 4.01(r)(iii).

"**Cap Ex Loan – Greka Integrated**" shall have the meaning assigned to such term in Section 4.01(r)(iii).

"**Capital Assets**" shall mean, with respect to any person, all equipment, fixed assets and Real Property or improvements of such person, or replacements or substitutions therefor or additions thereto, that, in accordance with GAAP, have been or should be reflected as additions to property, plant or equipment on the balance sheet of such person.

"**Capital Expenditures**" shall mean, for any period and in respect of any person, without duplication, all expenditures and costs during such period for Capital Assets (whether paid in cash or other consideration, financed by the incurrence of Indebtedness or accrued as a liability), but excluding expenditures and costs (i) made in connection with the reinvestment in assets pursuant to Section 2.10(b), (ii) that constitute Consolidated Lease Operating Expenses or (iii) made with Net Cash Proceeds of a Casualty Event in accordance with Section 2.10(e). For purposes of this definition, the purchase price of equipment or other fixed assets that are purchased simultaneously with the trade-in of existing assets shall be included in Capital Expenditures only to the extent of the gross amount by which such purchase price exceeds the credit granted by the seller of such assets for the assets being traded in at such time. Notwithstanding anything herein to the contrary, after such time as Borrowers shall have expended $7,500,000 of the proceeds of the Cap Ex Facility for the purposes set forth in Section 6.10(a) hereof, "Capital Expenditures" shall not include expenditures (i) funded by contributions to Borrowers indirectly through equity contributions to Holdings or (ii) paid from Retained Borrower Excess Cash Flow.

"**Capital Lease Obligations**" of any person shall mean the obligations of such person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such person under GAAP (whether contingent or otherwise), and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"**Cash Equivalents**" shall mean, as to any person, (a) securities issued, or directly, unconditionally and fully guaranteed or insured, by the United States or any agency or instrumentality thereof (*provided* that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than one year from the date of acquisition by such person; (b) time deposits and certificates of deposit of any Lender or any commercial bank having, or which is the principal banking subsidiary of a bank holding company organized under the laws of the United States, any state thereof or the District of Columbia having, capital and surplus aggregating in excess of $500.0 million and a rating of "A" (or such other similar equivalent rating) or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act) with maturities of not more than one year from the date of acquisition by such person; (c) repurchase obligations with a term of not more than



thirty (30) days for underlying securities of the types described in clause (a) above entered into with any bank meeting the qualifications specified in clause (b) above, which repurchase obligations are secured by a valid perfected security interest in the underlying securities; (d) commercial paper issued by any person incorporated in the United States rated at least A-1 or the equivalent thereof by Standard & Poor's Ratings Group or at least P-1 or the equivalent thereof by Moody's Investors Service Inc., and in each case maturing not more than one year after the date of acquisition by such person; (e) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (a) through (d) above; and (f) demand deposit accounts maintained in the ordinary course of business.

"**Casualty Event**" shall mean any involuntary loss of title, any involuntary loss of, damage to or any destruction of, or any condemnation or other taking (including by any Governmental Authority) of, any property of a Borrower or any Subsidiary. "Casualty Event" shall include but not be limited to any taking of all or any part of any Real Property of any person or any part thereof, in or by condemnation or other eminent domain proceedings pursuant to any Requirement of Law, or by reason of the temporary requisition of the use or occupancy of all or any part of any Real Property of any person or any part thereof by any Governmental Authority, civil or military, or any settlement in lieu thereof.

"**CERCLA**" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9601 *et seq.* and all implementing regulations.

A "**Change in Control**" shall be deemed to have occurred if:

(a)      Greka Integrated at any time ceases to own more than 50% of both the Equity Interests and the Voting Stock of Holdings, Holdings at any time ceases to own 100% of both the Equity Interests and the Voting Stock of HVI CC, or Greka Integrated at any time ceases to own 100% of both the Equity Interests and the Voting Stock of Holdings owned by Greka Integrated and its Affiliates;

(b)      HVI CC and Holdings at any time ceases to own 100% of the Equity Interests and Voting Stock of Rincon, or HVI CC at any time ceases to be the sole general partner of Rincon;

(c)      at any time a change of control occurs under any Material Indebtedness providing the holders thereof the right to require prepayment or other payment thereof;

(d)      the Permitted Holders (collectively) shall not, directly or indirectly, have the power to vote or direct the voting of Voting Stock of Holdings representing a majority of the voting power of the total outstanding Voting Stock of Holdings; or

(e)      the Permitted Holders (collectively) shall not, directly or indirectly, own Equity Interests representing a percentage of the total economic interests of the Equity Interests of Holdings which is equal to or greater than the percentage of the total economic interests of the Equity Interests of Holdings, on the Closing Date represented by the Equity Interests owned by the Permitted Holders on the Closing Date.

For purposes of this definition, a person shall not be deemed to have beneficial ownership of Equity Interests subject to a stock purchase agreement, merger agreement or similar agreement until the consummation of the transactions contemplated by such agreement.



"**Change in Law**" shall mean the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking into effect of any law, treaty, order, policy, rule or regulation, (b) any change in any law, treaty, order, policy, rule or regulation or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, regulations or directives thereunder or issued in connection therewith, and (ii) all requests, rules, guidelines, regulations or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"**Charges**" shall have the meaning assigned to such term in <u>Section 9.14</u>.

"**Chattel Paper**" shall have the meaning assigned to such term in the Security Agreement.

"**Closing Date**" shall mean the date on which the conditions precedent contemplated by <u>Article IV</u> are satisfied, it being understood that the Companies and the Administrative Agent shall enter into a certificate acknowledging the date on which the Closing Date occurs or is deemed to occur.

"**Closing Request**" shall mean a request by Borrowers in accordance with the terms of <u>Section 2.03</u> and substantially in the form of <u>Exhibit C</u>, or such other form as shall be approved by the Administrative Agent.

"**Code**" shall mean the Internal Revenue Code of 1986.

"**Collateral**" shall mean, collectively, all of the Security Agreement Collateral, the Mortgaged Property and all other property of whatever kind and nature subject or purported to be subject from time to time to a Lien under any Security Document.

"**Collateral Agent**" shall have the meaning assigned to such term in the preamble hereto.

"**Commitment**" shall mean, with respect to each Lender, the commitment, if any, of such Lender to make a Loan hereunder on the Closing Date as expressly contemplated hereby in the amount set forth on <u>Schedule 1.01(d)</u>. The aggregate amount of the Lenders' Commitments is $50,000,000.

"**Commodity Account**" shall have the meaning assigned to such term in the Security Agreement.

"**Communications**" shall have the meaning assigned to such term in <u>Section 9.01(b)</u>.

"**Companies**" shall mean Holdings, Borrowers and the Subsidiaries of the Borrowers; and "**Company**" shall mean any one of them.

"**Compliance Certificate**" shall mean a certificate of a Financial Officer substantially in the form of <u>Exhibit D</u>.

"**Consolidated Amortization Expense**" shall mean, for any period, the amortization expense of Borrowers and their Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP.



FILED: NEW YORK COUNTY CLERK 10/21/2019 10:53 PM
NYSCEF DOC. NO. Case 1:19-cv-10786-LLS-KNF   Document 5-2   Filed 11/21/19   Page 16 of 70

INDEX NO. 656157/2019

RECEIVED NYSCEF: 10/21/2019

"**Consolidated Depreciation Expense**" shall mean, for any period, the depreciation expense of Borrowers and their Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP.

"**Consolidated EBITDA**" shall mean, for any period, Consolidated Net Income for such period, adjusted by (x) *adding thereto*, in each case only to the extent (and in the same proportion) deducted in determining such Consolidated Net Income and without duplication (and with respect to the portion of Consolidated Net Income attributable to any Subsidiary of a Borrower only if a corresponding amount would be permitted at the date of determination to be distributed to such Borrower by such Subsidiary without prior approval (that has not been obtained), pursuant to the terms of its Organizational Documents and all agreements, instruments and Requirements of Law applicable to such Subsidiary or its equity holders):

    (a)     Consolidated Interest Expense for such period,

    (b)     Consolidated Amortization Expense for such period,

    (c)     Consolidated Depreciation Expense for such period,

    (d)     Consolidated Tax Expense for such period,

    (e)     costs and expenses directly incurred in connection with the Transactions, including the VPP Termination (not to exceed $300,000),

    (f)     the aggregate amount of all other non-cash charges, expenses or losses reducing Consolidated Net Income (excluding any non-cash charge, expense or loss that results in an accrual of a reserve for cash charges in any future period and any non-cash charge, expense or loss relating to write-offs, write-downs or reserves with respect to accounts or inventory) for such period, and

    (g)     cash payments made during such period as a result of the early termination of the Hedging Agreement (after giving effect to any netting agreements), and

(y) *subtracting therefrom* the aggregate amount of all non-cash items increasing Consolidated Net Income (other than the accrual of revenue or recording of receivables in the ordinary course of business) for such period.

Consolidated EBITDA shall be calculated on a Pro Forma Basis to give effect to Asset Sales (other than any dispositions in the ordinary course of business) or asset acquisitions consummated at any time on or after the first day of the Test Period and prior to the date of determination as if each such Asset Sale or asset acquisition had been consummated on the day prior to the first day of such period.

Notwithstanding the foregoing, for purposes of calculating the Senior Leverage Ratio and the Consolidated Interest Coverage Ratio, for the Test Period ended on (i) March 31, 2017, Consolidated EBITDA shall equal Consolidated EBITDA for the immediately preceding fiscal quarter *multiplied by* four (4), (ii) June 30, 2017, Consolidated EBITDA shall equal Consolidated EBITDA for the immediately preceding two (2) fiscal quarters, *multiplied by* two (2), and (iii) September 30, 2017, Consolidated EBITDA shall equal Consolidated EBITDA for the immediately preceding fiscal quarter *multiplied by* two (2) *plus* the sum of the actual Consolidated EBITDA for the fiscal quarter ended March 31, 2017 and the actual Consolidated EBITDA for the fiscal quarter ended June 30, 2017.



"**Consolidated G&A Expenses**" shall mean, for any period, the consolidated general and administrative expenses which would, in accordance with GAAP, be shown on a consolidated income statement of Borrowers and their Subsidiaries for such period. For avoidance of doubt, Consolidated G&A Expenses shall include (i) expenses related to any litigation, administrative or regulatory proceedings or governmental investigation and any judgments, settlements, and awards related thereto, and (ii) executive salaries, compensation (including bonuses) and other benefits (including retirement, health, stock option and other benefit plans) payable by or provided by Borrowers or their Subsidiaries. Notwithstanding anything herein to the contrary, Consolidated G&A Expenses shall not include any Deferred Closing Fees.

"**Consolidated Indebtedness**" shall mean, as at any date of determination, the aggregate amount of all Indebtedness of Borrowers and their Subsidiaries, determined on a consolidated basis in accordance with GAAP, excluding Indebtedness in respect of the GLR Facility.

"**Consolidated Interest Coverage Ratio**" shall mean, for any Test Period, the ratio of (x) Consolidated EBITDA for such Test Period to (y) Consolidated Interest Expense for such Test Period.

"**Consolidated Interest Expense**" shall mean, for any period, the total consolidated interest expense of Borrowers and their Subsidiaries for such period determined on a consolidated basis in accordance with GAAP *plus*, without duplication:

(a)     imputed interest on Capital Lease Obligations and Attributable Indebtedness of Borrowers and their Subsidiaries for such period;

(b)     commissions, discounts and other fees and charges owed by Borrowers or any of their Subsidiaries with respect to letters of credit securing financial obligations, bankers' acceptance financing and receivables financings for such period;

(c)     amortization of debt issuance costs, debt discount or premium and other financing fees and expenses incurred by Borrowers or any of their Subsidiaries for such period;

(d)     cash contributions to any employee stock ownership plan or similar trust made by Borrowers or any of their Subsidiaries to the extent such contributions are used by such plan or trust to pay interest or fees to any person (other than Borrowers or a Wholly Owned Subsidiary of either Borrower) in connection with Indebtedness incurred by such plan or trust for such period;

(e)     all interest paid or payable with respect to discontinued operations of Borrowers or any of their Subsidiaries for such period;

(f)     the interest portion of any deferred payment obligations of Borrowers or any of their Subsidiaries for such period;

(g)     all interest on any Indebtedness of Borrowers or any of their Subsidiaries of the type described in clause (f) or (k) of the definition of "Indebtedness" for such period;

*provided* that (a) consolidated interest expense in respect of Indebtedness under the GLR Facility shall be excluded from the calculation of Consolidated Interest Expense, (b) to the extent directly related to the Transactions, debt issuance costs, debt discount or premium and other financing fees and expenses shall be excluded from the calculation of Consolidated Interest Expense and (c) Consolidated Interest Expense shall be calculated after giving effect to Hedging Agreements related to interest rates (including



associated costs), but excluding unrealized gains and losses with respect to Hedging Agreements related to interest rates.

Consolidated Interest Expense shall be calculated on a Pro Forma Basis to give effect to any Indebtedness incurred, assumed or permanently repaid or extinguished at any time on or after the first day of the Test Period and prior to the date of determination in connection with any Asset Sales (other than any dispositions in the ordinary course of business) as if such incurrence, assumption, repayment or extinguishing had been effected on the first day of such period.

Notwithstanding the foregoing, for purposes of calculating the Consolidated Interest Coverage Ratio, for the Test Period ended on (i) March 31, 2017, Consolidated Interest Expense shall equal Consolidated Interest Expense for the immediately preceding fiscal quarter *multiplied by* four (4), (ii) June 30, 2017, Consolidated Interest Expense shall equal Consolidated Interest Expense for the immediately preceding two (2) fiscal quarters, *multiplied by* two (2), and (iii) September 30, 2017, Consolidated Interest Expense shall equal Consolidated Interest Expense for the immediately preceding fiscal quarter *multiplied by* two (2) *plus* the sum of the actual Consolidated Interest Expense for the fiscal quarter ended March 31, 2017 and the actual Consolidated Interest Expense for the fiscal quarter ended June 30, 2017.

"**Consolidated Lease Operating Expenses**" shall mean, for any period, the sum of consolidated (i) expenses incurred in the operation and maintenance of producing properties which would be shown as operating expenses on a consolidated income statement of Borrowers and their Subsidiaries for such period (it being understood that, for avoidance of doubt, Consolidated Lease Operating Expenses shall include expenditures necessary to maintain (or reduce the rate of decline of) existing production) and (ii) expenses and costs (including capitalized expenses and costs) that are necessary for Borrowers and their respective assets and operations to come into or remain in compliance with any Environmental Laws or other Requirements of Law relating specifically to applicable health, safety, security and environmental matters. For the avoidance of doubt, Consolidated Lease Operating Expenses shall not include, among other things, (i) expenses related to any litigation, administrative or regulatory proceedings or governmental investigation or any judgments, settlements, or awards related thereto, (ii)(x) executive salaries, compensation (including bonuses) and other benefits (including retirement, health, stock option and other benefit plans) payable by or provided by Borrowers or their Subsidiaries and (y) any administrative costs or expenses or other similar costs and expenses of Greka Integrated and its Affiliates allocated to Borrowers or their Subsidiaries, it being understood that, for avoidance of doubt, any amounts included in the calculation of Consolidated G&A Expenses shall not also be deducted from Excess Cash Flow as Consolidated Lease Operating Expenses, and (iii) Capital Expenditures and expenditures referred to in the last sentence of the definition of Capital Expenditures.

"**Consolidated Net Income**" shall mean, for any period, the consolidated net income (or loss) of Borrowers and their Subsidiaries determined on a consolidated basis in accordance with GAAP; *provided* that there shall be excluded from such net income (to the extent otherwise included therein), without duplication:

        (a)    the net income (or loss) of any person (other than a Subsidiary of a Borrower) in which any person other than Borrowers and their Subsidiaries has an ownership interest, except to the extent that cash in an amount equal to any such income has actually been received by a Borrower or (subject to clause (b) below) any Subsidiary of a Borrower during such period (or within 90 days after the end of such period);

        (b)    the net income of any Subsidiary of a Borrower during such period to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary of that



income is not permitted by operation of the terms of its Organizational Documents or any agreement, instrument or Requirement of Law applicable to that Subsidiary during such period, except that Borrowers' equity in net loss of any such Subsidiary for such period shall be included in determining Consolidated Net Income;

(c)     any gain (or loss), together with any related provisions for taxes on any such gain (or the tax effect of any such loss), realized during such period by Borrowers or any of their Subsidiaries upon any Asset Sale (other than any dispositions in the ordinary course of business) by Borrowers or any of their Subsidiaries;

(d)     gains and losses due solely to fluctuations in currency values and the related tax effects determined in accordance with GAAP for such period;

(e)     earnings or losses resulting from any reappraisal, revaluation, write-up or write-down of assets;

(f)     unrealized gains and losses with respect to Hedging Obligations for such period; and

(g)     any extraordinary or nonrecurring gain (or extraordinary or nonrecurring loss), together with any related provision for taxes on any such gain (or the tax effect of any such loss), recorded or recognized by Borrowers or any of their Subsidiaries during such period.

For purposes of this definition of "Consolidated Net Income," (1) "**nonrecurring**" means any gain or loss as of any date that is not reasonably likely to recur within the two years following such date; *provided* that if there was a gain or loss similar to such gain or loss within the two years preceding such date, such gain or loss shall not be deemed nonrecurring and (2) Consolidated Net Income shall be reduced (to the extent not already reduced thereby) by the amount of any payments to or on behalf of Borrowers made pursuant to Section 6.08(a)(iii).

"**Consolidated Net Revenues**" shall mean, for any period, the consolidated gross revenues which would, in accordance with GAAP, be shown on a consolidated income statement of Borrowers and their Subsidiaries for such period (after deducting, to the extent included in gross revenues, all royalties, overriding royalties, non-participating royalties, net profits interests, production payments, and other burdens on or payments out of production). For the avoidance of doubt, Consolidated Net Revenues shall not include any proceeds of the Cap Ex Loan or the proceeds of any Equity Issuance, Debt Issuance or issuance of Indebtedness permitted to be incurred by Section 6.01.

"**Consolidated Tax Expense**" shall mean, for any period, the tax expense of Borrowers and their Subsidiaries, for such period, determined on a consolidated basis in accordance with GAAP.

"**Contested Collateral Lien Conditions**" shall mean, with respect to any Permitted Lien of the type described in clauses (a), (b), (e) and (f) of Section 6.02, the following conditions:

(a)     Borrowers shall cause any proceeding instituted contesting such Lien to stay the sale or forfeiture of any portion of the Collateral on account of such Lien;

(b)     at the option and at the request of the Administrative Agent, to the extent such Lien is in an amount in excess of $250,000, the appropriate Company shall maintain cash reserves in an amount sufficient to pay and discharge such Lien and the Administrative Agent's reasonable estimate of all interest and penalties related thereto; and



(c)      such Lien shall in all respects be subject and subordinate in priority to the Lien and security interest created and evidenced by the Security Documents, except if and to the extent that the Requirement of Law creating, permitting or authorizing such Lien provides that such Lien is or must be superior to the Lien and security interest created and evidenced by the Security Documents.

"**Contingent Obligation**" shall mean, as to any person, any obligation, agreement, understanding or arrangement of such person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("**primary obligations**") of any other person (the "**primary obligor**") in any manner, whether directly or indirectly, including any obligation of such person, whether or not contingent, (a) to purchase any such primary obligation or any property constituting direct or indirect security therefor; (b) to advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation; (d) with respect to bankers' acceptances, letters of credit and similar credit arrangements, until a reimbursement obligation arises (which reimbursement obligation shall constitute Indebtedness); or (e) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; *provided, however*, that the term "Contingent Obligation" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or any product warranties.  The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such person may be liable, whether singly or jointly, pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such person is required to perform thereunder) as determined by such person in good faith.

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise, and the terms "**Controlling**" and "**Controlled**" shall have meanings correlative thereto.

"**Control Agreement**" shall have the meaning assigned to such term in the Security Agreement.

"**Credit Extension**" shall mean the making of a Loan by a Lender made or deemed made as of the Closing Date.

"**Debt Issuance**" shall mean the incurrence by any Company or any Subsidiary of any Indebtedness after the Closing Date (other than as permitted by Section 6.01).

"**Debtor Relief Laws**" shall mean the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Requirements of Law of the United States or other applicable jurisdictions from time to time in effect.

"**Default**" shall mean any event, occurrence or condition which is, or upon notice, lapse of time or both would constitute, an Event of Default.

"**Default Rate**" shall have the meaning assigned to such term in Section 2.06(b).

11

"**Defaulting Lender**" shall mean, subject to the last paragraph of <u>Section 2.18</u>, any Lender that (a) has failed to (i) fund any portion of its Loans required to be funded by it hereunder within two Business Days of the date required to be funded by it hereunder unless such Lender notifies the Administrative Agent and Borrowers in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in writing), or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified the Administrative Agent, any Lender and/or any Borrower in writing that it does not intend to comply with any of its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement or under other agreements in which it commits to extend credit (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after request by the Administrative Agent, to confirm that it will comply with the terms of this Agreement relating to its obligations to fund prospective Loans (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation, or any other state or federal regulatory authority acting in such capacity; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to the last paragraph of <u>Section 2.18</u>) upon delivery of written notice of such determination to each Borrower and each Lender.

"**Deferred Closing Fees**" shall have the meaning assigned to such term in <u>Section 2.05</u>.

"**Deposit Account**" shall have the meaning assigned to such term in the Security Agreement.

"**Deposit Account Control Agreement**" shall have the meaning assigned to such term in the Security Agreement.

"**Disqualified Capital Stock**" shall mean any Equity Interest which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the first anniversary of the Maturity Date, (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Equity Interests referred to in (a) above, in each case at any time on or prior to the first anniversary of the Maturity Date, or (c) contains any repurchase obligation which may come into effect prior to payment in full of all Obligations; *provided*, *however*, that any Equity Interests

that would not constitute Disqualified Capital Stock but for provisions thereof giving holders thereof (or the holders of any security into or for which such Equity Interests is convertible, exchangeable or exercisable) the right to require the issuer thereof to redeem such Equity Interests upon the occurrence of a change in control or an asset sale occurring prior to the first anniversary of the Maturity Date shall not constitute Disqualified Capital Stock if such Equity Interests provide that the issuer thereof will not redeem any such Equity Interests pursuant to such provisions prior to the repayment in full of the Obligations.

"**Dividend**" with respect to any person shall mean that such person has declared or paid a dividend or returned any equity capital to the holders of its Equity Interests or authorized or made any other distribution, payment or delivery of property (other than Qualified Capital Stock of such person) or cash to the holders of its Equity Interests as such, or redeemed, retired, purchased or otherwise acquired, directly or indirectly, for consideration any of its Equity Interests outstanding (or any options or warrants issued by such person with respect to its Equity Interests), or set aside any funds for any of the foregoing purposes, or shall have permitted any of its Subsidiaries to purchase or otherwise acquire for consideration any of the Equity Interests of such person outstanding (or any options or warrants issued by such person with respect to its Equity Interests). Without limiting the foregoing, "Dividends" with respect to any person shall also include all payments made or required to be made by such person with respect to any stock appreciation rights, plans, equity incentive or achievement plans or any similar plans or setting aside of any funds for the foregoing purposes.

"**dollars**" or "**$**" shall mean lawful money of the United States.

"**Eligible Assignee**" shall mean:

(a)     any Lender or any Affiliate of a Lender;

(b)     any commercial bank, insurance company or other regulated financial institution (including any fund that acquires debt investments and is managed by a federally-regulated investment advisor);

(c)     any Person that is not (i) primarily engaged in the oil and gas exploration and production business or in the oil and gas refining business or (ii) an Affiliate of a Person primarily engaged in the oil and gas exploration and production business or in the oil and gas refining business (any such Person described in clause (c)(i) or (c)(ii), a "**competitor**"), except in connection with any assignment pursuant to Section 9.04(b)(i)(A); and

(d)     any other assignee of the rights of a Lender that is consented to by the Borrowers in accordance with Section 9.04(b);

*provided* in the case of any such Person that is a Foreign Lender prior to or at the time of its acquisition of any interest in the Loans, such Foreign Lender shall have complied with Section 2.15(e) hereof; *provided further* that, except in the case of any assignment pursuant to Section 9.04(b)(i)(A), such Person shall not be any Borrower or any of its Affiliates.

"**Eligible Cap Ex**" shall have the meaning assigned to such term in Section 4.01(r)(iii).

"**Environment**" shall mean ambient air, indoor air, surface water and groundwater (including potable water, navigable water and wetlands), the land surface or subsurface strata, natural resources, the workplace or as otherwise defined in any Environmental Law.



"**Environmental Claim**" shall mean any claim, notice, demand, order, action, suit, proceeding or other communication alleging liability for or obligation with respect to any investigation, remediation, removal, cleanup, response, corrective action, damages to natural resources, personal injury, property damage, fines, penalties or other costs resulting from, related to or arising out of (i) the presence, Release or threatened Release in or into the Environment of Hazardous Material at any location or (ii) any violation or alleged violation of any Environmental Law, and shall include any claim seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from, related to or arising out of the presence, Release or threatened Release of Hazardous Material or alleged injury or threat of injury to health, safety or the Environment.

"**Environmental Law**" shall mean any and all present and future treaties, laws, statutes, ordinances, regulations, rules, decrees, orders, judgments, consent orders, consent decrees, code or other binding requirements, and the common law, relating to protection of public health or the Environment, the Release or threatened Release of Hazardous Material, natural resources or natural resource damages, or occupational safety or health, and any and all Environmental Permits.

"**Environmental Permit**" shall mean any permit, license, approval, registration, notification, exemption, consent or other authorization required by or from a Governmental Authority under Environmental Law.

"**Equity Interest**" shall mean, with respect to any person, any and all shares, interests, participations or other equivalents, including membership interests (however designated, whether voting or nonvoting), of equity of such person, including, if such person is a partnership, partnership interests (whether general or limited) and any other interest or participation that confers on a person the right to receive a share of the profits and losses of, or distributions of property of, such partnership, whether outstanding on the date hereof or issued after the Closing Date, but excluding debt securities convertible or exchangeable into such equity.

"**Equity Issuance**" shall mean, without duplication, (i) any issuance or sale by Holdings, any Borrower or any Subsidiary of a Borrower after the Closing Date of any Equity Interests in a Borrower or Subsidiary (including any such Equity Interests issued upon exercise of any warrant or option) or any warrants or options to purchase any such Equity Interests or (ii) any contribution to the capital of a Borrower or any Subsidiary of a Borrower.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"**ERISA Affiliate**" shall mean, with respect to any person, any trade or business (whether or not incorporated) that, together with such person, is treated as a single employer under Section 414 of the Code.

"**ERISA Event**" shall mean (a) any "reportable event," as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) with respect to a Plan, the failure to satisfy the minimum funding standard of Section 412 of the Code and Section 302 of ERISA, whether or not waived; (c) the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Plan or the failure to make any required contribution to a Multiemployer Plan; (d) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (e) the incurrence by any Company or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (f) the receipt by any Company or any of its ERISA Affiliates from the PBGC or a plan administrator of any

notice relating to the intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan, or the occurrence of any event or condition which could reasonably be expected to constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Plan; (g) the incurrence by any Company or any of its ERISA Affiliates of any liability with respect to the withdrawal from any Plan or Multiemployer Plan; (h) the receipt by any Company or its ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA; (i) the "substantial cessation of operations" within the meaning of Section 4062(e) of ERISA with respect to a Plan; (j) the making of any amendment to any Plan which could result in the imposition of a lien or the posting of a bond or other security; and (k) the occurrence of a nonexempt prohibited transaction (within the meaning of Section 4975 of the Code or Section 406 of ERISA) which could reasonably be expected to result in liability to any Company.

"**Eurodollar Borrowing**" shall mean a Borrowing comprised of Eurodollar Loans.

"**Eurodollar Loan**" shall mean any Loan bearing interest at a rate determined by reference to the Adjusted LIBOR Rate in accordance with the provisions of Article II.

"**Event of Default**" shall have the meaning assigned to such term in Section 7.01.

"**Excess Cash Flow**" shall mean, for any Excess Cash Flow Period, Consolidated Net Revenues of Borrowers and their Subsidiaries during such Excess Cash Flow Period, as shown on the financial statements for such Excess Cash Flow Period delivered pursuant to Section 5.01, *minus*, without duplication:

(i)     Consolidated Lease Operating Expenses paid with Internally Generated Cash during such Excess Cash Flow Period; *minus*

(ii)     Consolidated G&A Expenses paid with Internally Generated Cash during such Excess Cash Flow Period; *provided* no such expenses shall be included under this clause (ii) to the extent that Consolidated G&A Expenses in a fiscal year exceeds $4,000,000 in the aggregate or are prohibited by Section 6.10; *minus*

(iii)     scheduled principal and cash interest payments (other than Quarterly Amortization Payments pursuant to Section 2.09) in respect of Indebtedness of a Borrower or any Subsidiary, in each case made with Internally Generated Cash during such Excess Cash Flow Period; *minus*

(iv)     Capital Expenditures made with Internally Generated Cash during such Excess Cash Flow Period, excluding any Contract Amount (as defined below) deducted during the immediately preceding Excess Cash Flow Period pursuant to clause (x) below; *provided* that no such Capital Expenditures shall be included under this clause (iv) unless and until Borrowers have expended $7,500,000 of the proceeds of the Cap Ex Facility for the purposes set forth in Section 6.10(a) hereof and no Capital Expenditures shall be included under this clause (iv) to the extent that such Capital Expenditures are not permitted under Section 6.10(a) hereof; *minus*

(v)     optional prepayments of the Loans in each case made during such Excess Cash Flow Period with Internally Generated Cash, but only to the extent that such optional prepayments are expressly permitted hereunder; *minus*

(vi)     cash taxes paid during such Excess Cash Flow Period with Internally Generated Cash; *minus*

(vii)     Quarterly Amortization Payments with respect to such Excess Cash Flow Period, if any, pursuant to Section 2.09 in each case made with Internally Generated Cash; *minus*

(viii)     Performance Payments (as defined in the Second Lien Credit Agreement) made during such Excess Cash Flow Period in each case made with Internally Generated Cash; *minus*

(ix)     Deferred Closing Fees paid during such Excess Cash Flow Period with Internally Generated Cash; *minus*

(x)     without duplication of amounts deducted from Excess Cash Flow in prior Excess Cash Flow Periods or such Excess Cash Flow Period, to the extent set forth in a certificate of a Responsible Officer delivered to the Administrative Agent at or before the time the Compliance Certificate for the period ending simultaneously with such Excess Cash Flow Period is required to be delivered pursuant to Section 5.01(d), the aggregate amount that shall be required to be paid in cash in respect of Capital Expenditures to be made by the Borrowers or any Subsidiary during the 120 days following such Excess Cash Flow Period pursuant to binding contracts (the "**Contract Amount**") entered into prior to or during such Excess Cash Flow Period; *provided* that to the extent the aggregate amount of Internally Generated Cash actually utilized to finance such Capital Expenditures during such 120 day period is less than the Contract Amount, the amount of such shortfall shall be added to Excess Cash Flow for the Excess Cash Flow Period following such Excess Cash Flow Period; *provided further* that no such Contract Amount shall be included under this clause (x) unless and until Borrowers have expended $7,500,000 of the proceeds of the Cap Ex Facility for the purposes set forth in Section 6.10(a) hereof and no Capital Expenditures shall be included under this clause (x) to the extent that such Capital Expenditures are not permitted under Section 6.10 hereof.

"**Excess Cash Flow Period**" shall mean each fiscal quarter of Borrowers beginning with the fiscal quarter ending September 30, 2016.

"**Excluded Taxes**" shall mean, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of Borrowers hereunder, (a) Taxes imposed on or measured by its overall net income or profits and franchise taxes imposed on it (in lieu of net income taxes), however denominated, by a jurisdiction as a result of the recipient being organized or having its principal office or, in the case of any Lender, its applicable lending office in such jurisdiction, (b) in the case of a Foreign Lender (other than an assignee pursuant to a request by Borrowers under Section 2.16), any U.S. federal withholding tax that is imposed on interest payments pursuant to any Requirements of Law that are in effect at the time such Foreign Lender becomes a party hereto, except to the extent that such Foreign Lender's assignor, if any, was entitled, immediately prior to such assignment, to receive additional amounts or indemnity payments from Borrowers with respect to such withholding tax pursuant to Section 2.15; *provided* that this subclause (b) shall not apply to any tax imposed on a Lender in connection with an interest or participation in any Loan or other obligation that such Lender was required to acquire pursuant to Section 2.14(d), (c) in the case of a Foreign Lender who designates a new lending office, any U.S. federal withholding tax that is imposed on interest payments pursuant to any Requirements of Law that are in effect at the time of such change in lending office, except to the extent that such Foreign Lender was entitled, immediately prior to such change in lending office, to receive additional amounts or indemnity payments from Borrowers with respect to such withholding tax pursuant to Section 2.15, (d) any U.S. federal withholding tax that is attributable to such Lender's failure to comply with Section 2.15(e), or (e) any U.S. federal withholding Taxes imposed under FATCA.



"**Existing BofA Accounts**" shall mean (a) Deposit Account #11791-76379 at Bank of America, N.A. established by HVI CC, (b) Deposit Account #3250005-15720 at Bank of America, N.A. established by HVI CC, (c) Deposit Account #117937-6274 at Bank of America, N.A. established by HVI CC, (d) Deposit Account #11796-76169 at Bank of America, N.A. established by Rincon and (e) Deposit Account #3250005-15733 at Bank of America, N.A. established by Rincon.

"**Existing Lien**" shall have the meaning assigned to such term in Section 6.02(c).

"**FASB**" shall mean the Financial Accounting Standards Board.

"**FATCA**" shall mean Section 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantially comparable and not materially more onerous to comply with), any current or future Treasury Regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code.

"**Fee Letter**" shall mean the confidential fee letter, dated as of May 20, 2016, among Borrowers and the Administrative Agent.

"**Fees**" shall mean the Administrative Agent Fees, Deferred Closing Fees and any other fees payable pursuant to the Fee Letter.

"**Financial Officer**" of any person shall mean the chief financial officer, principal accounting officer, treasurer or controller of such person.

"**FIRREA**" shall mean the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended.

"**Foreign Lender**" shall mean any Lender that is not, for United States federal income tax purposes, (i) an individual who is a citizen or resident of the United States, (ii) a corporation, partnership or other entity treated as a corporation or partnership created or organized in or under the laws of the United States, or any political subdivision thereof, (iii) an estate whose income is subject to U.S. federal income taxation regardless of its source or (iv) a trust if a court within the United States is able to exercise primary supervision over the administration of such trust and one or more United States persons have the authority to control all substantial decisions of such trust. In addition, solely for purposes of clauses (b) and (c) of the definition of Excluded Taxes, a Foreign Lender shall include a partnership or other entity treated as a partnership created or organized in or under the laws of the United States, or any political subdivision thereof, but only to the extent the partners of such partnership (including indirect partners if the direct partners are partnerships or other entities treated as partnerships for U.S. federal income tax purposes created or organized in or under the laws of the United States or any political subdivision thereof) are treated as Foreign Lenders under the preceding sentence (in which event, the determination of whether a U.S. federal withholding tax on interest payments was imposed pursuant to any Requirements of Law in effect at the time such Foreign Lender became a party hereto will be made by reference to the time when the applicable direct or indirect partner became a direct or indirect partner of such Foreign Lender, but only if such date is later than the date on which such Foreign Lender became a party hereto).

"**Foreign Plan**" shall mean any employee benefit plan, program, policy, arrangement or agreement maintained or contributed to by any Company with respect to employees employed outside the United States.

"**Foreign Subsidiary**" shall mean a Subsidiary that is organized under the laws of a jurisdiction other than the United States or any state thereof or the District of Columbia.

"**Fund**" shall mean any person that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"**GAAP**" shall mean generally accepted accounting principles in the United States applied on a consistent basis.

"**GLR**" shall mean GLR, LLC (formerly named Greka Land Holdings, LLC), a Delaware limited liability company.

"**GLR Facility**" shall have the meaning assigned to such term in Section 4.01(r)(i).

"**GLR Facility Documents**" shall mean the "Loan Documents" as defined in the GLR Facility.

"**GLR Intercreditor Agreement**" shall have the meaning assigned to such term in Section 4.01(r)(ii).

"**Governmental Authority**" shall mean the government of the United States or any other nation, or of any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union, the European Central Bank or the Organisation for Economic Co-operation and Development).

"**Governmental Real Property Disclosure Requirements**" shall mean any Requirement of Law of any Governmental Authority requiring notification of the buyer, lessee, mortgagee, assignee or other transferee of any Real Property, facility, establishment or business, or notification, registration or filing to or with any Governmental Authority, in connection with the sale, lease, mortgage, assignment or other transfer (including any transfer of control) of any Real Property, facility, establishment or business, of the actual or threatened presence or Release in or into the Environment, or the use, disposal or handling of Hazardous Material on, at, under or near the Real Property, facility, establishment or business to be sold, leased, mortgaged, assigned or transferred.

"**Greka Collateral**" shall mean all property pledged or granted as collateral pursuant to the Greka Security Agreement from time to time.

"**Greka Guaranty**" shall mean the Guaranty Agreement substantially in the form of Exhibit H-2 among Greka Integrated, the Administrative Agent and the Collateral Agent for the benefit of the Secured Parties.

"**Greka Integrated**" shall mean Greka Integrated, Inc., a Colorado corporation.

"**Greka Refining**" shall mean Greka Refining Company (formerly known as Santa Maria Refining Company), a California corporation.

"**Greka Refining Asset Sale**" shall have the meaning assigned to such term in the Greka Guaranty.

"**Greka Security Agreement**" shall mean the Greka Integrated Security Agreement substantially in the form of Exhibit M-2 between Greka Integrated and the Collateral Agent for the benefit of the Secured Parties.

"**Guarantees**" shall mean, with respect to Holdings or any Subsidiary Guarantor, the guarantees issued under the Guaranty Agreement and the other Loan Documents, and with respect to Greka Integrated, the guarantee issued under the Greka Guaranty.

"**Guarantors**" shall mean Holdings, Greka Integrated and the Subsidiary Guarantors.

"**Guaranty Agreement**" shall mean the Guaranty Agreement substantially in the form of Exhibit H-1 among the Guarantors (other than Greka Integrated), the Administrative Agent and the Collateral Agent for the benefit of the Secured Parties.

"**Hazardous Materials**" shall mean the following: hazardous substances; hazardous wastes; polychlorinated biphenyls ("**PCBs**") or any substance or compound containing PCBs; asbestos or any asbestos-containing materials in any form or condition; radon or any other radioactive materials including any source, special nuclear or by-product material; petroleum, crude oil or any fraction thereof; and any other pollutant or contaminant or chemicals, wastes, materials, compounds, constituents or substances, subject to regulation or which can give rise to liability under any Environmental Laws.

"**Hedging Agreement**" shall mean any swap, cap, collar, forward purchase or similar agreements or arrangements to which any Company is a party dealing with interest rates, currency exchange rates or commodity prices, either generally or under specific contingencies.

"**Hedging Obligations**" shall mean obligations under or with respect to Hedging Agreements.

"**Holdings**" shall have the meaning assigned to such term in the preamble hereto.

"**HVI CC**" shall have the meaning assigned to such term in the preamble hereto.

"**Hydrocarbon Interests**" shall mean all rights, titles, interests and estates now or hereafter acquired in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests, including any reserved or residual interests of whatever nature.

"**Hydrocarbons**" shall mean oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom.

"**Immaterial Title Deficiencies**" shall mean defects or clouds on title, discrepancies in reported net revenue and working interest ownership percentage and other discrepancies and similar matters which do not, individually or in the aggregate, diminish by more than five percent (5%) the aggregate value of the Oil and Gas Properties of the Companies and their Subsidiaries evaluated in the most recently delivered Reserve Report(s).

"**Indebtedness**" of any person shall mean, without duplication, (a) all obligations of such person for borrowed money or advances; (b) all obligations of such person evidenced by bonds, debentures, notes or similar instruments; (c) all obligations of such person upon which interest charges are customarily paid or accrued; (d) all obligations of such person under conditional sale or other title

retention agreements relating to property purchased by such person; (e) all obligations of such person issued or assumed as the deferred purchase price of property or services (excluding trade accounts payable and accrued obligations incurred in the ordinary course of business on normal trade terms and not overdue by more than 90 days unless contested in good faith); (f) all Indebtedness of others secured by any Lien on property owned or acquired by such person, whether or not the obligations secured thereby have been assumed, but limited to the fair market value of such property; (g) all Capital Lease Obligations, Purchase Money Obligations and synthetic lease obligations of such person; (h) all Hedging Obligations to the extent required to be reflected on a balance sheet of such person; (i) all Attributable Indebtedness of such person; (j) all obligations of such person for the reimbursement of any obligor in respect of letters of credit, letters of guaranty, bankers' acceptances and similar credit transactions; and (k) all Contingent Obligations of such person in respect of Indebtedness or obligations of others of the kinds referred to in clauses (a) through (j) above. The Indebtedness of any person shall include the Indebtedness of any other entity (including any partnership in which such person is a general partner) to the extent such person is liable therefor as a result of such person's ownership interest in or other relationship with such entity, except (other than in the case of general partner liability) to the extent that terms of such Indebtedness expressly provide that such person is not liable therefor.

"**Indemnified Taxes**" shall mean all Taxes other than Excluded Taxes.

"**Indemnitee**" shall have the meaning assigned to such term in Section 9.03(b).

"**Information**" shall have the meaning assigned to such term in Section 9.12.

"**Initial Reserve Report**" shall mean the report of Netherland, Sewell & Associates, Inc., dated as of October 14, 2015, with respect to the Oil and Gas Properties of the Borrowers as of June 30, 2015.

"**Instruments**" shall have the meaning assigned to such term in the Security Agreement.

"**Insurance Requirements**" shall mean, collectively, all provisions of the insurance policies required by Section 5.04, all requirements of the issuers of such insurance policies and all orders, rules, regulations and any other requirements of the National Board of Fire Underwriters (or any other body exercising similar functions) binding upon each Company which is an owner of Mortgaged Property and applicable to the Mortgaged Property or any use or condition thereof.

"**Intellectual Property**" shall have the meaning assigned to such term in Section 3.07(a).

"**Intercompany Note**" shall mean a promissory note substantially in the form of Exhibit P.

"**Intercreditor Agreement**" shall mean the Intercreditor Agreement, dated as of the date hereof, among the Collateral Agent and the Second Lien Collateral Agent in the form of Exhibit R.

"**Interest Payment Date**" shall mean with respect to any Loan, the last Business Day of each month and the Maturity Date.

"**Interest Period**" shall mean (a) initially, the period commencing on the date of a Borrowing and ending on the last day of the calendar month in which such Borrowing took place and (b) thereafter, each calendar month; it being understood that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such

Interest Period shall end on the next preceding Business Day, (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period, and (c) any Interest Period in respect of any Loan that would otherwise extend beyond the Maturity Date shall end on the Maturity Date.

"**Internally Generated Cash**" shall mean any cash of a Borrower or any Subsidiary that is not generated from an Asset Sale, a Casualty Event, an incurrence of Indebtedness (including, for the avoidance of doubt, the Cap Ex Loan), an issuance of Equity Interests or a capital contribution; *provided* that any (i) Retained Borrower Excess Cash Flow shall not constitute Internally Generated Cash and (ii) deductions from Excess Cash Flow pursuant to the definition thereof shall be deemed to be made first with Internally Generated Cash.

"**Investment Property**" shall have the meaning assigned to such term in the Security Agreement.

"**Investments**" shall have the meaning assigned to such term in Section 6.04.

"**Landlord Access Agreement**" shall mean a Landlord Access Agreement, substantially in the form of Exhibit G, or such other form as may reasonably be acceptable to the Administrative Agent.

"**Leases**" shall mean any and all leases, subleases, tenancies, options, concession agreements, rental agreements, occupancy agreements, franchise agreements, access agreements and any other agreements (including all amendments, extensions, replacements, renewals, modifications and/or guarantees thereof), whether or not of record and whether now in existence or hereafter entered into, affecting the use or occupancy of all or any portion of any Real Property (including any Oil and Gas Property that constitutes Real Property).

"**Lenders**" shall mean (a) the financial institutions listed on Schedule 1.01(d) and (b) any Eligible Assignee that has become a party hereto pursuant to an Assignment and Assumption, other than, in each case, any such financial institution that has ceased to be a party hereto pursuant to an Assignment and Assumption.

"**LIBOR Rate**" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, the rate per annum determined by the Administrative Agent to be the arithmetic mean of the offered rates for deposits in dollars with a term comparable to such Interest Period that appears on the London Interbank Offered Rate administered by the ICE Benchmark Administration (or any other person that takes over the administration of such rate), displayed on the Reuters Screen LIBOR01 Page (or such other page as may replace such page on such service for the purpose of displaying the rates at which dollar deposits are offered by leading banks in the London interbank deposit market) at approximately 11:00 a.m., London, England time, on the second full London Business Day preceding the first day of such Interest Period; *provided, however,* that (i) if no comparable term for an Interest Period is available, the LIBOR Rate shall be determined using the weighted average of the offered rates for the two terms most nearly corresponding to such Interest Period and (ii) if there shall at any time no longer exist a London Interbank Offered Rate as set forth above, "LIBOR Rate" shall mean, with respect to each day during each Interest Period pertaining to Eurodollar Borrowings comprising part of the same Borrowing, the rate per annum equal to the rate at which the Administrative Agent is offered deposits in dollars at approximately 11:00 a.m., London, England time, two London Business Days prior to the first day of such Interest Period in the London interbank market for delivery on the first day of such Interest Period



for the number of days comprised therein and in an amount comparable to its portion of the amount of such Eurodollar Borrowing to be outstanding during such Interest Period.

"**Lien**" shall mean, with respect to any property, (a) any mortgage, deed of trust, lien, pledge, encumbrance, charge, assignment, hypothecation, security interest or encumbrance of any kind or any arrangement to provide priority or preference or any filing of any financing statement under the UCC or any other similar notice of lien under any similar notice or recording statute of any Governmental Authority, including any easement, right-of-way or other encumbrance on title to Real Property or Oil and Gas Properties, in each of the foregoing cases whether voluntary or imposed by law, and any agreement to give any of the foregoing, *provided* that this definition shall not include any expired financing statement or lien or improperly filed financing statement which, in any such case, does not otherwise give rise to a valid lien or security interest and is terminated within thirty (30) days after a Loan Party becomes aware of such financing statement; (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such property; and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"**Loan Documents**" shall mean this Agreement, the Intercreditor Agreement, the Notes (if any), the Security Documents, the Guaranty Agreement, the Greka Guaranty and, solely for purposes of paragraph (e) of Section 7.01, the Fee Letter.

"**Loan Parties**" shall mean Borrowers and Guarantors.

"**Loans**" shall mean the Loans made on the Closing Date pursuant to Section 2.01.

"**London Business Day**" shall mean any day on which banks are generally open for dealings in dollar deposits in the London interbank market.

"**Majority Lenders**" shall mean Lenders having more than 50% of the sum of all Loans outstanding; *provided* that the Loans held or deemed held by any Defaulting Lender shall be excluded for purposes of making a determination of Majority Lenders.

"**Margin Stock**" shall have the meaning assigned to such term in Regulation U.

"**Market Disruption Loans**" shall mean Loans the rate of interest applicable to which is based upon the Market Disruption Rate, and the Applicable Margin with respect thereto shall be the same as the Applicable Margin then applicable to Eurodollar Loans.

"**Market Disruption Rate**" shall mean, for any day, a fluctuating rate per annum (rounded upwards, if necessary, to the nearest 1/100th of 1%) equal to the rate for such day reasonably determined by the Administrative Agent to be the cost of funds of representative participating members in the interbank Eurodollar market selected by the Administrative Agent (which may include Lenders) for maintaining loans similar to the relevant Market Disruption Loans. Any change in the Market Disruption Rate shall be effective as of the opening of business on the effective day of any change in the relevant component of the Market Disruption Rate. Notwithstanding the foregoing, if the "Market Disruption Rate" as determined in accordance with the immediately preceding sentences is less than the percentage specified in the proviso of the definition of "Adjusted LIBOR Rate," then for all purposes of this Agreement and the other Loan Documents, the "Market Disruption Rate" shall be deemed equal to such percentage for such Interest Period.

"**Material Adverse Effect**" shall mean (a) a material adverse effect on the business, property, results of operations, prospects or condition, financial or otherwise, of Holdings, the Borrowers

and Subsidiaries, taken as a whole; (b) material impairment of the ability of the Companies or Greka Integrated to fully and timely perform any of their obligations under any Loan Document; (c) material impairment of the rights of or benefits or remedies available to the Lenders or the Collateral Agent under any Loan Document; or (d) a material adverse effect on the Collateral or the Liens in favor of the Collateral Agent (for its benefit and for the benefit of the other Secured Parties) on the Collateral or the priority of such Liens.

"**Material Indebtedness**" shall mean (a) Indebtedness under the Second Lien Loan Documents, (b) Indebtedness under the GLR Facility and (c) any other Indebtedness (other than the Loans) or Hedging Obligations of any Company in an aggregate outstanding principal amount exceeding $5.0 million. For purposes of determining Material Indebtedness, the "principal amount" in respect of any Hedging Obligations of any Company at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that such Company would be required to pay if the related Hedging Agreement were terminated at such time.

"**Maturity Date**" shall mean June 30, 2021.

"**Maximum Rate**" shall have the meaning assigned to such term in Section 9.14.

"**Midway Sunset Posting Price**" shall mean, for any month, the arithmetic average of the daily price of crude oil posted by Chevron, ExxonMobil, Shell and Phillips66 (Union 76) under the label "Midway Sunset"; *provided* that if any of the foregoing buyers ceases to post a daily price of crude oil under the label "Midway Sunset," then Midway Sunset Posting Price shall mean, for any month, the arithmetic average of the daily price of crude oil posted by, as determined by the Administrative Agent, (a) the remaining three of the above-mentioned buyers of crude oil or (b) the remaining three of the above-mentioned buyers of crude oil and a replacement buyer to be selected by the Administrative Agent with the consent of the Borrowers, such consent to any replacement buyer not to be unreasonably withheld.

"**Minimum Market Price**" shall mean, for any month, the Midway Sunset Posting Price less $7.00 per barrel.

"**MNPI**" shall have the meaning assigned to such term in Section 9.01(d).

"**Mortgage**" shall mean an agreement, including, but not limited to, a mortgage, deed of trust or any other document, creating and evidencing a Lien on a Mortgaged Property, which shall be substantially in the form of Exhibit J or other form reasonably satisfactory to the Collateral Agent, in each case, with such schedules and including such provisions as shall be necessary to conform such document to applicable local or foreign law or as shall be customary under applicable local or foreign law.

"**Mortgaged Property**" shall mean each Real Property and each Oil and Gas Property subject to a Mortgage delivered pursuant to Section 4.01(o)(i) or, after the Closing Date, pursuant to Section 5.11.

"**Multiemployer Plan**" shall mean a multiemployer plan within the meaning of Section 4001(a)(3) or Section 3(37) of ERISA (a) to which any Company or any of its ERISA Affiliates is then making or accruing an obligation to make contributions; (b) to which any Company or any of its ERISA Affiliates has within the preceding five plan years made contributions; or (c) with respect to which any Company could incur liability.

"**Net Cap Ex Facility Proceeds**" shall mean (a) $7,500,000 minus (b) the aggregate amount of 2016 Pre-Funding Cash Contributions, it being understood for the avoidance of doubt that Net Cap Ex Facility Proceeds shall not be less than $4,500,000.

"**Net Cash Proceeds**" shall mean:

(a)    with respect to any Asset Sale (other than any issuance or sale of Equity Interests), the cash proceeds received by any Company or any Subsidiary (including cash proceeds subsequently received (as and when received by any Company or any Subsidiary) in respect of non-cash consideration initially received) net of (i) selling expenses (including reasonable brokers' fees or commissions, legal, accounting and other professional and transactional fees, transfer and similar taxes and Borrowers' good faith estimate of income taxes actually paid or payable in connection with such sale); (ii) amounts provided as a reserve, in accordance with GAAP, against (x) any liabilities under any indemnification obligations associated with such Asset Sale, or (y) any other liabilities retained by any Company or any Subsidiary associated with the properties sold in such Asset Sale (excluding any liabilities owed to any Affiliates) (*provided* that, to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Cash Proceeds); (iii) Borrowers' good faith estimate of payments required to be made with respect to unassumed liabilities relating to the properties sold within 90 days of such Asset Sale (excluding liabilities owed to any Affiliate) (*provided* that, to the extent such cash proceeds are not used to make payments in respect of such unassumed liabilities within 90 days of such Asset Sale, such cash proceeds shall constitute Net Cash Proceeds); and (iv) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness for borrowed money (excluding any Subordinated Indebtedness or Indebtedness owed to any Affiliate) which is secured by a Lien on the properties sold in such Asset Sale (so long as such Lien was permitted to encumber such properties under the Loan Documents at the time of such sale) and which is repaid with such proceeds (other than any such Indebtedness assumed by the purchaser of such properties);

(b)    with respect to any Debt Issuance, any Equity Issuance or any other issuance or sale of Equity Interests by any Company or any Subsidiary, the cash proceeds thereof, net of customary fees, commissions, costs and other expenses incurred in connection therewith; and

(c)    with respect to any Casualty Event, the cash insurance proceeds, condemnation awards and other compensation received in respect thereof, net of all reasonable costs and expenses incurred in connection with the collection of such proceeds, awards or other compensation in respect of such Casualty Event.

"**Notes**" shall mean any notes evidencing the Loans issued pursuant to this Agreement, if any, substantially in the form of Exhibit K.

"**Obligations**" shall mean (a) obligations of Borrowers and the other Loan Parties from time to time arising under or in respect of the due and punctual payment of (i) the principal of and premium, if any, and interest (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, and (ii) all other monetary obligations, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), of Borrowers and the other Loan Parties under this Agreement and the other Loan Documents, and (b) the due and punctual

performance of all covenants, agreements, obligations and liabilities of Borrowers and the other Loan Parties under or pursuant to this Agreement and the other Loan Documents.

"**OFAC**" shall mean the U.S. Treasury's Office of Foreign Assets Control.

"**Officers' Certificate**" shall mean a certificate executed by the chairman of the Board of Directors (if an officer), the chief executive officer or the president and one of the Financial Officers, each in his or her official (and not individual) capacity.

"**Oil and Gas Properties**" shall mean (a) Hydrocarbon Interests; (b) the properties now or hereafter pooled or unitized with Hydrocarbon Interests; (c) all presently existing or future unitization, pooling agreements and declarations of pooled units and the units created thereby (including, without limitation, all units created under orders, regulations and rules of any Governmental Authority) which may affect all or any portion of the Hydrocarbon Interests; (d) all operating agreements, contracts and other agreements, including production sharing contracts and agreements, which relate to any of the Hydrocarbon Interests or the production, sale, purchase, exchange or processing of Hydrocarbons from or attributable to such Hydrocarbon Interests; (e) all Hydrocarbons in and under and which may be produced and saved or attributable to the Hydrocarbon Interests, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests; (f) all tenements, hereditaments, appurtenances and properties in any manner appertaining, belonging, affixed or incidental to the Hydrocarbon Interests; and (g) all properties, rights, titles, interests and estates described or referred to above, including any and all property, real or personal, now owned or hereinafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any of such Hydrocarbon Interests or properties (excluding drilling rigs, automotive equipment, rental equipment or other personal property which may be on such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, buildings, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.

"**Operating Accounts**" shall mean (a) Deposit Account #4996944404 at Citibank, N.A. established by HVI CC and (b) Deposit Account #4996947082 at Citibank, N.A. established by Rincon.

"**Organizational Documents**" shall mean, with respect to any person, (a) in the case of any corporation, the certificate of incorporation and by-laws (or similar documents) of such person, (b) in the case of any limited liability company, the certificate of formation and operating agreement (or similar documents) of such person, (c) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar documents) of such person, (d) in the case of any general partnership, the partnership agreement (or similar document) of such person and (e) in any other case, the functional equivalent of the foregoing.

"**Other Taxes**" shall mean all present or future stamp or documentary taxes or any other excise, property or similar taxes, charges or levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document (and any interest, additions to tax or penalties applicable thereto).

"**Participant**" shall have the meaning assigned to such term in <u>Section 9.04(d)</u>.

"**Participant Register**" shall have the meaning assigned to such term in Section 9.04(d).

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"**Perfection Certificate**" shall mean a certificate in the form of Exhibit L-1 or any other form approved by the Collateral Agent, as the same shall be supplemented from time to time by a Perfection Certificate Supplement or otherwise.

"**Perfection Certificate Supplement**" shall mean a certificate supplement in the form of Exhibit L-2 or any other form approved by the Collateral Agent.

"**Permitted Collateral Liens**" shall mean (a) in the case of Collateral other than Mortgaged Property and Securities Collateral, Permitted Liens, (b) in the case of Securities Collateral, the Liens described in clauses (l), (m) and (n) of Section 6.02 and other Permitted Liens arising solely by operation of law, and (c) in the case of Mortgaged Property, the Liens described in clauses (a), (b), (d), (e), (g), (l), (m) and (n) of Section 6.02.

"**Permitted Holders**" shall mean (a) the person named on Schedule 1.01(b), (b) the descendants, heirs and devisees of such person, and (c) the personal representatives, executors and trustees of any of the foregoing and any direct or indirect Wholly Owned Subsidiaries of the foregoing.

"**Permitted Liens**" shall have the meaning assigned to such term in Section 6.02.

"**Permitted Tax Distributions**" shall mean tax distributions by Holdings to Greka Integrated (so long as the Borrowers or Holdings are treated as pass through or disregarded entities for U.S. federal income tax purposes) ("**Tax Distributions**") in order to pay consolidated or combined federal, state or local income taxes attributable to the income of the Borrowers in an amount not to exceed the income tax liabilities that would have been payable by the Borrowers on a standalone basis, reduced by any such income taxes paid or to be paid directly by the Borrowers. For each taxable year subsequent to the Closing Date, the Borrowers shall make a final accounting for Tax Distributions for each taxable year after actual taxable income allocable from the Borrowers for such taxable year has been determined, and (i) any shortfall in the amount of Tax Distributions the members received for such taxable year based on such final determination may be distributed to such members, and (ii) any excess in the amount of Tax Distributions made for such taxable year shall be applied to reduce the amount of Tax Distributions to be made for the subsequent taxable year (and, to the extent not covered thereby, for taxable years thereafter) to the full extent thereof; *provided* that notwithstanding anything in the foregoing to the contrary, Permitted Tax Distributions shall not include any Tax Distributions related to (x) income or gain that may have accrued or been realized prior to January 1, 2016 or for which a Tax Distribution occurred prior to the Closing Date or (y) income or gain arising out of any transaction involving a change of control of Holdings or any of its Subsidiaries or any other transaction involving the sale or other disposition or distribution of any assets or capital stock of Holdings or any of its Subsidiaries; and *provided further* that Permitted Tax Distributions shall be made to any member only to the extent that such member is subject to U.S. federal, state or local income taxes with respect to such member's distributive share of Borrowers' income, and shall be reduced by the amount of any tax withheld by the Borrowers with respect to any such member and which is paid over to a taxing authority in satisfaction of such member's tax liability.

"**person**" shall mean any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**PIK Interest**" shall have the meaning set forth in Section 2.06(c).

"**Plan**" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA which is maintained or contributed to by any Company or its ERISA Affiliate or with respect to which any Company could incur liability (including under Section 4069 of ERISA).

"**Platform**" shall have the meaning assigned to such term in Section 9.01(c).

"**Preferred Stock**" shall mean, with respect to any person, any and all preferred or preference Equity Interests (however designated) of such person whether now outstanding or issued after the Closing Date.

"**Preferred Stock Issuance**" shall mean the issuance or sale by any Company or any Subsidiary of any Preferred Stock after the Closing Date.

"**Private Siders**" shall have the meaning assigned to such term in Section 9.01(d).

"**Pro Forma Basis**" shall mean on a basis in accordance with GAAP and Regulation S-X and otherwise reasonably satisfactory to the Administrative Agent.

"**Property**" shall mean any right, title or interest in or to property or assets of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible and including Equity Interests or other ownership interests of any person and whether now in existence or owned or hereafter entered into or acquired, including all Real Property and all Oil and Gas Properties.

"**Proved Reserves**" shall mean those Oil and Gas Properties designated as proved in the most recent Reserve Report.

"**Purchase Money Obligation**" shall mean, for any person, the obligations of such person in respect of Indebtedness (including Capital Lease Obligations) incurred for the purpose of financing all or any part of the purchase price of any property (including Equity Interests of any person) or the cost of installation, construction or improvement of any property and any refinancing thereof; *provided*, *however*, that (i) such Indebtedness is incurred within one year after such acquisition, installation, construction or improvement of such property by such person and (ii) the amount of such Indebtedness does not exceed 100% of the cost of such acquisition, installation, construction or improvement, as the case may be.

"**PV-10 Value**" shall mean, as of any date of determination, the present value of estimated future net cash flows attributable to the Proved Reserves of the Borrowers and their respective Subsidiaries (using a discount rate of 10%), as set forth in the most recent Reserve Report delivered pursuant to Section 4.01(q) or Section 5.16 calculated in accordance with the rules and regulations of the Securities and Exchange Commission then in effect based on the five-year forward strip price for crude oil (WTI) and natural gas (Henry Hub), and using the same level used for the fifth year for all years thereafter, as quoted on the NYMEX as of the first day of the second month immediately preceding the date on which the applicable Reserve Report shall have been delivered (as adjusted for basis differentials). The amount of the PV-10 Value then in effect shall be (i) calculated on a pro forma basis for dispositions and acquisitions of Oil and Gas Properties consummated since the date of the most recently delivered Reserve Report to the extent that a reserve report reasonably acceptable to the Collateral Agent in respect of Proved Reserves attributable to such disposition or acquisition is available and (ii) adjusted to give effect to the Borrowers' and their respective Subsidiaries' commodity Hedging Agreements then in effect. Prior to the completion of the Reserve Report, the Collateral Agent and the Collateral Agent's internal petroleum team shall be given the opportunity to review a draft Reserve



FILED: NEW YORK COUNTY CLERK 10/21/2019 10:53 PM
NYSCEF DOC. NO. Case 1:19-cv-10786-LLS-KNF Document 5-2 Filed 11/21/19 Page 37 of 70

INDEX NO. 656157/2019
RECEIVED NYSCEF: 10/21/2019

Report and discuss the assumptions therein with the Approved Petroleum Engineer. These assumptions shall include but are not limited to operating expenses, general and administrative expenses, capital expenditures, regional oil price differentials and production profile. The Collateral Agent shall have the right to adjust the Reserve Report for any assumptions which are not reflective of historical performance. The Collateral Agent shall also have the right to approve any deviation from the rules and regulations of the Securities and Exchange Commission.

"**Qualified Capital Stock**" of any person shall mean any Equity Interests of such person that are not Disqualified Capital Stock.

"**Quarterly Amortization Date**" shall mean the last Business Day of each fiscal quarter ending on and after the first fiscal quarter of 2019.

"**Quarterly Amortization Payment**" shall mean, with respect to any fiscal quarter in which a Quarterly Amortization Date occurs during 2019, $1,000,000 and with respect to any fiscal quarter in which a Quarterly Amortization Date occurs during 2020, $1,750,000.

"**Quarterly WTI Price**" shall mean with respect to any fiscal quarter the average daily WTI Price of oil per barrel for each day in such fiscal quarter. For purposes hereof, "**WTI Price**" shall mean the arithmetic average of the daily settlement prices as reported by NYMEX for the First Nearby Month NYMEX Light Sweet Crude Oil Futures Contract for each day during such fiscal quarter on which such contract is normally scheduled to trade on the NYMEX; where:

- "**NYMEX**" means the New York Mercantile Exchange, Inc. or its successor; and

- the "**First Nearby Month NYMEX Light Sweet Crude Oil Futures Contract**" means for any day in a month the "Light Sweet Crude Oil Futures Contract - Cushing, Oklahoma Delivery" (as defined by the New York Mercantile Exchange Guide) for delivery of the West Texas Intermediate Deliverable Crude Stream (as so defined) for the delivery month occurring nearest to but after such day that is normally scheduled to trade on the NYMEX on such day (i.e., the "first line" (prompt month) futures contract for such day).

Notwithstanding the foregoing, if any of the following occur with respect to the First Nearby Month NYMEX Light Sweet Crude Oil Futures Contract on any one or more days, the Administrative Agent will designate, in good faith, a reasonable alternative price or adjustment to the reported price for such day or days:

(i)     the number of contracts traded on NYMEX on the day that would otherwise be a trading day is so low as to not provide reasonably reliable pricing; or

(ii)    the imposition of, change in or removal of an excise, severance, sales, use, value-added, transfer, stamp, documentary, recording or similar tax on, or measured by reference to, oil (other than a tax on, or measured by reference to overall gross or net income) by any government or taxation authority after the Closing Date, if the direct effect of such imposition, change or removal is to raise or lower the daily settlement price from what it would have been without that imposition, change or removal.

As of the date hereof, the contract for the then nearest delivery month ceases to trade on the third Business Day prior to the twenty-fifth calendar day of the month preceding the then nearest delivery month and the contract for the following delivery month would then become the nearest delivery month

contract that continues to trade. The example calculation set forth on Schedule 1.01(c) annexed hereto illustrates the change during a given month from the then current nearest delivery month to the new nearest delivery month.

"**Quarterly WTI Price Reset Date**" shall mean January 1, 2018.

"**Quarterly WTI Reset Price**" shall mean the average daily WTI Price of oil per barrel for each day in the fiscal quarter ending December 31, 2017.

"**Real Property**" shall mean, collectively, all right, title and interest (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned, leased or operated by any person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof.

"**Register**" shall have the meaning assigned to such term in Section 9.04(c).

"**Regulation D**" shall mean Regulation D of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation S-X**" shall mean Regulation S-X promulgated under the Securities Act.

"**Regulation T**" shall mean Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation U**" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation X**" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Related Parties**" shall mean, with respect to any person, such person's Affiliates and the partners, directors, officers, employees, agents and advisors of such person and of such person's Affiliates.

"**Release**" shall mean any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, dispersing, emanating or migrating of any Hazardous Material in, into, onto or through the Environment.

"**Required Lenders**" shall mean Lenders having more than 66⅔% of the sum of all Loans outstanding; *provided* that the Loans held or deemed held by any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"**Requirements of Law**" shall mean, collectively, any and all applicable requirements of any Governmental Authority including any and all laws, judgments, orders, executive orders, decrees, determinations, ordinances, rules, regulations, permits, licenses, statutes or case law, applicable law, statute, code, ordinance, order, determination, rule, regulation, judgment, decree, injunction, franchise, permit, certificate, license, rules of common law, authorization or other directive or requirement, whether now or hereinafter in effect, including, without limitation, Environmental Laws, energy regulations and occupational, safety and health standards or controls.

"**Reserve Report**" shall mean the Initial Reserve Report and each other report, in form and substance reasonably satisfactory to the Administrative Agent, setting forth, as of each December 31st or June 30th, the proved oil and gas reserves attributable to the Oil and Gas Properties of the Companies, along with related probable and possible oil and gas reserves attributable to such Oil and Gas Properties, together with a projection of the rate of production and future net income, taxes, operating expenses and capital expenditures with respect thereto as of such date, as may be revised and adjusted by the Collateral Agent as described in the definition of "PV-10 Value".

"**Response**" shall mean (a) "response" as such term is defined in CERCLA, 42 U.S.C. § 9601(24), and (b) all other actions required by any Governmental Authority or voluntarily undertaken to (i) clean up, remove, treat, abate or in any other way address any Hazardous Material in the Environment; (ii) prevent the Release or threat of Release, or minimize the further Release, of any Hazardous Material; or (iii) perform studies and investigations in connection with, or as a precondition to, or to determine the necessity of the activities described in, clause (i) or (ii) above.

"**Responsible Officer**" of any person shall mean any executive officer or Financial Officer of such person and any other officer or similar official thereof with responsibility for the administration of the obligations of such person in respect of this Agreement.

"**Retained Borrower Excess Cash Flow**" shall mean the aggregate amount of Excess Cash Flow generated by Borrowers in all prior Excess Cash Flow Periods, cumulatively, *minus* all amounts prepaid or required to be prepaid in accordance with Section 2.10(f) with respect to all such Excess Cash Flow Periods, cumulatively.

"**Rincon**" shall have the meaning assigned to such term in the preamble hereto.

"**ROFR Notice**" has the meaning assigned to such term in Section 9.04(b)(i)(A).

"**ROFR Period**" has the meaning assigned to such term in Section 9.04(b)(i)(A).

"**Sale and Leaseback Transaction**" has the meaning assigned to such term in Section 6.03.

"**Sanctioned Person**" shall mean any person that (i) (x) is publicly identified on the most current list of "Specially Designated Nationals and Blocked Persons" published by OFAC, (y) is publicly identified on the most current list of "Foreign Sanctions Evaders List" published by OFAC or (z) is a national of or resides, is organized or chartered, or has a place of business in a country or territory that is subject to any Sanctions (including Cuba, Iran, North Korea, Sudan and Syria), (ii) is otherwise subject to or the target of any Sanctions, or (iii) is owned or controlled by (including by virtue of such person being a director or owning Voting Stock), or acts, directly or indirectly, for or on behalf of, any person described in clause (i) or (ii) above or a foreign government that is the subject or target of Sanctions.

"**Sanctions**" shall mean any sanctions administered or enforced by OFAC or the U.S. State Department, the European Union, the United Nations Security Council, Her Majesty's Treasury, or other relevant Governmental Authority.

"**Sanctions Laws**" shall mean any Requirements of Law related to counter-terrorism and economic sanctions, including the USA PATRIOT Act, The Currency and Foreign Transactions Reporting Act (31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959), the Trading With the Enemy Act (50 U.S.C. §§ 1 *et seq.*), the International Emergency Economic Powers Act (50 U.S.C. §§ 1701 *et seq.*), any Sanctions and, in each case, their implementing rules and regulations.



"**Second Lien Administrative Agent**" shall mean UBS AG, London Branch, in its capacity as administrative agent under the Second Lien Credit Agreement, and its successors and assigns.

"**Second Lien Collateral Agent**" shall mean UBS AG, London Branch, in its capacity as collateral agent under the Second Lien Credit Agreement, and its successors and assigns.

"**Second Lien Credit Agreement**" shall mean (a) that certain second lien credit agreement dated as of the date hereof among Borrowers, Holdings, the lenders party thereto and UBS AG, London Branch, as administrative agent and as collateral agent for the Second Lien Secured Parties, as amended, restated, supplemented or modified from time to time to the extent permitted by this Agreement and the Intercreditor Agreement and (b) any other credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any indebtedness or other financial accommodation that has been incurred to extend (subject to the limitations set forth herein and in the Intercreditor Agreement) or refinance in whole or in part the indebtedness and other obligations outstanding under the (x) credit agreement referred to in clause (a) or (y) any subsequent Second Lien Credit Agreement, unless such agreement or instrument expressly provides that it is not intended to be and is not a Second Lien Credit Agreement hereunder.  Any reference to the Second Lien Credit Agreement hereunder shall be deemed a reference to any Second Lien Credit Agreement then in existence.

"**Second Lien Loan Documents**" shall mean the Second Lien Credit Agreement and the other Loan Documents (as defined in the Second Lien Credit Agreement), including each mortgage and other security documents, guaranties and the notes issued thereunder.

"**Second Lien Loans**" shall mean the senior secured second lien term loan facility under the Second Lien Credit Agreement.

"**Second Lien Secured Parties**" shall mean the Second Lien Administrative Agent, the Second Lien Collateral Agent and each person that is a lender or agent under the Second Lien Credit Agreement.

"**Second Lien Security Documents**" shall have the meaning assigned to the term "Security Documents" in the Second Lien Credit Agreement.

"**Secured Asset Coverage Ratio**" shall mean, at any time, the ratio of (a) the PV-10 Value in effect at such time to (b) Consolidated Indebtedness less the aggregate amount of unsecured Indebtedness of Borrowers and their Subsidiaries at such time (excluding, for avoidance of doubt, Indebtedness in respect of the GLR Facility (including the Cap Ex Facility)).

"**Secured Obligations**" shall mean (a) the Obligations, (b) the due and punctual payment and performance of all obligations of Borrowers and the other Companies under each Hedging Agreement entered into with any counterparty that is a Secured Party; *provided*, that the Majority Lenders shall have consented to such counterparty being a Secured Party with respect to Hedging Agreements, and (c) the due and punctual payment and performance of all obligations of Borrowers and the other Companies (including overdrafts and related liabilities) under each Treasury Services Agreement entered into with any counterparty that is a Secured Party.

"**Secured Parties**" shall mean, collectively, (a) the Administrative Agent, (b) the Collateral Agent, (c) the Lenders and (d) each counterparty to a Hedging Agreement or Treasury Services Agreement if (i) at the date of entering into such Hedging Agreement or Treasury Services Agreement such person was an Agent or a Lender or an Affiliate of an Agent or a Lender, (ii) in the case of a



Hedging Agreement, the Required Lenders shall have consented to such person being a Secured Party with respect to Hedging Agreements, and (iii) such person executes and delivers to the Administrative Agent a letter agreement in form and substance acceptable to the Administrative Agent pursuant to which such person (A) appoints the Collateral Agent as its agent under the applicable Loan Documents and (B) agrees to be bound by the provisions of Sections 8.03, 9.03 and 9.09 as if it were a Lender.

"**Securities Account**" shall have the meaning assigned to such term in the Security Agreement.

"**Securities Act**" shall mean the Securities Act of 1933.

"**Securities Collateral**" shall have the meaning assigned to such term in the applicable Security Document.

"**Security Agreement**" shall mean a Security Agreement substantially in the form of Exhibit M-1 among the Loan Parties (other than Greka Integrated) and the Collateral Agent for the benefit of the Secured Parties.

"**Security Agreement Collateral**" shall mean all property pledged or granted as collateral pursuant to the Security Agreement (a) on the Closing Date or (b) thereafter pursuant to Section 5.11.

"**Security Documents**" shall mean the Security Agreement, the Greka Security Agreement, the Mortgages, the Control Agreements, the Cap Ex Control Agreement, and each other security document or pledge agreement delivered in accordance with applicable local or foreign law to grant a valid, perfected security interest in any property as collateral for the Secured Obligations, and all UCC or other financing statements or instruments of perfection required by this Agreement, any Security Agreement, any Mortgage or any other such security document or pledge agreement to be filed with respect to the security interests in property and fixtures created pursuant to any Security Agreement or any Mortgage and any other document or instrument utilized to pledge or grant or purport to pledge or grant a security interest or lien on any property as collateral for the Secured Obligations.

"**Senior Leverage Ratio**" shall mean, at any date of determination, the ratio of (a) Indebtedness of Borrowers and their Subsidiaries under the Loan Documents on such date to (b) Consolidated EBITDA for the Test Period then most recently ended.

"**Specified Litigation**" shall mean the litigation matter existing on the Closing Date involving HVI CC that the Borrowers and the Administrative Agent have agreed pursuant to any email communications between their respective law firms is the litigation matter subject to Section 7.01(i).

"**Specified Oil and Gas Properties**" means those properties that are not producing Hydrocarbons as of the Closing Date.

"**Statutory Reserves**" shall mean for any Interest Period for any Eurodollar Borrowing, the average maximum rate at which reserves (including any marginal, supplemental or emergency reserves) are required to be maintained during such Interest Period under Regulation D by member banks of the United States Federal Reserve System in New York City with deposits exceeding one billion dollars against "Eurocurrency liabilities" (as such term is used in Regulation D). Eurodollar Borrowings shall be deemed to constitute Eurocurrency liabilities and to be subject to such reserve requirements without benefit of or credit for proration, exceptions or offsets which may be available from time to time to any Lender under Regulation D.

"**Subordinated Indebtedness**" shall mean (a) the Indebtedness under the Second Lien Loan Documents, (b) Indebtedness under the GLR Facility, and (c) any other Indebtedness of any Loan Party that is by its terms subordinated in right of payment to the Obligations.

"**Subsidiary**" shall mean, with respect to any person (the "**parent**") at any date, (i) any person the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, (ii) any other corporation, limited liability company, association or other business entity of which securities or other ownership interests representing more than 50% of the voting power of all Equity Interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Board of Directors thereof are, as of such date, owned, controlled or held by the parent and/or one or more subsidiaries of the parent, (iii) any partnership (a) the sole general partner or the managing general partner of which is the parent and/or one or more subsidiaries of the parent or (b) the only general partners of which are the parent and/or one or more subsidiaries of the parent and (iv) any other person that is otherwise Controlled by the parent and/or one or more subsidiaries of the parent. Unless the context requires otherwise, "Subsidiary" refers to a Subsidiary of a Borrower.

"**Subsidiary Guarantor**" shall mean each Subsidiary listed on Schedule 1.01(a), and each other Subsidiary that is or becomes a party to this Agreement pursuant to Section 5.11.

"**Supply Contract**" shall mean each of (a) the Crude Oil Purchase Contract, Contract No. COP-002, dated as of August 1, 1999, between Santa Maria Refining Company, as buyer, and HVI CC, as seller, as amended by the Crude Oil Purchase Contract Amendment, Amended Contract No. COP-002/A1, dated as of October 21, 1999, the Crude Oil Purchase Contract Amendment, Amended Contract No. COP-002/A2, dated as of July 1, 2002, the Crude Oil Purchase Contract Amendment, Amended Contract No. COP-002/A3, dated as of January 1, 2003, the Crude Oil Purchase Contract Amendment, Amended Contract No. COP-002/A4, dated as of January 1, 2004, the Crude Oil Purchase Contract Amendment, Amended Contract No. COP-002/A5, dated as of July 31, 2004, the Crude Oil Purchase Contract Amendment, Amended Contract No. COP-002/A6, dated as of January 1, 2007, the Crude Oil Purchase Contract Amendment, Amended Contract No. COP-002/A7, dated as of November 1, 2007, the Crude Oil Purchase Contract Amendment, Amended Contract No. COP-002/A8, dated as of June 1, 2010, the Crude Oil Purchase Contract Amendment, Amended Contract No. COP-002/A9, dated as of March 1, 2011, the Crude Oil Purchase Contract Amendment, Amended Contract No. COP-002/A10, effective as of January 1, 2012, and the Crude Oil Purchase Contract Amendment, Amended Contract No. COP-002/A11, effective as of July 1, 2012, (b) the Crude Oil Purchase Contract, Contract No. COP-003, dated as of August 1, 2000, between Santa Maria Refining Company, as buyer, and HVI CC, as seller, as amended by the Crude Oil Purchase Contract Amendment, Amended Contract No. COP-003/A1, dated as of February 1, 2002, the Crude Oil Purchase Contract Amendment, Amended Contract No. COP-003/A2, dated as of January 1, 2004, the Crude Oil Purchase Contract Amendment, Amended Contract No. COP-003/A3, dated as of August 1, 2005, the Crude Oil Purchase Contract Amendment, Amended Contract No. COP-003/A4, dated as of January 1, 2007, and the Crude Oil Purchase Contract Amendment, Amended Contract No. COP-003/A5, dated as of October 1, 2007, and (c) the Crude Oil Purchase Contract, Contract No. COP-004, dated as of June 1, 2009, between Santa Maria Refining Company, as buyer, and HVI CC, as seller, as amended by the Crude Oil Purchase Contract Amendment, Amended Contract No. COP-004/A1, dated as of September 1, 2010, and the Crude Oil Purchase Contract Amendment, Amended Contract No. COP-004/A2, dated as of December 1, 2013.

"**Tax Distributions**" shall have the meaning assigned to such term in the definition of "Permitted Tax Distributions.



"**Tax Return**" shall mean all returns, statements, filings, attachments and other documents or certifications required to be filed in respect of Taxes.

"**Taxes**" shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

A "**Test Period**" at any time shall mean the period of four consecutive fiscal quarters of Borrowers ended on or prior to such time (taken as one accounting period).

"**Transaction Documents**" shall mean the Loan Documents, the Second Lien Loan Documents, the GLR Facility Documents, the GLR Intercreditor Agreement and the VPP Termination Documents.

"**Transactions**" shall mean, collectively, the transactions to occur on or prior to the Closing Date pursuant to the Transaction Documents, including (a) the execution, delivery and performance of the Loan Documents and the borrowings hereunder; (b) the VPP Termination; (c) the execution, delivery and performance of the Second Lien Loan Documents and the borrowings thereunder; and (d) the payment of all fees and expenses to be paid on or prior to the Closing Date and owing in connection with the foregoing.

"**Treasury Services Agreement**" shall mean any agreement to which any Company is a party relating to treasury, depositary and cash management services or automated clearinghouse transfer of funds.

"**UCC**" shall mean the Uniform Commercial Code as in effect from time to time (except as otherwise specified) in any applicable state or jurisdiction.

"**United States**" shall mean the United States of America.

"**USA PATRIOT Act**" shall have the meaning set forth in the definition of "Anti-Money Laundering Laws."

"**Volumetric Production Payment**" shall mean the volumetric production payment conveyed by Borrowers to UBS AG, pursuant to the Volumetric Production Payment Documents.

"**Volumetric Production Payment Documents**" shall mean (a) the Purchase and Sale Agreement, dated as of February 14, 2007, among Borrowers and UBS AG, as amended as of the date hereof, including by the First Amendment to Purchase and Sale Agreement, dated as of June 29, 2010, and the Second Amendment to Purchase and Sale Agreement, dated as of January 10, 2011, (b) the Conveyance of Term Overriding Royalty Interest, dated as of February 14, 2007, by Borrowers to UBS AG, as amended as of the date hereof, including by the First Amendment to Conveyance of Term Overriding Royalty Interest, dated as of June 29, 2010, and (c) the Production and Marketing Agreement, dated as of February 14, 2007, among Borrowers and UBS AG, as amended as of the date hereof, including by the First Amendment to Production and Marketing Agreement, dated as of June 29, 2010, the Second Amendment to Production and Marketing Agreement, dated as of January 10, 2011 and the Third Amendment to Production and Marketing Agreement, dated as of February 13, 2012.

"**Voting Stock**" shall mean, with respect to any person, any class or classes of Equity Interests pursuant to which the holders thereof have the general voting power under ordinary circumstances to elect at least a majority of the Board of Directors of such person.

"**VPP Termination**" shall mean the termination of the Volumetric Production Payment and the Volumetric Production Payment Documents and the execution and delivery of all reconveyances, releases and related documents required in connection therewith including, without limitation, a special warranty deed.

"**VPP Termination Documents**" shall mean (i) the Termination Agreement, dated as of May 20, 2016 by and among UBS AG and the Borrowers, (ii) the Waiver, Release and Discharge Agreement dated as of May 20, 2016 by and among UBS AG and the Loan Parties, (iii) the Release Agreement dated as of May 20, 2016 by UBS AG and Randeep S. Grewal and (iv) the Full Reconveyance, Release and Termination of Liens and Term Overriding Royalty Interest, dated as of May 20, 2016 by UBS AG in favor of the Borrowers.

"**Wholly Owned Subsidiary**" shall mean, as to any person, (a) any corporation 100% of whose capital stock (other than directors' qualifying shares) is at the time owned by such person and/or one or more Wholly Owned Subsidiaries of such person and (b) any partnership, association, joint venture, limited liability company or other entity in which such person and/or one or more Wholly Owned Subsidiaries of such person have a 100% equity interest at such time.

"**Withdrawal Liability**" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

SECTION 1.02    [Reserved].

SECTION 1.03    **Terms Generally**.

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (a) any definition of or reference to any Loan Document, agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any person shall be construed to include such person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) any reference to any law or regulation herein shall refer to such law or regulation as amended, modified or supplemented from time to time, (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (g) "on," when used with respect to the Mortgaged Property or any property adjacent to the Mortgaged Property, means "on, in, under, above or about."

SECTION 1.04    **Accounting Terms; GAAP**.

Except as otherwise expressly provided herein, all financial statements to be delivered pursuant to this Agreement shall be prepared in accordance with GAAP as in effect from time to time and all terms of an accounting or financial nature shall be construed and interpreted in accordance with GAAP, as in effect on the date hereof unless otherwise agreed to by Borrowers and the Majority Lenders.



SECTION 1.05    **Resolution of Drafting Ambiguities**.

Each Loan Party acknowledges and agrees that it was represented by counsel in connection with the execution and delivery of the Loan Documents to which it is a party, that it and its counsel reviewed and participated in the preparation and negotiation hereof and thereof and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation hereof or thereof.

## ARTICLE II

## THE LOANS

SECTION 2.01    **Loans on Closing Date**.

(a)    Subject to the terms and conditions and relying upon the representations and warranties herein set forth, each Lender agrees, severally and not jointly to make a Loan to Borrowers on the Closing Date in the principal amount equal to such Lender's Commitment, the aggregate of all such Commitments, and, thus, all such Loans being equal to $50,000,000, it being understood that the Loans shall be made in exchange for, and in consideration of, the VPP Termination on the Closing Date without the payment of any other amount by any Agent or Lender to any Loan Party or other person.

(b)    Amounts paid or prepaid in respect of Loans may not be reborrowed.

SECTION 2.02    **Loans**.

(a)    Each Loan is part of the Borrowing consisting of Eurodollar Loans made by the Lenders on the Closing Date.

(b)    Each Lender may at its option make or maintain any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make or maintain such Loan; *provided* that any exercise of such option shall not affect the obligation of Borrowers to repay such Loan in accordance with the terms of this Agreement.

(c)    The Loans shall be continued as set forth in the definition of Interest Period except as expressly set forth herein.

SECTION 2.03    **Closing Procedure**.

Borrowers shall deliver, by telecopier, a duly completed and executed Closing Request to the Administrative Agent on the Closing Date. The Closing Request shall be irrevocable and shall specify the following information in compliance with Section 2.02:

(a)    the Closing Date, which shall be a Business Day; and

(b)    that the conditions set forth in Sections 4.02(b)-(d) have been satisfied as of the date of the notice.

For the avoidance of doubt, the Loans made on the Closing Date shall constitute Eurodollar Loans.

SECTION 2.04   **Evidence of Debt; Repayment of Loans**.

(a)   Promise to Repay.  Each Borrower hereby unconditionally promises to pay, on a joint and several basis, to the Administrative Agent for the account of each Lender, the principal amount of the Loans of such Lender as provided in Section 2.09.

(b)   Lender and Administrative Agent Records.  Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of Borrowers to such Lender resulting from the Loans made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.  The Administrative Agent shall maintain records including: (i) the amount of the Loans made hereunder and the Interest Period applicable thereto; (ii) the amount of any principal or interest due and payable or to become due and payable from Borrowers to each Lender hereunder; and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.  The entries made in the records maintained by the Administrative Agent and each Lender pursuant to this paragraph shall be *prima facie* evidence of the existence and amounts of the obligations therein recorded; *provided* that the failure of any Lender or the Administrative Agent to maintain such records or any error therein shall not in any manner affect the obligations of Borrowers to repay the Loans in accordance with their terms.  In the event of any conflict between the records maintained by any Lender and the records of the Administrative Agent in respect of such matters, the records of the Administrative Agent shall control in the absence of manifest error.

(c)   Promissory Notes.  Any Lender by written notice to Borrowers (with a copy to the Administrative Agent) may request that Loans made by it be evidenced by a promissory note.  In such event, Borrowers shall prepare, execute and deliver to such Lender a promissory note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns) in the form of Exhibit K.  Thereafter, unless otherwise elected by such Lender by written notice to the Borrowers (with a copy to the Administrative Agent), the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 9.04) be represented by one or more promissory notes in such form payable to the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

SECTION 2.05   Fees.

Borrowers agree to pay to the Administrative Agent, for its own account, the administrative fees payable in the amounts and at the times separately agreed upon between Borrowers and the Administrative Agent (the "**Administrative Agent Fees**").  In addition to the foregoing, Borrowers agree to pay to the Administrative Agent deferred closing fees on the last Business Day of each month and in the amounts at least equal to those set forth on Schedule 2.05 (but in any event in an aggregate amount not greater than $1,427,329.78) (the "**Deferred Closing Fees**") until the Deferred Closing Fees shall have been paid in full, it being understood that Borrowers may defer payment to the Administrative Agent of any portion of the Deferred Closing Fees until December 29, 2018; *provided*, that Borrowers agree to pay an aggregate amount equal to the "Total Deferred Closing Fees" (as set forth on Schedule 2.05) by no later than December 29, 2018.  Notwithstanding anything herein or in the Fee Letter to the contrary, any amounts due and payable on the Closing Date pursuant to the Fee Letter shall be included in the calculation of Deferred Closing Fees.

SECTION 2.06   **Interest on Loans**.

(a)   Eurodollar Loans.  Subject to the provisions of Section 2.06(b), the Loans comprising the Eurodollar Borrowing, which for avoidance of doubt are the Loans made or deemed made

as of the Closing Date, shall bear interest at a rate per annum equal to the Adjusted LIBOR Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin in effect from time to time.

(b)     Default Rate.  Notwithstanding the foregoing, if (i) there is an Event of Default and notice that the Default Rate shall apply has been given by the Majority Lenders or by the Administrative Agent at the instruction of the Majority Lenders, (ii) any principal of or interest on the Loans or any fee or other amount payable by Borrowers hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise or (iii) an Event of Default occurs pursuant to Section 7.01(g) or (h) then, the Obligations shall, to the extent permitted by applicable law, bear interest, after as well as before judgment, at a rate per annum equal to (i) in the case of amounts constituting principal on the Loans, 2% *plus* the rate otherwise applicable to such Loan as provided in the preceding paragraphs of this Section 2.06 or (ii) in the case of any other outstanding amount, 2% *plus* the rate otherwise applicable to Eurodollar Loans as provided in Section 2.06(a) (in either case, the "**Default Rate**").

(c)     Interest Payment Dates.  Accrued interest on the Loans shall be payable in arrears on each Interest Payment Date for such Loan; *provided* that (i) interest accrued pursuant to Section 2.06(b) shall be payable on demand, (ii) in the event of any repayment or prepayment of the Loans, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment, and (iii) all interest payable pursuant to clauses (i) and (ii) shall be payable in cash and may not constitute PIK Interest (as defined below).  On each Interest Payment Date, Borrowers shall pay interest in cash; *provided* that for each Interest Payment Date commencing on the first Interest Payment Date after the Closing Date and ending with the Interest Payment Date on December 31, 2016, Borrowers shall have the option, at their election upon delivery of written notice to the Administrative Agent at least three (3) Business Days prior to the applicable Interest Payment Date to pay interest payable-in-kind ("**PIK Interest**") on the outstanding principal balance of the Loans (including any capitalized PIK Interest thereon) for such Interest Payment Date at the rate otherwise applicable to the Loans as provided in Section 2.06(a), which PIK Interest shall accrue, be capitalized and be compounded and added to the principal balance of the Loans as of such Interest Payment Date and shall itself accrue interest under this Section 2.06.  All PIK Interest shall be deemed an extension of additional Loans pursuant to the terms of, and subject to, the Loan Documents.  Unless the context otherwise requires, for all purposes hereof, references to "principal amount" of Loans refers to the original face amount of the Loans plus all increases in the principal amount of the outstanding Loans as a result of PIK Interest.

(d)     Interest Calculation.  All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Market Disruption Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The Adjusted LIBOR Rate or Market Disruption Rate shall be determined by the Administrative Agent in accordance with the provisions of this Agreement and such determination shall be conclusive absent manifest error.

SECTION 2.07     **Termination of Commitments**.

The Commitments shall automatically terminate upon making of the Loans as contemplated hereby on the Closing Date.

SECTION 2.08     **Interest Period**.

The Borrowing on the Closing Date shall consist of Eurodollar Loans with an Interest Period as set forth in the definition of Interest Period.

SECTION 2.09    **Amortization**.

Borrowers shall pay to the Administrative Agent, for the account of the Lenders, on each Quarterly Amortization Date, a principal amount of the Loans equal to the Quarterly Amortization Payment, together in each case with accrued and unpaid interest thereon. To the extent not previously paid, the Loans and other Obligations shall be due and payable on the Maturity Date.

SECTION 2.10    **Optional and Mandatory Prepayments of Loans**.

(a)    Optional Prepayments. Borrowers shall not have the right to optionally prepay or redeem the Loans, unless (i) such prepayment is made in conjunction and concurrently with the prepayment in full of the Second Lien Loans in accordance with the Second Lien Credit Agreement or (ii) with the prior written consent of the Administrative Agent and Majority Lenders in their respective sole discretion. Except as otherwise agreed by the Administrative Agent and Majority Lenders, any such permitted payment under this Section 2.10 shall be in an integral multiple of $1.0 million or, if less, the outstanding amount of the Loans.

(b)    Asset Sales. Not later than five Business Days following the receipt of any Net Cash Proceeds of any Asset Sale by a Borrower or any Subsidiary thereof, Borrowers shall make prepayments in accordance with Sections 2.10(i) and (j) in an aggregate amount equal to 100% of such Net Cash Proceeds; *provided* that:

(i)    no such prepayment shall be required under this Section 2.10(b) with respect to (A) any Asset Sale permitted by Section 6.06(a), (B) the disposition of property which constitutes a Casualty Event, or (C) Asset Sales for fair market value resulting in up to $250,000 in Net Cash Proceeds per Asset Sale (or series of related Asset Sales) and up to $1.0 million in Net Cash Proceeds in any fiscal year; *provided* that clause (C) shall not apply in the case of any Asset Sale described in clause (b) of the definition thereof; and

(ii)    so long as no Default shall then exist or would arise therefrom, an aggregate amount of such Net Cash Proceeds of Asset Sales of up to $3.0 million in any fiscal year of Borrowers shall not be required to be so applied on such date to the extent that Borrowers shall have delivered an Officers' Certificate to the Administrative Agent on or prior to such date stating that such Net Cash Proceeds are expected to be reinvested in fixed or capital assets within 12 months following the date of such Asset Sale (which Officers' Certificate shall set forth the estimates of the proceeds to be so expended); *provided* that if all or any portion of such Net Cash Proceeds is not so reinvested within such 12-month period, such unused portion shall be applied on the last day of such period as a mandatory prepayment as provided in this Section 2.10(b); *provided, further*, that if the property subject to such Asset Sale constituted Collateral, then all property purchased with the Net Cash Proceeds thereof pursuant to this subsection shall be made subject to the Lien of the applicable Security Documents in favor of the Collateral Agent, for its benefit and for the benefit of the other Secured Parties in accordance with Sections 5.11 and 5.12.

(c)    Prohibited Debt Issuance or Preferred Stock Issuance. Not later than one Business Day following any Debt Issuance or Preferred Stock Issuance by Holdings, Borrowers or any of their Subsidiaries (other than issuances of Preferred Stock that is Qualified Capital Stock to Holdings or HVI CC if such Preferred Stock is pledged to the Collateral Agent pursuant to a Security Agreement), Borrowers shall make prepayments in accordance with Sections 2.10(i) and (j) in an aggregate amount equal to 100% of the Net Cash Proceeds of any such Debt Issuance or Preferred Stock Issuance.

FILED: NEW YORK COUNTY CLERK 10/21/2019 10:53 PM
NYSCEF DOC. NO. Case 1:19-cv-10786-LLS-KNF Document 5-2 Filed 11/21/19 Page 49 of 70

INDEX NO. 656157/2019
RECEIVED NYSCEF: 10/21/2019

(d)     Equity Issuance.  Not later than five Business Days following any Equity Issuance, Borrowers shall make prepayments in accordance with Sections 2.10(i) and (j) in an aggregate amount equal to 100% of the Net Cash Proceeds of such Equity Issuance; *provided* that no such prepayment shall be required for any Equity Issuance to any Company if such Equity Interests are pledged to the Collateral Agent pursuant to a Security Agreement.

(e)     Casualty Events.  Not later than five Business Days following the receipt of any Net Cash Proceeds by a Borrower or any Subsidiary thereof from a Casualty Event (or series of related Casualty Events) involving a loss in excess of $250,000 or in excess of $1,000,000 in the aggregate in any fiscal year, Borrowers shall make prepayments in accordance with Sections 2.10(i) and (j) in an aggregate amount equal to 100% of such Net Cash Proceeds; *provided* that:

(i)     so long as no Default shall then exist or arise therefrom, such proceeds shall not be required to be so applied on such date to the extent that, Borrowers shall have delivered an Officers' Certificate to the Administrative Agent on or prior to such date stating that such proceeds are expected to be used to repair, replace or restore any property in respect of which such Net Cash Proceeds were paid, no later than 12 months following the date of receipt of such proceeds; *provided* that if the property subject to such Casualty Event constituted Collateral under the Security Documents, then all property purchased with the Net Cash Proceeds thereof pursuant to this subsection shall be made subject to the Lien of the applicable Security Documents in favor of the Collateral Agent, for its benefit and for the benefit of the other Secured Parties in accordance with Sections 5.11 and 5.12; and

(ii)     if any portion of such Net Cash Proceeds shall not be so applied within such 12-month period, such unused portion shall be applied on the last day of such period as a mandatory prepayment as provided in this Section 2.10(e).

(f)     Excess Cash Flow.  No later than five Business Days after the date on which the financial statements with respect to each fiscal quarter in which an Excess Cash Flow Period occurs are or are required to be delivered pursuant to Section 5.01 (without giving effect to any grace period applicable thereto), Borrowers shall make prepayments in accordance with Sections 2.10(i) and (j) in an aggregate amount equal to 50% of Excess Cash Flow for the Excess Cash Flow Period then ended; *provided* that once Borrowers have generated an aggregate amount of $6.0 million in Excess Cash Flow (prior to any mandatory prepayments pursuant to this Section 2.10(f)), aggregating all Excess Cash Flow from the Excess Cash Flow Period then ended and all prior Excess Cash Flow Periods, cumulatively), Borrowers shall make such prepayments in an aggregate amount equal to 90% of Excess Cash Flow for any Excess Cash Flow Period then ended.

(g)     Greka Asset Dispositions.  Not later than five (5) Business Days following receipt of any Net Proceeds (as such term is defined in the Greka Guaranty) of any Greka Refining Asset Sale, Borrowers shall make prepayments in accordance with and to the extent required under the Greka Guaranty.

(h)     Mandatory Prepayment on December 31, 2018.  Borrowers shall pay to the Administrative Agent, for the account of the Lenders, on December 31, 2018, a principal amount of the Loans equal to the amount by which the aggregate principal amount of the Loans (including PIK Interest) on such date exceeds $45,000,000, together with accrued and unpaid interest on such principal amount required to be paid.

(i)     Application of Prepayments.  Any prepayments of Loans pursuant to Section 2.10 shall be applied in inverse order of maturity.  Amounts to be applied pursuant to this

Section 2.10 to the prepayment of Loans shall be applied, as applicable, ratably, to reduce outstanding Loans.

(j)     Notice of Prepayment.  Borrowers shall notify the Administrative Agent by written notice of any prepayment hereunder not later than 11:00 a.m., London time, three Business Days before the date of prepayment.  Each such notice shall be irrevocable; *provided* that a notice of prepayment delivered by Borrowers may state that such notice is conditioned upon the effectiveness of another credit facility or the closing of a securities offering, in which case such notice may be revoked by Borrowers (by notice to the Administrative Agent on or prior to the specified prepayment date) if such condition is not satisfied.  Each such notice shall specify the prepayment date, the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment.  Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each partial prepayment of any Borrowing shall be in an amount not less than $500,000 except as otherwise agreed by the Administrative Agent, except as necessary to apply fully the required amount of a mandatory prepayment.  Each prepayment of a Borrowing shall be applied ratably to the Loans and otherwise in accordance with this Section 2.10.  Prepayments shall be accompanied by accrued interest to the extent required by Section 2.06.

SECTION 2.11     **Alternate Rate of Interest**.

If prior to the commencement of any Interest Period for a Eurodollar Borrowing:

(a)     the Administrative Agent determines (which determination shall be final and conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBOR Rate for such Interest Period; or

(b)     the Administrative Agent determines or is advised in writing by the Majority Lenders that the Adjusted LIBOR Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period; *provided* that neither the Administrative Agent nor the Majority Lenders shall be entitled to make such determination or advisement, as the case may be, unless it or any of them shall have determined that such determination or advisement is consistent with its or their general practices under similar circumstances in respect of similarly situated borrowers with credit agreements entitling it or any of them to make such determinations (it being agreed that neither the Administrative Agent nor any Lender shall be required to disclose any confidential or proprietary information in connection with such determination or advisement);

then the Administrative Agent shall give written notice thereof to Borrowers and the Lenders as promptly as practicable thereafter and, until the Administrative Agent notifies Borrowers and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Eurodollar Borrowing requested to be made on the first day of such Interest Period shall be made as a Market Disruption Loan, (ii) any Borrowing that were to have been converted on the first day of such Interest Period to a Eurodollar Borrowing shall be continued as a Market Disruption Loan and (iii) any outstanding Eurodollar Borrowing shall be converted, on the last day of the then-current Interest Period, to a Market Disruption Loan.

SECTION 2.12     **Yield Protection**.

(a)     Increased Costs Generally. If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in, by any Lender (except any reserve requirement reflected in the Adjusted LIBOR Rate);

(ii)    subject any Lender to any Tax of any kind whatsoever with respect to this Agreement, any participation in any Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for Indemnified Taxes, Other Taxes indemnifiable under <u>Section 2.15</u> and any Excluded Tax payable by such Lender); or

(iii)    impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or Eurodollar Loans made by such Lender or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Loan (or of maintaining its obligation to make any such Loan), then, upon request of such Lender, Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)    <u>Capital Requirements</u>.  If any Lender determines (in good faith, but in its sole absolute discretion) that any Change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time Borrowers will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    <u>Certificates for Reimbursement</u>.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this <u>Section 2.12</u> and delivered to Borrowers shall be conclusive absent manifest error.  Borrowers shall pay such Lender or its holding company, as the case may be, the amount shown as due on any such certificate within 10 days after receipt thereof; *provided* that no Lender shall be entitled to submit a claim for compensation based upon a Change in Law unless it shall have determined that the making of such claim is consistent with its general practices under similar circumstances in respect of similarly situated borrowers with credit agreements entitling it to make such claims (it being agreed that no Lender shall be required to disclose any confidential or proprietary information in connection with such determination or the making of such claim).

(d)    <u>Delay in Requests</u>.  Failure or delay on the part of any Lender to demand compensation pursuant to this <u>Section 2.12</u> shall not constitute a waiver of such Lender's right to demand such compensation; *provided* that Borrowers shall not be required to compensate a Lender pursuant to this <u>Section 2.12</u> for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender, as the case may be, notifies Borrowers of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).



SECTION 2.13    **Breakage Payments**.

In the event of (a) the payment or prepayment, whether optional or mandatory, of any principal of any Eurodollar Loan earlier than the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the failure to prepay the Loans on the date specified in any notice delivered pursuant hereto or (c) the assignment of any Eurodollar Loan earlier than the last day of the Interest Period applicable thereto as a result of a request by Borrowers pursuant to <u>Section 2.16(b)</u>, then, in any such event, Borrowers shall compensate each Lender for the loss, cost and expense attributable to such event. In the case of a Eurodollar Loan, such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBOR Rate that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor, over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the eurodollar market. A certificate of any Lender setting forth in reasonable detail any amount or amounts that such Lender is entitled to receive pursuant to this <u>Section 2.13</u> shall be delivered to Borrowers (with a copy to the Administrative Agent) and shall be conclusive and binding absent manifest error. Borrowers shall pay such Lender the amount shown as due on any such certificate within 5 days after receipt thereof.

SECTION 2.14    **Payments Generally; Pro Rata Treatment; Sharing of Setoffs**.

(a)    <u>Payments Generally</u>.  Borrowers shall make each payment required to be made by it hereunder or under any other Loan Document (whether of principal, interest or fees, or of amounts payable under <u>Section 2.12</u>, <u>2.13</u>, <u>2.15</u> or <u>9.03</u>, or otherwise) on or before the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 2:00 p.m., London time), on the date when due, in immediately available funds, without setoff, deduction or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent at its offices at London, England, and except that payments pursuant to <u>Sections 2.12</u>, <u>2.13</u>, <u>2.15</u> and <u>9.03</u> shall be made directly to the persons entitled thereto and payments pursuant to other Loan Documents shall be made to the persons specified therein. The Administrative Agent shall distribute any such payments received by it for the account of any other person to the appropriate recipient promptly following receipt thereof. If any payment under any Loan Document shall be due on a day that is not a Business Day, unless specified otherwise, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments under each Loan Document shall be made in dollars, except as expressly specified otherwise.

(b)    <u>Pro Rata Treatment</u>.

(i)    Each payment by Borrowers of interest in respect of the Loans shall be applied to the amounts of such obligations owing to the Lenders *pro rata* according to the respective amounts then due and owing to the Lenders.

(ii)    Each payment on account of principal of the Loans shall be allocated among the Lenders *pro rata* based on the principal amount of the Loans held by the Lenders.



Case 1:19-cv-10786-LLS-KNF   Document 5-2   Filed 11/21/19   Page 53 of 70

       (c)    <u>Insufficient Funds</u>. If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) *first*, toward payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) *second*, toward payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties. It is understood that the foregoing does not apply to any adequate protection payments under any federal, state or foreign bankruptcy, insolvency, receivership or similar proceeding, and that the Administrative Agent may, subject to any applicable federal, state or foreign bankruptcy, insolvency, receivership or similar orders, distribute any adequate protection payments it receives on behalf of the Lenders to the Lenders in its sole discretion (*i.e.*, whether to pay the earliest accrued interest, all accrued interest on a pro rata basis or otherwise).

       (d)    <u>Sharing of Set-Off</u>. If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or other Obligations resulting in such Lender's receiving payment of a proportion of the aggregate amount of its Loans and accrued interest thereon or other Obligations greater than its *pro rata* share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for cash at face value) participations in the Loans and such other obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them, *provided* that:

       (i)    if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

       (ii)    the provisions of this paragraph shall not be construed to apply to (x) any payment made by Borrowers pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrowers or any Subsidiary thereof (as to which the provisions of this paragraph shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable Requirements of Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation. If under applicable bankruptcy, insolvency or any similar law any Secured Party receives a secured claim in lieu of a setoff or counterclaim to which this <u>Section 2.14(d)</u> applies, such Secured Party shall to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights to which the Secured Party is entitled under this <u>Section 2.14(d)</u> to share in the benefits of the recovery of such secured claim.

       (e)    <u>Borrower Default</u>. Unless the Administrative Agent shall have received notice from Borrowers prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that Borrowers will not make such payment, the Administrative Agent may assume that Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders, as the case may be, the amount due. In such event, if Borrowers have not in fact made such payment, then each of the Lenders, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to

it to but excluding the date of payment to the Administrative Agent, at a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

SECTION 2.15    Taxes.

(a)    Payments Free of Taxes.  Any and all payments by or on account of any obligation of the Loan Parties hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Taxes; *provided* that if the applicable withholding agent shall be required by applicable Requirements of Law (as determined in the good faith discretion of the applicable withholding agent) to deduct any Taxes (including any Other Taxes) from any such payment, then (i) if such Tax is an Indemnified Tax or Other Tax, the sum payable shall be increased by the Loan Parties as necessary so that after all required deductions have been made (including deductions applicable to additional sums payable under this Section) the Administrative Agent or Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) the applicable withholding agent shall make such deductions and (iii) the applicable withholding shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Requirements of Law.

(b)    Payment of Other Taxes by Borrowers.  Without limiting the provisions of paragraph (a) above, Borrowers shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Requirements of Law.

(c)    Indemnification by Borrowers.  Borrowers shall indemnify the Administrative Agent and each Lender, within 10 days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) payable by the Administrative Agent or such Lender, as the case may be, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to Borrowers by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)    Evidence of Payments.  As soon as practicable after any payment of Taxes by Borrowers to a Governmental Authority pursuant to this Section 2.15, Borrowers shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)    Status of Lenders.  Any Foreign Lender that is entitled to an exemption from or reduction of any withholding tax with respect to any payments hereunder or under any other Loan Document shall, to the extent it may lawfully do so, deliver to Borrowers and to the Administrative Agent, at the time or times reasonably requested by Borrowers or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Requirements of Law as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if requested by Borrowers or the Administrative Agent, shall deliver such other documentation prescribed by applicable Requirements of Law or reasonably requested by Borrowers or the Administrative Agent as will enable Borrowers or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the above two sentences, in the case of any Taxes that are not U.S. federal withholding taxes, the completion, execution and submission of such documentation shall not be required

if in the Lender's judgment such completion, execution or submission would subject such Lender to any unreimbursed cost or expense or would be disadvantageous to such Lender in any material respect.

Without limiting the generality of the foregoing, in the event that either Borrower is resident for tax purposes in the United States of America, any Foreign Lender shall, to the extent it may lawfully do so, deliver to such Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of such Borrower or the Administrative Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(i)       duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable (or any successor forms) claiming eligibility for benefits of an income tax treaty to which the United States of America is a party,

(ii)      duly completed copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(iii)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate, in substantially the form of Exhibit Q(1), or any other form approved by the Administrative Agent, to the effect that such Foreign Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of either Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code, and that no payments in connection with the Loan Documents are effectively connected with such Foreign Lender's conduct of a U.S. trade or business and (y) duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable (or any successor forms),

(iv)      to the extent a Foreign Lender is not the beneficial owner (for example, where the Foreign Lender is a partnership or participating Lender granting a typical participation), an Internal Revenue Service Form W-8IMY, accompanied by a Form W-8ECI, W-8BEN, W-8BEN-E, a certificate in substantially the form of Exhibit Q(2) or Exhibit Q(3), Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided* that, if the Foreign Lender is a partnership (and not a participating Lender) and one or more beneficial owners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a certificate, in substantially the form of Exhibit Q(4), on behalf of such beneficial owner(s),

(v)       any other form prescribed by applicable Requirements of Law as a basis for claiming exemption from or a reduction in United States federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable Requirements of Law to permit Borrowers and the Administrative Agent to determine the withholding or deduction required to be made, or

(vi)      if a payment made to a Foreign Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Foreign Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Foreign Lender shall deliver to Borrowers and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by Borrowers or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code)



and such additional documentation reasonably requested by Borrowers and the Administrative Agent to comply with their obligations under FATCA and to determine that such Foreign Lender has complied with such Foreign Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (vi), "FATCA" shall include amendments made to FATCA after the date of this Agreement.

Each Foreign Lender shall, from time to time after the initial delivery by such Foreign Lender of the forms described above, whenever a lapse in time or change in such Foreign Lender's circumstances renders such forms, certificates or other evidence so delivered obsolete or inaccurate, promptly (1) deliver to the Borrowers and the Administrative Agent (in such number of copies as shall be requested by the recipient) renewals, amendments or additional or successor forms, properly completed and duly executed by such Foreign Lender, together with any other certificate or statement of exemption required in order to confirm or establish such Foreign Lender's status or that such Foreign Lender is entitled to an exemption from or reduction in U.S. federal withholding tax or (2) notify Administrative Agent and Borrowers of its inability to deliver any such forms, certificates or other evidence.

Any Lender that is not a Foreign Lender shall deliver to Borrowers and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter as prescribed by applicable law or upon the request of Borrowers or the Administrative Agent), duly executed and properly completed copies of Internal Revenue Service Form W-9 certifying that it is not subject to backup withholding.

(f)     Treatment of Certain Refunds. If the Administrative Agent or a Lender determines, in its sole discretion, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by a Loan Party or with respect to which a Loan Party has paid additional amounts pursuant to this Section, it shall pay to the applicable Loan Party an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by such Loan Party under this Section with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all reasonable and actual out-of-pocket expenses of the Administrative Agent or such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); *provided* that such Loan Party, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to such Loan Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender or in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. This paragraph shall not be construed to require the Administrative Agent or any Lender to make available its Tax Returns (or any other information relating to its taxes that it deems confidential) to Borrowers or any other person. Notwithstanding anything to the contrary, in no event will the Administrative Agent or any Lender be required to pay any amount to a Loan Party the payment of which would place the Administrative Agent or such Lender in a less favorable net after-tax position than the Administrative Agent or such Lender would have been in if the Indemnified Taxes or Other Taxes giving rise to such refund had never been imposed in the first instance.

(g)     Payments. For purposes of this Section 2.15, (i) any payments by the Administrative Agent to a Lender of any amounts received by the Administrative Agent from Borrowers on behalf of such Lender shall be treated as a payment from Borrowers to such Lender and (ii) if a Lender is treated as a partnership by a jurisdiction imposing an Indemnified Tax, any withholding or payment of such Indemnified Tax by the Lender in respect of any of such Lender's partners shall be considered a withholding or payment of such Indemnified Tax by the Borrowers.



SECTION 2.16     **Mitigation Obligations; Replacement of Lenders**.

(a)     Designation of a Different Lending Office. If any Lender requests compensation under Section 2.12, or requires Borrowers to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, then, at Borrowers' request, such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.12 or 2.15, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender at Borrowers' request in connection with any such designation or assignment. A certificate setting forth such costs and expenses submitted by such Lender to Borrowers shall be conclusive absent manifest error.

(b)     Replacement of Lenders. If any Lender requests compensation under Section 2.12 or requires Borrowers to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, or if any Lender is a Defaulting Lender, or if Borrowers exercises their replacement rights under Section 9.02(d), then Borrowers may, at their sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 9.04), all of its interests, rights and obligations under this Agreement and the other Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); *provided* that:

(i)     Borrowers shall have paid to the Administrative Agent the processing and recordation fee specified in Section 9.04(b);

(ii)     such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 2.13), from the assignee (to the extent of such outstanding principal and accrued interest and fees) or Borrowers (in the case of all other amounts);

(iii)     in the case of any such assignment resulting from a claim for compensation under Section 2.12 or payments required to be made pursuant to Section 2.15, such assignment will result in a reduction in such compensation or payments thereafter; and

(iv)     such assignment does not conflict with applicable Requirements of Law.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling Borrowers to require such assignment and delegation cease to apply.

Each Lender agrees that, if Borrowers elect to replace such Lender in accordance with this Section 2.16(b), it shall promptly execute and deliver to the Administrative Agent an Assignment and Assumption to evidence the assignment and shall deliver to the Administrative Agent any Note (if Notes have been issued in respect of such Lender's Loans) subject to such Assignment and Assumption; *provided* that the failure of any such Lender to execute an Assignment and Assumption shall not render such assignment invalid and such assignment shall be recorded in the Register.

SECTION 2.17    <u>Joint and Several Liability of Borrowers</u>.

(a)    Each Borrower is accepting joint and several liability hereunder in consideration of the financial accommodation to be provided by the Lenders under this Agreement, for the mutual benefit, directly and indirectly, of each Borrower and in consideration of the undertakings of each Borrower to accept joint and several liability for the obligations of each of them.

(b)    Each Borrower jointly and severally hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrower with respect to the payment and performance of all of the obligations arising under this Agreement and the other Loan Documents, it being the intention of the parties hereto that all of the obligations hereunder and under the other Loan Documents shall be the joint and several obligations of each Borrower without preferences or distinction between them.

(c)    If and to the extent that either Borrower shall fail to make any payment with respect to any of the obligations hereunder as and when due or to perform any of such obligations in accordance with the terms thereof, then in each such event, the other Borrower will make such payment with respect to, or perform, such obligation.

(d)    The provisions of this <u>Section 2.17</u> are made for the benefit of the Agents and the Lenders and their successors and assigns and may be enforced by them from time to time against either Borrower as often as occasion therefor may arise and without requirement on the part of the Agents or the Lenders first to marshall any of their claims or to exercise any of its rights against the other Borrower or to exhaust any remedies available to them against the other Borrower or to resort to any other source or means of obtaining payment of any to the obligations hereunder or to elect any other remedy. The provisions of this <u>Section 2.17</u> shall remain in effect until all the obligations hereunder shall have been paid in full or otherwise fully satisfied. If at any time, any payment, or any part thereof, made in respect of any of the obligations, is rescinded or must otherwise be restored or returned by the Agents or the Lenders upon the insolvency, bankruptcy or reorganization of either Borrower, or otherwise, the provisions of this <u>Section 2.17</u> will forthwith be reinstated an in effect as though such payment had not been made.

(e)    Notwithstanding any provision to the contrary contained herein or in any of the other Loan Documents, to the extent the obligations of either Borrower shall be adjudicated to be invalid or unenforceable for any reason (including, without limitation, because of any applicable state or federal law relating to fraudulent conveyances or transfers) then the obligations of such Borrower hereunder shall be limited to the maximum amount that is permissible under applicable law (whether federal or state and including, without limitation, the Bankruptcy Code).

(f)    Each Borrower hereby appoints the other Borrower to act as its agent for all purposes under this Agreement (including, without limitation, with respect to all matters relating to the borrowing, conversion, continuance and repayment of Loans) and agrees that (i) any notice or communication delivered by an Agent or a Lender to a Borrower shall be deemed delivered to both Borrowers, (ii) any notice, document, instrument or agreement executed and delivered by one Borrower to one or more Agents or Lenders under a Loan Document shall be deemed to be executed and delivered by both Borrowers, and (iii) the Agents and the Lenders may accept, and be permitted to rely on, any notice, document, instrument or agreement executed and delivered by one Borrower as if it were executed and delivered by both Borrowers.

SECTION 2.18    **Defaulting Lenders**.

Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender, to the extent permitted by applicable Requirements of Law:

(a)    any amount payable to such Defaulting Lender hereunder (whether on account of principal, interest, fees or otherwise and including any amount that would otherwise be payable to such Defaulting Lender pursuant to Section 2.14(d) but excluding Section 2.16(b)) may, in lieu of being distributed to such Defaulting Lender, be retained by the Administrative Agent in a segregated non-interest bearing account and, subject to any applicable Requirements of Law, be applied at such time or times as may be determined by the Administrative Agent (i) first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder, (ii) second, to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent, (iii) third, if so determined by the Administrative Agent and Borrowers, held in such account as cash collateral for future funding obligations of the Defaulting Lender under this Agreement, (iv) fourth, pro rata, to the payment of any amounts owing to Borrower or the Lenders as a result of any judgment of a court of competent jurisdiction obtained by Borrower or any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement and (v) fifth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; and

(b)    such Defaulting Lender's right to approve or disapprove any amendment, waiver or content with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders".

The rights and remedies against a Defaulting Lender under this Section 2.18 are in addition to other rights and remedies that Borrower, the Administrative Agent, and the non-Defaulting Lenders may have against such Defaulting Lender.  The arrangements permitted or required by this Section 2.18 shall be permitted under this Agreement, notwithstanding any limitation on Liens or the pro rata sharing provisions or otherwise.  Notwithstanding anything to the contrary herein, this Section 2.18 and the other provisions herein with respect to a Defaulting Lender shall be inapplicable if there is only one lender hereunder.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

Each of Holdings and each Borrower, on behalf of itself and its Subsidiaries, represents and warrants to the Administrative Agent, the Collateral Agent and each of the Lenders that:

SECTION 3.01    **Organization; Powers**.

Each Company (a) is duly organized and validly existing under the laws of the jurisdiction of its organization, (b) has all requisite corporate, partnership or limited liability company power and authority to carry on its business as now conducted and to own and lease its property and (c) is qualified and in good standing (to the extent such concept is applicable in the applicable jurisdiction) to do business in every jurisdiction where such qualification is required, except in such jurisdictions where the failure to so qualify or be in good standing, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  There is no existing default under any Organizational Document of any Company or any event which, with the giving of notice or passage of time or both,

would constitute a default by any party thereunder. The chief executive office of HVI CC is located at 630 Fifth Ave., Suite 2410, New York, NY 10111.

SECTION 3.02    **Authorization; Enforceability**.

The Transactions to be entered into by each Company are within such Company's powers and have been duly authorized by all necessary action on the part of such Company. This Agreement has been duly executed and delivered by each Company and each other Loan Document to which any Company is to be a party, when executed and delivered by such Company, will constitute, a legal, valid and binding obligation of such Company, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.03    **No Conflicts**.

Except as set forth on Schedule 3.03, the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except (i) such as have been obtained or made and are in full force and effect, (ii) filings necessary to perfect Liens created by the Loan Documents and (iii) consents, approvals, registrations, filings, permits or actions the failure to obtain or perform which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, (b) will not violate the Organizational Documents of any Company, (c) will not violate any Requirement of Law in any material respect, (d) will not violate or result in a default or require any consent or approval under any indenture, agreement or other instrument, in each case with respect to Indebtedness of any Company or Greka Integrated, binding upon any Company or Greka Integrated or its property, or give rise to a right thereunder to require any payment to be made by any Company, (e) will not in any material respect violate or result in a default or require any consent or approval under any agreement or other instrument (other than with respect to Indebtedness of any Company or Greka Integrated) binding upon any Company or Greka Integrated or its property, or give rise to a right thereunder to require any payment to be made by any Company, and (f) will not result in the creation or imposition of any Lien on any property of any Company, except Liens created by the Loan Documents and Permitted Liens.

SECTION 3.04    **Financial Statements; Projections**.

(a)    Historical Financial Statements.  Borrowers have heretofore delivered to the Lenders the consolidated balance sheets and related statements of income, stockholders' equity and cash flows of Borrowers, (i) as of and for the fiscal years ended December 31, 2012, December 31, 2013 and December 31, 2014, audited by and accompanied by the unqualified opinion of BDO Seidman, independent public accountants (except in the case of the 2014 financial statements of the Borrowers), and (ii) as of and for the nine-month period ended September 30, 2015 and for the comparable period of the preceding fiscal year, in each case, certified by the chief financial officer of HVI CC and (iii) as of and for the months ended January 31, 2016 and February 29, 2016, in each case, certified by the chief financial officer of HVI CC.  Such financial statements and all financial statements delivered pursuant to Sections 5.01(a), (b) and (c) have been prepared in accordance with GAAP and present fairly and accurately the financial condition and results of operations and cash flows of the Borrowers as of the dates and for the periods to which they relate (except the financial statements in clause (iii) need not have footnotes and are subject to quarterly adjustment).

(b)    No Liabilities.  Except as set forth in the financial statements referred to in Section 3.04(a), there are no liabilities of any Borrowers, Holdings or any of their Subsidiaries of any

kind, whether accrued, contingent, absolute, determined, determinable or otherwise, which could, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, and Borrowers and Holdings know of no existing condition, situation or set of circumstances which could reasonably be expected to result in such a liability, other than liabilities under the Loan Documents, the Second Lien Loan Documents and the GLR Facility Documents. Since December 31, 2014, there has been no event, change, circumstance or occurrence that, individually or in the aggregate, has had or could reasonably be expected to result in a Material Adverse Effect.

(c)     Forecasts. The forecasts of financial performance of Borrowers and their Subsidiaries furnished to the Lenders have been prepared in good faith by Borrowers and based on assumptions believed by Borrowers to be reasonable.

SECTION 3.05     **Properties**.

(a)     Generally. Each Company has good and defensible title to, or valid leasehold interests in, the Oil and Gas Properties evaluated in the most recently delivered Reserve Report(s) (except for those Oil and Gas Properties that have been disposed of since the date of such Reserve Report(s) in accordance with this Agreement or leases which have expired in accordance with their terms) and good title to, or valid leasehold interests in, all other property material to its business, in each case, free and clear of all Liens except for, in the case of Collateral, Permitted Collateral Liens and, in the case of all other material property, Permitted Liens, and in the case of Oil and Gas Properties, Immaterial Title Deficiencies, and in the case of all other material property, minor irregularities or deficiencies in title that, individually or in the aggregate, do not interfere with its ability to conduct its business as currently conducted or to utilize such property for its intended purpose. The property of the Companies, taken as a whole, (i) is in good operating order, condition and repair (ordinary wear and tear excepted) and (ii) constitutes all the property which is required for the business and operations of the Companies and Subsidiaries as presently conducted. Other than Immaterial Title Deficiencies and after giving full effect to the Permitted Collateral Liens, (x) the Company specified as the owner owns the net interests in production attributable to the Hydrocarbon Interests as reflected in the most recently delivered Reserve Report(s) (except for those properties that have been disposed of since the date of such Reserve Report(s) in accordance with this Agreement or leases which have expired in accordance with their terms), and (y) the ownership of such Oil and Gas Properties shall not in the aggregate in any material respect obligate such Company to bear the costs and expenses relating to the maintenance, development and operations of any such Oil and Gas Property in an amount in excess of the working interest of such Oil and Gas Property set forth in the most recently delivered Reserve Report(s) that is not offset by a corresponding proportionate increase in such Company's or Subsidiary's net revenue interest in such Oil and Gas Property.

(b)     Real Property. Schedules 7(a) and 7(b) to the Perfection Certificate dated the Closing Date contain a true and complete list of (i) Oil and Gas Properties of the Companies constituting not less than 95% of the PV 10 Value of the Oil and Gas Properties evaluated in the Initial Reserve Report and (ii) other material real property owned, leased or otherwise held by each Company as of the Closing Date and, in each of the cases described in clauses (i) and (ii) of this Section 3.05(b), whether any material Lease requires the consent of the landlord or tenant thereunder, or other party thereto, to the Transactions.

(c)     No Casualty Event; Flood Insurance. No Company has received any notice of, nor has any knowledge of, the occurrence or pendency or contemplation of any Casualty Event affecting all or any portion of its property. No Mortgage encumbers a building or mobile home (as defined in the applicable regulations) on Real Property that is located in an area that has been identified by the Secretary of Housing and Urban Development as an area having special flood hazards within the meaning of the



National Flood Insurance Act of 1968, unless flood insurance available under such Act has been obtained in accordance with Section 5.04.

(d)  Collateral.  Each Company owns or has rights to use all of the Collateral and all rights with respect to any of the foregoing used in, necessary for or material to each Company's business as currently conducted.  The use by each Company and Subsidiary of such Collateral and all such rights with respect to the foregoing do not infringe on the rights of any person other than such infringement which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  No claim has been made and remains outstanding that any Company's or Subsidiary's use of any Collateral does or may violate the rights of any third party that could, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(e)  Technical Information.  The Companies either own or have valid licenses or other rights to use all databases, geological data, geophysical data, engineering data, seismic data, maps, interpretations and other technical information used in their businesses as presently conducted, subject to the limitations contained in the agreements governing the use of the same, which limitations are customary for companies engaged in the business of the exploration and production of Hydrocarbons, with such exceptions as, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(f)  Oil and Gas Properties.  None of Greka Integrated or any of its Subsidiaries or Affiliates that produces oil and gas (other than Borrowers) owns or leases any Oil and Gas Properties in any field in which any Borrower owns or leases any Oil and Gas Property or (other than Liens securing obligations under the GLR Facility) owns, leases or otherwise holds a Lien on or against any Oil and Gas Property of any Borrower.

(g)  Released Liens and Related Indebtedness.  To the Companies' best knowledge, none of the Companies, any Affiliates of the Companies or any of their or their Affiliates' respective successors or assigns, currently own or hold any rights under any of the agreements, Liens or other matters listed on Schedule 3.05(g), or any other obligations or claims of any nature that are now or that were in the past secured or evidenced by such agreements, Liens or matters.  All such agreements, Liens and matters, and the obligations and claims secured or evidenced thereby, previously were fully released or terminated or are no longer valid or enforceable or no longer exist (any such Liens, agreements, matters, obligations or claims (as each the same may have been amended, modified, restated, renewed or otherwise changed), collectively, the "**Released Claims and Agreements**").

SECTION 3.06    **Maintenance of Oil and Gas Properties.**

Except as set forth on Schedule 3.06 and except for such acts or failures to act as, individually or in the aggregate, could not be reasonably expected to have a Material Adverse Effect, the Oil and Gas Properties of the Companies (and the Oil and Gas Properties unitized therewith) have been maintained, operated and developed in a good and workmanlike manner and in conformity with all Requirements of Law and in conformity with the provisions of all leases, subleases or other contracts comprising a part of the Hydrocarbon Interests and other contracts and agreements forming a part of such Oil and Gas Properties. Specifically in connection with the foregoing, except for those as, individually or in the aggregate, could not be reasonably expected to have a Material Adverse Effect, (i) no Oil and Gas Property of any Company is subject to having allowable production reduced below the full and regular allowable (including the maximum permissible tolerance) because of any overproduction (whether or not the same was permissible at the time) and (ii) none of the wells comprising a part of the Oil and Gas Properties of the Companies (or the Oil and Gas Properties unitized therewith) are deviated from the vertical more than the maximum permitted by Requirements of Law, and such wells are, in fact, bottomed



under and are producing from, and the well bores are wholly within, such Oil and Gas Properties (or in the case of wells located on Oil and Gas Properties unitized therewith, such unitized Oil and Gas Properties). Except as set forth on <u>Schedule 3.06</u>, all pipelines, wells, gas processing plants, platforms and other material improvements, fixtures and equipment owned in whole or in part by any Company that are necessary to conduct normal operations are being maintained in a state adequate to conduct normal operations, and with respect to such of the foregoing which are operated by the Companies, in a manner consistent with the Companies' and the Subsidiaries' past practices (other than those the failure of which to maintain in accordance with this <u>Section 3.06</u>, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect).

SECTION 3.07 <u>Intellectual Property</u>.

(a) <u>Ownership/No Claims</u>. Each Company owns, or is licensed to use, all patents, patent applications, trademarks, trade names, service marks, copyrights, technology, trade secrets, proprietary information, domain names, know-how and processes necessary for the conduct of its business as currently conducted (the "**Intellectual Property**"), except for those the failure to own or license which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. No claim has been asserted and is pending by any person challenging or questioning the use of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property, nor does any Company know of any valid basis for any such claim. The use of such Intellectual Property by each Company does not infringe the rights of any person, except for such claims and infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b) <u>Registrations</u>. Except as set forth on <u>Schedule 3.07(b)</u> and except pursuant to licenses and other user agreements entered into by each Company in the ordinary course of business that are listed in Schedule 11(a) or 11(b) to the Perfection Certificate, on and as of the date hereof (i) each Company owns and possesses the right to use, and has done nothing to authorize or enable any other person to use, any copyright, patent or trademark (as such terms are defined in the Security Agreement) listed in Schedule 11(a) or 11(b) to the Perfection Certificate and (ii) all registrations listed in Schedule 11(a) or 11(b) to the Perfection Certificate are valid and in full force and effect.

(c) <u>No Violations or Proceedings</u>. To each Company's knowledge, on and as of the date hereof, there is no material violation by others of any right of such Company thereof with respect to any copyright, patent or trademark listed in Schedule 11(a) or 11(b) to the Perfection Certificate, pledged by it under the name of such Company or Subsidiary except as may be set forth on <u>Schedule 3.07(c)</u>.

SECTION 3.08 <u>Equity Interests and Subsidiaries</u>.

(a) <u>Equity Interests</u>. Schedules 1(a) and 9(a) to the Perfection Certificate dated the Closing Date set forth a list of (i) the Companies and all the Subsidiaries of Borrowers and their jurisdictions of organization as of the Closing Date and (ii) the number of each class of their Equity Interests authorized, and the number outstanding, on the Closing Date and the number of shares covered by all outstanding options, warrants, rights of conversion or purchase and similar rights at the Closing Date. All Equity Interests of each Company and each Subsidiary are duly and validly issued and are fully paid and non-assessable, and, other than the Equity Interests of Borrowers, are Wholly Owned Subsidiaries owned by the persons identified on <u>Schedule 3.08(a)</u>. All Equity Interests of HVI CC are owned directly by Holdings, all Equity Interests of Rincon are owned directly by Holdings and HVI CC, and all Equity Interests of Holdings are owned directly by Greka Integrated. Each Company is the record and beneficial owner of, and has good and marketable title to, the Equity Interests pledged by it under the Security Documents to which it is a party, free of any and all Liens, rights or claims of other persons, except the security interest created by the Security Documents, and there are no outstanding warrants,

options or other rights to purchase, or shareholder, voting trust or similar agreements outstanding with respect to, or property that is convertible into, or that requires the issuance or sale of, any such Equity Interests.

(b)     No Consent of Third Parties Required.  No consent of any person including any other general or limited partner, any other member of a limited liability company, any other shareholder or any other trust beneficiary is necessary or reasonably desirable (from the perspective of a secured party) in connection with the creation, perfection or first priority status of the security interest of the Collateral Agent in any Equity Interests pledged to the Collateral Agent for the benefit of the Secured Parties under a Security Document or the exercise by the Collateral Agent of the voting or other rights provided for in a Security Document or the exercise of remedies in respect thereof.

(c)     Organizational Chart.  An accurate organizational chart, showing the ownership structure of each Loan Party and each Subsidiary on the Closing Date, and after giving effect to the Transactions, is attached hereto as Schedule 3.08(c).

SECTION 3.09     Litigation; Compliance with Laws.

Except as disclosed on Schedule 3.09, there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority now pending or, to the knowledge of any Company, threatened against or affecting any Company or any business, property (other than the Specified Oil and Gas Properties) or rights of any Company (i) that involve any Loan Document or any of the Transactions or (ii) that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or result in liabilities or other obligations of the Companies, in the aggregate, of more than $2.5 million.  Except for matters covered by Section 3.19 and except with respect to the Specified Oil and Gas Properties, no Company or any of its property is in violation of, nor will the continued operation of its property as currently conducted violate, any Requirements of Law (including any zoning or building ordinance, code or approval or any building permits) or any restrictions of record or agreements affecting any Company's Real Property or is in default with respect to any Requirement of Law, where such violation or default, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

SECTION 3.10     Agreements.

No Company is a party to any agreement or instrument or subject to any corporate or other constitutional restriction that, individually or in the aggregate, has resulted or could reasonably be expected to result in a Material Adverse Effect.  No Company is in default in any manner under any provision of any indenture or other agreement or instrument evidencing Indebtedness, or any other agreement or instrument to which it is a party or by which it or any of its property is or may be bound, where such default, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect, and no condition exists which, with the giving of notice or the lapse of time or both, would constitute such a default.  Schedule 3.10 accurately and completely lists all material agreements (other than customary oil and gas leases and other leases of Real Property) to which any Company or any Subsidiary is a party which are in effect on the date hereof in connection with the operation of the business conducted thereby and, to the extent requested by the Administrative Agent, Borrowers have delivered to the Administrative Agent complete and correct copies of all such material agreements, including any amendments, supplements or modifications with respect thereto, and all such agreements are in full force and effect.

SECTION 3.11    **Federal Reserve Regulations**.

No Company is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock. No part of the proceeds of the Loans will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of, or that is inconsistent with, the provisions of the regulations of the Board, including Regulation T, U or X. The pledge of the Securities Collateral pursuant to the Security Documents does not violate such regulations.

SECTION 3.12    **Investment Company Act**.

No Company is an "investment company" or a company "controlled" by an "investment company," as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

SECTION 3.13    **[Reserved]**.

SECTION 3.14    **Taxes**.

Each Company has (a) timely filed or caused to be timely filed all federal Tax Returns and all material state, local and foreign Tax Returns required to have been filed by it and all such Tax Returns are true and correct in all material respects, (b) duly and timely paid, collected or remitted or caused to be duly and timely paid, collected or remitted all Taxes (whether or not shown on any Tax Return) due and payable, collectible or remittable by it and all assessments received by it, except Taxes (i) that are being contested in good faith by appropriate proceedings and for which such Company has set aside on its books adequate reserves in accordance with GAAP or (ii) which could not, individually or in the aggregate, have a Material Adverse Effect and (c) satisfied all of its withholding Tax obligations except for failures that could not be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect. Each Company and each Subsidiary thereof has made adequate provision in accordance with GAAP for all material Taxes not yet due and payable. No Company is aware of any proposed or pending Tax assessments, deficiencies or audits that could be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect. Except as could not be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect, no Company has ever "participated" in a "listed transaction" within the meaning of Treasury Regulation Section 1.6011-4.

SECTION 3.15    **No Material Misstatements**.

No information, report, financial statement, certificate, Closing Request, exhibit or schedule furnished by or on behalf of any Company to the Administrative Agent or any Lender in connection with the negotiation of any Loan Document or included therein or delivered pursuant thereto, taken as a whole, contained or contains any material misstatement of fact or omitted or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were or are made, not misleading as of the date such information is dated or certified; *provided* that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection, each Company represents only that it acted in good faith and utilized reasonable assumptions in the preparation of such information, report, financial statement, exhibit or schedule.

SECTION 3.16    **Labor Matters**.

As of the Closing Date, there are no strikes, lockouts or slowdowns against any Company pending or, to the knowledge of any Company, threatened. The hours worked by and payments made to

employees of any Company have not been in violation of the Fair Labor Standards Act of 1938, as amended, or any other applicable federal, state, local or foreign law dealing with such matters in any manner which, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. All payments due from any Company, or for which any claim may be made against any Company, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such Company except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. The consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Company is bound.

SECTION 3.17    **Solvency**.

Immediately after the consummation of the Transactions to occur on the Closing Date, (a) the fair value of the assets including the value of the PV-10 Value of the Companies (on a consolidated basis) exceeds its debts and liabilities, subordinated, contingent or otherwise; (b) the present fair saleable value of the property including the value of the PV-10 Value of the Companies (on a consolidated basis) is greater than the amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (c) the Companies (on a consolidated basis with the Cap Ex Facility) are able to pay their debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured in the ordinary course of business; and (d) the Companies (on a consolidated basis with the Cap Ex Facility) do not have unreasonably small capital with which to conduct the business in which they are engaged as such businesses are now conducted and are proposed to be conducted following the Closing Date.

SECTION 3.18    **Employee Benefit Plans**.

Each Plan has been established and administered in compliance in all material respects with the applicable provisions of ERISA and the Code and the regulations and published interpretations thereunder, except for such failures that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events, could reasonably be expected to result in material liability of any Company or any of its ERISA Affiliates or the imposition of a Lien on any of the property of any Company. The present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions used for purposes of FASB Accounting Standards Codification Topic 715-30) did not, as of the date of the most recent financial statements reflecting such amounts, exceed by more than $250,000 the fair market value of the property of all such underfunded Plans. For purposes of the foregoing sentence, an "underfunded Plan" is a Plan for which the present value of such Plan's accumulated benefit obligation exceeds such Plan's assets. Using actuarial assumptions and computation methods consistent with subpart I of subtitle E of Title IV of ERISA, the aggregate liabilities of each Company or its ERISA Affiliates to all Multiemployer Plans in the event of a complete withdrawal therefrom, as of the close of the most recent fiscal year of each such Multiemployer Plan, could not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.19    **Environmental Matters**.

(a)    Except as set forth in Schedule 3.19, except with respect to the Specified Oil and Gas Properties and except as, individually or in the aggregate, could not reasonably be expected to result in a loss to the business, property, operations or prospects of any Company in excess of $3,000,000:

(i)     The Companies and their businesses, operations and Real Property are in material compliance with, and the Companies have no liability under, any applicable Environmental Law; and under the currently effective business plan of the Companies, no expenditures or operational adjustments will be required in order to comply with applicable Environmental Laws during the next five years;

(ii)     The Companies have obtained all material Environmental Permits required for the conduct of their businesses and operations, and the ownership, operation and use of their property, under Environmental Law, all such Environmental Permits are valid and in good standing and, under the currently effective business plan of the Companies, no expenditures or operational adjustments will be required in order to renew or modify such Environmental Permits during the next five years;

(iii)     There has been no material Release or threatened Release of Hazardous Material on, at, under or from any Real Property or facility presently or formerly owned, leased or operated by the Companies or their predecessors in interest that could result in liability by the Companies under any applicable Environmental Law;

(iv)     There is no material Environmental Claim pending or, to the knowledge of the Companies, threatened against the Companies, or relating to the Real Property currently or formerly owned, leased or operated by the Companies or their predecessors in interest or relating to the operations of the Companies, and there are no actions, activities, circumstances, conditions, events or incidents that could form the basis of such an Environmental Claim;

(v)     No person with an indemnity or contribution obligation to the Companies relating to compliance with or material liability under Environmental Law is in default with respect to such obligation;

(vi)     No Company is obligated to perform any action or otherwise incur any expense under Environmental Law pursuant to any order, decree, judgment or agreement by which it is bound or has assumed by contract, agreement or operation of law, and no Company is conducting or financing any Response pursuant to any Environmental Law with respect to any Real Property or any other location; and

(vii)     No Lien has been recorded or, to the knowledge of any Company, threatened under any Environmental Law with respect to any Real Property or other assets of the Companies.

(b)     Except as set forth in <u>Schedule 3.19</u> and except with respect to the Specified Oil and Gas Properties:

(i)     No Real Property or facility owned, operated or leased by the Companies and, to the knowledge of the Companies, no Real Property or facility formerly owned, operated or leased by the Companies or any of their predecessors in interest is (i) listed, or, to the knowledge of the Companies, proposed for listing in a public notice, on the National Priorities List promulgated pursuant to CERCLA or (ii) listed on the Comprehensive Environmental Response, Compensation and Liability Information System promulgated pursuant to CERCLA or (iii) to the knowledge of the Companies, included on any similar list maintained by any Governmental Authority including any such list relating to petroleum;



FILED: NEW YORK COUNTY CLERK 10/21/2019 10:53 PM
NYSCEF DOC. NO. Case 1:19-cv-10786-LLS-KNF   Document 5-2   Filed 11/21/19   Page 68 of 70

INDEX NO. 656157/2019
RECEIVED NYSCEF: 10/21/2019

(ii)     The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby will not require any notification, registration, filing, reporting, disclosure, investigation, remediation or cleanup pursuant to any Governmental Real Property Disclosure Requirements or any other applicable Environmental Law; and

(iii)     The Companies have made available to the Lenders all material records and files in the possession, custody or control of, or known to be reasonably available to, the Companies concerning compliance with or liability under Environmental Law, including those concerning the actual or suspected existence of Hazardous Material at Real Property or facilities currently or formerly owned, operated, leased or used by the Companies.

SECTION 3.20     **Insurance**.

Schedule 3.20 sets forth a true, complete and correct description of all insurance maintained by each Company as of the Closing Date. All insurance maintained by the Companies is in full force and effect, all premiums have been duly paid, no Company has received notice of violation or cancellation thereof, their Oil and Gas Properties, Mortgaged Property and other assets, and the use, occupancy and operation thereof, comply in all material respects with all Insurance Requirements, and there exists no default under any Insurance Requirement. Each Company and each Subsidiary has insurance in such amounts and covering such risks and liabilities as are customary for companies of a similar size engaged in similar businesses in similar locations.

SECTION 3.21     **Security Documents**.

(a)     Security Agreement. The Security Agreement is effective to create in favor of the Collateral Agent for the benefit of the Secured Parties, legal, valid and enforceable Liens on, and security interests in, the Security Agreement Collateral and, when (i) financing statements and other filings in appropriate form are filed in the offices specified on Schedule 6 to the Perfection Certificate and (ii) upon the taking of possession or control by the Collateral Agent of the Security Agreement Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Collateral Agent to the extent possession or control by the Collateral Agent is required by a Security Agreement), the Liens created by the Security Agreement shall constitute fully perfected Liens on, and security interests in, all right, title and interest of the grantors in the Security Agreement Collateral (other than such Security Agreement Collateral in which a security interest cannot be perfected under the UCC as in effect at the relevant time in the relevant jurisdiction), in each case subject to no Liens other than Permitted Collateral Liens.

(b)     PTO Filing; Copyright Office Filing. If the Security Agreement or a short form thereof is filed in the United States Patent and Trademark Office and the United States Copyright Office, the Liens created by such Security Agreement shall constitute fully perfected Liens on, and security interests in, all right, title and interest of the grantors thereunder in Patents (as defined in the Security Agreement) registered or applied for with the United States Patent and Trademark Office or Copyrights (as defined in the Security Agreement) registered or applied for with the United States Copyright Office, as the case may be, in each case subject to no Liens other than Permitted Collateral Liens.

(c)     Mortgages. Each Mortgage is effective to create, in favor of the Collateral Agent (or such trustee for the benefit of the Collateral Agent as may be required or desired under local law), for its benefit and the benefit of the Secured Parties, legal, valid and enforceable first priority Liens on, and security interests in, all of the applicable Company's right, title and interest in and to the Mortgaged Properties thereunder and the proceeds thereof, subject only to Permitted Collateral Liens or other Liens



acceptable to the Collateral Agent, and when the Mortgages are filed in the offices specified on Schedule 7(a) to the Perfection Certificate dated the Closing Date (or, in the case of any Mortgage executed and delivered after the date thereof in accordance with the provisions of Sections 5.11 and 5.12, when such Mortgage is filed in the offices specified in the local counsel opinion delivered with respect thereto in accordance with the provisions of Sections 5.11 and 5.12), the Mortgages shall constitute fully perfected Liens on, and security interests in, all right, title and interest of the Companies in the Mortgaged Properties and the proceeds thereof, in each case prior and superior in right to any other person, other than Liens permitted by such Mortgage.

(d)     Valid Liens.  Each Security Document delivered pursuant to Sections 5.11 and 5.12 will, upon execution and delivery thereof, be effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, legal, valid and enforceable Liens on, and security interests in, all of the Companies' right, title and interest in and to the Collateral thereunder, and (i) when all appropriate filings or recordings are made in the appropriate offices as may be required under applicable law and (ii) upon the taking of possession or control by the Collateral Agent of such Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Collateral Agent to the extent required by any Security Document), such Security Document will constitute fully perfected Liens on, and security interests in, all right, title and interest of the Companies in such Collateral, in each case subject to no Liens other than the applicable Permitted Collateral Liens.

SECTION 3.22     Anti-Terrorism and Related Laws.

(a)     No Company and, to the knowledge of each Company, none of its Affiliates and none of the respective owners, officers, directors, brokers or agents of Greka Integrated or such Company or any Affiliate (i) has violated or is in violation of Sanctions Laws or Anti-Money Laundering Laws or (ii) has been convicted of, has been charged with, or is under investigation by, a Governmental Authority for violations of Sanctions Laws, Anti-Money Laundering Laws or any other Requirements of Law. The Companies have instituted and maintain, and will continue to maintain, in effect, policies and procedures designed to promote and achieve compliance with Sanctions Laws and Anti-Money Laundering Laws and with the representations, warranties and covenants contained in this Section 3.22 and Section 6.19.

(b)     No Company, none of its Subsidiaries and, to the knowledge of each Company, none of its Affiliates and none of the respective owners, officers, directors, employees, representatives, brokers or agents of such Company, such Subsidiary or such Affiliate is acting or benefiting in any capacity in connection with the Loans is an Sanctioned Person, is a shell bank or is subject to special measures because of money laundering concerns under Section 311 of the USA PATRIOT Act and its implementing regulations.

(c)     No Company and, to the knowledge of each Company, none of its Affiliates and none of the respective owners, officers, directors, employees, representatives, brokers or agents of such Company, such Subsidiary or such Affiliate acting or benefiting in any capacity in connection with the Loans (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Sanctioned Person, (ii) deals in, or otherwise engages in any transaction related to, any Sanctioned Person, any property or interests in property of a Sanctioned Person or otherwise blocked pursuant to any Sanctions Law or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any Sanctions Law.

(d)     Borrowers will not, directly or indirectly, use the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner other



person, (i) to fund any activities or business of or with any Sanctioned Person, or in any country or territory that, at the time of such funding is, or whose government is, the subject of any Sanctions, (ii) to facilitate any unlawful activity or (iii) in any other manner that would result in a violation of Sanctions by any person (including any person participating in the Loans, whether as lender, underwriter, advisor, investor or otherwise).

(e)    No Company, nor any director, officer, or employee, nor, to any Company's knowledge, any agent, representative or Affiliate of such Company, has taken or will take any action in furtherance of, nor will any proceeds of the Loans be used, directly or indirectly, in furtherance of, an offer, payment, promise to pay, or authorization or approval of the payment or giving of money, property, gifts or anything else of value, directly or indirectly, to any "government official" (including any officer or employee of a government or government-owned or controlled entity or of a public international organization (e.g. the International Monetary Fund or World Bank), or any person acting in an official capacity for or on behalf of any of the foregoing, or any political party or party official or candidate for political office) to influence official action or secure an improper advantage or otherwise in any manner which results in violation of the U.S. Foreign Corrupt Practices Act of 1977, as amended, the UK Bribery Act 2010 and the rules and regulations thereunder or any other applicable Requirements of Law relating to anti-corruption or anti-bribery (collectively, "**Anti-Corruption Laws**"); and each Company has conducted its business in compliance with Anti-Corruption Laws and has instituted and maintained and will continue to maintain policies and procedures designed to promote and achieve compliance with such Anti-Corruption Laws and with the representations, warranties and covenants contained herein.

SECTION 3.23     **Gas Imbalances, Prepayments.**

Except as set forth on Schedule 3.23 or on the most recent certificate delivered pursuant to Section 5.16(b), on a net basis there are no gas imbalances, take or pay or other prepayments which would require any Company or any Subsidiary to deliver Hydrocarbons produced from the Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor with a value in excess of $1,000,000 in the aggregate.

SECTION 3.24     **Marketing of Production.**

Except for contracts listed on Schedule 3.24, and thereafter either disclosed in writing to the Administrative Agent or included in the most recently delivered Reserve Report(s) (with respect to all of which contracts the Companies represent that they are receiving a price for all production sold thereunder which is computed substantially in accordance with the terms of the relevant contract and are not having deliveries curtailed substantially below the subject Oil and Gas Property's delivery capacity), no material agreements exist which are not cancelable on one hundred twenty days' notice or less without penalty or detriment for the sale of production from the Companies' Hydrocarbons (including, without limitation, calls on or other rights to purchase, production, whether or not the same are currently being exercised) that (a) pertain to the sale of production at a fixed price and (b) have a maturity or expiry date of longer than six months from the date hereof.

SECTION 3.25     **Hedging Agreements.**

Schedule 3.25, as of the date hereof, and after the date hereof, each report required to be delivered by Borrowers pursuant to Section 5.01(j), sets forth, a true and complete list of all Hedging Agreements of each Company in effect on the date of such report, the material terms thereof (including the type, term, agreement date, settlement date, and notional amounts or volumes), all credit support relating thereto (including any margin required or supplied) and the counterparty to each such agreement.