UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**UBS AG, LONDON BRANCH,**

                    Plaintiff,

          - against -

**GREKA INTEGRATED, INC.,**

                    Defendant.

```
                        DC SDNY
                        DOCUMENT
                        ELECTRONICALLY FILED
                        DOC #:
                        DATE FILED:   4/23/20
```

19 Civ. 10786 (LLS)

**OPINION & ORDER**

          Plaintiff UBS AG, London Branch brought this diversity
action alleging that defendant Greka Integrated, Inc. failed to
repay a $100 million loan that it guaranteed.  Plaintiff moves
for summary judgment, and to dismiss defendant's counterclaims.
For the following reasons, both motions are granted.

**BACKGROUND**

          UBS AG, London Branch ("UBS") is a Switzerland corporation
with a principal place of business in the United Kingdom.  Greka
Integrated, Inc., now known as GIT, Inc. ("GIT"), is a Colorado
corporation with a principal place of business in California.

Credit Agreements

          On May 20, 2016, UBS agreed to lend $100 million to two oil
and gas production firms, HVI Cat Canyon, Inc. ("HVICC") and
Rincon Island Limited Partnership ("Rincon," collectively the
"Borrowers") under the First Lien Credit Agreement and Second
Lien Credit Agreement ("Credit Agreements").  Under the two
Credit Agreements, each specifying the amount of $50 million,

the Borrowers are required to repay the loans with interest, in addition to certain fees and costs.

The Credit Agreements list potential events of default, including the failure to pay principal, interest, or other fees when due, and the commencement of a voluntary bankruptcy proceeding by one of the Borrowers. Chandler Aff. Exs. 3, 4 ("Credit Agreements") § 7.01(a), (b), (h). When an event of default due to a failure to make required payments occurs, UBS may

> declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued Fees and all other Obligations of the Companies accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind . . . .

Id. § 7.01. When an event of default due to a bankruptcy filing occurs,

> the principal of the Loans, together with accrued interest thereon and any unpaid accrued Fees and all other Obligations of Borrowers accrued hereunder and under any other Loan Document, shall automatically become due and payable, without presentment, demand, protest or any other notice of any kind . . . .

Id.

The Credit Agreements also state that the Borrowers shall pay "all documented and actual out-of-pocket expenses incurred" by UBS "in connection with the enforcement or protection of its rights" under the agreements. Id. § 9.03(a).

-2-

### Guaranty Agreements

On the same day that UBS and the Borrowers executed the Credit Agreements, UBS and GIT, an affiliate of the Borrowers, entered into the First Lien Guaranty Agreement and Second Lien Guaranty Agreement ("Guaranties").

Under the Guaranties, GIT guarantees to UBS "the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of the principal of and interest on" the loans made to the Borrowers under the Credit Agreements.  Chandler Aff. Exs. 1, 2 ("Guaranties") § 2.01.

### Events of Default

Rincon and HVICC filed voluntary bankruptcy petitions on August 8, 2016 and July 25, 2019, respectively.

Between August of 2016 and July of 2019, UBS sent the Borrowers over seventeen letters notifying them of their Events of Default, such as the bankruptcy petitions and HVICC's failure to make required payments.  A July 10, 2019 letter from UBS addressed to both HVICC and GIT stated,

> As a result of the Existing Defaults, among other things, pursuant to Article VII of each Credit Agreement, the principal of the Loans, together with accrued interest thereon, interest accruing at the Default Rate thereon, any unpaid accrued Fees and all other Obligations of the Borrowers accrued thereunder and under any other Loan Document, automatically became due and payable.

Chandler Aff. Ex. 11.

-3-

The Borrowers have not made any required payments of

principal under the Credit Agreements. GIT is aware of the

Borrowers' defaults and failure to pay, but has not made any

payments to UBS.

## Solvency Certificates

Under the Credit Agreements, the Borrowers were required to

provide UBS with a Solvency Certificate. Credit Agreements

§ 4.01(h). On May 20, 2016, the Borrowers executed the Solvency

Certificates, which represent that the value of their oil and

gas reserves exceeds their debts and liabilities:

Immediately following the consummation of the Transactions and
immediately following the making of each Loan and after giving
effect to the application of the proceeds of each Loan on the
date hereof, (a) the fair value of the assets including the
value of the PV-10 Value of the Companies (on a consolidated
basis) exceeds its debts and liabilities, subordinated,
contingent or otherwise; (b) the present fair saleable value of
the property including the value of the PV-10 Value of the
Companies (on a consolidated basis) is greater than the amount
that will be required to pay the probable liability of its debts
and other liabilities, subordinated, contingent or otherwise,
as such debts and other liabilities become absolute and
matured . . . .

Whalen Decl. Exs. D, E ¶ 2.

The "PV-10 Value of the Companies" is the present value

quantification of future cash flows to be generated from the

Borrowers' oil and gas reserves, using a discount rate of 10

percent. In the fall of 2015, UBS had proposed an earlier draft

of the Solvency Certificates that did not contain any reference

to the PV-10 value. The Borrowers modified the draft to include

-4-

that language.

During HVICC's 2019 bankruptcy proceeding in the U.S. Bankruptcy Court for the Southern District of New York, UBS objected to HVICC's cash collateral motion. UBS's expert witness testified that the PV-10 value was not an appropriate method to calculate the value of HVICC's reserves. Although a Reserve Report stated that the PV-10 value of HVICC's reserves was $135.9 million, UBS's expert witness testified that HVICC's total assets were worth between $50 million and $75 million.

### This Action

On October 21, 2019, UBS filed this summary judgment motion in lieu of complaint in New York State Supreme Court pursuant to CPLR § 3213, requesting that judgment be entered in its favor in the amount of $100 million plus interest, fees, and costs.

GIT removed the action to this court on November 21, 2019. On December 20, 2019, GIT filed counterclaims against UBS alleging (1) fraud, fraudulent inducement, promissory fraud, and (2) innocent misrepresentation. UBS moved to dismiss the counterclaims on January 24, 2020. On February 7, 2020, GIT filed amended counterclaims alleging three additional claims: (1) breach of contract, (2) breach of implied covenant of good faith and fair dealing, and (3) promissory estoppel.

UBS moves to dismiss the amended counterclaims for failure to state a claim.

-5-

### DISCUSSION

CPLR § 3213 states, "When an action is based upon an
instrument for the payment of money only or upon any judgment,
the plaintiff may serve with the summons a notice of motion for
summary judgment and the supporting papers in lieu of a
complaint."

"A federal court to which a state action is removed takes
the action in the posture in which it existed when removed from
a state court's jurisdiction and must give effect to all actions
and procedures accomplished in a state court prior to removal."
Istituto Per Lo Sviluppo Economico Dell' Italia Meridionale v.
Sperti Prod., Inc., 47 F.R.D. 310, 312 (S.D.N.Y. 1969). "Only
pleadings filed subsequent to removal must conform to the
requirements of the federal rules." Id.

"The court shall grant summary judgment if the movant
shows that there is no genuine dispute as to any material fact
and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect
the outcome of the suit under the governing law,' and a dispute
is genuine if 'the evidence is such that a reasonable jury could
return a verdict for the nonmoving party.'" Baldwin v. EMI
Feist Catalog, Inc., 805 F.3d 18, 25 (2d Cir. 2015) (quoting
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct.
2505, 2510 (1986)).

-6-

To meet its prima facie burden on its summary judgment motion, UBS must prove "the existence of the guaranty, the underlying debt and the guarantor's failure to perform under the guaranty." Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A. v. Navarro, 25 N.Y.3d 485, 492 (2015) (citation and internal quotation marks omitted). "Thereafter, the burden shifts to the defendant to establish, by admissible evidence, the existence of a triable issue with respect to a bona fide defense." Id. (citation and internal quotation marks omitted.)

GIT does not dispute the existence of the loans and Guaranties or its failure to perform under the Guaranties. GIT argues that summary judgment should not be granted because (1) the Guaranties are not "an instrument for the payment of money only" as required under CPLR § 3213, (2) there is a genuine issue as to the amount of damages owed, and (3) there is a genuine issue as to whether UBS fraudulently induced GIT into entering the Guaranties by concealing UBS's view on the PV-10 value of the Borrowers' oil and gas reserves. UBS's view on the value of the reserves is also the basis of GIT's amended counterclaims.

CPLR 3213

GIT argues that UBS's summary judgment motion in lieu of complaint was not properly brought under CPLR § 3213 because the Guaranties are not "an instrument for the payment of money

-7-

only." However, the Guaranties state,

> The Guarantor hereby acknowledges that the guarantee in this Agreement constitutes an instrument for the payment of money, and consents and agrees that any Lender, Agent or other Secured Party, at its sole option, in the event of a dispute by such Guarantor in the payment of any moneys due hereunder, shall have the right to bring a motion-action under New York CPLR Section 3213.

Guaranties § 2.06. The Guaranties also state that GIT's guarantee obligations are unconditional, and "New York courts have consistently held that an unconditional guarantee is an instrument for the payment of money only within the meaning of the CPLR § 3213." BC Media Funding Co. II v. Lazauskas, No. 08-CV-6228 (RPP), 2008 WL 4735236, at *2 (S.D.N.Y. Oct. 24, 2008).[1] See Guaranties § 2.02:

> The obligations of the Guarantor under Section 2.01 shall constitute a guaranty of payment and, to the fullest extent permitted by applicable Requirements of Law, are absolute, irrevocable and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations of Borrowers and other Loan Parties under the Credit Agreement . . . .

GIT argues that the Guaranties are not "an instrument for the payment of money only" because it also guaranteed performance of other obligations. First, GIT argues that it guaranteed not only the Borrowers' payment obligations but also "all other Secured Obligations," which include "the due and punctual performance of all covenants, agreements, obligations

---

[1] The Guaranties and Credit Agreements are governed by New York law. Guaranties § 6.09(a); Credit Agreements § 9.09(a).

-8-

and liabilities of Borrowers." Guaranties § 2.01; Credit

Agreements § 1.01. However, the Guaranties make clear that "all

other Secured Obligations" concern the payment of money only.

The Guaranties state,

> The Guarantor hereby guarantees to each Secured Party and their
> respective successors and assigns, the prompt payment in full
> when due (whether at stated maturity, by required prepayment,
> declaration, demand, by acceleration or otherwise) of the
> principal of and interest on (including any interest, fees, costs
> or charges that would accrue but for the provisions of the Title
> 11 of the United States Code after any bankruptcy or insolvency
> petition under Title 11 of the United States Code) the Loans
> made by the Lenders to, and the Notes held by each Lender of,
> Borrowers, and all other Secured Obligations from time to time
> owing to the Secured Parties by any other Loan Party under any
> other Loan Document or by any other Loan Party under any Hedging
> Agreement or Treasury Services Agreement entered into with a
> counterparty that is a Secured Party (provided that, in the case
> of any Hedging Agreement, the Required Lenders shall have
> consented to such counterparty being a Secured Party with respect
> to Hedging Agreements), in each case strictly in accordance with
> the terms thereof (such obligations being herein collectively
> called the **"Guaranteed Obligations"**). The Guarantor hereby
> agrees that if a Borrower or another Company shall fail to pay
> in full when due (whether at stated maturity, by acceleration
> or otherwise) any of the Guaranteed Obligations, the Guarantor
> will promptly pay the same in cash, without any demand or notice
> whatsoever, and that in the case of any extension of time of
> payment or renewal of any of the Guaranteed Obligations, the
> same will be promptly paid in full when due (whether at extended
> maturity, by acceleration or otherwise) in accordance with the
> terms of such extension or renewal. The liability of the
> Guarantor under this Guarantee is a primary, and not secondary,
> obligation of such Guarantor.

Guaranties § 2.01 (emphasis in original). In that section, the

phrase "all other Secured Obligations" is included within the

broader category of the "Guaranteed Obligations," and the

"Guaranteed Obligations" are obligations to pay money only. See

id. ("if a Borrower . . . shall fail to pay in full when

-9-

due . . . any of the Guaranteed Obligations, the Guarantor will promptly pay the same in cash").

GIT also argues that the Guaranties require GIT to provide UBS with annual and quarterly financial reports, notices of certain asset sales, a certificate of GIT's financial condition, and "such other information regarding the operations, business affairs and financial condition of the Guarantor, or compliance with the terms of this Agreement." Id. § 4.01. However,

> An instrument that contains more than an unconditional promise to pay money is not necessarily disqualified as being for the payment of money only (First Interstate Credit Alliance, Inc. v. Sokol, 179 A.D.2d 583, 684 [1st Dept 1992]). The mere presence of additional provisions in the guaranty does not constitute a bar to CPLR 3213 relief, provided that the provisions do not require additional performance as a condition precedent to repayment, or otherwise alter the defendant's promise of payment (Juste v. Niewdach, 26 A.D.3d 416, 417 [2d Dept 2006]; Stevens v. Phlo Corp., 288 A.D.2d 56, 56 [1st Dept 2001]; Machidera Inc. v. Toms, 258 A.D.2d 418, 418 [1st Dept 1999]; Afco Credit Corp. v. Boropark Twelfth Ave. Realty Corp., 187 A.D.2d 634, 634 [2d Dept 1992]).

Bank of Am., N.A. v. Solow, 862 N.Y.S.2d 812 (Sup. Ct. 2008), aff'd, 874 N.Y.S.2d 48 (App. Div. 2009). GIT's obligation to give UBS financial information is neither a condition precedent to nor an alteration of its obligation to guarantee repayment of the loans.

## Amount of Damages

GIT argues that there is an issue of fact as to the amount of damages owed under the Guaranties. See HSBC Bank USA v. IPO, LLC, 735 N.Y.S.2d 531, 532 (App. Div. 2002) (the prima facie

-10-

case for relief under CPLR § 3213 "requires documentary evidence or an explanation of how the indebtedness is calculated, other than in the form of mere conclusory allegations"). GIT cites UBS's letters notifying the Borrowers and GIT of the Borrowers' defaults to show that UBS fails to establish the amount of damages, fails to explain or provide documents showing how damages are calculated, overestimates the amount of principal and interest due, and seeks money owed under other agreements that are not part of this action.

UBS's claim for damages in the amount of $100 million, plus interest, fees, and other costs due under the Credit Agreements, is supported by the documents. The Guaranties guarantee GIT's repayment of the two loans made to the Borrowers under the two Credit Agreements, in addition to "interest, fees, costs or charges." Guaranties § 2.01. The Credit Agreements state multiple times that each loan is in the amount of $50 million, for a total of $100 million. See Credit Agreements § 1.01 ("The aggregate amount of the Lenders' Commitments is $50,000,000."); id. § 2.01 ("all such Loans being equal to $50,000,000"); Chandler Aff. Exs. 6, 7 (Schedule 1.1(d) to the Credit Agreements lists "UBS AG, London Branch" as the sole "Lender" with a "Commitment" of $50,000,000).

The Credit Agreements also set forth how UBS's fees and interest should be calculated. See Credit Agreements § 2.05

-11-

(the Borrowers agree to pay UBS "the administrative fees payable in the amounts and at the times separately agreed upon" and "deferred closing fees . . . in the amounts at least equal to those set forth on Schedule 2.05" ), id. § 2.06 (the loans "shall bear interest at a rate per annum equal to the Adjusted LIBOR Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin in effect from time to time"). "That the rate of interest was not specifically set forth in the note does not render it any the less an instrument for the payment of money only." Schwartz v. Turner Holdings, Inc., 527 N.Y.S.2d 229, 230 (App. Div. 1988).

UBS attaches its letters to show that the Borrowers were in default and that they (and GIT) had notice of those defaults and that the full amount of the loans was due and payable. The numbers stated in the letters were the amounts of principal, interest, fees, and costs due at the time UBS sent each of those letters; UBS does not claim that it is owed those amounts now.[2]

Therefore, there is no genuine issue as to the amount of damages.

## Fraudulent Inducement

GIT argues that it was fraudulently induced into executing

---

[2] UBS states that the amount of interest, fees, and costs depends on the date of judgment, and "respectfully submits that . . . any proceedings necessary to calculate the amount of interest, fees, and costs should be referred to a Magistrate Judge or Special Master." Pl. Summ. J. Reply Br. at 6, n.7.

the Guaranties, nullifying GIT's obligations. Specifically, GIT argues that in 2016, UBS concealed its view that the PV-10 value of the Borrowers' reserves was inaccurate, and did not disclose that view until HVICC's 2019 bankruptcy proceeding. Therefore, GIT claims it was deceived into believing that UBS agreed that the $100 million loan was adequately secured by the Borrowers' reserves. GIT asserts that if UBS had disclosed its view in 2016, GIT would not have entered into the Guaranties.

To establish a fraudulent inducement claim, GIT must show a "misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury." Shea v. Hambros PLC, 673 N.Y.S.2d 369, 373 (App. Div. 1998) (quoting Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 421 (1996)) (internal quotation marks omitted).

There is no evidence or other indication that UBS made any misrepresentation concerning the PV-10 value of the reserves. The Solvency Certificates were representations made by the Borrowers to UBS, not representations by UBS to GIT. GIT argues that UBS "engaged in a course of behavior, through actions, statements, and omissions" that defrauded GIT, pointing to UBS's requirement of Solvency Certificates, acceptance of the modified

-13-

PV-10 language in those certificates, receipt of subsequent

periodic Reserve Reports from the Borrowers that used the PV-10

valuation method, and inquiries about the PV-10 value. However,

none of those acts constitutes a statement or representation

about UBS's view on the value of the reserves.

Nor did UBS make a material omission of fact. There is no

evidence that in 2016, UBS held the same view on the PV-10 value

as that of its expert witness in 2019.[3]  Even assuming that it

did and concealed that view, "When an allegation of fraud is

based upon nondisclosure, there can be no fraud absent a duty to

speak." Chiarella v. United States, 445 U.S. 222, 235, 100 S.

Ct. 1108, 1118 (1980).

New York recognizes a duty by a party to a business transaction
to speak in three situations: first, where the party has made a
partial or ambiguous statement, on the theory that once a party
has undertaken to mention a relevant fact to the other party it
cannot give only half of the truth, see Junius Constr. Corp. v.
Cohen, 257 N.Y. 393, 400, 178 N.E. 672 (1931) (Cardozo, J.);
second, when the parties stand in a fiduciary or confidential
relationship with each other, see Allen, 945 F.2d at 45; and
third, "where one party possesses superior knowledge, not
readily available to the other, and knows that the other is
acting on the basis of mistaken knowledge."

Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir.

1993).

---

[3] GIT states that "this dispute should proceed to discovery" and that
"discovery is appropriate to uncover direct evidence of UBS's views of PV-10
Value upon entering the Credit Agreement Transaction." Def. Summ. J. Br. at
3; Def. Dismiss Countercl. Br. at 25.  Fed. R. Civ. P. 56(d) provides for
such discovery if GIT "shows by affidavit or declaration that, for specified
reasons, it cannot present facts essential to justify its opposition." See
also Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d
919, 926 (2d Cir. 1985).  GIT has not attempted to make that showing.

-14-

None of those three situations applies. First, as discussed, there is no evidence that UBS made any statement, let alone a partial or ambiguous statement, about its view on the PV-10 value of the reserves.

Second, UBS and GIT do not have a fiduciary or confidential relationship; the Guaranties disclaim such a relationship. See Guaranties § 6.13 (UBS "may be engaged in a broad range of transactions that involve interests that differ from those of the Guarantor" and does not have "any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship").

Third, there is no evidence that UBS possessed superior knowledge about the value of the reserves that was not readily available to GIT. "The special facts doctrine, under which a party may have a duty to disclose information particularly within its knowledge, even in the absence of a fiduciary duty, requires satisfaction of a two-prong test: (1) that a material fact was information peculiarly within the knowledge of the defendant, and (2) that the information was not such that could have been discovered by plaintiff through the exercise of ordinary intelligence." Kriegel v. Donelli, No. 11-CV-9160 (ER), 2014 WL 2936000, at *13 n.14 (S.D.N.Y. June 30, 2014).

UBS's view on the PV-10 value was an opinion, not a fact, and did not have a duty to disclose it. See SSA Holdings LLC v.

Kaplan, 992 N.Y.S.2d 405, 406 (App. Div. 2014) ("Nor did the duty to disclose arise under the special facts doctrine, as the complaint does not allege that defendants had superior knowledge of essential facts . . . 'While there may have been concealment of opinions, there was no concealment of the facts upon which those opinions were based' and defendants 'were not bound to volunteer their opinions'") (quoting Trustees of Amherst Coll. v. Ritch, 151 N.Y. 282, 322 (1897)).

Because UBS did not make a misrepresentation or material omission of fact, GIT's alternative argument that the Guaranties are voidable under the doctrine of innocent misrepresentation is equally unavailing.

Therefore, there is no genuine issue as to whether GIT was fraudulently induced into executing the Guaranties; it was not.

### GIT's Counterclaims

"A motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint." Holborn Corp. v. Sawgrass Mut. Ins. Co., 304 F. Supp. 3d 392, 397 (S.D.N.Y. 2018) (citation and internal quotation marks omitted). On a motion to dismiss under Rule 12(b)(6), the court accepts "all factual allegations in the complaint as true, drawing all reasonable inferences in favor of the plaintiff." Kelly-Brown v. Winfrey, 717 F.3d 295, 304 (2d Cir. 2013). To survive a motion to dismiss, a complaint must plead "enough facts to state

-16-

a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009).

GIT's amended counterclaims ("ACC", Dkt. No. 25) concern the same issue of UBS's view on the PV-10 value of the Borrowers' reserves. GIT alleges (1) breach of the Credit Agreements, (2) breach of the implied covenant of good faith and fair dealing under the Guaranties, (3) promissory estoppel, (4) fraud, fraudulent inducement, promissory fraud, and (5) innocent misrepresentation.

For the reasons stated above, GIT's fourth and fifth counterclaims alleging that UBS's concealment of its view on the value of the reserves was a fraudulent or innocent misrepresentation or material omission of fact are dismissed. The counterclaims do not adequately allege that UBS made any representation about the value of the reserves or that UBS had a duty to state its view.

Similarly, GIT's promissory estoppel counterclaim alleging that GIT relied on UBS's promise that the PV-10 value accurately measured the value of the reserves is dismissed because it does

-17-

not allege that UBS made any statement or "clear and unambiguous promise" to GIT about the value of the reserves.  Kaye v. Grossman, 202 F.3d 611, 615 (2d Cir. 2000).  UBS's actions of requiring Solvency Certificates, accepting Solvency Certificates and Reserve Reports that included the PV-10 value, and inquiring about the PV-10 value do not constitute a promise.

GIT's breach of contract counterclaim alleges that "UBS breached its agreement when it asserted rights in the HVI Cat Canyon bankruptcy proceeding based on its newly-disclosed view that HVI Cat Canyon's reserves were worth only a mere fraction of their PV-10 Value."  ACC ¶ 34.  However, the counterclaim does not identify which provision or which contract UBS breached.  GIT specifies in its brief that §§ 3.17, 5.11(c), and 6.09(c) of the Credit Agreements "contain three covenants establishing PV-10 Value as the parties' agreed-upon measure."  Def. Dismiss Countercl. Br. at 12.  However, none of those provisions imposes an obligation on UBS that it could have breached, and the breach of contract counterclaim is therefore dismissed.  See Credit Agreements § 3.17 ("the fair value of the assets including the value of the PV-10 Value of the Companies (on a consolidated basis} exceeds its debts and liabilities");  id. § 5.11(c) ("review the Reserve Report and the list of current Mortgaged Properties . . . to ascertain whether the Mortgaged Properties include Oil and Gas Properties that

represent at least 95% of the PV-10 Value of the Oil and Gas
Properties evaluated in the most recently completed Reserve
Report"); id. § 6.09(c) (specifying a "Minimum Secured Asset
Coverage Ratio," which is defined as "the ratio of (a) the PV-10
Value in effect at such time to (b) Consolidated Indebtedness
less the aggregate amount of unsecured Indebtedness of Borrowers
and their Subsidiaries").

GIT also alleges that UBS breached the implied covenant of
good faith and fair dealing under the Guaranties "when it sought
to impose far greater liability on GIT under the Guarantees than
would otherwise exist by asserting in the HVI Cat Canyon
bankruptcy proceeding its secretly-held view that HVI Cat
Canyon's reserves were worth only a mere fraction of their PV-10
Value." ACC ¶ 43.

> In New York, all contracts imply a covenant of good faith and
> fair dealing in the course of performance. Breach of the implied
> covenant is considered a breach of the underlying contract. This
> covenant embraces a pledge that neither party shall do anything
> which will have the effect of destroying or injuring the right
> of the other party to receive the fruits of the contract.
> Additionally, the covenant imposes an obligation on the parties
> to refrain from intentionally and purposefully [doing] anything
> to prevent the other party from carrying out the agreement on
> his part. While the implied covenant of good faith and fair
> dealing does not imply obligations inconsistent with other terms
> of the contractual relationship, it does encompass any promises
> which a reasonable person in the position of the promisee would
> be justified in understanding were included.

Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A, 244
F.R.D. 204, 214 (S.D.N.Y. 2007) (alteration in original)
(citations and internal quotation marks omitted).

A reasonable person would not be justified in thinking that
the Guaranties (which do not mention PV-10) imply an obligation
on UBS to agree with the PV-10 value of the reserves.  Such an
obligation is not necessary to effectuate the purpose of the
Guaranties, as GIT's guarantee to repay the loans is absolute
and unconditional, and does not depend on the PV-10 value of the
reserves.  GIT's implied covenant counterclaim is dismissed.
See Broder v. Cablevision Sys. Corp., 418 F.3d 187, 198-99 (2d
Cir. 2005) ("The implied covenant can only impose an obligation
consistent with other mutually agreed upon terms in the
contract.  It does not add [ ] to the contract a substantive
provision not included by the parties.") (alteration in
original) (citations and internal quotation marks omitted);
Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 407 (2d Cir.
2006) ("this covenant only applies where an implied promise is
so interwoven into the contract as to be necessary for
effectuation of the purposes of the contract") (citation and
internal quotation marks omitted).

GIT's request for leave to amend its counterclaims a second
time is denied because amendment would be futile.  UBS's first
motion to dismiss the counterclaims addressed the same

deficiencies of GIT's fraud and innocent misrepresentation
allegations, such as the failure to plead any relevant statement
made by UBS.  GIT had notice of that defect (which also applied
to its additional promissory estoppel counterclaim) and an
opportunity to cure it in its amended counterclaims, but did
not.  The reasons for dismissal of the breach of contract and
implied covenant of good faith and fair dealing counterclaims do
not turn on points of pleading; there is no provision in the
Guaranties or Credit Agreements that imposes an express or
implied obligation on UBS regarding its view on the PV-10 value.
See Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir.
1993) ("Where it appears that granting leave to amend is
unlikely to be productive, however, it is not an abuse of
discretion to deny leave to amend.").

## CONCLUSION

Plaintiff's motion for summary judgment (Dkt. No. 5-1) and
motion to dismiss defendant's amended counterclaims (Dkt. No.
28) are granted.

Plaintiff's motions for oral argument (Dkt. Nos. 21, 30)
are denied.

This action is referred to Magistrate Judge Kevin Nathaniel
Fox for the calculation of interest, fees, and costs.

So ordered.

Dated:    New York, New York

April 23, 2020

_____ Louis L. Stanton
LOUIS L. STANTON
U.S.D.J.