UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------X

UBS AG, LONDON BRANCH,

                    Plaintiff,             Case No. 19 Civ. 10786 (LLC) (KNF)

   - against -

                                         Hon. Louis L. Stanton, U.S.D.J.

GREKA INTEGRATED, INC.,          Hon. Kevin N. Fox, U.S.M.J.

                 Defendant.

-----------------------------------------------------X

## GIT's MEMORANDUM OF LAW IN OPPOSITION TO UBS MOTION TO DETERMINE THE AMOUNTS DUE UNDER THE GUARANTIES

BERRY LAW PLLC
*Attorneys for Greka Integrated, Inc.*
*now known as GIT, Inc.*
745 FIFTH AVENUE, FIFTH FLOOR
NEW YORK, NEW YORK  10019
(212) 355-0777

New York, New York
September 30, 2020

# TABLE OF CONTENTS

**Page**

Table of Authorities........................................................................................ iii

A. INTRODUCTION........................................................................................ 1

B. BACKGROUND............................................................................................ 3

C. PROCEDURAL HISTORY........................................................................ 4

     (i) The Rincon Bankruptcy Case............................................................ 4

     (ii) The First Default Notice.................................................................... 5

     (iii) The Subsequent Default Notices.................................................... 5

     (iv) Rincon's Inability to Reorganize.................................................... 5

     (v) The HVICC Bankruptcy.................................................................... 5

     (vi) UBS' Motion for Summary Judgment in Lieu of Complaint................... 5

     (v) Judge Stanton's Decision................................................................ 6

D. ARGUMENT.................................................................................................. 6

     Point I
     Assessing Damages or Entering Judgment
     Against GIT Would Violate the Automatic
     Stay Imposed by the HVICC Bankruptcy........................................... 6

     Point II
     GIT is Guarantor, Not a Surety, of the Borrowers' Obligations
     and Thus is Not Yet Responsible for those  Obligations, Since
     an Actionable Default by the Borrowers Had Not Yet Occurred................... 8

        A. No Actionable Default by the Borrowers Has Yet Occurred.......... 8

            1. Rincon's Bankruptcy Filing is an
            Unenforceable Ipso Facto Default............................................. 9

            2. Rincon's Bankruptcy Did Not
            Trigger an Enforceable Default by HVICC.......................... 11

**Table of Contents (con'd)**

| | Page |
|---|---|
| 3. None of the Default Notices Were Not Effective Against the Borrowers Since Since they Violated the Automatic Stay.................................. | 12 |
| Point III<br>Since GIT is a Guarantor, its Liability Is Derivative of that of of the Buyers,  and any Assessment of Damages is Premature....................... | 13 |
| Point IV<br>Holding GIT to Be A Surety Rather than A Guarantor Would Not Change the Outcome...................................................... | 16 |
| Point V<br>Assessment of Amounts Due under the Guarantee is Premature Since GIT is First Required to Exhaust the Collateral Securing the Credit Agreements................................. | 18 |
| Point VI<br>The Foregoing Arguments Are Not Precluded By, or Inconsistent With, Judge Stanton's April 23, 2020 Ruling.............................. | 19 |
| Point VII<br>In All Events, the Request for "Fees" and an Additional Amount Allegedly Due Under an Instrument Not Covered by the Guarantees Should Be Excluded............................................ | 20 |
| E. CONCLUSION.................................................................................. | 21 |

## TABLE OF AUTHORITIES

**Case**                                                                   **Page(s)**

*In re Adler*, 494 B.R. 43 (Bankr. E.D.N.Y. 2013)
aff'd, 518 B.R. 228 (E.D.N.Y. 2014)................................................... 7n.5

*In re American Home Mortgage Holdings, Inc.*
402 B.R. 87 (D. Del. 2009)............................................................... 17

*In re Bender*, 562 B.R. 578 (Bankr., E.D.N.Y. 2016)...................................... 12

*In re Bownetree*, 2009 WL 2226107 (Bankr., E.D.N.Y. 2009)...................... 11

*Boxed Beef Distributors v. Rexton*, 509 A.2d 1060 (Conn. App. 1986).......... 15

*In re Charter Comm'ns*, 419 B.R. 221 (Bankr., S.D.N.Y. 2009)................... 10, 16, 18n.7

*In re Chateaugay Corp.*,1993 WL 159969 (S.D.N.Y., May 10, 1993)........... 10

*Farrish v. Town of East Hartford*, 2 Fed.Appx. 110 (2d Cir. 2001)............... 20

*Federal Insurance Co. v. Sheldon*, 150 B.R. 314 (S.D.N.Y. 1993)................ 12

*Gulfmark Offshore, Inc. v. Bender Shipbuilding*
2009 WL 2413664 (S.D. Ala., Aug. 3, 2009)..................................... 8

*Jennings Communications Corp. v. PCG of Golden Strand, Inc.*
486 S.E.2d 229 (N.C. App. 1997)........................................................ 19

*In re Joe's Friendly Service & Son, Inc.*
2019 WL 1313519 (Bankr, E.D.N.Y., March 21, 2019)................................. 8, 12-13

*Lehman Bros Special Financing Inc v BNY Corp. Trustee Svcs. Ltd.*
(*In re Lehman Bros. Holdings Inc.*)
422 B.R. 407, 416 (Bankr., S.D.N.Y. 2010)...................................... 10, 11, 17, 18

*Maritime Elec. Co. v. United Jersey Bank*
959 F.2d 1194 (3d Cir.1992)............................................................... 8

*In Re Metal Center*, 31 B.R. 458 (D. Conn.1983)........................................... 7

*In re Penn Traffic Co.*, 524 F.3d 373 (2d Cir. 2008)...................................... 10

**Table of Authorities (con'd**

|  | Page(s) |
|---|---|
| *Queenie Ltd. v. Nygard International*, 321 F.3d 282 (2d Cir. 2003).............. | 7 |
| *Rhode Island Hosp. Trust Nat. Bank v. Ohio Cas. Ins. Co.* 789 F.2d 74 (1st Cir. 1986).................................................................. | 14 |
| *Robert Plan v. Liberty Mutual Ins.* 2010 WL 1193151 (E.D.N.Y., March 23, 2010)............................................ | 7n.5 |
| *Sigmon v. Goldman Sachs Mortg. Co.*, 539 B.R. 221 (S.D.N.Y. 2015)......... | 18n.7 |
| *In re Texaco Inc.*, 73 B.R. 960 (Bankr., S.D.N.Y. 1987)............................... | 10, 11 |
| *Torin Associates, Inc. v. Perez* 2016 WL 6662271 (S.D.N.Y., Feb. 14, 2019).................................... | 14 |
| *In re Ward*, 392 B.R. 788 (Bankr., W.D. Mo. 2008)..................................... | 11 |
| *In re Wildman*, 72 B.R. 700 (Bankr., N.D. Ill. 1987)..................................... | 21 |

**Statutes**

| Fed. R. Civ. P. 54(b).................................................................... | 20 |
|---|---|
| Fed. R. Civ. P. 59(a).................................................................... | 20 |
| 11 U.S.C. 330.............................................................................. | 20 |
| 11 U.S.C. 362.............................................................................. | 1, 5, 7, 12 |
| 11 U.S.C. 362(a)(3)...................................................................... | 8, 12 |
| 11 U.S.C. 363.............................................................................. | 10 |
| 11 U.S.C. 365(e)........................................................................... | 11 |
| 11 U.S.C. 365(e)(1)...................................................................... | 2, 10 |
| 11 U.S.C. 365(e)(1)(B).................................................................. | 9 |

**Table of Authorities (con'd**

|  | Page(s) |
|---|---|
| 11 U.S.C. 365(e)(2)(B) | 10 |
| 11 U.S.C. 365(e)(e) | 11 |
| 11 U.S.C. 541(c) | 2, 9, 11 |
| 11 U.S.C. 541(c)(1) | 11 |
| 11 U.S.C. 541(c)(1)(A) | 16 |
| 11 U.S.C. 541(c)(1)(B) | 16 |
| CPLR 3213 | 5 |

**Miscellaneous**

| 1-3 COLLIER ON BANKRUPTCY ¶365.07 (Matthew Bender 15th ed. rev.) | 10 |
| 38 Am. Jur.2d, Guaranty §76 | 14, 15 |

Defendant Greka Integrated, Inc., now known as GIT, Inc. ("GIT"), respectfully submits this memorandum of law in opposition to the motion by UBS, London Branch AG for a determination of the amount due under the "First Lien" and Second Lien" "Integrated Guaranty Agreements" between GIT and UBS ("the Guaranties").

## A. <u>INTRODUCTION</u>

In the Guarantees, GIT agreed to satisfy obligations of two affiliates, Rincon Island L.P. and HVI Cat Canyon, Inc. ("HVICC"), under their separate "Credit Agreements" with UBS.[1] The "First" Guaranty is annexed as Exhibit A and the "Second" Guaranty as Exhibit B to the September 30, 2020 declaration of Eric Berry (ECF 56).[2] (Together, Rincon and HVICC will be referred to as "Borrowers.")

Point I of this memorandum will show that an assessment of amounts due to UBS under the Guaranties would violate the automatic stay under 11 U.S.C. §362[3] resulting from a pending Chapter 11 (Reorganization) case filed by HVICC in the Central District of California. (*In re HVICC*, 19-bk-11573-MB). Specifically, the Guaranties are defined in the Credit Agreements as among the "Loan Documents" that UBS may enforce. An adjudicated breach of the obligation to pay any "Loan Document," *including* one based on GIT's failure to pay the Guaranties, grants UBS the right to call the loan from HVICC, and assume control over and liquidate HVICC's assets. Under the case law, §362 thus stays this action since, though nominally against a non-

---

[1]  The Credit Agreements are Ex. 1 (ECF 43-1) and Ex. 2 (ECF 43-2) to the July 10, 2020 declaration of William W. Chandler in support of UBS' motion. The Credit Agreements are essentially identical to each other, and all citations herein will reference the First Credit Agreement.

[2]  The Guaranties are essentially identical to each other, and all citations herein will reference the First Guaranty (ECF 56-1)

[3]All statutory citations herein are to the Bankruptcy Code.

debtor, it would immediately harm the HVICC bankruptcy estate and establish UBS' control over property of that estate.

Point II will show that neither Rincon nor HVICC has yet committed an actionable default.  The bankruptcy-based defaults determined in Judge Stanton's April 23, 2020 summary judgment decision (ECF 38) do not permit UBS to pursue any remedies under the Guaranties. Bankruptcy "events of default" are not actionable. Instead, they are "*ipso facto* clauses," made unenforceable under Bankruptcy Code sections 365(e)(1) and 541(c).  Those sections prohibit modifications of a debtor's contractual rights or restrictions on its property stemming from a bankruptcy filing or a contractual financial stress test.

Point II further shows that, under the Credit Agreements, non-bankruptcy defaults – such as missed interest payments or inadequate financial reporting to UBS –  are actionable only upon *notice* to the Borrowers.  However, UBS' default notices were all sent after Rincon filed its own bankruptcy case in 2016, *In re Rincon Island, L.P.*, Case No. 16-33174 (Bankr., N.D. Tex.)  and were therefore void *ab initio* (and ineffective to declare a default) by reason of the automatic stay stemming from the *Rincon* bankruptcy.

Point III shows that GIT's liability is that of a guarantor, not a surety, and that GIT can only be liable based upon an actionable default by one of the Borrowers.

Even if GIT were a surety rather than a guarantor of the Borrowers' obligations, the bankruptcy events of default would remain unenforceable as against GIT as *ipso facto* clauses. Likewise, interpreting the Guaranties to make GIT a surety would mean that GIT's failure to comply with the Guaranties is a causal link between the Borrowers' bankruptcies and a modification of their rights under the Credit Agreements and exclusions of property from their

bankruptcy estates, and would mean that the Guaranties were impermissible *ipso facto* clauses. (Point IV, *infra*.)

Point V will show that any assessment of amounts due under the Guaranties is premature because, in the Credit Agreements, UBS specifically stipulated that the "Loan Parties" – which include GIT – will be liable only "in the event" that the a deficiency remains following the UBS' liquidation of the collateral securing the Credit Agreement, an event which has not yet occurred. ECF 43-1, §7.02, at p. 102.

Point VI will show that these arguments in Points I through V are not precluded by or inconsistent with Judge Stanton's April 23, 2020 decision on UBS's summary judgment motion.

Finally, in no event can UBS recover in this action either attorneys' fees it allegedly incurred in the *Rincon* and *HVICC* bankruptcy cases or amounts due under certain "Trustee Credit Agreements" that are not covered by the Guaranties.  (Point VII, *infra*.)

**B.  BACKGROUND**

HVICC and Rincon ("the Borrowers," as defined above) are oil and gas producers operating primarily in California.  December 5, 2019 declaration of Ernesto Olivares (ECF 17), ¶2. GIT is an affiliate of the Borrowers.  December 10, 2019 declaration of Randeep Grewal (ECF 16), ¶5

In 2017, UBS and the Borrowers concluded a Volumetric Production Payment ("VPP") agreement.  ECF 16, ¶ 2.  Pursuant to the VPP agreement, UBS provided the Borrowers funds in the amount of $161.5 million in exchange for contractually specified quantities of oil or gas that the Borrowers extracted and processed.  *Id*.  While the VPP agreement was in effect, UBS received $180.5 million in value from the Borrowers, exceeding its cash investment.  *Id*.

3

In 2015, the Borrowers and UBS began to discuss replacing the VPP agreement with new terms.  ECF 16,  ¶¶4, 6.  On May 20, 2016, as part of a new deal, the Borrowers jointly entered into two separate, essentially identical, Credit Agreements with UBS, each in the principal amount of $50 million, for $100 million total.

UBS obtained significant new advantages in this transaction, including:  (1) GIT and GLR, LLC – another GIT affiliate – provided $7.5 million in new funding to Rincon and HVICC, an injection intended to enhance their Borrowers production capabilities; (2) GIT provided the Guaranties that are issues in this case; and (3) GLR's $51.9 existing lien on the Borrowers' assets was subordinated to the liens securing UBS' rights under the Credit Agreements.  *Id*. ¶5; ECF 17, ¶3.  UBS did *not* provide the Borrowers with additional funding in connection with these new agreements.  ECF 17, ¶3

In addition to the Credit Agreements and Guaranties, numerous newly-prepared security agreements, subordination agreements, promissory notes, certificates, schedules and exhibits were executed on May 20, 2016, representing nearly 1000 single-spaced pages, with almost all of the drafting coming from the UBS side.   Accordingly, any ambiguities or contradictory terms within these agreements "should be construed against the interest" of UBS, "the drafting party." *Seltzer v. Clark Associates*, LLC, 2020 WL 5525590, *4 n.7  (S.D.N.Y., Sept. 3, 2020).

C. **PROCEDURAL HISTORY**

**(i)  The Rincon Bankruptcy Case**  On August 8, 2016, Rincon filed a Chapter 11 case in the Northern District of Texas, necessitated, in part, by environmental claims asserted by California state agencies pertaining to the Rincon's oil and gas producing leases.   *In re Rincon, supra,* 16-bk-33174.

4

(ii) **The First Default Notice**  On August 19, 2016, UBS sent a letter to Rincon and HVICC alleging that Rincon's bankruptcy filing was a default under §7.01(h)[4] of the Credit Agreements (which purports to make a voluntary Borrower bankruptcy an event of default). (Berry Decl., Ex. C, ECF 56-3.)  As shown below, under bankruptcy law, the commencement of that case was not an enforceable event of default.

(iii) **The Subsequent Default Notices**  Following the *Rincon* bankruptcy, UBS issued several additional notice alleging non-bankruptcy events of default, such as missed interest payments and the failure to certify financial information provided to UBS.  However, as shown below, these default notices were void *ab initio* by reason of the §362 automatic stay stemming from the *Rincon* bankruptcy, and therefore did not trigger any liability on the Borrowers' part.

(iv) **Rincon's Inability to Reorganize**  Eventually, Rincon was unable to reorganize, the case was converted to a Chapter 7 and the Rincon assets were abandoned.

(v) **The HVICC Bankruptcy**  On July 25, 2019, HVICC filed its own Chapter 11 case, *In re HVI Cat Cantyon, Inc.*, 19-bk-12417-MEW (Bankr., S.D.N.Y.)  The case was transferred first to the Northern District of Texas, and then to the Central District of California, *In re HVICC*, *supra*, 19-bk-11573-MB.  The case is still ongoing.  Like the *Rincon* case, under bankruptcy law, HVICC's filing was not itself an actionable default, and voided *ab initio* all subsequent default notices.

(vi) **UBS' Motion for Summary Judgment in Lieu of Complaint**  On October 21, 2019,  UBS moved for summary judgment in lieu of complaint pursuant to CPLR 3213 in Supreme Court, New York County.  GIT removed the case to this Court.  In its motion, the only

---

[4]ECF 43-1, p. 100.

default that UBS adequately alleged were the Borrowers' bankruptcy filings, asserting that they

defaulted, "by, at minimum, . . . filing bankruptcy petitions."  (ECF 20, p. 1)  In its Proof of

Claim in the HVICC bankruptcy (excerpted at Berry Decl., Ex. D), UBS admitted that Rincon's

August 8, 2016, Chapter 11 filing was the "earliest default" (*id.*, ¶19).

  **(v) Judge Stanton's Decision** On April 23, 2020, Judge Stanton granted UBS' motion.

The decision did not specify any defaults beyond the bankruptcy events.  While the decision

stated that the Borrowers "ha[d] not made any required payments of principal" (*id.*, p. 4), it did

not find that the obligation to pay principal had been accelerated to earlier than the June 30, 2021

due date (*see* ECF 38, p. 23.)

## D. ARGUMENT

### Point I

### Assessing Damages or Entering Judgment Against GIT Would Violate the Automatic Stay Imposed by the HVICC Bankruptcy

The Guaranties that UBS is seeking to enforce are among "Loan Documents" defined in

the Credit Agreements between UBS and the Borrowers.  ECF 43-1, p. 22 (defining "Loan

Documents" to include "the Guaranty Agreement [and] the Greka Guaranty.")  The Credit

Agreements also define, at §7.01(b), "Events of Default" to include "default . . . in the payment

of . . . any . . . amount . . . due under *any Loan Document*. . . ."  ECF 43-1, p. 88.

GIT's failure to pay the Guaranties is thus a defined event of default under §7.01(b) of

*the Credit Agreements.*

 Like other defaults under the Borrowers' Credit Agreements, GIT's failure to pay the

Guaranties permits UBS to "declare the Loans then outstanding to be forthwith due and payable

in whole or in part, whereupon the principal of the Loans so declared to be due and payable[ .]" Credit Agreements (ECF 43-1), p. 101, clause following §7.01(q).  Accordingly, this is an action to establish a failure to pay an amount due under a "Loan Document" no less than one to enforce the Credit Agreements would be.  If successful, this action would monetize not only GIT's liability under the Guarantees but also HVICC's liability under the Credit Agreements.

This action therefore contravenes the §362 stay resulting from the HVICC bankruptcy even though GIT is nominally not the bankruptcy debtor.  In *Queenie Ltd. v. Nygard International*, 321 F.3d 282, 287 (2d Cir. 2003) the Second Circuit recognized that "the automatic stay can apply to non-debtors . . . when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate."[5]

The *Queenie* standard is satisfied.  HVICC's own liability is at stake in this action (under §7.01(b) the Credit Agreements), HVICC's own assets are diminished if UBS is successful in this action (under §7.02 of the Credit Agreements), and GIT and HVICC are affiliates.  *Id.*, 321 F.3d at 288 (applying the stay where there was "such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant.")  *Accord: In Re Metal Center*, 31 B.R. 458, 462 (D. Conn.1983) (stating, *in dicta*, that §362 would stay a case against a non-debtor where it and the "debtor are so bound by . . .  contract that the liability of the non-debtor is imputed to the debtor by operation of law").

---

[5]*Accord:  Robert Plan v. Liberty Mutual Ins.*, 2010 WL 1193151, *3 (E.D.N.Y., March 23, 2010) (holding that suit against debtor's affiliate  was automatically stayed because, if successful, the suit would impose upon the debtor the obligation to indemnify officers);  *see generally:  In re Adler*, 494 B.R. 43, 57 (Bankr. E.D.N.Y. 2013), *aff'd,* 518 B.R. 228 (E.D.N.Y. 2014) ("This 'adverse economic consequence' requirement . . . has been construed to include any perceptible economic harm to a non-party debtor's tangible or intangible property interest.")

If successful, this action would establish UBS' right to assume control of, and liquidate, the HVICC assets securing the Credit Agreements. ECF 43-1, p. 102. It therefore violates §362(a)(3) which automatically stays claims to "exercise control over property of the estate." *See In re Joe's Friendly Service & Son, Inc.*, 2019 WL 1313519,*9 (Bankr, E.D.N.Y., March 21, 2019) (stay operates against "a wide range of actions" and is "in intended to protect . . . property of the estate").

GIT did not waive the protection of the automatic stay by failing to raise it at the outset of this lawsuit. "Because the automatic stay serves the interests of both debtors and creditors, it may not be waived. . . ." *Maritime Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1204 (3d Cir.1992). Finally, this Court may enforce the stay. In *Gulfmark Offshore, Inc. v. Bender Shipbuilding*, 2009 WL 2413664, *2 (S.D. Ala., Aug. 3, 2009), a District Court enforced the automatic stay since: "To the extent that GulfMark succeeds in obtaining a judgment against the [non-debtor parties], that judgment will be, in effect, a judgment against [the debtor] by operation of the relevant indemnification provisions."

### Point II

### GIT is Guarantor, Not a Surety, of the Borrowers' Obligations and Thus is Not Yet Responsible for those Obligations, Since an Actionable Default by the Borrowers Had Not Yet Occurred

### A. No Actionable Default by the Borrowers Has Yet Occurred

As a matter of law, the Borrowers are not yet liable under the Credit Agreements. Under the Credit Agreements, the Borrowers' liability (and UBS' remedies) are conditioned upon an actionable event of default. The events of default defined in the Credit Agreements fall into two categories. Section 7.01 provides that, for *non*-bankruptcy related defaults, UBS may

> . . . *by notice to Borrowers*," may . . . (ii) declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon. . . . together with accrued interest thereon and any unpaid accrued Fees and all other Obligations of the Companies accrued hereunder and under any other Loan Document, shall become forthwith due and payable.

*Id.*, p. 101, clause immediately following §7.01(q)  (Emphasis added.)

By contrast, in the event of a bankruptcy case filed by or against the Borrowers (as provided in §§7.01(g) & (h)), UBS need not issue a default notice to the Borrowers.  Instead, in the event of a Borrower bankruptcy:

> . . . the principal of the Loans, together with accrued interest thereon and any unpaid accrued Fees and all other Obligations of Borrowers accrued hereunder and under any other Loan Document, shall *automatically* become due and payable.

Credit Agreement, p. 101, clause preceding §7.02 (emphasis added).

## 1.  **Rincon's Bankruptcy Filing is an Unenforceable *Ipso Facto* Default**

The adjudicated defaults under Judge Stanton's decision re the *Rincon* and *HVICC* bankruptcy filings.   However, as a matter of law, neither bankruptcy was an enforceable default.

An "*ipso facto* clause" is one that terminates or modifies a contractual obligation because of a bankruptcy filing or because the obligor cannot meet a contractual financial stress test. Typically, *ipso facto* clauses are deemed unenforceable as a matter of federal bankruptcy law. Code section 365(e)(1)(B) nullifies defaults in executory contracts arising from *ipso facto* clauses by "render[ing] unenforceable contract provisions that alter[] the rights or obligations of a debtor as a result of the "insolvency or financial condition" or the "commencement of" a bankruptcy case.  Section 541(c) of the Bankruptcy Code voids any exclusion of property from a debtor's estate based on an *ipso facto* clause.  Section 363 invalidates contracts that deprive

debtors of the use of property based on a bankruptcy filing. In light of these sections, the "overriding federal bankruptcy policy [is] that *ipso facto* clauses are, as a general matter, unenforceable." *In re Charter Comm'ns*, 419 B.R. 221, 250-251 (Bankr., S.D.N.Y. 2009)

Under these sections, neither Rincon's 2016 bankruptcy nor that filed by HVICC in 2019 triggered an enforceable default. *In re Chateaugay Corp.*,1993 WL 159969, 54 (S.D.N.Y., May 10, 1993) ("No reliance may be placed upon an alleged default where the only cause for default is the debtor's commencement of a bankruptcy case."); *In re Texaco Inc*., 73 B.R. 960, 964-65 (Bankr., S.D.N.Y. 1987) (clause in indenture agreement triggering default remedies based on debtors' bankruptcy filing is an unenforceable *ipso facto* clause); 1-3 COLLIER ON BANKRUPTCY ¶365.07 (Matthew Bender 15th ed. rev.)

UBS cannot successfully argue that the Credit Agreements were non-executory contracts and thus exempt from §365(e)(1)'s invalidation of *ipso facto* clauses.  The Credit Agreements were executory, since, at §7.02, they require that UBS liquidate the assets securing them and distribute proceeds, something that UBS has not yet done, making its own obligations "unperformed." *In re Penn Traffic Co.*, 524 F.3d 373, 379-380 (2d Cir. 2008) (contract was executory based upon unsatisfied contractual obligation to pay); *Lehman Bros Special Financing Inc. v BNY Corp. Trustee Svcs. Ltd. ( In re Lehman Bros. Holdings Inc.),* 422 B.R. 407, 416 (Bankr., S.D.N.Y. 2010) (swap agreement was  executory due to "outstanding obligations to make payments").

 Also, the Credit Agreements are also not "loan contracts" or "financial accommodations" excepted under §365(e)(2)(B) from the general invalidation of *ipso facto* clauses since they did not require UBS to provide additional funding and, instead, only

terminated UBS' rights under the prior VPP agreements.  *In re Ward*, 392 B.R. 788, 793 (Bankr., W.D. Mo. 2008) (invalidating as *ipso facto* clause with a contract that did  not "extend other debt financing," and "was simply an agreement to waive . . . arrearage and to restructure an existing loan); *see generally:  In re Texaco, Inc.*, *supra*, 73 B.R. at 965 (§365(e)(e) exception pertains only to executory commitments to extend future credit); *accord:  In re Bownetree,* 2009 WL 2226107, *3 (Bankr., E.D.N.Y. 2009).

Finally, as detailed below, a finding that Rincon's bankruptcy was an actionable default would also violate §541(c)(1).

## 2.  Rincon's Bankruptcy Did Not Trigger an Enforceable Default by HVICC

Here, the Credit Agreements define Rincon's bankruptcy as also an event of default by HVICC, its co-obligor. *Id.*, §7.01 (g) & (h).  However, making Rincon's bankruptcy a default by HVICC is also an unenforceable *ipso facto* clause.  *Lehman Bros. v. BNY*, *supra*, noted that when Congress invalidated *ipso facto* defaults it rejected versions of §365(e) and §541(c) that made unenforceable only bankruptcy-based defaults based on cases "commenced by or against" a debtor in favor one that was expanded to void defaults stemming from, simply, the commencement of a bankruptcy case.  422 B.R. at 419.

Also, under §7.02(a) of Credit Agreements, treating the Rincon bankruptcy as an actionable default by HVICC on the grounds that HVICC was not the debtor would still give UBS an option to assume control of, and liquidate, assets that were part of the Rincon bankruptcy estate.

### 3.  None of the Default Notices Were Effective Against the Borrowers Since they Violated the *Rincon* Automatic Stay

Judge Stanton did not hold that a non-bankruptcy default occurred. Also, UBS has not adequately alleged a non-bankruptcy default, asserting only that the Borrowers defaulted . . . . "by, at minimum, . . . filing bankruptcy petitions."  UBS' Reply Brief in Support of its Motion for Summary Judgment (ECF 20), at p. 1.

In fact, under §7.01 of the Credit Agreements, any non-bankruptcy default requires that UBS deliver an effective default notice to the Borrowers.  *Id.*, p. 101.  Because, as UBS admits, the "earliest such default occurred" was the August 8, 2016 Rincon bankruptcy filing (Berry Decl., Ex. D, ¶19), the notices that UBS issued alleging the non-bankruptcy defaults were all subsequent to that bankruptcy, and void *ab initio* under the §362 automatic stay.  *Federal Insurance Co. v. Sheldon,* 150 B.R. 314, 319-320 (S.D.N.Y. 1993) (post-petition acceleration notice *void ab initio* as in violation of the automatic stay).

The automatic stay resulting from the *Rincon* bankruptcy made the default notices void not only as against Rincon, but also against HVICC.  The Credit Agreement were secured by not only Rincon's assets.  If effective, a notice of a default by HVICC following the *Rincon* bankruptcy would allow UBS to assume control of and liquidate the Rincon assets securing Rincon's obligation to UBS.  Those assets are property of the Rincon bankruptcy estate.  *In re Bender*, 562 B.R. 578, 584 (Bankr., E.D.N.Y. 2016) ("collateral securing a pre-petition debt will fall within the category of 'property of the estate'").  Thus, the default notices following the Rincon bankruptcy *as against HVICC* were also void *ab initio* under §362(a)(3) which prohibits attempts to "exercise control over property of the estate."  *See In re Joe's Friendly Service &*

12

*Son, Inc.*, 2019 WL 1313519  (Bankr, E.D.N.Y. March 21, 2019) (the stay operates against "a wide range of actions" and is "in intended to protect . . . property of the estate").  In fact, UBS understood that the default notices were ineffective in light of the automatic stay.  The first, dated August 19, 2016 (Berry Decl., Ex. C, at p. 2), the last, dated September 12, 2019 (*id*., Ex. E, at p. 5), and all intermediate default notices it relies upon expressly acknowledge, *e.g.*, " that they "will apply to Rincon and HVICC only to the extent permitted by the Bankruptcy Code" (*id.*)

Accordingly, there are no matured defaults against the Borrowers.  The bankruptcy events of default are unenforceable *ipso facto* provisions.  The non-bankruptcy events of default never became actionable because they require notice to the Borrowers, and the default notices that UBS issued did not effectively trigger any defaults because they were subsequent to the Rincon bankruptcy filing, and void *ab initio* by reason of the automatic stay.

**Point III**

**Since GIT is a Guarantor, its Liability Is Derivative of that of
 of the Buyers,  and any Assessment of Damages is Premature**

The Guaranties, in §2.01, defines "Guaranteed Obligations" as:

> . . . prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of the *principal* of and interest on (including any interest, fees, costs or charges. . . .) the Loans made by the Lenders to [*i.e.,* UBS], and the Notes held by each Lender of, Borrowers [*i.e.*, Rincon and HVICC], and all other Secured Obligations from time to time owing to the Secured Parties by any other Loan Party under any other Loan Document [*i.e.*, the Credit Agreements] . . . *in each case strictly in accordance with the terms thereof. . .* [.]

(Bracket material and emphasis added.)  Since GIT's liability under the Guaranties is derivative of – "strictly in accordance with" – the Borrowers' liability under the Credit Agreements, GIT is

13

a guarantor, not a surety of those Borrower obligations. *Rhode Island Hosp. Trust Nat. Bank v. Ohio Cas. Ins. Co.*, 789 F.2d 74, 78 (1ˢᵗ Cir. 1986) (a guarantor's liability is contingent on establishing an actionable "default by the principal" obligor).  As stated in *Torin Associates, Inc. v. Perez*, 2016 WL 6662271 (S.D.N.Y., Feb. 14, 2019): "The main distinction between a contract of guaranty and a contract of suretyship is that '[a] surety' is typically jointly and severally liable with the principal obligor on an obligation to which they are both bound, while a 'guarantor' typically contracts to fulfill an obligation *upon the default of the principal obligor*." *Id.*, *5 n.7  (emphasis added, internal citations omitted).

The last sentence of §2.01– "The liability of the Guarantor under this Guarantee is a primary, and not secondary, obligation of such Guarantor" – does not contradict the earlier language in that section that makes GIT's liability derivative of that of the Borrowers. Specifically, this last sentence does not say that "the liability of the Guarantor *under the Credit Agreement* is a primary, and not secondary, obligation."  Had it said that, then GIT would be primarily liable under the Credit Agreement – a surety rather than a guarantor. *Rhode Island Hosp. Trust Nat. Bank v. Ohio Cas. Ins. Co.*, *supra.*

What the sentence says, however, is that GIT's obligation "*under the Guarantee*" is a primary obligation. The purpose of the sentence is to incorporate the rule that a debt that has *matured* against the guarantor becomes a  *primary* obligation of the guarantor.  For example, an oft-cited section, 38 Am. Jur.2d, Guaranty §76,  pp. 1082-1083 provides:  "*[W]hen the debt has matured against the guarantor*, the debt is the guarantor's *primary obligation* and interest may be recovered even though the effect is to increase the judgment beyond the limit of liability stated in the guaranty contract." (Emphasis added.)

14

The last sentence of §2.01 thus does not mean that the Borrower's *unmatured* debts are GIT's responsibility, only that once matured (by reason of an actionable default by the Borrowers) they are GIT's primary responsibility, rather than dependent on first adjudicating the Borrowers' liability. As stated in *Boxed Beef Distributors v. Rexton*, 509 A.2d 1060 (Conn. App. 1986):

> Thus, "[w]hen interest is sought as a part of the underlying obligation, the guaranty limit applies so that the total amount collected cannot exceed the amount stated in the guaranty contract...." 8 Am. Jur.2d, Guaranty § 76. "[W]hen the debt has matured against the guarantor, the debt is the guarantor's primary obligation and interest may be recovered although the effect is to increase the judgment beyond the limit of liability stated in the guaranty contract." *Id. The terms of the Silano guaranty in this case expressly specified that he would become obligated "upon maturity" of the debts of the corporation.* There was, however, no provision for the maturity of these debts against Silano. *The underlying debts in this case were based upon an open account for goods sold by the plaintiff to the defendant corporation. Unlike a note which matures on a fixed date, this account did not have a set maturity date.*

*Id.* at 1062-1063 (emphasis in original).

.     Here, too, GIT has agreed that it would become obligated upon maturity for the debts of the Borrowers. Accordingly, the purpose of the last sentence of §2.01 is to confirm, that when the obligations of the Borrowers do mature, GIT will be not only be liable for them, but also primarily so. However, as in *Boxed Beef,* the liability of the underlying obligors has not yet matured, in this case because of the absence of an actionable event of default, as shown in Point II, s*upra*.

15

**Point IV**

**Holding GIT to Be A Surety Rather than A
 Guarantor Would Not Change the Outcome**

If GIT is deemed to be a surety, then UBS' right under §7.02 of the Credit Agreements to assume control of the Rincon/HVICC assets securing those Agreements would be conditioned not only upon the bankruptcy filings, but also on GIT's failure to pay the amounts accelerated and due by reason of Rincon's bankruptcy.

Treating GIT's failure to pay the amounts due and accelerated by reason of Rincon's bankruptcy would "restrict[] or condition[] transfer of" Rincon's property by reason of the commencement of a bankruptcy case, which is prohibited under §541(c)(1)(A).   It would also "give" UBS the "option to effect a . . . modification . . .  of the debtor's interest in" the Rincon assets pledged as collateral "conditioned . . . the commencement of" Rincon's bankruptcy case, in violation of §541(c)(1)(B).

Interpreting the Guaranties to make GIT a surety would mean that GIT's failure to pay an amount due under the Guaranties is a causal link between the Borrowers' bankruptcies and exclusions of the Borrowers'  property from their bankruptcy estates, and would render the Guaranties unenforceable *ipso facto* clauses.  Similar circumstances occurred in *In re Charter Comm'ns, supra.*  There, a failure by certain affiliated holding companies to make payments resulting in the acceleration of a credit agreement triggered, under a cross-default provisions, a termination of their affiliated operating company's rights under that agreement.  *Id.* at 250.  The court held that the cross-default provision was an unenforceable *ipso facto* clause since its purpose was "to specifically link[] the financial condition of the . . .  holding companies and the financial condition of [the operating company]."  *Id.* 419 B.R. at 251.

16

Similarly, *In re American Home Mortgage Holdings, Inc*., 402 B.R. 87 (D. Del.  2009) concerned terms in a servicing-retained loan purchase agreement that made the failure by a mortgage servicing agent to remit payments to the buyer a cross-default triggering an obligation of its affiliated loan originator to indemnify the buyer.  The cross-default provision was held to be an unenforceable *ipso facto* clause since linking the two companies' obligations enabled the buyer to "move its money [out] of their control" when the servicing company's failure to remit the payments gave the buyer an "early warning" of the affiliate's distress.  *Id.* at 99. Here, similarly,  if GIT is deemed a surety, its inability to pay UBS the amounts accelerated and accrued by reason of Rincon's bankruptcy, granting UBS the option to assume control of Rincon's assets pursuant to §7.02 of the Credit Agreements.  Under *American Home Mortgage*, making GIT's own financial condition a link between Rincon's bankruptcy and modification of the Credit Agreements, such an acceleration of amounts due, is an impermissible *ipso facto* clause.

Similarly, *Lehman v. BNY*, *supra*, concluded, *in dicta*, that a swap agreement that modified a priority position held by LBSF, a Lehman Bros. affiliate, in the event of a bankruptcy case commenced by the Lehman Bros. holding company (LBHI) was an unenforceable *ipso facto* clause, since LBHI and LBSF were part of an "integrated" enterprise.   *Id.* at 420.   *Accord: Lehman Bros. Special Fin. Inc. v. Ballyrock ABS CDO 2007–1 Ltd. (In re Lehman Bros.)*, 452 B.R. 31, 39 (Bankr., S.D.N.Y.2011) (citing *Lehman Bros v. BNY* to hold that modification of LBSF's priority position  stated a claim to invalidate as an unenforceable *ipso facto* clause triggered by the *Lehman* bankruptcy).  As UBS has repeatedly acknowledged, Rincon, HVICC

17

and GIT comprise an integrated entity.[6] As in the *Lehman* cases, to the extent Rincon's

bankruptcy automatically triggers GIT's liability to UBS for the accelerated and accrued

amounts due under the Credit Agreements then the Guaranties would be unenforceable *ipso facto*

clauses adversely effecting Rincon because of the inability of GIT, its ultimate parent, to provide

credit support. *Cf.*, *Lehman v. BNY*, 422 B.R. at 420 (LBSF could "claim the protections of the

*ipso facto* provisions of the Bankruptcy Code because its ultimate corporate parent and credit

support provider . . . had filed a case under the Bankruptcy Code.")[7]

### Point V

### Assessment of Amounts Due under the Guarantee is Premature Since GIT is First Required to Exhaust the Collateral Securing the Credit Agreements

The Credit Agreements require that UBS liquidate the assets securing them and distribute

the proceeds before seeking deficiency judgments against either the Borrowers or GIT: "*In the*

*event* that any such proceeds are insufficient to pay in full the items described in clauses (a)

through (e) of this Section 7.02, *the Loan Parties* shall remain liable, jointly and severally, for

any deficiency." ECF 43-1, p. 102 (emphasis added). The Credit Agreements also state: "'Loan

Parties' shall mean shall mean Borrowers *and Guarantors*." *Id.*, at p. 22 (emphasis added).

Such express agreements that collateral must be exhausted before a deficiency judgment can be

---

[6]See UBS' August 30, 2019 objection the debtor's motion to approve use of cash collateral (excerpted at Berry Decl., Ex. F), ¶26, second bullet point (alleing that Rincon and its affiliates were "managed in concert")

[7]*See also: Sigmon v. Goldman Sachs Mortg. Co.*, 539 B.R. 221, 230 (S.D.N.Y. 2015) (citing *Charter Comm'ns* and upholding the claim that an accommodation party should be allowed to avoid, as an ipso facto clause, a provision reinstating the borrowers' liability because of her bankruptcy since she was also an owner and principal of one of the borrowers and not in a "straight forward guarantor relationship" with them).

obtained against a guarantor are enforceable.  *Jennings Communications Corp. v. PCG of Golden Strand, Inc.*, 486 S.E.2d 229, 232 (N.C. App. 1997) ("since the guaranty agreement establishes unambiguously that a condition precedent must be met before TCI's liability attaches, the plaintiff is required to first exhaust all remedies it has . . . against all collateral securing the note").  Accordingly, assessing liability against GIT is premature, and must await the liquidation of the collateral securing the Credit Agreements.

**Point VI**

**The Foregoing Arguments Are Not Precluded By, or Inconsistent With, Judge Stanton's April 23, 2020 Ruling**

Just as the bankruptcy petitions were the only default definitively alleged by UBS' motion –  the Borrowers defaulted "by, at minimum, . . . filing bankruptcy petitions" (ECF 20, p. 1) – the bankruptcy filings were the only event of default specifically adjudicated by Judge Stanton's April 23, 2020 decision.

Judge Stanton held:  "Between August of 2016 and July of 2019, UBS sent the Borrowers over seventeen letters notifying them of their Events of Default, such as the bankruptcy petitions and HVICC's failure to make required payments."  ECF 38, p. 3.  This is a description of the content of the default notices, not a judicial finding that a particular payment had not been made, or that a non-bankruptcy default had occurred or that the default notices were effective (as opposed to *void ab initio* by reason of the automatic stay).   There is no specific finding that any particular interest payment was not made.  It is only a finding – and a correct one – that the bankruptcy cases, which indisputably were filed, were *defined* events of default in the Credit Agreements, not a legal conclusion that they were *actionable* defaults as a matter of law.

19

Second, Judge Stanton also held that: "The Borrowers have not made any required payments of principal under the Credit Agreements."  ECF 38, p. 3.  This is clearly true. However, there is no holding any where in the opinion that the principal amounts payable had been properly accelerated so that they were due earlier than the June 30, 2021 date set forth in the Credit Agreements.

Finally, even if the argument contained herein were inconsistent with Judge Stanton's decision, the parties will have an opportunity to request that Judge Stanton review the determination of the amount due pursuant to Fed. R. Civ. P. 59(a).  Judge Stanton would then have the right to revise his April 23, 2020 ruling in accordance with Rule 54(b) which permits non-final rulings to be revised at any time "at any time before entry of judgment."  *See also: Farrish v. Town of East Hartford,* 2 Fed.Appx. 110, 111 (2d Cir. 2001)  ( District  Courts "possesses inherent power over interlocutory orders, and can reconsider them when . . . consonant with justice").

### Point VII

### In All Events, the Request for "Fees" and an Additional Amount Allegedly Due Under an Instrument Not Covered by the Guarantees Should Be Excluded

UBS also seeks to recover $7,539,126.57 in "fees."   July 20, 2020 Chandler Decl. (ECF No. 43), ¶40.  UBS acknowledges that an unspecified bulk of these fees were are for alleged attorney services in connection with the *Rincon* and *HVICC* bankruptcies. *Id.*,  ¶38.  However, no itemized time records are submitted in support of these claims.   Allowing them would therefore contravene Bankruptcy Code section 330, which requires that fee applications "list each activity, its date, the attorney who performed the work, a description of the nature and

20

substance of the work performed, and the time spent on the work[.]" *In re Wildman*, 72 B.R. 700, 708 (Bankr., N.D. Ill. 1987)

UBS also requests  the amount of $695,083.29 and $11,390,315.89 allegedly due under "Trustee Credit Agreements," dated August 21, 2017 with Rincon (Chandler Decl., Ex. 13 (ECF 43-13)) and November 8, 2019 with HVICC (*id.*, Ex. 14 (ECF 43-14)).  The debts alleged under Trustee Credit Agreements were concluded subsequent to the Guaranties and are not obligations that GIT has undertaken, and must be excluded from the amount of the judgment.

**E. CONCLUSION**

For the foregoing reasons, there is no amount due under the Guaranties at this time.

Dated:  New York, New York
       September 30, 2020

Berry Law PLLC
              /s/ Eric W. Berry
By: _____
    Eric W. Berry [EB 8598]
*Attorneys for Greka Integrated, Inc.*
*  now known as GIT, Inc.*
745 Fifth Avenue, Fifth Floor
New York, New York   10019
(212) 355-0777