UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

UBS AG, LONDON BRANCH,        :

                Plaintiff,     :

      -against-         :      **MEMORANDUM AND ORDER**

GREKA INTEGRATED, INC.,       :      19-CV-10786 (LLS) (KNF)

            Defendant.   :
------------------------------------------------------X
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

On April 23, 2020, the assigned district judge granted the plaintiff's summary judgment

motion and motion to dismiss the counterclaims, finding as follows:

> UBS's claim for damages in the amount of $100 million, plus interest, fees, and
> other costs due under the Credit Agreements, is supported by the documents. The
> Guaranties guarantee GIT's repayment of the two loans made to the Borrowers
> under the two Credit Agreements, in addition to "interest, fees, costs or charges."
> Guaranties § 2.01. . . . The Credit Agreements also set forth how UBS's fees and
> interest should be calculated. <u>See</u> Credit Agreements § 2.05 (the Borrowers agree
> to pay UBS "the administrative fees payable in the amounts and at the time
> separately agreed upon" and "deferred closing fees … in the amounts at least equal
> to those set forth on Schedule 2.05"), <u>id</u>. § 2.06 (the loans "shall bear interest at a
> rate per annum equal to the Adjusted LIBOR Rate for the Interest Period in effect
> for such Borrowing plus the Applicable Margin in effect from time to time"). "That
> the rate of interest was not specifically set forth in the note does not render it any
> the less an instrument for the payment of money only." <u>Schwartz v. Turner</u>
> <u>Holdings, Inc.</u>, 527 N.Y.S.2d 229, 230 (App. Div. 1988). UBS attaches its letters
> to show that the Borrowers were in default and that they (and GIT) had notice of
> those defaults and that the full amount of the loans was due and payable. The
> numbers stated in the letters were the amounts of principal, interest, fees, and costs
> due at the time UBS sent each of those letters; UBS does not claim that it is owed
> those amounts now.

> Docket Entry No. 38.

On April 1, 2021, the assigned district judge found the following:

1. Performance Payments

For the reasons set forth in plaintiff's brief, and undisputed by defendant, defendant is liable for the Performance Payments pursuant to Sections 2.04(a) and 2.09(e) of the Second Lien Credit Agreement. The payments are calculated based on the table provided in Section 1.01 of the Agreement (defining "Performance Payments"). Plaintiff shall present evidence of the quarters in which the Quarterly WTI Price of crude oil has exceeded $65.00 per barrel to Judge Fox for a final determination of the amount of Performance Payments owed.

2. Legal Fees and Advisory/Collateral Management Fees

Pursuant to Section 9.03(a) of the Credit Agreements, defendant is liable for the legal and advisory/collateral management fees plaintiff has incurred in connection with the enforcement or protection of its rights. Plaintiff's Memorandum in Support of Its Claim for Interest, Fees and Costs (Dkt. No. 42) and the attached Declaration (Dkt. No. 43) set forth the amounts requested and supporting documents. Judge Fox may review that evidence, and any additional evidence he requires, to determine the reasonable amount of fees owed.

3. Amounts Advanced under the Trustee Loan Agreements

Defendant is not liable for the amounts advanced to the RILP [Rincon Island L.P.] or HVICC [HVI Cat Canyon, Inc.] Trustees. Those advances of "working capital" do not fit within the class of "Costs and Expenses" defined in or contemplated by Section 9.03(a) of the Credit Agreements, and to hold defendant responsible for those amounts would expand its liability well beyond its intended scope.

Conclusion

Based on this Order and my February 26, 2021 Order (Dkt. No. 68), the parties shall now proceed before Judge Fox for a final calculation of the amounts owed for interest, Administrative Agent Fees and Deferred Closing Fees, Performance Payments, Advisory and Collateral Management fees, and Legal fees and costs.

Docket Entry No. 73.

On April 2, 2021, the Court directed the plaintiff to file its submissions as directed by the April 1, 2021 order and the defendant to file its opposition, as well as permitted the plaintiff to file any reply. See Docket Entry No.74. Thereafter, the assigned district judge directed the Clerk of Court to enter final judgment against the defendant in the amount of $100 million of unpaid principal, plus interest, fees, and costs, stating:

> Under the Order dated April 1, 2021, Judge Fox is determining the reasonableness and arithmetic calculation of the amounts owed for interest, Administrative Agent Fees and Deferred Closing Fees, Performance Payments, Advisory and Collateral

Management fees, and Legal fees and costs, but those are matters separate from the entry of judgment. See Fed. R. Civ. P. 58 (e); see also Correspondent Servs. Corp. v. J. V.W. Invs. Ltd., No. 99 CIV. 8934 (RWS), 2003 WL 221746, at *3 (S.D.N.Y. Jan. 31, 2003) ("there is no just reason for delay in the entry of a final judgment on liability, given that the largely ministerial task of determining the amount and reasonableness of attorneys' fees and expenses will not affect that judgment.") (internal citations and quotation marks omitted). Disposal of those matters will commence the running of the time for appeal under Fed. R. App. P. 4.

Docket Entry No. 87.

The Clerk of Court entered a Rule 54(b) Judgment on May 5, 2021. See Docket Entry No. 88.

### PLAINTIFF'S SUBMISSIONS PURSUANT TO THE APRIL 2, 2021 ORDER

In its submissions pursuant to the April 2, 2021 order, the plaintiff asserts that

this memorandum provides further explanation of how the Quarterly WTI Price and the Performance Payment amounts owed to UBS ["the plaintiff"] are calculated under the Second Lien Credit Agreement, and submits evidence establishing the quarters during which the Quarterly WTI Price of crude oil exceeded $65.00 per barrel. As detailed below, the Performance Payments owed to UBS total $1,500,000. For the other categories of unpaid interest, fees, and costs, UBS respectfully refers this Court to the calculations set forth in UBS's Claim for Interest, Fees, and Costs (ECF Doc. No. 42), UBS's Reply Memorandum in Support of its Claim (ECF Doc. No. 61), and the declarations of William Chandler ['Chandler'] in support of UBS's Claim and Reply, respectively (ECF Doc. Nos. 43, 62). These memoranda and declarations provide explanations of, and evidence supporting, (i) the amount claimed for each category of interest, fees and costs UBS seeks as of September 30, 2020, and (ii) the method by which each amount was calculated. These amounts—totaling $45,723,312.50 as of September 30, 2020— are summarized in this memorandum.

Concerning evidence of the quarterly WTI price in support of its claim for performance

payments, the plaintiff contends:

The Second Lien Credit Agreement requires the Borrowers to make Performance Payments to UBS in the amount of $750,000 for any quarter in which the price of crude oil is greater than or equal to $65.00 per barrel but less than $75.00 per barrel. The Second Lien Credit Agreement states that the price of crude oil is measured by the "Quarterly WTI Price," which is defined as "the average daily WTI Price of oil per barrel for each day in a fiscal quarter" with respect to any fiscal quarter. In turn, the Second Lien Credit Agreement defines "WTI Price" as follows: "WTI Price" shall mean the arithmetic average of the daily settlement prices as reported by NYMEX for the First Nearby Month NYMEX Light Sweet

Crude Oil Futures Contract for each day during such fiscal quarter on which such contract is normally scheduled to trade on the NYMEX; where:

• "NYMEX" means the New York Mercantile Exchange, Inc. or its successor; and
• the "First Nearby Month NYMEX Light Sweet Crude Oil Futures Contract" means for any day in a month the "Light Sweet Crude Oil Futures Contract – Crushing, Oklahoma Delivery" (as defined by the New York Mercantile Exchange Guide) for delivery of the West Texas Intermediate Deliverable Crude Stream (as so defined) for the delivery month occurring nearest to but after such day that is normally scheduled to trade on the NYMEX on such day (i.e., the "first line" (prompt month) futures contract for such day).

The U.S. Energy Information Administration publishes the NYMEX Futures Prices for the Cushing, Oklahoma Light Sweet Crude Oil Futures for every day, week, and month since 1983 on its website. The Quarterly WTI Price can be calculated from the information on the U.S. Energy Information Administration's website by taking the average of the daily NYMEX Futures Prices for the Cushing, Oklahoma Light Sweet Crude Oil Futures for the relevant fiscal quarters since May 20, 2016. Since the Second Lien Credit Agreement's execution on May 20, 2016, the Quarterly WTI Price has exceeded $65.00 per barrel only during two fiscal quarters in 2018. In the second fiscal quarter (April-June), the WTI Price was $67.91. In the third fiscal quarter (July-September), the WTI Price was $69.51. Therefore, for each of those fiscal quarters, the Borrowers were required to pay UBS $750,000, for a total of $1,500,000. Additionally, as UBS explained in its Claim for Interest, Fees, and Costs, UBS is also entitled to interest on the unpaid Performance Payments at the Default Rate. UBS seeks $1,742,987.12 for the total amount of unpaid Performance Payments plus interest.

The plaintiff provides a summary of the calculation of its claim for interest, fees and costs as follows, asserting it is entitled to interest, fees and costs, as of September 30, 2020, totaling $45,723,312.50. The components of this total amount are summarized as follows:

| ELEMENT | SUM AS OF SEPTEMBER 20, 2020 |
|---|---|
| Unpaid Interest on First Lien Credit Agreement Principal | $11,427,656.27 |
| Unpaid Interest on Second Lien Credit Agreement Principal | $19,446,933.45 |
| Unpaid Administrative Agent Fees plus Interest | $394,071.81 |
| Unpaid Deferred Closing Fees plus Interest | $1,817,488.34 |
| Unpaid Performance Payments plus Interest | $1,742,987.12 |
| Advisory and Collateral Management Fees | $2,138,513.11 |

| Legal Fees and Costs | $8,755,662.40 |
| --- | --- |
| TOTAL | $45,723,312.50 |

In support of its arguments, the plaintiff submitted the April 12, 2021 declaration by its attorney, Daniel L. Cantor ("Cantor"), with Exhibit 1, "a capture of the U.S. Energy Information Administration's website that lists the NYMEX Futures Prices for the Cushing, Oklahoma Light Sweet Crude Oil Futures for every day, week, and month from April 1983 to February 2021 ('USEIA Crude Oil Price Chart'), available at https://www.eia.gov/dnav/pet/hist/RCLCID.htm," and Exhibit 2, "a website capture of the U.S. Energy Information Administration's website that provides definitions, sources, and explanatory notes for the USEIA Crude Oil Price Chart. The webpage confirms that the Cushing, Oklahoma Light Sweet Crude Oil streams include West Texas Intermediate, available at https://www.eia.gov/dnav/pet/TblDefs/pet_pri_fut_tbldef2.asp."

Cantor states:

> Since the Second Lien Credit Agreement's execution on May 20, 2016, the Quarterly WTI Price has exceeded $65.00 per barrel in only two fiscal quarters. . . . In the second fiscal quarter of 2018, the WTI Price was $67.91. This amount can be calculated by taking the average of the prices listed on the USEIA Crude Oil Price Chart for each day in the months of April, May, and June of 2018. . . . In the third fiscal quarter of 2018, the WTI Price was $69.51. This amount can be calculated by taking the average of the prices listed on the USEIA Crude Oil Price Chart for each day in the months of July, August, and September of 2018. . . . According to the Second Lien Credit Agreement, the Borrowers—HVI Cat Canyon and Rincon Island Limited Partnership, for whom GIT guaranteed payment under the Second Lien Guaranty—were required to pay UBS $750,000 for each fiscal quarter in which any Quarterly WTI Price that falls between $65.00 and $75.00. (ECF Doc. No. 43-2 at 27 (definition of "Performance Payment").) . . . Therefore, for each of those fiscal quarters, the Borrowers were required to pay UBS $750,000, or a total of $1,500,000, in Performance Payments.

Chandler, a managing director for the plaintiff, states in his July 10, 2020 declaration that interest calculations had

to be adjusted at various points in time to take into account PIK [payable-in-kind] and Default Rate interest. Because the Basic Rate and Default Rate are annual rates and the interest due is payable monthly based on the number of days in the Interest Period (as defined) and using a 360-day year, the actual formula used to calculate the monthly interest is: [(unpaid balance) * (number of days in Interest Period) * (applicable interest rate)] ÷ 360. *See, e.g.,* Spreadsheet, "1st Lien Principal and Interest" Tab, formulas for Cell I3. This same formula is used for most of the interest calculations discussed below, including for the Second Lien Rate interest, which was payable quarterly. The only exceptions are the Trustee Loans, which use a 365/366-day year, which changes the denominator of the formula. *See, e.g., id.* "HVICC Trustee" Tab, formula for Cell H5; id. "RILP Trustee" Tab, formula for Cell H4.

Concerning the "First Lien Credit Agreement," Chandler explains as follows:

> For the period from Closing through December 30, 2016, the monthly interest due on the principal under the First Lien Credit Agreement was paid-in-kind. Thus, for each month, interest was calculated using the Basic Rate and that interest was then added to the principal amount, which would form the basis for the next month's interest calculation. *See, e.g.*, Spreadsheet, "1st Lien Principal and Interest" Tab, formulas for Cells K3, A4. As of December 30, 2016, the amount of principal due under the First Lien Credit Agreement was $51,266,041.52. *See id.* Cell A11. . . . From December 30, 2016 through May 31, 2017, UBS used the principal amount of $51,266,041.52 as the basis for calculating the interest due from Borrowers. *See id.* Cells A11-A16. During that period, Borrowers made monthly payments of Basic Rate interest and, thus, the principal balance remained the same. *See id.* Cells M11-M15. . . . On May 26, 2017, UBS sent a Notice of Default to Borrowers that, among other things, (i) identified multiple unresolved defaults by Borrowers; (ii) declared the Loans to be accelerated and immediately due and payable; and (iii) notified Borrowers that interest on the Loans would thereafter accrue at the Default Rate. Attached hereto as Exhibit 4 is a true and correct copy of the May 26, 2017 Notice of Default. Thus, beginning on May 31, 2017, the monthly interest due was calculated using the Default Rate. *See, e.g.*, *id*. formula for Cell H16. . . . From May 31, 2017 through August 31, 2018, Borrowers continued to make monthly Basic Rate interest payments (although not always the full amount due), but failed to make any Default Rate payments. *See id*. Cells K16-K30, L16-L30, M16-M30. From August 31, 2018 forward, Borrowers failed to make any interest payments (Basic Rate or Default Rate). *See id.* Cells M31-M52. . . . Beginning on June 30, 2017, the unpaid interest was capitalized and compounded and was added to the unpaid principal balance, and that sum became the basis for the next month's interest calculation. *See, e.g., id*. formulas for Cells O16, A17. . . . The total amount of unpaid interest (PIK, Basic Rate, and Default Rate) on the principal under the First Lien Credit Agreement is $10,546,878.47. *See id.*, compare Cell A53 with Cell A3; *see also id.* "Main" Tab, Cell B4.

With respect to the "Second Lien Credit Agreement," Chandler states:

For the period from Closing through March 31, 2017, the quarterly interest due on the principal under the Second Lien Credit Agreement was calculated using the Second Lien Rate and was paid-in-kind; for each quarter, the interest calculated was added to the principal amount, and this total formed the basis for the next quarter's interest calculation. *See, e.g., id*. "2nd Lien Principal and Interest" Tab, formulas for Cells I3, A4. As of March 31, 2017, the amount of principal due was $52,675,774.79. *Id*. Cell A7. . . . Beginning with the payment for the second quarter of 2017, based on the May 26, 2017 Notice of Default, the quarterly interest due was payable in cash only; and beginning on June 30, 2017, interest was calculated using the Default Rate. *Id*. formula for Cell H8. Borrowers never made any interest payments (Basic Rate or Default Rate). The unpaid interest was capitalized and compounded and was added to the unpaid principal balance, and that sum became the basis for the next month's interest calculation. *See, e.g., id*. formulas for Cells I4, A5. . . . The total amount of unpaid interest (PIK, Basic Rate, and Default Rate) on the principal under the Second Lien Credit Agreement is $18,055,575.03. *See id.*, compare Cell A20 with Cell A3; *see also id*. "Main" Tab, Cell B11.

Concerning "Administrative Agent Fees," Chandler states:

> Attached as Exhibit 5 is a true and correct copy of the First Lien Bank Facilities Fee Letter, dated as of May 20, 2016, by and among UBS, Borrowers, and GOGH, LLC. . . . Attached as Exhibit 6 is a true and correct copy of the Second Lien Bank Facilities Fee Letter, dated as of May 20, 2016, by and among UBS, Borrowers, and GOGH, LLC. . . . Borrowers failed to pay the Administrative Agent Fees due in: (i) May 2017 for the Second Lien Credit Agreement; (ii) May 2018 for both Credit Agreements; (iii) May 2019 for both Credit Agreements; and (iv) May 2020 for both Credit Agreements. Altogether, UBS is owed $350,000 in Administrative Agent Fees. *See id*. "Admin Agent Fees" Tab, Cells A3, A33, A50, A56, A98, A128, A145. . . . The interest on the Administrative Agent Fees is calculated separately for each unpaid $50,000 Administrative Agent Fee by applying the Default Rate to the unpaid fee for each month since that particular unpaid fee came due. Interest for each month is capitalized and compounded and was added to the unpaid principal balance, and that sum becomes the basis for the next month's interest calculation. *See, e.g., id*. formulas for Cells I3, A4.

Chandler states that the summary of the unpaid Administrative Agent Fees is as follows:

| FEE | INTEREST | CELLS |
|---|---|---|
| May 2017 (Second Lien) | $12,754.54 | A93 minus A56 |
| May 2018 (First Lien) | $8,508.42 | A28 minus A3 |

| May 2018 (Second Lien) | $8,508.42 | A123 minus A98 |
| May 2019 (First Lien) | $4,072.86 | A46 minus A33 |
| May 2019 (Second Lien) | $4,072.86 | A141 minus A128 |
| May 2020 (First Lien) | $252.16 | A51 minus A50 |
| May 2020 (Second Lien) | $252.16 | A146 minus A145 |
| **TOTAL** | $38,421.42 | |

Chandler states that "the total amount due for unpaid Administrative Agent Fees plus accrued interest thereon is $38,421.42, as of June 30, 2020. *See id.*, "Main" Tab, Cells B5–7, 12–15."

In connection with the "Deferred Closing Fees," Chandler states:

Attached as Exhibit 7 is a true and correct copy of Schedule 2.05 to the First Lien Credit Agreement, which reflects that UBS is entitled to Deferred Closing Fees totaling $1,427,329.78. Although Schedule 2.05 contemplated that the Deferred Closing Fees would be paid monthly through September 2018, the full amount was accelerated and became immediately due and payable based on UBS's May 26, 2017 Notice of Default to Borrowers. *See id.* "Deferred Closing" Tab, Cell A3. Borrowers have not paid any of the Deferred Closing Fees. . . . Interest on the Deferred Closing Fees is calculated by applying the Default Rate to the total unpaid fee for each month since the fee came due. Interest for each month is capitalized and compounded and was added to the unpaid principal balance, and that sum becomes the basis for the next month's interest calculation. *See, e.g., id.* formulas for Cells I3, A4. . . . The total amount due for unpaid Deferred Closing Fees plus accrued interest thereon is $1,791,428.36, as of June 30, 2020. *See id.* Cell A40; *see also id.* "Main" Tab, Cell B23.

Chandler explains "Performance Payments" due as follows:

The Second Lien Credit Agreement requires Borrowers to make Performance Payments to UBS for any quarter in which the price of crude oil—measured by the Quarterly WTI Price (as defined in the agreement)—was greater than or equal to $65.00 per barrel. . . . Since the Second Lien Credit Agreement's execution on May 20, 2016, the Quarterly WTI Price has exceeded $65.00 per barrel only in the second and third quarters of 2018. . . . For each of those quarters, the Borrowers were required to pay UBS $750,000, or a total of $1,500,000. Borrowers did not make any Performance Payments. . . . Interest for the Performance Payments is calculated by applying the Default Rate to the missed Performance Payment for

each month beginning with the Quarterly Performance Payment Date when that payment was due and every full month thereafter. For the Second Quarter 2018 Performance Payment the interest calculation begins on July 27, 2018. *See id*. "2nd Lien Performance Payments" Tab, Row 3. For the Third Quarter 2018 Performance Payment the interest calculation begins on October 26, 2018. *See id*. Row 32. Interest for each month is capitalized and compounded and was added to the unpaid principal balance, and that sum becomes the basis for the next month's interest calculation. *See id*. formulas for Cells I3, A4. . . . The Performance Payment amount, including accrued interest, that the Borrowers owe UBS is $1,717,995.38, as of June 30, 2020. This amount is obtained by taking the sum of the values in Cells A27 and A53 from the "2nd Lien Performance Payments" Tab of the Spreadsheet; *see also id*. "Main" Tab, Cells B16–17.

Respecting "Advisory and Collateral Management Fees," Chandler states:

> UBS worked with several outside firms that assisted it in its various efforts to protect its rights under the Credit Agreements. Prior to HVICC's bankruptcy filing, UBS took steps to pursue non-judicial foreclosure on certain collateral securing the Loans. Petru Corporation ["Petru"] provided title search services for HVICC assets in Kern County, Santa Barbara County, and Orange County, California. The title searches were required to enable UBS to initiate foreclosure proceedings, as well as to notify mineral owners and other lienholders about the foreclosure proceedings, as required by California law. . . . Attached as Exhibit 8 are true and correct copies of the invoices for fees sent by Petru to UBS, covering the period December 14, 2018 to August 23, 2019. . . . Huron Consulting Group ["Huron"] (through its affiliates Huron Consulting Services LLC and Huron Transaction Advisory LLC) assisted UBS in several ways. Huron's initial role was to provide a valuation of the HVICC assets to enable UBS to make a decision on what approach to take to maximize value of the assets. Huron's initial review included providing a summary of the staffing and resource needs for UBS and Huron to operate HVICC through foreclosure or bankruptcy. Huron also spent time analyzing HVICC's financial statements and accounting documents for evidence of related-party transactions. This included reviewing HVICC's documentation of large transactions with related parties to determine whether HVICC's transactions were consistent with market pricing of comparable transactions as part of Huron's due diligence services to UBS. Huron also assisted UBS with marketing HVICC's assets, including reaching out to potential buyers for a sale of the assets at a foreclosure sale or a sale of the Loans, presenting diligence materials, and negotiating and executing loan sale transactions of HVICC's assets with such buyers. . . . Attached as Exhibit 9 are true and correct copies of the invoices for fees sent by Huron to UBS, covering the period October 5, 2019 to July 6, 2020. . . . First American Title Insurance Company ["First American"] acted as a foreclosure trustee; acting through MK Consultants, Inc., it assisted UBS in the foreclosure process by, among other things, assisting with the preparation of notices of default and notices of sale and with the publication of such notices. . . . Attached as Exhibit 10 are true and correct copies

of the invoices for fees sent by First American to UBS, covering the period February 21, 2019 to April 24, 2020. . . . UBS notified Borrowers that it was entitled to reimbursement from Borrowers for these expenses in Notices of Default sent monthly from January 2019 through November 2019. Attached as Exhibit 11 are true and correct copies of the letters regarding "Defaults and Reservations of Rights under the Credit Agreements" dated from January through November 2019. . . . UBS has continued to incur expenses since HVICC's bankruptcy filing and those amounts are likewise immediately due and payable. Borrowers have not reimbursed UBS for any expenses incurred before or after HVICC's bankruptcy filing. . . . The total amount of advisory and collateral management fees that UBS seeks to recover is $1,952,989.72. *See id*. "A&C Expenses" Tab, Cell E2; *see also id*. "Main" Tab, Cell B25.

Chandler submitted counsel's invoices sent to the plaintiff covering the period from August 2016 through May 2020, totaling $7,539,126.57, the amount "derived by taking the amount from Cell N2 of the 'Legal Fees' Tab of the Spreadsheet ($6,861,249.30) and adding it to the amount reflected on the as-yet-unpaid invoices for April and May 2020 in Exhibit 12."

In his declaration dated October 14, 2020, Chandler updated the amounts of interest, fees and costs to account for the passage of time since June 30, 2020: (a) "[t]he total amount of unpaid interest (PIK, Basic Rate, and Default Rate) on the principal under the First Lien Credit Agreement as of September 30, 2020 is $11,427,656.27"; (b) "[t]he total amount of unpaid interest (PIK, Basic Rate, and Default Rate) on the principal under the Second Lien Credit Agreement as of September 30, 2020 is $19,446,933.45"; (c) "[t]he total amount due for unpaid Administrative Agent Fees plus accrued interest thereon is $394,071.81 as of September 30, 2020"; (d) "[t]he total amount due for unpaid Deferred Closing Fees plus accrued interest thereon is $1,817,488.34, as of September 30, 2020"; (e) "[t]he Performance Payment amount, including accrued interest, that the Borrowers owe UBS is $1,742,987.12, as of September 30, 2020"; (f) "[t]he total amount of advisory and collateral management fees that UBS seeks to

recover as of September 30, 2020 is $2,138,513.11"[1]; and (g) "[t]he total legal fees and costs UBS claims are $8,755,662.40, covering the period September 2016 through August 2020."

## DEFENDANT'S OPPOSITION TO THE PLAINTIFF'S SUBMISSIONS

The defendant argues: (1) "since [the defendant] is a guarantor, rather than surety, its liability is derivative of that of the borrowers"; (2) "the borrowers' bankruptcy petitions are not actionable events of default"; (3) "the bankruptcy invalidated all default notices"; and (4) "USB is not entitled to the requested attorneys fees or consulting fees since it has not submitted time records establishing that they are reasonable." The defendant contends that bankruptcy "events of default" are not actionable; rather, "they are '*ipso facto* clauses,' made unenforceable under Bankruptcy Code sections 365(e)(1)6, 541(c) and 363," and "Code section 365(e)(1)(B) nullifies defaults in executory contracts arising from *ipso facto* clauses by render[ing] unenforceable contract provisions that alter[] the rights or obligations of a debtor" as a result of the "insolvency or financial condition" or the "commencement of" a bankruptcy case." According to the defendant, "neither Rincon's 2016 bankruptcy nor that filed by HVICC in 2019 was an actionable default." The defendant asserts:

> In its Proof of Claim in the HVICC bankruptcy (ECF 56-4), UBS acknowledged that Rincon's August 8, 2016, Chapter 11 filing was the "earliest default" (*id.*, ¶19). Since all default notices delivered by UBS post-dated the Rincon bankruptcy, they are void *ab initio* by reason of the automatic stay.

Since the bankruptcy filings were not actionable defaults and "the rest of the alleged defaults mature only upon delivery of an effective default notice and all the default notices were void *ab*

---

[1] In addition to $1,952,989.72, the total amount due in Advisory and Collateral Management Fees as of June 30, 2020, for which Chandler submitted invoices in his July 10, 2020 declaration, Chandler also submitted additional invoices, in his October 14, 2020 declaration, showing $185,523.39 as an additional total amount due for the period from July 1, 2020, to September 18, 2020. Thus, the total amount due in Advisory and Collateral Management Fees is $2,138.513.11.

*initio* by the reason of the automatic stay, [the defendant] is not liable for the Borrowers' obligations."

      With respect to the attorneys' fees request, the defendant contends:

> UBS claims $8,755,662.40 in fees and expenses that it alleges are for: "(i) the RILP bankruptcy; (ii) defaults by HVICC on the Loans, (iii) the HVICC bankruptcy, or (iv) this litigation with GIT." ECF 42, at p. 10, incorporated by reference in UBS Response (ECF 79), at p. 6 n.10.; ECF 61, at p. 9. Items (i), (ii) and (iii) are based on the allegations that GIT is derivatively liable for fees that may be charged to the Borrowers under the Credit Agreements. However, GIT, as a guarantor rather than a surety, can only be liable for the amount of the attorneys fees owed by the Borrowers. . . . There has yet to be any determination of the Borrowers' obligations for attorneys fees, and UBS has not submitted the sort of documentation that would permit the Court to determine that liability. Even awards based on contractual-fee shifting are permitted to include only amounts determined to be reasonable. . . . UBS has not submitted any attorney time record whatsoever. That failure is fatal to its attorneys fees claims. . . . Denying UBS' fee request on grounds of inadequate documentation is particularly appropriate in this case since this Court is being tasked with determining reasonableness based on the complexity and nature of the work the [sic] took place in other fora – the California and Texas bankruptcy courts – rather in a case before it.

The defendant asserts that the advisory and collateral management fees request should be denied because "no consultants' time records have been submitted" and for "the overwhelming number of the consultants' invoices (ECF 43-9; ECF 43-10), UBS has not submitted an affidavit by a person with first-hand knowledge of why the fees were incurred or what they were far [sic], and the invoices themselves provide little to no insight as to what the nature of the services." The declarations supporting the fee application are by Chandler, an executive in the plaintiff's Westport office, address only two consultants' invoices. The remaining invoices were sent to counsel's Los Angeles and New York office and "[t]here is no affidavit by anyone with first hand [sic] knowledge of what actual services these invoices relate to, apart possibly from the two addressed to Chandler." The defendant maintains that the plaintiff's

> request for a determination of liability should be denied in its entirety. Alternatively, the $8,755,662.40 UBS seeks in attorneys fee and the $2,138,513.11

it seeks in Advisory and Collateral Management Fees should be denied. The total of $13,787,254.61 that UBS previously requested in additional loan advances made to the Rincon and HVICC bankruptcy trustees should also be denied in accordance with Judge Stanton's April 1, 2021 order. (*See* ECF 73.)

## PLAINTIFF'S REPLY

The plaintiff contends that the defendant had two opportunities to challenge the calculation of the interest, fees and costs, but "has spurned both opportunities, choosing instead to advance spurious arguments about its liability under the Guaranties—an issue decided by Judge Stanton a year ago and not remotely part of the reference to this Court." The defendant submitted no evidence in opposition to the plaintiff's submissions and its arguments are irrelevant to the only issue before the Court, namely, the calculation of the interest, fees and costs. Furthermore, the plaintiff failed to raise its argument of "no actionable default" in its motion for reconsideration of the summary judgment decision, and the argument is baseless because the defendant "does not, and cannot, dispute that UBS provided HVICC with numerous notices of default that, among other things, declared the Loans immediately due and payable."

The April 1, 2021 order clarified that the defendant is liable for legal fees and advisory and collateral management fees, and the defendant did not submit any evidence to oppose the plaintiff's fee request. The defendant's assertion, that the plaintiff did not submit attorney time records, is false because the plaintiff submitted 49 invoices on behalf of its counsel "in its capacity as Administrative Agent, Collateral Agent, and Lender. (ECF Doc. Nos. 43-13, 62-4 (Invoices for Legal Fees by O'Melveny & Myers to UBS).)." According to the plaintiff, it satisfied the requirement "to provide reasonable time entries" by identifying the general subject matter of the time expenditure and the defendant "provided no meaningful analysis as to why" the plaintiff's time records are unreasonable or its explanations of legal work insufficient. The

defendant's assertion that "no consultants' time records have been submitted" is also false because each invoice the plaintiff

> submitted from Petru Corporation (ECF Doc. Nos. 43-9, 62-2) and First American Title Insurance Company (ECF Doc. No. 43-11) provide descriptions of the services rendered, the number of hours those services were performed, and the amounts for which those services were charged. And while the invoices UBS submitted from Huron Consulting Group (ECF Doc. No. 43-10) do not contain descriptions of the services rendered on their face, UBS provided detailed explanations of the nature of Huron's services in its Claim for Interest, Fees, and Costs. (ECF Doc. No. 42 at 6–7.).

The defendant contends that no affidavits by anyone with first-hand knowledge were submitted identifying "Huron, Petru, and First American's" services besides two invoices addressed to Chandler, but Chandler's statements in his declaration are based on his personal knowledge and review of the plaintiff's records, "including invoices from Huron, Petru, and First American."

## CALCULATION OF INTEREST, FEES AND COSTS

### *Interest*

The defendant failed to make arguments and provide evidence to rebut the plaintiff's calculation of interest. In its submissions, including pursuant to the April 2, 2021 order, the defendant challenges its liability to the plaintiff. However, the assigned district judge already determined liability in this case in favor of the plaintiff and referred the matter to the Court solely for the purpose of calculating interest, fees and costs. Thus, the Court will not entertain the defendant's arguments concerning liability.

The credit agreements provide that the loans will bear interest at specified rates. The annual interest rate under the First Lien Credit Agreement is calculated monthly and is equal to the "Adjusted LIBOR Rate," as defined in Section 1.01, for each month during which the loan is outstanding plus a margin, referred to as the "Applicable Margin," of 3.50%. The Adjusted LIBOR Rate plus the Applicable Margin constitute the "Basic Rate." All Basic Rate interest

payments due on or before December 31, 2016, were PIK, which means under the credit agreements that the interest due "shall accrue, be capitalized and be compounded and added to the principal balance of the Loans as of such Interest Payment Date and shall itself accrue interest under this Section 2.06." Basic Rate interest accruing after December 31, 2016, is payable in cash only, and is due on the last business day of each month. The borrowers failed to make cash payments of Basic Rate interest due for January 2018, and for each month from September 2018 forward. Interest accrues under the Second Lien Credit Agreement at an annual rate of 6.00%, referred to as the "Second Lien Rate," and is payable quarterly. All Second Lien Rate interest was PIK unless and until an Event of Default occurred; thereafter, Second Lien Rate interest would be payable in cash only. The borrowers failed to make cash payments of Second Lien Rate interest.

The credit agreements also provide that upon the occurrence of an Event of Default, including the Borrowers' failure to make principal or interest payments when due or the voluntary or involuntary commencement of bankruptcy proceedings, the annual interest rate on the Loans shall increase by 2.00% and the Credit Agreements refer to this as the Default Rate. The Default Rate has been applied since May 31, 2017, based on UBS's May 26, 2017 Notice of Default to Borrowers. The borrowers failed to pay Default Rate interest on the principal of the loans.

Upon review of the entirety of the plaintiff's submissions in support of its request for interest, fees and costs, including the evidentiary support, the Court finds that the plaintiff's calculation of interest based on the credit agreements is well explained and accurate, as well as unrebutted by the defendant. Accordingly, awarding unpaid interest of $11,427,656.27 on the

First Lien Credit Agreement principal and $19,446,933.45 on the Second Lien Credit Agreement principal to the plaintiff is warranted.

***Administrative Agent Fees***

The credit agreements provide that the plaintiff, as an administrative agent, is entitled to an annual Administrative Agent Fee of $50,000 for each loan. The borrowers failed to pay the Administrative Agent Fees due in May 2017, for the Second Lien Agreement, and May 2018, May 2019 and May 2020 for both credit agreements. The interest on unpaid Administrative Agent Fees is calculated separately for each unpaid $50,000 Administrative Agent Fee by applying the Default rate to the unpaid fee for each month since that unpaid fee came due. Interest for each month is capitalized and compounded and was added to the unpaid principal balance, and that sum becomes the basis for the next month's interest calculation. The Court finds that awarding $394,071.81 in Administrative Agent Fees to the plaintiff is warranted.

***Deferred Closing Fees***

The plaintiff, as an administrative agent, is entitled to Deferred Closing Fees under the First Lien Credit Agreement in the amount specified in its Schedule 2.05. Although Schedule 2.05 contemplated that the Deferred Closing Fees would be paid monthly through September 2018, the full amount was accelerated and became immediately due and payable based on UBS's May 26, 2017 Notice of Default to Borrowers. Borrowers have not paid any of the Deferred Closing Fees. The interest on unpaid Deferred Closing Fees is calculated by applying the Default Rate to the total unpaid fee for each month since the fee came due. Interest for each month is capitalized and compounded and was added to the unpaid principal balance, and that sum becomes the basis for the next month's interest calculation. Thus, the Court finds that awarding $1,817,488.34 in Deferred Closing Fees to the plaintiff is warranted.

***Performance Payments***

As the assigned district judge found, the plaintiff is entitled to "Performance Payments pursuant to Sections 2.04(a) and 2.09(e) of the Second Lien Credit Agreement. The payments are calculated based on the table provided in Section 1.01 of the Agreement (defining "Performance Payments")." The plaintiff presented evidence of the quarters in which the Quarterly WTI Price of crude oil has exceeded $65.00 per barrel. Since the Second Lien Credit Agreement's execution on May 20, 2016, the Quarterly WTI Price has exceeded $65.00 per barrel in only two fiscal quarters, namely, the second fiscal quarter of 2018, when the WTI Price was $67.91, and the third fiscal quarter of 2018, when the WTI Price was $69.51. For each of the quarters, the borrowers were required to pay the plaintiff $750,000, for a total of $1,500,000, but they failed to do so. Interest for each month is capitalized and compounded and was added to the unpaid principal balance, and that sum becomes the basis for the next month's interest calculation. The Court finds that awarding $1,742,987.12 in Performance Payments to the plaintiff is warranted.

***Advisory and Collateral Management Fees***

The defendant asserts that the request for Advisory and Collateral Management Fees should be denied because "no consultants' time records have been submitted" and "[t]here is no affidavit by anyone with first hand [sic] knowledge of what actual services these invoices relate to, apart possibly from the two addressed to Chandler." However, the assigned district judge already determined that the "defendant is liable for the legal and advisory/collateral management fees plaintiff has incurred in connection with the enforcement or protection of its rights. Plaintiff's Memorandum in Support of Its Claim for Interest, Fees and Costs (Dkt. No. 42) and the attached Declaration (Dkt. No. 43) set forth the amounts requested and supporting

documents." No additional evidence was submitted by the plaintiff concerning Advisory and Collateral Management Fees. Thus, the defendant's assertions are meritless.

The total amount of invoices submitted by Petru and paid by the plaintiff is $370,648.84. The total amount of invoices submitted by Huron and paid by the plaintiff is $1,487,764.91. The total amount of invoices submitted by First American and paid by the plaintiff is $94,575.97. Between July 1, 2020, and September 30, 2020, the plaintiff incurred additional expenses in connection with protecting its rights under the credit agreements, namely, $184,407.33 from Huron and $1,116.06 from Petru, for which the plaintiff was not reimbursed. The Court finds that awarding $2,138,513.11 in Advisory and Collateral Management Fees to the plaintiff is warranted.

### *Attorney's Fees and Costs*

"The awarding of attorneys' fees in diversity cases . . . is governed by state law." Grand Union Co. v. Cord Meyer Dev., 761 F.2d 141, 147 (2d Cir. 1985) (citations omitted). The credit agreements at issue are governed by New York law. Under New York law, "an award of attorney's fees pursuant to . . . a contractual provision may only be enforced to the extent that the amount is reasonable and warranted for the services actually rendered." People's United Bank v. Patio Gardens III, LLC, 143 A.D.3d 689, 691, 38 N.Y.S.3d 262, 264 (App. Div. 2nd Dep't 2016). In determining reasonable attorney's fees in New York, courts consider the following factors: "time and labor required, the difficulty of the questions involved, and the skill required to handle the problem presented; the lawyer's experience, ability and reputation; the amount involved and benefit resulting to the client from the services; the customary fee charged by the Bar for similar services; the contingency or certainty of compensation; the results obtained; and the

responsibility involved."  Estate of Freeman v. Freeman, 34 N.Y.2d 1, 9, 355 N.Y.S.2d 336, 341 (1974).

The defendant asserts that the plaintiff "has not submitted any attorney time record whatsoever.  That failure is fatal to its attorneys fees claims."  In its reply pursuant to the April 2, 2021 order, the plaintiff asserts that it "*did* in fact submit attorney time records" because it "submitted to this Court 49 invoices that O'Melveny & Myers LLP ("O'Melveny") provided UBS as its counsel," which satisfies the "requirement to provide reasonable time entries when the parties 'identify the general subject matter of time expenditures.'"  No additional evidence pursuant to April 2, 2021 order was submitted by the plaintiff concerning attorney's fees and costs.

The plaintiff submitted invoices for legal fees it received from its counsel and paid for the period from September 2016 through August 2020, totaling $8,755,662.40.  Apart from the invoices the plaintiff received from its counsel, no affidavit by the plaintiff's counsel or any other evidence was submitted by the plaintiff explaining the factors required for the Court to determine the reasonableness of the attorney's fees request, namely, "time and labor required, the difficulty of the questions involved, and the skill required to handle the problem presented; the lawyer's experience, ability and reputation; the amount involved and benefit resulting to the client from the services; the customary fee charged by the Bar for similar services; the contingency or certainty of compensation; the results obtained; and the responsibility involved."  Estate of Freeman, 34 N.Y.2d at 9, 355 N.Y.S.2d at 341.  The plaintiff's assertion that it "*did* in fact submit attorney time records" because it submitted invoices it received from its counsel is unsupported by citation to any legal authority and frivolous because the plaintiff's invoices are not attorney time records and they identify only the amounts due "[f]or professional services."

The plaintiff relies on <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 103 S. Ct. 1933 (1983), for the proposition that it satisfied the "requirement to provide reasonable time entries when the parties 'identify the general subject matter of time expenditures.'"   However, none of the invoices identifies, as the defendant asserts, "the general subject matter of time expenditures," or the time expenditure and the attorneys who expended time or their experience, ability and reputation or their hourly rates.  The plaintiff had an opportunity to submit additional evidence in support of its fee request pursuant to the April 2, 2020 order, but elected not to do so.  The plaintiff failed to satisfy the requirements articulated by the Supreme Court, namely that

> the fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates. The applicant should exercise "billing judgment" with respect to hours worked, and should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims.

> <u>Hensley</u>, 461 U.S. at 437, 103 S. Ct. at 1941 (internal citation omitted).

Having elected not to submit any affidavit(s) by its counsel, time records documenting in any manner hours worked, hourly rates, the customary fee charged for similar services and identifying attorneys who expended hours, their experience, ability and reputation, or any other evidence that would enable the Court to determine the reasonableness of the fee request based on the factors required to be considered by New York law, the plaintiff failed to satisfy its burden of showing that its fee request is reasonable.  The Court finds that awarding attorney's fees and costs is not warranted.

## CONCLUSION

For the foregoing reasons, the Court finds that the following amounts are warranted to be awarded to the plaintiff: (1) interest of  $11,427,656.27 on First Lien Credit Agreement principal; (2) interest of $19,446,933.45 on Second Lien Credit Agreement; (3) $394,071.81 in

Administrative Agent Fees; (4) $1,817,488.34 in Deferred Closing Fees; (5) $1,742,987.12 in

Performance Payments; and (6) $2,138,513.11 in Advisory and Collateral Management Fees.

Dated:  New York, New York           SO ORDERED:
       May 20, 2021

_Kevin Nathaniel Fox_
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE